**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Debtor. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>ALPHA PRIME FUND LIMITED,<br><br>        and<br><br>HSBC BANK PLC,<br><br>        and<br><br>HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.,<br><br>        Defendants. | Adv. Pro. No. _____ (BRL) |

## COMPLAINT

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), by and through his undersigned counsel, for his Complaint, states as follows:

## NATURE OF PROCEEDING

1.     This adversary proceeding arises from the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff").  In early December 2008, BLMIS generated client account statements for its nearly 7,000 client accounts at BLMIS.  When added together, these statements purportedly show that clients of BLMIS had approximately $64.8 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a small fraction of that amount.  On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts, and on June 29, 2009, he was sentenced to 150 years imprisonment based on his conviction for the fraud. Defendant Alpha Prime Fund Limited ("Alpha Prime") received avoidable transfers and fraudulent transfers from BLMIS, and the purpose of this proceeding is to recover those transfers received by Alpha Prime.

2.     This adversary proceeding is brought pursuant to 15  U.S.C. §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 542, 547, 550(a) and 551 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt & Cred. § 270 *et. seq.* (McKinney 2001)), and other applicable law, for turnover, accounting, preferences, fraudulent conveyances, an objection to claim and damages, in connection with  transfers of property by BLMIS to or for the benefit of Alpha Prime.  The Trustee seeks to set aside such transfers and preserve the property for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

3.      This is an adversary proceeding brought in this Court, the Court in which the

main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending.

The SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding").  This Court has

jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§

78eee(b)(2)(A) and (b)(4).  This Court has personal jurisdiction under N.Y. C.P.R.L. § 302(a)(1)

and Bankruptcy Rule 7004.

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (E), (F), (H)

and (O).

5.      Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE AND STANDING

6.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment

adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange

Commission ("SEC") filed a complaint in the District Court that commenced the District Court

Proceeding against Madoff and BLMIS.  The District Court Proceeding remains pending in the

District Court.  The SEC complaint alleged that the Madoff and BLMIS engaged in fraud

through the investment advisor activities of BLMIS.

7.      On December 12, 2008, The Honorable Louis L. Stanton of the District Court

entered an order, which appointed Lee S. Richards, Esq., as receiver (the "Receiver") for the

assets of BLMIS.

8.      On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC

consented to a combination of its own action with an application of the Securities Investor

Protection Corporation ("SIPC").  Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B), SIPC filed

an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protections afforded by SIPA.

9.      Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

            a.      appointed the Trustee for the liquidation of the business of BLMIS

pursuant to 15 U.S.C. § 78eee(b)(3);

            b.      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15

U.S.C. § 78eee(b)(3); and

            c.      removed the case to this Bankruptcy Court pursuant to 15 U.S.C. §

78eee(b)(4).

10.      By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of

BLMIS.

11.      At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned

*United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal

indictment filed against him by the United States Attorney's Office for the Southern District of

New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the

investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23:14-17).  Additionally, Madoff

asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (*Id.* at 23:20-21). On June 29, 2009, Madoff was sentenced to 150 years in prison, the maximum amount of time possible for his crimes.

12.     As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out customer property to BLMIS' customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

13.     Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in addition to the powers granted by SIPA pursuant to 15 U.S.C. § 78fff(b). Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case.

14.     Pursuant to 15 U.S.C. § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

15.     The Trustee has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1 and the Bankruptcy Code including 11 U.S.C. § 101 *et seq.* and sections 323(b) and 704(1) because, among other reasons:

      a.     BLMIS incurred losses as a result of the claims set forth herein;

      b.     The Trustee is a bailee of customer funds entrusted to BLMIS for investment purposes; and

      c.     The Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").  As of this date hereof, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against Defendant.  As assignee, the Trustee stands in the shoes of persons who have suffered injury, in fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages.

## THE FRAUDULENT PONZI SCHEME

16.     BLMIS is a New York limited liability company that is wholly owned by Madoff. Founded in 1959, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS with family members and employees.  BLMIS was registered with the SEC as a securities broker-dealer under section 15(b) of the Securities Exchange Act of 1934 15 U.S.C. § 78*o*(b). By that registration, BLMIS is a member of SIPC.  BLMIS had three business units: investment advisory (the "IA Business"), market making and proprietary trading.

17.     Madoff ascribed the IA Business' consistent investment success to his investment strategy called the "split-strike conversion" strategy which involved the purchase of securities, options and government securities.  Madoff promised clients that their funds would be invested

in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest

publicly traded companies.  The basket of stocks would be intended to mimic the movement of

the S&P 100 Index.  Madoff asserted that he would carefully time purchases and sales to

maximize value, but this meant that the clients' funds would intermittently be out of the market.

During these times, Madoff asserted that the funds would be invested in United States issued

securities.  The second part of the split-strike conversion strategy was the hedge of such

purchases with option contracts.  Madoff purported to purchase and sell option contracts

corresponding to the stocks in the basket, thereby controlling the downside risk of price changes

in the basket of stocks.

18.     Although clients of the IA Business received monthly or quarterly statements

purportedly showing the securities, options and government securities that were held in—or had

been traded through—their accounts as well as the growth of and profit from those accounts over

time, the trades reported in these statements were a complete fabrication.  The security purchases

and trades depicted in the account statements never occurred and the profits reported were

entirely fictitious.  At the Plea Hearing, Madoff admitted that he never in fact purchased any of

the securities he claimed to have purchased for customer accounts.  Indeed, based on the

Trustee's investigation to date and with the exception of isolated individual trades for certain

clients other than Alpha Prime, there is no record of the BLMIS having cleared any purchase or

sale of securities in connection with the split/strike conversion strategy at the Depository Trust &

Clearing Corporation, the clearing house for such transactions, or any other trading platform on

which BLMIS could have reasonably traded securities.

19.     The Madoff Defendants, over the years, falsely assured clients and regulators that

BLMIS conducted all trades on the over-the-counter market, after hours.  To bolster that false

representation, BLMIS periodically wired hundreds of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a London-based entity controlled by Madoff. MSIL did not use the wired funds to purchase securities for the accounts of the IA Business clients.

20.    Additionally, based on the Trustee's investigation to date, there is no evidence that the BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased.

21.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff concealed the ongoing fraud in an effort to hinder and delay other current and prospective customers of BLMIS from discovering the fraud.  The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to, or payments on behalf of, other investors.   The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others, including Defendant, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

22.    During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, transferred portions to other accounts or removed portions of the purportedly available funds, and were paid consistently with the statements they had been receiving.  Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

23.    When payments were made to or on behalf of these investors, including Alpha Prime, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains.  In reality, BLMIS had not invested the investor's principal as reflected in customer statements.  In an attempt to conceal the ongoing fraud and thereby hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors such as Alpha Prime the inflated amount reflected in the falsified customer statements, including non-existent principal and fictitious profits, not such investors' true depleted account balances.

24.    BLMIS used the funds deposited from new investments from existing customers to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due to the siphoning and diversion of new investments to pay requests for payments or redemptions from older investors,  BLMIS did not have the funds to repay the principal amounts due to the investors on account of their new investments.  BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

25.    In an effort to hinder, delay and defraud authorities from detecting the fraud, BLMIS did not register as an investment Advisor until September 2006.

26.    In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration.  The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.  In fact, in January 2008, BLMIS had over 4,900 active client accounts with a purported value of approximately $68 billion under management.

27.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports
"prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New
York.  Of the three employees at the firm, one employee was an assistant and one was a semi-
retired accountant living in Florida.

28.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars
greater than the assets of BLMIS.  At all relevant times, BLMIS was insolvent in that (i) its
assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they
came due and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

29.     This and similar complaints are being brought to recapture monies paid to or for
the benefit of certain investors so that this customer property can be equitably distributed among
all of the victims of BLMIS in accordance with the provisions of SIPA.

## THE DEFENDANTS AND THE TRANSFERS

30.     Defendant Alpha Prime is an investment partnership fund organized under the
laws of Bermuda, with a principal place of business at 6 Front Street, Hamilton, HM 11,
Bermuda.

31.     Defendant HSBC Bank PLC ("HSBC") is a banking institution with an address at
8 Canada Square, London E14 5HQ.  Upon information and belief, HSBC served as the
beneficiary bank for Alpha Prime.

32.     Defendant HSBC Securities Services (Luxembourg) S.A. ("HSBC
(Luxembourg)"), formerly known as Bank of Bermuda (Luxembourg) S.A., is a banking
institution with an address at 40, Avenue Monterey, L-2163 Luxembourg.  HSBC (Luxembourg)
served as the custodian of the assets of Alpha Prime.

33.     At all times relevant hereto, Alpha Prime was a client of the IA Business.
According to BLMIS' records, Alpha Prime maintained an account with BLMIS that was

designated account 1FR097 (the "Alpha Prime Account").  The Alpha Prime Account was

opened on or about June 10, 2003 when a Customer Agreement, an Option Agreement, and a

Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account

Agreements") were executed and delivered to BLMIS at BLMIS' headquarters at 885 Third

Avenue, New York, New York.

34.     The Customer Agreements signed by BLMIS and Alpha Prime states that all

transactions are subject to the Securities Exchange Act of 1934, the Commodities Exchange Act,

the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and

the Commodities Futures Trading Commission, all laws of the United States.  Alpha Prime

voluntarily made transactions with BLMIS subject to these laws.

35.     Between June 2003 and the Filing Date, certain entities including HSBC and

HSBC (Luxembourg), for the benefit of Alpha Prime, invested $227.55 million with BLMIS

through 62 separate wire transfers directly into BLMIS' account at JPMorgan Chase & Co. in

New York, New York, Account #000000140081703 (the "BLMIS Bank Account").

36.     The Account Agreements were to be performed in New York, New York through

securities trading activities that would take place in New York, New York.  The Alpha Prime

Account was held in New York, New York, through BLMIS.  HSBC and HSBC (Luxembourg),

or their predecessors, consistently wired funds to the BLMIS Bank Account in New York, New

York for application to the Alpha Prime Account and the conduct of trading activities.  All

Defendants have intentionally taken advantage of the benefits of conducting transactions in the

State of New York and, therefore, have submitted themselves to the jurisdiction of this Court for

purposes of this proceeding.

37.     On October 27, 2008, BLMIS wired $10 million from the BLMIS Bank Account to HSBC for the benefit of Alpha Prime.  On November 3, 2008, BLMIS wired $38.8 million from the BLMIS Bank Account to HSBC.  Additionally, prior to the Filing Date, during the months of September, October and November of 2008, BLMIS withdrew funds from the Alpha Prime Account on 35 occasions and made tax payments to the appropriate tax authorities on behalf of Alpha Prime totaling $244,302 during the 90 days prior to the Filing Date.  Together these 37 transfers, totaled $49,044,302, all of which were apparently done for the benefit of Alpha Prime and took place within 90 days of the Filing Date (collectively, the "90-Day Transfers"), and are recoverable under sections 547, 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

38.     On March 1, 2007 BLMIS wired $4.5 million from the BLMIS Bank Account to HSBC for the benefit of Alpha Prime.  On May 14, 2007, BLMIS wired $150,000 from the BLMIS Bank Account to HSBC.  On September 4, 2007, BLMIS wired $4.5 million from the BLMIS Bank Account to HSBC.  On October 25, 2007, BLMIS wired $4 million from the BLMIS Bank Account to HSBC.  On January 3, 2008, BLMIS wired $11 million from the BLMIS Bank Account to HSBC.  On September 2, 2008, BLMIS wired $3.5 million from the BLMIS Bank Account to HSBC.  Additionally, within the two years prior to the Filing Date, BLMIS made 216 withholding tax payments to the appropriate tax authorities on behalf of Alpha Prime totaling $1,399,688.  Together these 222 transfers plus the 90-Day Transfers, totaled $78,093,994.  All of these transfers were apparently done for the benefit of Alpha Prime and took place within two years of the Filing Date (collectively, the "Two-Year Transfers") and are recoverable under sections 548(a)(1), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. 78fff-2(c)(3).

39.    On January 3, 2005 BLMIS wired $1,720,000 from the BLMIS Bank Account to HSBC for the benefit of Alpha Prime.  On August 1, 2005 BLMIS wired $400,000 from the BLMIS Bank Account to HSBC.  On December 6, 2006 BLMIS wired $4.6 million from the BLMIS Bank Account to HSBC.  Additionally, within the six years prior to the Filing Date, BLMIS made 343 withholding tax payments to the appropriate tax authorities on behalf of Alpha Prime totaling $1,010,720.  Together these 348 transfers plus the Two-Year Transfers, totaled $85,824,710.  All of these transfers were apparently done for the benefit of Alpha Prime and took place within six years of the Filing Date (collectively, the "Six-Year Transfers") and are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. Debt. & Cred. §§ 273 – 276.

40.    Alpha Prime knew or should have known that Madoff's IA Business was predicated on fraud.  Hedge funds and funds of funds like Alpha Prime were sophisticated investors that accepted fees from their customers based on purported assets under management and/or stock performance in consideration for the diligence they were expected to exercise in selecting and monitoring investment managers like Madoff.  Alpha Prime failed to exercise reasonable due diligence of BLMIS and its auditors in connection with the Ponzi scheme. Among other things, Alpha Prime was on notice of the following indicia of irregularity and fraud but failed to make sufficient inquiry:

a.    Financial industry press reports, including a May 27, 2001 article in *Barron's* entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," and a May, 2001 article in *MAR/Hedge*, an industry newsletter, entitled "Madoff Tops Charts; Skeptics Ask How," raised serious questions about the legitimacy of BLMIS and

Madoff and their ability to achieve the IA Business returns they purportedly had achieved using the split-strike conversion strategy Madoff claimed to employ.

       b.     Madoff avoided questions about his IA Business operations, was consistently vague in responding to any such questions, and operated with no transparency.

       c.     BLMIS did not provide its customers with electronic real-time online access to their accounts, which was and is customary in the industry for hedge fund and fund of funds investors. BLMIS also utilized outmoded technology, including paper trading confirmations, despite Madoff's history of being in the forefront of computer-based trading. The use of paper confirmations created after the fact was critical to Madoff's ability to perpetuate his Ponzi scheme.

       d.     BLMIS functioned as both investment manager and custodian of securities. This arrangement eliminated another frequently utilized check and balance in investment management by excluding an independent custodian of securities from the process, and thereby furthering the lack of transparency of BLMIS to other investors, regulators, and other outside parties.

       e.     BLMIS reported returns that were too good to be true, reflecting a pattern of abnormal profitability, both in terms of consistency and amount that was simply not credible. Alpha Prime received annual rates of return on their investments with BLMIS, ranging on average from approximately 9% to 13% for the years 2005 through 2007. Alpha Prime's account incurred a negative return in only one month of purported trading (equal to 2.8%) during the full 36-month period from January 2005 through December 2007. In contrast, for the period from January 2005 through and including December 2007, the S&P 500 had a total of 11 months

which generated negative returns, equal to 30.6% of the total number of 36 months during that

period.

       f.     At times, Alpha Prime's monthly account statements reflected trades

purportedly purchased or sold on behalf of Alpha Prime's account in certain securities that were

allegedly executed at prices outside the daily range of prices for such securities traded in the

market on the days in question.  For example, Alpha Prime's monthly account statement for

December 2006 reported a sale of Merck & Co., Inc. (MRK) with a settlement date of December

28, 2006 of 27,493 shares.  BLMIS records reflect a trade date of December 22, 2006 at a price

of $44.61 for this transaction.  However, the daily price range for Merck & Co., Inc. stock on

December 22, 2006 was a low of $42.78 to a high of $43.42.

       g.     The BLMIS stated "split-strike conversion strategy" required purchases of

options on the S&P 100 index in combination with purchases of select underlying stocks that are

components of the S&P 100 index.  These options are traded on the Chicago Board Options

Exchange, ("CBOE"), through a licensing agreement between CBOE and Standard & Poor's

("S&P").  As reported on the monthly account statement for January 2008 received by

Defendant, on January 23, 2008, BLMIS purportedly bought a total of 2,066 OEY put options

(with February expiration and a strike price of 600) with a settlement date of January 28, 2008

when the total volume traded on the CBOE on that date for such contracts was 8,645.  Similarly,

on the same trade and settlement dates, BLMIS purportedly sold a total of 2,066 OEY call

options (with February expiration and a strike price of 610) when the total volume traded on the

CBOE on that date for such contracts was 631.  In each transaction, Alpha Prime should have

understood that the option volume being reported was highly unlikely in the instance of the

purchase of the put options and impossible in the instance of the sale of the call options as there were not that many option contracts available on the CBOE.

      h.    BLMIS had purportedly told its investors that it purchased these options in the over-the-counter ("OTC") market.  Trading options in the OTC market would have likely been more expensive than trading over the CBOE, yet those costs did not appear to be passed on to BLMIS' investors.  The absence of such costs, together with BLMIS' representation that it was trading in the OTC market, should have prompted a sophisticated hedge fund manager like the Defendant to request verification of the trades and demand more transparency into the operations of BLMIS.

      i.    BLMIS' statements to investors reflected a consistent ability to trade stocks near their monthly highs and lows to generate consistent and unusual profits.  No experienced investment professional could have reasonably believed that this could have been accomplished legitimately.

      j.    BLMIS, which reputedly ran the world's largest hedge fund, was purportedly audited by Friehling & Horowitz, an accounting firm that had three employees, one of whom was semi-retired, with offices located in a strip mall.  No experienced investment professional could have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS.

      k.    The compensation system utilized by BLMIS was atypical in that BLMIS, the entity purportedly employing the hugely-successful and secret proprietary trading system, was compensated only for the trades that it executed, while Alpha Prime, whose only role was to funnel money to BLMIS, received administrative fees and a share of the profits that would normally go to the entity in the position of BLMIS.  This compensation arrangement, together

with the lack of transparency and other factors listed herein, should have caused an experienced investment professional to question Madoff's operation.

l.      Despite its immense size, BLMIS was substantially a family-run operation, employing many of Madoff's relatives, and virtually no outside professionals.

m.      At no time did Alpha Prime conduct a performance audit of BLMIS or match any trade confirmations provided by BLMIS with actual trades executed through any domestic or foreign public exchange despite the fact Alpha Prime had hundreds of millions of dollars in assets and easily could have afforded to do this.

n.      Based on all of the foregoing factors, many banks, industry advisors and insiders who made an effort to conduct reasonable due diligence flatly refused to deal with BLMIS and Madoff because they had serious concerns that their IA Business operations were not legitimate. On information and belief, included among these were Societé Generale, Goldman Sachs, CitiGroup, Morgan Stanley, Merrill Lynch, Bear Stearns, and Credit Suisse.

o.      BLMIS purported to convert all of its holdings to cash immediately before each quarterly report, a strategy that had no practical benefit but which had the effect of shielding BLMIS' purported trading activities from scrutiny.

41.     This Complaint seeks the return of the all of the above-listed transfers made to or for the benefit of Alpha Prime by BLMIS or the value of such transfers.

42.     All of the transfers are and continue to be customer property within the meaning of 15 U.S.C. § 78lll(4), and are subject to turnover pursuant to section 542 of the Bankruptcy Code.

43.     The transfers are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3),

17

and applicable provisions of N.Y. CPRL § 203(g) (McKinney 2001) and N.Y. Debt. & Cred. §§ 273 – 276 (McKinney 2001).

44.     The Six-Year Transfers are recoverable under sections 548(a)(1), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

45.     The Two-Year Transfers are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

46.     The 90-Day Transfers are avoidable as preferences and recoverable under sections 547, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

47.     The Trustee's investigation is on-going, and the Trustee reserves the right to (i) supplement the information with respect to the 90-Day Transfers, Two-Year Transfers and Six-Year Transfers (collectively the "Transfers") and any additional or subsequent transfers, and (ii) seek recovery of such additional or subsequent transfers.

<u>**COUNT ONE**</u>
<u>**TURNOVER AND ACCOUNTING – 11 U.S.C. § 542**</u>

48.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

49.     The Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

18

50.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover of the Transfers from the Defendants to the Trustee.

51.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all such Transfers received by Defendants from BLMIS, directly or indirectly.

<u>COUNT TWO</u>
<u>PREFERENTIAL TRANSFER - 11 U.S.C. §§ 547(b), 550, AND 551</u>

52.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

53.    At the time of each of the 90-Day Transfers (hereafter, the "Preference Period Transfers"), Alpha Prime was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

54.    Each of the Preference Period Transfers constitutes a transfer of interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

55.    Each of the Preference Period Transfers was to or for the benefit of Alpha Prime.

56.    Pleading in the alternative, each of the Preference Period Transfers was made on account of antecedent debts owed by BLMIS before such transfer was made.

57.    Each of the Preference Period Transfers was made while BLMIS was insolvent.

58.    Each of the Preference Period Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

59.    The Preference Period Transfers enabled Alpha Prime to receive more than it would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the

transfers had not been made, and (iii) Alpha Prime received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

60.     Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from Alpha Prime pursuant to section 550(a).

61.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT THREE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550, AND 551

62.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

63.     The Two-Year Transfers were made on or within two years before the filing date of BLMIS' case.

64.     The Two-Year Transfers were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' then existing or future creditors.

65.     The Two-Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Alpha Prime pursuant to section 550(a).

66.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-Year Transfers, (b) directing that the Two-Year Transfers be set aside, and (c) recovering the

Two-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of

BLMIS.

<b><u>COUNT FOUR</u></b>
<b><u>FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B) , 550, AND 551</u></b>

67.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

68.    The Two-Year Transfers were made on or within two years before the Filing

Date.

69.    BLMIS received less than a reasonably equivalent value in exchange for each of

the Two-Year Transfers.

70.    At the time of each of the Two-Year Transfers, BLMIS was insolvent, or became

insolvent as a result of the Two-Year Transfers in question.

71.    At the time of each of the Two-Year Transfers, BLMIS was engaged in a business

or a transaction, or was about to engage in business or a transaction, for which any property

remaining with BLMIS was an unreasonably small capital.

72.    At the time of each of the Two-Year Transfers, BLMIS intended to incur, or

believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts

matured.

73.    The Two-Year Transfers constitute fraudulent transfers avoidable by the Trustee

pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Alpha Prime

pursuant to section 550(a).

74.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of

the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-

Year Transfers, (b) directing that the Two-Year Transfers be set aside, and (c) recovering the

21

Two-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of

BLMIS.

**COUNT FIVE**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

75.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

76.     At all times relevant to the Six-Year Transfers, there have been one or more

creditors who have held and still hold matured or unmatured unsecured claims against BLMIS

that were and are allowable under section 502 of the Bankruptcy Code or that were and are not

allowable only under section 502(e).

77.     The Six-Year Transfers were made by BLMIS with the actual intent to hinder,

delay, or defraud the creditors of BLMIS.  BLMIS made the Six-Year Transfers to or for the

benefit of Alpha Prime in furtherance of a fraudulent investment scheme.

78.     As a result of the foregoing, pursuant to sections 276, 276-a, 278 and/or 279 of

the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy

Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and

preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, (c)

recovering the Six-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the

estate of BLMIS, and (d) recovering attorneys' fees from the Defendant.

**COUNT SIX**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551 AND 1107**

79.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

22

80.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

81.     BLMIS did not receive fair consideration for the portion of the Six-Year Transfers.

82.     BLMIS was insolvent at the time it made each of the Six-Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six-Year Transfers.

83.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278, and 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551 of the Bankruptcy Code: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW
### §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551, AND 1107

84.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

85.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

86.     BLMIS did not receive fair consideration for the Six-Year Transfers.

87.     At the time BLMIS made each of the Six-Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six-Year Transfers was an unreasonably small capital.

88.     As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law and sections 544(b) and 550(a) of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS.

## COUNT EIGHT
## FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551

89.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

90.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

91.     BLMIS did not receive fair consideration for the Six-Year Transfers.

92.     At the time BLMIS made each of the Six-Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

93.     As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers, (b)

24

directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or

the value thereof, from Alpha Prime for the benefit of the estate of BLMIS.

**COUNT NINE**
**UNDISCOVERED FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE**
**LAW AND RULES 203(g) AND NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

94.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

95.     At all times relevant to the Transfers, the fraudulent scheme perpetrated by

BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

96.     At all times relevant to the Transfers, there have been one or more creditors who

have held and still hold matured or unmatured unsecured claims against BLMIS that were and

are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only

under section 502(e).

97.     The Transfers were made by BLMIS with the actual intent to hinder, delay, or

defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of the

Defendant in furtherance of a fraudulent investment scheme.

98.     As a result of the foregoing, pursuant to NY CPLR 203(g) sections 276, 276-a,

278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of

the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a)

avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering

the transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS, and

(d) recovering attorneys' fees from Alpha Prime.

## COUNT TEN
## OBJECTION TO ALPHA PRIME'S SIPA CLAIM

99.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

100.    Alpha Prime has filed a SIPA claim.

101.    Alpha Prime's claim (the "Claim") is not supported by the books and records of BLMIS nor the claim materials submitted by Alpha Prime, and, therefore, should be disallowed.

102.    The Claim also should not be allowed as a general unsecured claim.  Alpha Prime is the recipient of Transfers of BLMIS' property which are recoverable under sections 547, 548 and 550 of the Bankruptcy Code, and Alpha Prime has not returned the Transfers to the Trustee. As a result, pursuant to section 502(d) the Claim must be disallowed unless and until Alpha Prime returns the transfers to the Trustee.

103.    As a result of the foregoing, the Trustee is entitled to an order disallowing the Claim.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

i.      On the First Claim for Relief, pursuant to sections 542, 550(a), and 551 of the Bankruptcy Code: (a) that the property that was the subject of the Transfers be immediately delivered and turned over to the Trustee, and (b) for an accounting by the Defendants of the property that was the subject of the Transfers or the value of such property;

ii.     On the Second Claim for Relief, pursuant to sections 547, 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS;

iii.     On the Third Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two-Year Transfers, (b) directing that the Two-Year Transfers be set aside, and (c) recovering the Two-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS;

iv.     On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two-Year Transfers, (b) directing that the Two-Year Transfers be set aside, and (c) recovering the Two-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS;

v.     On the Fifth Claim for Relief, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and sections 544(b), 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, (c) recovering the Six-Year Transfers, or the value thereof, from the Alpha Prime for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Alpha Prime;

vi.     On the Sixth Claim for Relief, pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS;

vii.     On the Seventh Claim for Relief, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551, and 1107 of the Bankruptcy Code: (a) avoiding and preserving the Six-Year Fraudulent Transfers, (b) directing the Six-Year

Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the state of BLMIS;

viii.    On the Eighth Claim for Relief, pursuant to New York Debtor and Creditor Law sections 275, 278, and/or 279 and Bankruptcy Code sections 544(b), 550, 551, and 1107: (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS;

ix.    On the Ninth Claim for Relief, pursuant to NY CPLR 203(g) and sections 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law and section 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Alpha Prime;

x.    On the Tenth Claim for Relief, that the claim of Alpha Prime be disallowed;

xi.    On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001, 5004 awarding the Trustee prejudgment interest from the date on which the Transfers were received;

xii.    On all Claims for Relief, establishment of a constructive trust over the proceeds of the Transfers in favor of the Trustee for the benefit of BLMIS' estate;

xiii.    On all Claims for Relief, assignment of Alpha Prime's rights to seek refunds from the government for federal, state, and local taxes paid on fictitious profits during the course of the scheme;

xiv.    Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xv.    Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

Dated:  New York, New York
         July 15, 2009

                                        /s/ Marc E. Hirschfield
                                        Baker & Hostetler LLP
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone: (212) 589-4200
                                        Facsimile: (212) 589-4201
                                        David J. Sheehan
                                        Email: dsheehan@bakerlaw.com
                                        Marc E. Hirschfield
                                        Email: mhirschfield@bakerlaw.com

                                        *Attorneys for Irving H. Picard, Trustee for the
                                        Substantively Consolidated SIPA Liquidation
                                        of Bernard L. Madoff Investment Securities
                                        LLC and Bernard L. Madoff*

Of Counsel:

Frederick W. Chockley, III
Adam J. Smith
Baker & Hostetler LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, D.C. 20036
Telephone: (202) 861-1680
Facsimile: (202) 861-1783
Email: fchockley@bakerlaw.com
Email:  ajsmith@bakerlaw.com

095879, 300012408