1715pic1                    argument

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IRVING PICARD,

                    Plaintiff,

            v.                          11 Civ. 3605 (JSR)

SAUL B. KATZ, et al.,

                    Defendants.

------------------------------x

                                        July 1, 2011
                                        4:40 p.m.
Before:

                        HON. JED S. RAKOFF,

                                        District Judge

                        APPEARANCES

BAKER HOSTETLER
        Attorneys for Plaintiff
BY:  DAVID J. SHEEHAN
        FERNANDO A. BOHORQUEZ, JR.

DAVIS, POLK & WARDWELL, LLP
        Attorneys for Defendants
BY:  KAREN E. WAGNER
        DANA M. SESHENS

SECURITIES INVESTOR PROTECTION CORPORATION
        Attorneys for Intervenor
BY:  CHRISTOPHER H. LaROSA

1715pic1                    argument
```
 1                (Case called)
 2                MS. WAGNER:  Good afternoon, your Honor.  Karen
 3   Wagner, member of the firm of Davis, Polk & Wardwell for the
 4   Katz defendants.
 5                THE COURT:  Good afternoon.
 6                MS. SESHENS:  Dana Seshens, also with Davis, Polk &
 7   Wardwell also for the Katz defendants.
 8                THE COURT:  Good afternoon.
 9                MS. SESHENS:  Good afternoon.
10                MR. SHEEHAN:  Good afternoon, your Honor.  David
11   Sheehan with Baker Hostetler for the trustee.
12                THE COURT:  Good afternoon.
13                MR. BOHORQUEZ:  Good afternoon, your Honor.  Fernando
14   Bohorquez for the trustee.
15                THE COURT:  Good afternoon.
16                MR. LaROSA:  Christopher LaRosa for the Security
17   Investor Protection Corporation.
18                THE COURT:  We are here on the motion to withdraw the
19   bankruptcy reference.  Let me hear first from moving counsel.
20                MS. WAGNER:  Thank you, your Honor.
21                Your Honor, we are here to withdraw the reference
22   because the case that is pending in the bankruptcy court, the
23   adversary proceedings, raise a number of issues that require
24   significant interpretation of SIPA and that also require
25   significant interpretation of how SIPA interacts with other
```

1715pic1                    argument

1  laws including security, state law and the bankruptcy code.  So
2  we believe withdrawal of the reference is mandatory.
3         THE COURT:  This mostly comes up by way of your
4  defenses.
5         MS. WAGNER:  Correct.
6         THE COURT:  Does that matter?
7         MS. WAGNER:  I don't think it matters at all, your
8  Honor.  I think the -- we are saying that there is no basis for
9  the adversary proceedings because the avoidance laws cannot be
10  applied in the way that the trustee is seeking to apply them
11  and therefore we believe withdrawal of the reference is
12  mandated now because all of the papers are before you.  This
13  might be an issue, I think it is one reason we didn't
14  immediately move to withdraw the reference.  There might be an
15  issue if the only thing pending in front of you was a complaint
16  for awardance.  But you now have pending before you a completed
17  motion to dismiss and, indeed, for summary judgment dismissing
18  the complaint, which lays out all of the legal arguments
19  related to that complaint.  So, I do not think that that is
20  relevant.  I think this case is absolutely ripe and it is
21  appropriate to consider all of these issues at this time.
22         THE COURT:  Go ahead.
23         MS. WAGNER:  Thank you, your Honor.
24         As your Honor is well aware, the issue before the
25  Court right now is very narrow, it is due to legal questions

1715pic1                    argument

1  presented by the underlying motion require that the presiding
2  Judge engage in a significant interpretation of federal laws
3  apart from the bankruptcy statute, Title 11 of the U.S. Code.
4  We do contend, as I said, that they certainly do.
5          The trustee is seeking a billion dollars from the
6  plaintiffs which constitute sums withdrawn from their brokerage
7  accounts over more than two decades.  These payments, when they
8  were made, were protected by state and federal laws that are
9  well established and that govern the relationship between a
10 broker and its customer and there would have been no question
11 that no SIPA case commenced, but these transfers were entirely
12 legally valid and appropriate and, indeed, had a customer at
13 any time prior to the filing of the SIPA case, had the broker
14 refused to make these payments, the customer could have gone to
15 a Court and gotten a judgment requiring the broker to make the
16 payments.
17         THE COURT:  So, what are you saying, in part, as I
18 read your papers, is that the trustee is seeking to impose on
19 you, after the fact, duties that you would not have had at the
20 time of the underlying events and that his purported basis for
21 doing so is the bankruptcy law but it places, in your view,
22 that law in conflict with the laws that actually created your
23 duties at the time of the events.
24         MS. WAGNER:  That's absolutely true, your Honor.  And
25 we further would argue that the laws that govern at the time

```
 1   were such that when the payments were made, they discharged
 2   antecedent debt, to use the terms that are used in the
 3   bankruptcy and SIPA context.  They discharged antecedent debt
 4   and I think we are very definitely arguing that you cannot have
 5   avoidance of any transfer that does discharge a valid
 6   antecedent debt.  So, that is another of our arguments.
 7               And, of course, finally we are arguing that a
 8   provision of the bankruptcy code, Section 546E, also limits
 9   very strongly the kinds of avoidance actions that can be
10   brought in this case.  That's correct, your Honor.  But, our
11   principal argument certainly is that the laws that were in
12   effect at the time that all of this occurred, the laws were not
13   SIPA, obviously, and SIPA, we argue, does not have any
14   retroactive effect.
15               The trustee is arguing that because this is a SIPA
16   case -- and I think he is arguing that it is because it is a
17   Ponzi scheme that commenced, was the cause for the trigger of
18   this SIPA proceeding -- that none of these laws can be
19   considered to apply anymore, that he is permitted to go back in
20   time, redo everything under a scheme which is unprecedented in
21   any court before this, and he can reallocate people's rights
22   and he can take away the antecedent debt defense because he is
23   going to recalculate what that debt was at the time when it was
24   discharged and on that basis he can engage in this effort to
25   recalibrate everybody's rights.
```

 1           Whether or not he can do that of course is the
 2   question that will be before the Court that hears this.  The
 3   question before your Honor is does this raise a huge question
 4   of interpreting a law other than Title 11.  And of course we
 5   argue that it does.  Trustee's argument is based principally, I
 6   believe, on the provisions in SIPA that govern net equity and
 7   customer.  Those are definitions that he uses to contend that
 8   he can in fact go back and recalculate all these claims so that
 9   he can even out customers losses over time and to do that by
10   recovering from some people to pay other people.  This is an
11   unprecedented interpretation of SIPA.  By itself I think it
12   would mandate withdrawal.
13           THE COURT:  I don't think he is saying quite that.
14           What he is saying, at least to the extent that I was
15   able to read his 373-page complaint without falling asleep but
16   I do admire his Tolstoy-like rhetoric, was that your clients
17   knew from if not the beginning, certainly early on during their
18   25-year relationship with the Madoff company, that this was a
19   Ponzi scheme and because your clients had, if you will, the
20   inside track, they were reasonably comfortable in going along
21   with the scheme figuring they would be the most likely not to
22   be left holding the bag when the scheme came tumbling down.  Of
23   course, as it turns out, you lost what, a half billion dollars
24   or something like that.  But I'm not sure that's quite the same
25   as your theory of let's redistribute the wealth.

1715pic1                    argument

 1            MS. WAGNER:  Your Honor, first of all, of course we
 2   take issue with all of that.  Secondly --
 3            THE COURT:  No, I understand.  These are just
 4   allegations.
 5            MS. WAGNER:  Absolutely.
 6            Secondly, I think even the trustee doesn't allege
 7   exactly that.  He alleges that we should have known starting at
 8   some point in --
 9            THE COURT:  He says you were willfully blind.
10            MS. WAGNER:  He does say that.
11            THE COURT:  It is not quite should have known and it
12   is not quite did know, it is in between.
13            MS. WAGNER:  That's correct, your Honor.  And we have
14   disputed all of that.  But even if that were -- if there were
15   some world in which that were true, there is still a question
16   that is raised on this motion for summary judgment which is
17   what law applies to that analysis.  Is the law the law of the
18   bankruptcy code that says according to the trustee, first of
19   all, I can avoid this debt for, quote unquote, fictitious
20   profits; and secondly, I can avoid it all because these people
21   should have known.
22            What is the law that governs that?  We argue that at
23   the time these transfers occurred it was the securities laws
24   that governed it and the securities laws do not impose upon a
25   customer any obligation to investigate his broker.  In fact,

1715pic1                    argument

1    the securities laws are quite the opposite, they protect the
2    customer.  And I think fairly read --
3         THE COURT:  Are you saying that under the securities
4    laws one sued by a customer could not assert an in pari delicto
5    defense based on willful blindness?
6         MS. WAGNER:  Your Honor, I think if you are positing
7    that the customer would sue the broker for returning the
8    securities on his statement but the broker would say that you
9    are in pari delicto.
10        THE COURT:  You knew or willfully blinded yourself to
11   what was going on in our Ponzi scheme, therefore --
12        MS. WAGNER:  Your Honor, I think in that situation
13   probably the law would leave everybody where they are, I think,
14   at that point.  But, if that were the situation that was
15   presented, I do think what they would have to prove is that the
16   customer, when the customer made the investment with the
17   broker, the customer knew at that point that there was a Ponzi
18   scheme going on.  That is not the allegation being made here.
19        The avoidance principles depend upon the transfer
20   itself being avoidable and we are arguing that that transfer is
21   not avoidable on the good faith basis alleged in the bankruptcy
22   code, it has to be -- they have to prove that the customer knew
23   at the time of the investment that Madoff was engaged in a
24   Ponzi scheme, knew that they were involving themselves in a
25   fraudulent scheme, and if they can prove that the customer was

1715pic1                    argument

1  therefore complicit then maybe there is an argument that there
2  was no antecedent debt to back up the transfer had they got the
3  money.
4          This is all governed by the bankruptcy code.  The
5  complaint, it is an avoidance complaint under the bankruptcy
6  code and their position is, in the complaint, that the
7  transfers were taken in bad faith because we should have known
8  or were willfully blind that the transfers were transfers of
9  other people's money.  Our argument is you can't -- that is not
10 a valid analysis where the transfers are from a broker to a
11 customer based on a regularly issued statement.  At that point
12 you have to prove that the customer knew when the customer put
13 in the money that the broker was engaged in a fraudulent
14 scheme, so the customer is effectively --
15         THE COURT:  There is a duty imposed.
16         MS. WAGNER:  Correct.
17         THE COURT:  And that's where you say the conflict
18 between the alleged interpretation of the bankruptcy law
19 invoked by the trustee and your interpretation of what your
20 duty was under the securities laws, that's the issue that you
21 think needs to be resolved by an Article 3 Court.
22         MS. WAGNER:  There are several parts of that package
23 but, yes, that is fundamentally the issue.  Yes, your Honor.
24         THE COURT:  Let me hear from your adversary.  Thank
25 you.

1715pic1                    argument

 1              MS. WAGNER:  Thank you, your Honor.
 2              MR. SHEEHAN:  Your Honor, not surprisingly, we
 3    disagree.  I don't think there is an iota of an issue that
 4    requires Article 3 firepower here.  Indeed, what we have before
 5    your Honor is a classic case that is brought every day in the
 6    bankruptcy court resolved by a bankruptcy judge involving
 7    issues that he deals with every day including antecedent debt
 8    which is part and parcel of every proof of claim in front of a
 9    judge that he deals with every day.
10              THE COURT:  Well, let me ask you this:  Your complaint
11    substantially asserts a theory of willful blindness, yes?
12              MR. SHEEHAN:  Yes, your Honor.
13              THE COURT:  And willful blindness is a function, in
14    part, of what there was a duty to look at.  For example, in all
15    the great accounting cases involving willful blindness the
16    theory of the law is that an accountant has a duty to probe
17    beyond what the average person would be probing and therefore
18    if the accountant fails, purposefully or consciously fails to
19    look for stuff that the average person would have no reason to
20    look for but which an accountant has a duty to look for, then
21    the accountant is engaged in willful blindness and may be
22    liable in the same way as an intentional participant.
23              So, in this case is there not an issue of what was the
24    duty to look of a customer situated in the position of the
25    defendants here, and isn't that a function of non-bankruptcy

 1   law?
 2               MR. SHEEHAN:  Absolutely not.
 3               First of all, the accountant analogy --
 4               THE COURT:  I am glad it is absolutely not as opposed
 5   to just no.
 6               MR. SHEEHAN:  I suspect, your Honor, that it sounded a
 7   little bit overstated there but I can't react to it more
 8   strongly, your analogy than that, because we are not talking
 9   about accountants here or the decades and decades of law
10   evolved through statute and decisional law surrounding
11   accountant liability has no application here to begin with.
12               Secondly --
13               THE COURT:  No, no.  The analogy was designed to raise
14   the question of whether willful blindness, by its very nature,
15   can only be determined if one knows what duty there was, if
16   any, to look.
17               MR. SHEEHAN:  Yes.
18               THE COURT:  Willful blindness means turning away
19   from -- purposefully turning away from what one should have
20   been looking at.  And if the law, for example, was in a given
21   situation then one had no duty to look at anything.  Then there
22   could never, in that hypothetical, be any willful blindness
23   theory.
24               So, doesn't -- don't you have to determine, in any
25   willful blindness case, what law determines what you need --

1715pic1                    argument

 1   what the duty is to look?
 2              MR. SHEEHAN:  That was my second point.
 3              THE COURT:  Yes.
 4              MR. SHEEHAN:  I believe that you are absolutely right
 5   and there is a body of law, it is well-established, been in
 6   force for decades called the Bankruptcy Law.  It is now
 7   embodied in Bankruptcy Code that has within it the law that
 8   provides that if you, as a creditor, operated on inquiry notice
 9   that you, during the course of the existence -- pre-bankruptcy
10   the existence of that company had reason to know that something
11   untoward was occurring without necessarily knowing exactly what
12   it was, that you stand in a different position vis-a-vis the
13   body of innocent creditors who had no reason to know, no
14   inquiry notice.  That is the body of law which is why I said at
15   the outset we are in the bankruptcy world here, we are dealing
16   with bankruptcy law and the bankruptcy code and these issues
17   are dealt with there every day.  None of this requires your
18   Honor to get involved using Article 3 power to make that
19   decision.  It is done on a routine basis.
20              If you go through each and every one of the elements
21   raised by my adversary whether it is antecedent debt, as you
22   suggested to, you're dealt with every day, part and parcel of
23   what the bankruptcy court does in determining what?  A proof of
24   claim.  A proof of claim is the quintessential -- it is the
25   essence of what goes on in the bankruptcy court.

1715pic1                    argument

1      What we have here is our adversaries file proofs of
2   claim, we file adversary proceedings against them suggesting,
3   no, you are not entitled under 502D of the Bankruptcy Code to
4   get paid.  Why?  Because two reasons.  One, under certain
5   sections of the code you have received fictitious profits in
6   the context of a Ponzi scheme other people's money.  You cannot
7   keep it, you never gave fair value.  Another unique bankruptcy
8   code law.
9      Then, beyond that, we say you acted in bad faith.
10  What does bad faith mean in a bankruptcy context?  You are in
11  inquiry notice.  The litany of things in the perhaps overly
12  long complaint but we think it is just right, outlines what was
13  exactly going on, what was going on over decades that puts
14  those folks on notice that makes them stand out differently
15  than the other body of creditors.
16      THE COURT:  Is there not a difference, now, since you
17  are suggesting, between a situation where a creditor says I
18  want to be paid money that I've not previously been paid and
19  you say, well, under the bankruptcy law the remaining assets of
20  the debtor have to be apportioned taking account of all the
21  things you just mentioned, so you may be out of luck.
22      MR. SHEEHAN:  Yes.
23      THE COURT:  Isn't that very different from a situation
24  where you say we are going to go back 25 years and claw back
25  from you monies that you got years and years ago on a theory

1715pic1                     argument

1  that because the happenstance occurred that the person who paid
2  you ultimately went into bankruptcy decades later, the
3  bankruptcy standard governs whether we can get back from you or
4  not the money you were paid as opposed to what the law would
5  have been if there had been no bankruptcy decades later.
6          Isn't that a very different question?
7          MR. SHEEHAN:  I may have lost the thread of your
8  question there, your Honor.
9          THE COURT:  Well, my fault in making it too wordy.
10         What I am trying to suggest is it seems to me there
11  might well be a difference in saying that if a debtor goes into
12  bankruptcy and you want to get money out of the estate of that
13  debtor, you have to meet the requirements of the bankruptcy law
14  as opposed to saying we, the trustee, can go back and get from
15  you a billion dollars for conduct that you took years before
16  there was any remote possibility or likelihood of bankruptcy
17  and yet apply the bankruptcy law to your conduct post facto.
18         MR. SHEEHAN:  I understand the distinction, your
19  Honor, and I do see those as two different situations, but I
20  still think in the context of what we are arguing here today,
21  the bankruptcy code controls both of those situations because
22  the bankruptcy code anticipates the latter illustration.  It
23  anticipates that there can be pre-petition conduct that is
24  going on within an organization that would give you inquiry
25  notice that there is something untoward occurring and the

        1715pic1                    argument
 1    bankruptcy code gives the authority to the trustee to look
 2    back, to look back on that conduct and say, look, if we are
 3    going to have the equality of distribution of these assets
 4    those who are seeking relief like the first guy in your
 5    illustration, the guy who had been --
 6              THE COURT:  It is not equality of distribution of the
 7    assets, it is equality of distribution of sums that you are
 8    seeking to recover.
 9              MR. SHEEHAN:  Well, yes and no.  I think you're right
10    but I think I am too.  I think we both are.
11              The reason I said equality of distribution is this --
12              THE COURT:  Well, that's comforting.
13              MR. SHEEHAN:  I feel good about it.  I certainly do.
14              What I meant by that, your Honor, is this:  Is that
15    the estate happens, lights go out.  Everybody is standing still
16    looking around, where do we stand vis-a-vis this estate?  The
17    trustee comes in and what is his job?  His job, which has gone
18    on for decades, this is not a new unprecedented approach by a
19    trustee, this is exactly what trustees have done going back, as
20    we said to the Cunningham case in 1924; they take a look at it
21    and they say, okay, we have a vast body of people all seeking
22    to partake in the estate that has now been created by a
23    function of the bankruptcy law.  He then has to, or she has to
24    look at it and say, okay, we have to evaluate these claims and
25    then part of evaluating it is are there distinctions between

1715pic1                          argument

```
 1   them.  If all that was doing was during the course of
 2   bankruptcy -- and he is different than perhaps somebody who is
 3   perhaps dealing with it and was taking money out during a
 4   pre-satisfaction and that person is on an unequal footing
 5   vis-a-vis the estate frozen in period of time they're ahead of
 6   the game, they got more money than they should have.  That's
 7   what the code is saying.  That's what the bankruptcy law is
 8   saying.
 9            So, the trustee creates this pool of money and then
10   redistributes it.  That doesn't mean that, for example, in the
11   Katz/Wilpon situation where a claim has been filed and it is a
12   net loser claim that ultimately Katz/Wilpon will participate in
13   the distribution, they will, upon resolution of this litigation
14   because it is all within the context, just as Chief justice
15   Roberts taught us in Stern v. Marshall, when you in fact have
16   the resolution of the claim resolving all of their issues and
17   it all gets resolved at once, where does it belong?  In the
18   bankruptcy court.  It is not before an Article 3 Judge.  There
19   are no such issues here before your Honor today.
20            What is 546E but a bankruptcy code provision.  What
21   did we learn the other day from the Enron decision?  Did anyone
22   say that justice Gonzalez did not have jurisdiction, that he
23   went beyond his powers.  Of course not.  He didn't like it,
24   they reversed it.  I think Judge Koeltl was right, not the
25   majority, but that's my opinion.  The point is, at the end of
```

1715pic1                     argument

```
 1   the day they didn't say there was no jurisdiction.  Why?
 2   Because it was the bankruptcy code.  And Judge Gonzalez had
 3   every right and did the right thing and he decided that,
 4   ultimately got reversed but he was in the right ballpark, he
 5   had jurisdiction.
 6               THE COURT:  Was that issue raised?
 7               MR. SHEEHAN:  It is raised here that that is an issue.
 8               THE COURT:  No, no.  I'm saying in the Second Circuit
 9   decision that you are referencing, the Enron decision, was the
10   issue of whether Judge Gonzalez had jurisdiction and that there
11   should have been mandatory withdrawal to a district court?  I
12   don't recall that issue being raised.
13               MR. SHEEHAN:  And of course it wasn't.
14               THE COURT:  So, what is the relevance?
15               MR. SHEEHAN:  Because it would be inappropriate to do
16   so.
17               THE COURT:  No, no, no.  This is a funny argument.
18               What you are saying is that a Court, in this case the
19   Second Circuit, didn't decide an issue that was never presented
20   to them.  Yes, indeed.  And in fact that's their job not to
21   decide issues that are not presented to them except in the most
22   extraordinary circumstances.
23               I don't see what the relevance of that case is.
24               MR. SHEEHAN:  I think it is only relevant in this
25   sense:  That it represents traditionally whether it has been
```

1715pic1                     argument

 1  dealt with in 546E.  There is no change, there is no
 2  unprecedented nature of a 546E application.  It represents only
 3  that.  I'm not suggesting otherwise, that if your Honor looks
 4  back at the history of 546E and the cases that dealt with that,
 5  they've never said that that belongs not -- and your Honor may
 6  say well, it was never raised and the reason it was never
 7  raised is because it appropriately belongs -- belongs with the
 8  bankruptcy judge.  He resolves that issue.  Yes, it is
 9  appealed, yes, it is reviewed, but there is no basis for
10  suggesting that somehow this requires the presence of five --
11          THE COURT:  I still find it, forgive me, a funny
12  argument that because an issue has -- your argument essentially
13  because an issue has not been raised previously therefore the
14  issue is without merit.  On that theory, of course, there would
15  never be any changes in the law whatsoever.
16          MR. SHEEHAN:  I understand that, your Honor, and
17  perhaps I am making more of it than I should and your Honor's
18  admonition is well understood.  I was simply suggesting that in
19  fact there is no basis -- let me just abandon that, since it is
20  clearly unappealing.
21          The thing that I was trying to get through to your
22  Honor is this, is that 546E is part of the code.  It gets
23  resolved on a daily basis by bankruptcy judges.
24          THE COURT:  That I do understand.
25          MR. SHEEHAN:  And there is no basis here for

1715pic1                    argument

1    suggesting that that somehow reaches out and requires Article 3
2    firepower.  It just doesn't.  And the same thing is true with
3    the other issues that are raised.  Think about it.  What was
4    being argued to your Honor here copiously in the briefs is
5    Article 8 of the UCC.  Last time I looked that does not trigger
6    157 D firepower.  It just doesn't.  That's a state law issue.
7           And, by the way, the very state law, interestingly
8    enough, anticipate a bankruptcy filing.  And what does that
9    very state law tell you?
10          THE COURT:  You mean the debtor/creditor law?
11          MR. SHEEHAN:  No, not Article 8 itself.
12          THE COURT:  Article 8 of the UCC.
13          MR. SHEEHAN:  Right, suggest -- doesn't suggest, it
14   states -- all these rules in there, antecedent debt, what the
15   broker owes based on the statement, all of that gets trumped --
16   trumped -- by the filing of the SIPA proceeding and SIPA takes
17   over and controls.  Two reasons, one, it says so; secondly,
18   supremacy clause.
19          So, is that, again, the kind of issue that requires
20   the Article 3 Judge to step in and resolve?  We suggest not.
21   It is something that clearly was dealt with and very readily so
22   by Judge Lifland along with the antecedent debt issues which he
23   dealt with.  All of those things are things that are dealt
24   with, traditionally, by the Court every day.  These are not
25   unique issues, they're quite frankly, respectfully, we can call

1715pic1                    argument

1  them core but another term can be run of the mill.  They're
2  there every day and every bankruptcy judge deals with them and
3  nothing that has been raised here changes any of that other
4  than to suggest, in sort of a conclusory fashion, it is
5  unprecedented.  It is novel.  In what sense is it novel?  It is
6  not novel at all.  It is the kind of thing, as I said more than
7  once and I am repeating myself, are dealt with every day in the
8  bankruptcy court.
9          THE COURT:  You are saying that all they're saying, in
10  your view, is that because it is big bucks it is novel and that
11  doesn't -- that's a distinction without difference.
12          MR. SHEEHAN:  No, I don't think it is just big bucks,
13  your Honor.  I think -- and I value my colleague's opinion and
14  their positions here, I understand what they're saying.  I
15  think what they're trying to suggest, your Honor, is that
16  somehow because there is a SIPA statute involved that that
17  somehow creates a federal question issue for your Honor to
18  reach out and deal with.  And that might be so in another
19  context such as you recently decided in HSBC which they
20  referred to.
21          THE COURT:  There is no doubt in my mind that this is
22  a very different situation from HSBC and that, to be frank, in
23  my view, is an easy case for withdrawal.  This is a much closer
24  case.  So, I agree with you that that involved issues that are
25  not remotely triggered here.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1715pic1                    argument

```
 1          MR. SHEEHAN:  And, your Honor, obviously I'm
 2   advocating my position that it is beyond remote, they're not
 3   even in the ballpark.  No pun intended.
 4          At the end of the day what we are looking at here, and
 5   as your Honor studies this and looks at it, and I know you
 6   will, each of those issues raised by --
 7          THE COURT:  I think that is a terrible slight to a now
 8   winning team.
 9          MR. SHEEHAN:  4 out of 5, they're looking pretty good,
10   Judge.  They're looking pretty good.
11          But, the point is that as we study the law with regard
12   to mandatory withdrawal of the reference -- and that is what we
13   are talking about here, we are talking about mandatory
14   withdrawal of the reference -- and so I get it right, I'm going
15   to treat and I am reading from the Ionosphere case we are
16   talking about, the Ionosphere decision in the Second Circuit,
17   it says that it should be construed narrowly to begin with.
18   And I don't think there is anything here that would suggest you
19   should go beyond that, and that mandatory material
20   consideration of non-bankruptcy federal issues that are
21   necessary for resolution, I submit to your Honor as your Honor
22   canvasses these issues and looks at these issues as I just have
23   done, I won't repeat it, none of those reach that level, reach
24   that criteria that require you to reach out and bring them to
25   you.  I believe that all of those issues, and many of them as
```

1715pic1                    argument
 1  we have outlined to your Honor, and I don't want to get into
 2  that part of the brief, have already been dealt with.  Many of
 3  these issues have been dealt with in the context of the net
 4  equity dispute.  Clearly in the net equity dispute those issues
 5  of antecedent debt, state law, UCC, all were argued before
 6  Judge Lifland, before the Second Circuit.  All of those issues
 7  were dealt with there because they're appropriately dealt with
 8  in that context.  There is no need to then go to this Court and
 9  suggest that there is a need to review them again.
10          THE COURT:  All right.  Thank you very much.
11          MR. SHEEHAN:  Thank you.
12          THE COURT:  Did counsel for SiPC want to say anything?
13          MR. LaROSA:  Just a couple of comments, your Honor.
14          First of all, it seems to me that there may actually
15  be two issues that are raised here, not one.  The first issue
16  is whether or not, as we see it whether or not the existence of
17  whether or not the account balances that are reflected on
18  fraudulent account statements issued as part of the Ponzi
19  scheme can qualify as antecedent debt for purposes of the
20  bankruptcy code and that's clearly a bankruptcy code question.
21          The second question is the one that wasn't much
22  discussed in the papers but one which I think your Honor has
23  raised today which is what significance, if any, does a pre
24  liquidation duty or lack of duty stemming from some
25  non-bankruptcy securities law have for purposes of the

1715pic1                       argument
1    bankruptcy code.
2              THE COURT:  Yes.  And you correctly state -- it was
3    interesting to me that although this was raised by the movants,
4    neither the movants nor the respondents spent as much time on
5    that issue as on the other issues but it does seem to me to be
6    at least a colorable issue and that's why I wanted to hear what
7    you had to say to that.
8              MR. LaROSA:  We think perhaps it is a colorable issue
9    but we think if it is, it is a colorable issue under the
10   bankruptcy code.
11             The question is, for example, assuming arguendo that
12   there were no duty, what effect, if any, would that have under
13   the avoidance provisions.  That would be the issue.  And so it
14   is really --
15             THE COURT:  Well, I am looking, for example, at what
16   the Second Circuit said in In Re: New Times Security Services,
17   Inc., 371 F.3d 68, (2d Cir. 2004) that is referenced in the
18   papers, "A goal of greater investor diligence is not emphasized
19   in the legislative history of SIPA.  Instead, the drafters'
20   emphasis was on promoting investor confidence in the securities
21   market and protecting broker/dealer customers."
22             So, one reading of that, and certainly not
23   self-evident but one reading of that would be that Congress
24   envisioned that SIPA would not be used to impose the kind of
25   duty that allegedly would trigger the willful blindness

1715pic1                    argument

 1  avoidance of duty that's asserted here in the complaint.  And I
 2  guess my question to you is, assuming that's a reasonable
 3  interpretation of SIPA and of what the Second Circuit said
 4  about SIPA but assuming that it is by no means a slam dunk
 5  interpretation given that it wasn't exactly what was being or
 6  even in the same context when it was raised in the New Times
 7  Securities case as it is in this case, isn't the determination
 8  of what duty or not there is which is the premise on which any
 9  willful blindness deviation from that duty would fall a
10  question of non-bankruptcy law and important question of
11  non-bankruptcy law, a non-obvious question of non-bankruptcy
12  law that needs to be resolved by the District Court?
13              (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

171Wpic2

```
 1              MR. LA ROSA:  Your Honor, that case came up in the
 2     context of whether or not to allow a customer claim, and that's
 3     a very different scenario --
 4              THE COURT:  I agree.
 5              MR. LA ROSA:  -- than the one we're involved in here.
 6              Obviously SIPA is a remedial statute.  While the
 7     customers provisions do have to be construed narrowly, and
 8     we're not even sure the statute is properly applied, it is a
 9     remedial statute and I think the feeling was in that case that
10     one shouldn't penalize claimants too much or require too much
11     of them in making a decision about whether or not to allow the
12     claims.  That's a totally different context than what we're
13     dealing with here, which is a situation where someone has
14     received essentially transfers of other people's money.
15              THE COURT:  What law do you say --
16              MR. LA ROSA:  And extends the Bankruptcy Code, by the
17     way.  SIPA incorporates by reference --
18              THE COURT:  Yes.  So what law do you say determines
19     the duty of inquiry, if any, of a customer of a securities
20     brokerage firm of the kind that Mr. Madoff had here?
21              MR. LA ROSA:  In the context of the causes of action
22     brought by the trustee?
23              THE COURT:  Yes.
24              MR. LA ROSA:  It would be the avoidance provisions of
25     the Bankruptcy Code.
```

171Wpic2

```
 1          THE COURT:  I must say I find that very difficult to
 2  understand, and forgive me, I certainly want to hear your
 3  response.
 4          MR. LA ROSA:  Sure.
 5          THE COURT:  How can it be that the law governing
 6  someone's duty to inquire at a given moment in time is
 7  determined not by what the governing laws in place at that
 8  moment in time were as to what in the normal course would be
 9  that person's duty, but by the happenstance that, decades
10  later, the entity involved went into bankruptcy?
11          MR. LA ROSA:  That's the nature of bankruptcy law,
12  your Honor.
13          THE COURT:  I'm not sure I agree with that.  That is
14  clearly the nature of bankruptcy law to the extent that a
15  creditor is making claims for what the creditor has not
16  previously received.  It's clearly the nature of bankruptcy law
17  with respect to preferences within the 90-day period.  I'm not
18  so sure that that's the established law governing duty of
19  inquiry with respect to claims made by the trustee for events
20  that occurred 20 years earlier.  What's your authority on that?
21          MR. LA ROSA:  It would be the Bankruptcy Code itself.
22  By the way, your Honor --
23          THE COURT:  Where do you find that in the Bankruptcy
24  Code?
25          MR. LA ROSA:  Let me point your Honor to a case
```

171Wpic2

```
 1   decided about four years ago by the Bankruptcy Court in this
 2   district.  It's called In re Bayou Group LLC, 362 B.R. 624.
 3   It's a Ponzi scheme, of course, very much like this case.  It
 4   was a case involving fictitious account statements that were
 5   issued, very much like this case, that showed fictitious
 6   account balances, very much like this case, and, of course, the
 7   trustee attempted to, in that case, recover redemption payments
 8   that were made on the basis of the balances shown in these
 9   fraudulent account statements, and there was a motion to
10   dismiss filed.
11           THE COURT:  Was it a willful blindness case?
12           MR. LA ROSA:  The words willful blindness were not
13   used.
14           THE COURT:  Because I think it's totally different.
15   You don't need the bankruptcy law at all if you're dealing with
16   a coconspirator or thief.  That law, I think, goes back about
17   500 years.  But willful blindness, by contrast, has been one of
18   the most controversial areas in the law, both bankruptcywise
19   and nonbankruptcywise, for at least the last four decades.
20           MR. LA ROSA:  I guess my point, your Honor, is what
21   the court decided in that case was not to give effect to the
22   balances shown on these account statements despite the fact
23   that it's quite possible that the recipients of these
24   redemption payments could have enforced what purported to be
25   their right to the assets shown on those statements prior to
```

171Wpic2

1   the commencement of the bankruptcy.  In other words, the
2   bankruptcy law, in effect, vitiated a prior right that existed
3   prior to the bankruptcy.  And that doesn't seem to me to be
4   dissimilar to what's going on here.  In fact, what we're saying
5   is the bankruptcy law now determines whether or not you can get
6   away with willful blindness when you could before.
7           THE COURT:  I understand that argument.  I think that
8   is different from saying that the bankruptcy law determines
9   what is willful blindness in a particular context.  That is, I
10  think, not inherently a function of the bankruptcy law, at
11  least I haven't yet been persuaded it is.  It's one thing to
12  say if you were in fact willfully blind under whatever the
13  appropriate legal standard was, then you may owe money to the
14  bankruptcy trustee.  It's quite something else to say, And
15  we're going to determine after the fact, so to speak, under the
16  bankruptcy law, what the definition of willful blindness in any
17  given context is oblivious to any other federal laws that may
18  set the standard.
19          MR. LA ROSA:  I don't think it would be oblivious to,
20  your Honor.  I think it would merely be, in effect, the
21  Bankruptcy Code ultimately sort of resolves the issue.  It
22  might be, for example, that they would present evidence and
23  make the argument that they had no duty under preliquidation
24  law and that should be taken into account in determining, for
25  example, whether or not they were willfully blind for purposes

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

171Wpic2
```
 1  of the application of the avoidance provisions, but it wouldn't
 2  be determinative.  It would be bankruptcy law that would be
 3  determinative.  It would be, in a sense, a piece of evidence
 4  that they would offer and an argument that they would make, but
 5  it wouldn't settle the matter.
 6              THE COURT:  Thank you very much.
 7              Let me hear in rebuttal from counsel for the
 8  defendants.
 9              MS. WAGNER:  Thank you, your Honor.
10              I think that this argument has resulted in a focus on
11  a number of things that are very important to this discussion,
12  a key one being we are not here before your Honor to discuss
13  the merits of our proof of claim in this bankruptcy.  That is
14  an issue which is in fact in front of the Second Circuit, and
15  that is an extremely different issue, as your Honor has pointed
16  out, from how you judge the actions of a party 20 years before
17  a SIPC proceeding was filed, and those are extremely different
18  issues.  I think that it is impossible to say, especially when
19  you're dealing with a regulated broker-dealer whose customers
20  have the benefits of the federal securities laws, it's
21  impossible to say, or at least I should say an Article III
22  judge should decide whether the protections of the federal
23  securities laws somehow are vitiated by the ultimate filing of
24  a SIPC proceeding.  That seems to me very unlikely, but it is
25  what is being presented to you today.
```

171Wpic2

```
 1              If I could just address a couple of other things that
 2   were discussed.  First of all, the 546(e) issue in Enron.
 3   There's no question that the issue in Enron was does 546(e)
 4   cover redemptions on commercial paper.  That is definitely a
 5   bankruptcy question because it's a 546(e) is part of the
 6   Bankruptcy Code.  That is not issue that is involved in this
 7   case.  The issue in this case is:  In a SIPA case, does 546(e)
 8   apply, and the position that has been taken is it does not
 9   apply because it is not consistent with what we are trying to
10   achieve here, which is equality.  So that is clearly a question
11   that is withdrawable because that has SIPA and the Bankruptcy
12   Code at odds.  So I believe that is clearly withdrawable and
13   it's very different from what was decided in Enron.
14              In the Ivy case, Ivy did not involve a registered
15   broker-dealer.  The redemptions there were equity redemptions
16   from a hedge fund, a whole different body of law.  We are very
17   focused here on the fact that this is a registered
18   broker-dealer who issued regular statements who said he was
19   taking money from customers in order to buy Blue Chip
20   securities.  He sent statements to say that's what he had done.
21   There's no other way for a customer to determine what he's
22   done.  He then sold them.  There were cash in the accounts.
23   People took the cash out.  This is fundamental to the whole
24   system of broker-dealer regulations.  It would be a shock to
25   the system to be told, Maybe, one day if we find out your
```

171Wpic2

1    broker was engaged in a Ponzi scheme, all of this is going to
2    come back to haunt you.  All of the money you put in there
3    you're going to have to give back.  It's a complete conflict
4    between the securities laws and the Bankruptcy Code, your
5    Honor.
6            Finally, on the UCC and supremacy clause, if there
7    were a conflict between SIPA and the UCC, clearly the notion
8    would come into play.  But there is no conflict, and there is
9    surely no conflict found in the UCC.  The UCC says if there is
10   a bankruptcy, the bankruptcy will determine distribution on the
11   claims.  It certainly does not say that the UCC has nothing
12   more TO DO with what the claims are.  In fact, in normal
13   bankruptcies, the existence and value of the claim are
14   determined by nonbankruptcy law.  The allowance and division
15   are determined by bankruptcy law.  That is normally what
16   happens and that is what we're saying should happen in this
17   case.  But, in any event, we're not asking to have our claims
18   allowed; we're asking to have a huge lawsuit against us
19   dismissed on the grounds that we are governed by the securities
20   laws, and the Bankruptcy Code cannot reach back to SIPA in
21   particular.  It's not the bankruptcy law, it's SIPA changing
22   the bankruptcy law.
23           Your Honor, just one final point.  As you heard, I
24   think, in the trustee's argument, he's objecting to equality,
25   and he cites to the Supreme Court Cunningham case.  Equality

171Wpic2

```
 1   and Cunningham are preference matters.  Preference law in the
 2   Bankruptcy Code is something that has nothing to do with
 3   knowledge or intent.  It is an absolute statute.  If you get
 4   something more than I got during the 90 days preceding
 5   bankruptcy, you have to give it back, and that's all there is
 6   to it.  It doesn't matter what either of us knew about
 7   anything, but that's a 90-day period.  That's not a 25-year
 8   period.
 9           So what my colleague is arguing here is is that
10   somehow the 90 days should be stretched to be 25 years.  And
11   what's the basis for that?  That's SIPA.  He's saying SIPA
12   allows him to do that, so again that's a huge interpretation of
13   SIPA that I think merits withdrawal of the reference.
14           THE COURT:  Thank you all for this very helpful
15   argument.
16           I have thought a lot about this issue even before this
17   argument, and it seems to me that part of what we have here is,
18   in effect, one of the dangers that you sometimes have when you
19   have specialized courts dealing with only one particular area
20   of federal law, and that is something of a tunnel vision.  It
21   does not seem to me to be self-evident at all that the
22   bankruptcy law sets the parameters of the duty of inquiry that
23   a customer in a securities brokerage investment situation has.
24   The area of willful blindness or the concept of doctrine of
25   willful blindness, which is the premise of the voluminous
```

171Wpic2

1  complaint in this action has been among the most difficult and
2  controversial areas of the law for at least half a century.
3  Judges as great as Learned Hand and Henry Friendly have
4  struggled with this concept, which is somewhat between
5  negligence and purposefulness but where in between is a
6  function of what is the duty of inquiry, and the duty of
7  inquiry varies from situation to situation but also from legal
8  context to legal context.
9        Here, the movants have made, in the Court's view, a
10 more than plausible argument that the duty of inquiry of their
11 clients in a securities context is governed by securities law
12 and cannot be overridden after the fact by the bankruptcy law
13 or by the interpretation of a nonbankruptcy law, SIPA, being
14 asserted by the trustee.  Now, they may be totally wrong about
15 that.  But it seems to me on its face to raise a highly
16 material issue of interpretation not just of bankruptcy law,
17 which is for the Bankruptcy Court in the first instance, but of
18 nonbankruptcy law, securities law of SIPA, and indeed, there
19 are even intimations, though not raised by the movants, of
20 constitutional issues.
21       So I think that the Court, though finding this not
22 nearly as easy a situation as the previous ones I've had to
23 deal with involving the trustee, is obliged and mandated to
24 withdraw the reference, not forever, but to make a
25 determination of the threshold issues, and I include in that

171Wpic2

1  all three issues raised by the movants.  I have considered the
2  other objections to withdrawal raised by the trustee, such as
3  untimeliness and waiver and the like, and I find them, to be
4  frank, entirely without merit.  The difficult issue here was
5  the one that has been the source of this excellent argument
6  from all parties here this afternoon.  But in the end, I think
7  withdrawal is mandated.
8           So let me ask counsel for the movants when you can
9  submit your brief on the three issues that this Court will now
10 consider.
11          MS. WAGNER:  Your Honor, the briefing on the
12 underlying motion's all done already, so you have it all.  But
13 if you would like us to submit, you know, take out the parts of
14 it that --
15          THE COURT:  I think there has to be a formal motion
16 here of some sort.  This is, in effect, a motion to dismiss, is
17 it not?
18          MS. WAGNER:  I guess my conception of it, your Honor,
19 was that the motion that is already pending and briefed is now
20 before you.
21          THE COURT:  I'm happy to take it on those terms.
22          Let me ask counsel for the trustee and SIPA.  Do you
23 want to put in further responses, or do you want the Court to
24 decide this on the papers you've submitted?
25          MR. SHEEHAN:  I would like to do a further submission

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

171Wpic2
```
 1  based on your Honor's comments this afternoon.
 2              THE COURT:  Very good.  When would you like to do
 3  that?
 4              MR. SHEEHAN:  Two, three weeks, whatever.  I don't
 5  know.  Whatever your Honor thinks is appropriate.
 6              THE COURT:  That's fine.  I'm anxious to move these
 7  things along not only because there's the need to have
 8  threshold issues resolved promptly but also because if I
 9  resolve them negatively to the movants, I can't wait to send
10  the case back to Judge Lifland to get it off my calendar.
11  Three weeks would be fine.
12              MR. SHEEHAN:  I might have spoken too quickly, but
13  I'll try to work on it.  I was thinking here, reflecting on
14  what your Honor said about these issues being troubling to
15  Judges Friendly and Hand, whether three weeks will be enough
16  time.  But we'll work with three weeks.
17              THE COURT:  Okay.  That would be July 22.
18              Does that work for SIPA as well?
19              MR. LA ROSA:  It does, and we would reserve the right
20  to file something.  We may or may not.  But we would reserve
21  the opportunity.
22              THE COURT:  Very good.  How about a response from the
23  movants?
24              MS. WAGNER:  We would like to respond, your Honor.
25  It's sort of the in the middle of vacation period, but I don't
```

171Wpic2

 1    want to hold you up.
 2                THE COURT:  How many lawyers are there at Davis Polk?
 3                MS. WAGNER:  There are a lot.
 4                THE COURT:  I bet they're not all taking vacation.
 5                MS. WAGNER:  We wish we were.
 6                Your Honor, I would like three weeks.
 7                Your Honor, if I may.
 8                THE COURT:  Just let me get the schedule set.  So that
 9    would be August 12 and we will have oral argument on August 19
10    at 4 p.m.
11                MS. WAGNER:  Your Honor, that's what I was going to
12    ask you.  There is argument set on this motion in the
13    Bankruptcy Court.  So I'm assuming that is, you've got it now
14    before you.
15                THE COURT:  I'm staying everything --
16                MS. WAGNER:  Exactly.
17                THE COURT:  -- in the Bankruptcy Court.  When was the
18    argument set?
19                MS. WAGNER:  August 17.
20                THE COURT:  I can't guarantee this, of course, but my
21    tendency is to try to get quick decisions.  So it won't delay
22    things, and assuming I find in favor of your adversary, it
23    won't delay things very long in the Bankruptcy Court, in any
24    event.
25                MS. WAGNER:  It won't.

171Wpic2

1          THE COURT:  Anyway, yes, everything is stayed in the
2   Bankruptcy Court until I decide this motion.
3          MS. WAGNER:  Thank you, your Honor.
4          THE COURT:  All right.  Anything else we need to take
5   up?
6          MR. SHEEHAN:  No.  Thank you, Judge.
7          THE COURT:  Thanks so much.
8          (Proceedings adjourned)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25