**Baker & Hostetler LLP**
45 Rockefeller Plaza New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Marc D. Powers
Email: mpowers@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　　　Debtor. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　　　　　　v.<br><br>J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., GABRIEL CAPITAL CORPORATION,<br><br>　　　　　　　Defendants. | Adv. Pro. No. 09-1182 (BRL) |

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION**
**BY DEFENDANTS ARIEL FUND LTD. AND GABRIEL CAPITAL L.P.**
**TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT .............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 5

A.   The BLMIS Ponzi Scheme. ..................................................................................... 5

B.   The Defendants Ariel Fund and Gabriel Fund. ...................................................... 5

C.   Defendants Ariel Fund and Gabriel Fund Knew Or Should Have Known That
     BLMIS Was Not Legitimate. .................................................................................. 6

ARGUMENT .......................................................................................................................... 8

I.    THE TRUSTEE HAS SUFFICIENTLY PLED A CLAIM TO AVOID THE
      FRAUDULENT TRANSFERS RECEIVED BY ARIEL FUND AND GABRIEL
      FUND. ..................................................................................................................... 10

      A.   Ariel Fund And Gabriel Fund Are Liable For The Knowledge And
           Actions Of Merkin. ..................................................................................... 13

      B.   Defendant Funds Cannot Establish Merkin's "Good Faith" Because He
           Had Inquiry Notice And Failed To Diligently Pursue All Red Flags Until
           Those Concerns Were Reasonably Allayed. ............................................... 18

      C.   The Trustee Has Sufficiently Pled That Defendants Ariel Fund And
           Gabriel Fund Were On Inquiry Notice And Failed To Diligently
           Investigate. .................................................................................................. 19

II.   THE TRUSTEE HAS SUFFICIENTLY ALLEGED COUNT V OF THE
      COMPLAINT: NEW YORK LAW DOES NOT REQUIRE FRAUDULENT
      INTENT ON THE TRANSFEREE'S PART TO ALLEGE ACTUAL FRAUD ........... 25

III.  THE TRANSFERS TO DEFENDANT FUNDS WERE CONSTRUCTIVELY
      FRAUDULENT ...................................................................................................... 28

      A.   The Transfers Were Constructively Fraudulent Under § 548. ...................... 28

      B.   The Transfers Were Constructively Fraudulent Under State Law ................ 29

IV.   SECTION 546(E) DOES NOT PRECLUDE THE TRUSTEE FROM BRINGING
      CLAIMS TO AVOID FRAUDULENT TRANSFERS ............................................... 31

      A.   The Defendant Funds' Proposed Interpretation of Section 546(e) Must Be
           Rejected As Inconsistent with the Purposes of that Section and the
           Remedial Purposes of SIPA ........................................................................ 31

      B.   The Transfers Were Not Made in Connection with a "Securities Contract"
           as that Term Is Defined for Purposes of a SIPA Proceeding ...................... 36

**TABLE OF CONTENTS**
**(continued)**

Page

V.    THE TRUSTEE CAN AVOID THE TRANSFERS UNDER SECTION 548(A)(1)(A) AND NY DCL § 276 WITHOUT REGARD TO WHETHER THEY SATISFIED ANY OUTSTANDING OBLIGATION TO THE FUNDS, BECAUSE DEFENDANT FUNDS DID NOT TAKE IN GOOD FAITH AND DID NOT EXCHANGE VALUE IN GOOD FAITH. ...................................................... 38

VI.   THE TRUSTEE'S TURNOVER CLAIM IS PROPERLY PAIRED WITH HIS AVOIDANCE CLAIMS ............................................................................. 41

VII.  THE TRUSTEE HAS PROPERLY ALLEGED DISALLOWANCE OF DEFENDANTS' SIPA CLAIMS .................................................................. 44

CONCLUSION ........................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**

*Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F.Supp.2d 185 (S.D.N.Y. 2009) ........................................................................................ 9

*Alfa, S.A.B. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.)*, 2009 WL 5174119 (S.D.N.Y. 2009) ................................................. 33

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79 (S.D.N.Y. 2004) ....................................................................................... 37

*Andrew Velez Constr., Inc.v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Valez Constr., Inc.)*, 373 B.R. 262 (Bankr. S.D.N.Y. 2007) .............................. 26, 42

*Apollo Fuel Oil v. U.S.*, 195 F.3d 74 (2d Cir. 1999) ....................................... 14

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ....................................................... 9

*Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240 (2d Cir. 1987) ............. 12, 29

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.)*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000) ......................................................... 11, 29, 30

*Bankr. Servs. v. Ernst & Young (In re CBI Holding Co.)*, 529 F.3d 432 (2d Cir. 2008) ................................................................................................ 15, 17

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In Re Bayou Group, LLC)*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008) ................................... passim

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007) .......................................... 11, 40

*Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1 (S.D.N.Y. 2007) ........................................................... 12, 18, 26, 38

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................ 9, 31

*Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan*, 878 F. 2d 742 (3d Cir. 1989) ..................................................................................... 32

*Boykin v. KeyCorp.*, 521 F.3d 202 (2d Cir. 2008) .......................................... 9

*Cobalt Multifamily Investors I, LLC v. Shapiro*, 2009 WL 2058530 (S.D.N.Y. July 15, 2009) ....................................................................................... 15

*CompuDyne Corp. v. Shane*, 453 F.Supp. 2d 807 (S.D.N.Y. 2006) .................... 14

*Conley v. Gibson*, 355 U.S. 41 (1957) ......................................................... 31

*Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992 (S.D.N.Y. 1991) ............ 25

*Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480 (D. Conn. 2002) ......... 29

*Doyle v. Paolino (In re Energy Savings Center, Inc.)*, 61 B.R. 732 (E.D. Pa. 1986) ......... 42, 44

*Drenis v. Haligiannis*, 452 F. Supp. 2d 418 (S.D.N.Y. 2006) ........................... 30, 38

*Ede v. Ede*, 193 A.D.2d 940 (N.Y. Ct. App. 1993) ....................................... 40

*Enron Corp. v. JP Morgan Secs., Inc. (In re Enron Corp.)*, 2008 WL 281972 (S.D.N.Y. Jan. 25, 2008) ........................................................................ 34

*Erickson v. Pardus*, 551 U.S. 89 (2007) ...................................................... 31

*F.D.I.C. v. Daniel*, 158 F.R.D. 101 (E.D. Tex. 1994)................................................... 10

*FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125 (2d. Cir. 1992) ........................ 42, 43

*Fed. Sav. & Loan Ins. Corp. v. Musacchio*, 695 F. Supp. 1053 (N.D. Cal. 1988) ................... 11

*Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866 (Bankr. N.D. Ill. 2000)....................................................................................................... 28

*Gentry v. Kovler (In re Kovler)*, 249 B.R. 238 (Bankr. S.D.N.Y. 2000), 329 B.R. 17 (Bankr. S.D.N.Y. 2005) .................................................................... 25, 26

*Geron v. Schulman (In re Manschul Constr. Corp.)*, 2000 WL 1228866 (S.D.N.Y. Aug. 30, 2000) ...................................................................................... 25

*Gibbs & Sterrett Mfg. Co. v. Brucker*, 111 U.S. 597 (1884) ....................................... 29

*Gilbert v. Bagley*, 492 F. Supp. 714 (M.D.N.C. 1980)............................................... 11

*Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500 (Bankr. S.D.N.Y. 2002)............................................................... 32

*Gredd v. Bear, Sterns Sec. Corp. (In re Manhattan Inv. Fund, Ltd.)*, 359 B.R. 510 (Bankr. S.D.N.Y. 2007) ................................................................. 19

*Grubin v. Rattet (In re Food Management Group, LLC)*, 380 B.R. 677 (Bankr. S.D.N.Y. 2008) ............................................................................ 17

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ............................... 27, 28, 39

*HBE Leasing Corp. v. Frank*, 61 F.3d 1054 (2d Cir. 1995) ................................. 25, 30

*In re Agria Corp. Secs. Litig.*, 2009 WL 4276967 (S.D.N.Y. Nov. 30, 2009) ...................... 8, 9

*In re Luxottica Group S.P.A., Securities Litig.*, 293 F. Supp. 2d 224 (E.D.N.Y. 2003) .................................................................................................... 10

*In re Saba Enters., Inc.*, 2009 WL 3049651 (Bankr. S.D.N.Y. Sept. 18, 2009)............... 9, 26, 27

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66 (2d Cir. 1998) ................................................................................... 8

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406 (S.D.N.Y. 2001) .................................................................... 32, 33, 34, 35

*Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330 (10th Cir. 1996) ................... 19

*Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846 (10th Cir. 1990) .................... 31

*Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*, 321 B.R. 527 (B.A.P. 9th Cir. 2005).............................................................................. 34

*Le Café Crème, Ltd. v. Le Roux (In re Café Crème, Ltd.)*, 244 B.R. 221 (Bankr. S.D.N.Y. 2000) ............................................................................ 25

*Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822 (2d Cir. 1997) .......... 15, 16, 17

*Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646 (Bankr. E.D.N.Y. 2008)... 30, 31, 42, 44

*Merrill v. Abbott (In re Indep. Universal Clearing House Co.)*, 77 B.R. 843 (D. Utah 1987) ................................................................................... 29

*Mirror Group Newspapers, plc v. Maxwell Newspapers (In re Maxwell Newspapers, Inc.)*, 164 B.R. 858 (Bankr. S.D.N.Y. 1994)................................... 14

*N.F.L. Ins. Ltd. v. B & B Holdings, Inc.*, 874 F. Supp. 606 (S.D.N.Y. 1995) ..................... 10

- iv -

*New York University v. Ariel Fund Ltd., et al.*, Supreme Court, County of New York, Index No. 08603803/2008 .......................................................... 7, 23

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007) .......................................................................... 10, 26

*Official Comm. Of Unsecured Creditors of Grumman Olson Indus., Inc. v. McConnell (In re Grumman Olson Indus., Inc.)*, 329 B.R. 411 (Bankr. S.D.N.Y. 2005) .................................................................................................. 16

*People of the State of New York v. J. Ezra Merkin, et al.*, Supreme Court, County of New York, Index No. 450879/2009 .................................................... 6

*Picard v. Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505 (Bankr. S.D.N.Y. 2005) .................. 26

*Rahl v. Bande*, 328 B.R. 387 (S.D.N.Y. 2005) .............................................................. 10

*Resolution Trust Corp. v. Heiserman*, 839 F. Supp. 1457 (D. Colo. 1993) ................................ 11

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 20007) ............................................................. 23

*Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574 (2d Cir. 1983) ......................................... 27, 28

*Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134 (Bankr. S.D.N.Y. 2005) ................................................................................................ 43

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr. S.D.N.Y. 1999) ................................................................................................ 25, 30

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2d Cir. 2005) .................................................................................. passim

*Silverman v. Actrade Capital, Inc. (In Re Actrade Financial Technologies, Ltd.)*, 337 B.R. 791 (S.D.N.Y. 2005) .......................................................................... 39

*Smith v. Arthur Andersen L.L.P.*, 175 F. Supp. 2d 1180 (D. Ariz. 2001) ................................... 10

*Spanierman Gallery, PSP v. Love*, 320 F. Supp. 2d 108 (S.D.N.Y. 2004) .................................. 30

*Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) ................................. 23

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539 (Bankr. D.Del. 2005) .......................................................................................... 43

*Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 198 B.R. 352 (D. Colo. 1996) .......................................................................... 32

*Wider v. Wootton*, 907 F.2d 570 (5th Cir. 1990) ......................................................... 34

*Wieboldt Stores, Inc. v. Schottenstein*, 111 B.R. 162 (N.D. Ill. 1990) ................................... 11

*Woods & Erickson LLP. v. Leonard (In re Avi, Inc.)*, 389 B.R. 721 (B.A.P. 9th Cir. 2008) .................................................................................................. 43

## Other Authorities

5 *Collier's on Bankruptcy* ¶ 550.07 (2009) ................................................................ 43

6 *Collier's on Bankruptcy* ¶ 741.07 (2009) ................................................................ 34

H.R. Rep. No. 109-648, Pt. 1 (2006) .......................................................................... 33

H.R. Rep. No. 97-420, at 1 (1982) ............................................................................ 32

**Statutes and Rules**

11 U.S.C. § 541(a)(3)................................................................. 43

11 U.S.C. § 542................................................................. 42, 44

11 U.S.C. § 542(a)................................................................. 42

11 U.S.C. § 544................................................................. 35

11 U.S.C. § 546(e)................................................................. 35

11 U.S.C. § 547................................................................. 35

11 U.S.C. § 548(a)(1)(A)................................................................. 40

11 U.S.C. § 548(a)(1)(B)................................................................. 35

11 U.S.C. § 548(a)(1)(B)(i)................................................................. 30

11 U.S.C. § 548(c)................................................................. 10, 40

11 U.S.C. § 550................................................................. 41

11 U.S.C. § 741(7)(A)................................................................. 37

15 U.S.C. § 78aaa................................................................. 1

15 U.S.C. § 78fff(b)................................................................. 35, 36

15 U.S.C. § 78fff-2(c)(3)................................................................. 35, 41

F.R.C.P. 12(b)(6)................................................................. 9

N.Y. Debt. & Cred. Law § 272................................................................. passim

N.Y. Debt. & Cred. Law § 273................................................................. 29, 31, 38

N.Y. Debt. & Cred. Law § 274................................................................. 29, 31, 38

N.Y. Debt. & Cred. Law § 275................................................................. 29, 31, 38

N.Y. Debt. & Cred. Law § 276................................................................. 25, 26, 27, 28

<u>**PRELIMINARY STATEMENT**</u>

Defendants Ariel Fund Ltd. and Gabriel Capital, L.P. ("Ariel Fund" and "Gabriel Fund" or "Defendant Funds") have filed what they call a motion to dismiss, but which is in fact a thinly-disguised attempt to get summary judgment before any discovery takes place. Attached to their motion is a declaration, an affidavit from a purported expert witness, and a full four inch stack of material extraneous to the pleadings, including newspaper articles, pleadings from other lawsuits and the like. These materials are entitled to no consideration on a motion to dismiss, which tests only the adequacy of the pleadings. They should be ignored by this Court.

The Defendant Funds lead their Memorandum of Law in support of their Motion to Dismiss the Second Amended Complaint ("MTD") by arguing that they are being victimized twice by this lawsuit, and in essence deserve special treatment from the Trustee[1] and the Court. Not so. Almost everyone who invested through BLMIS has been victimized, and many have been victimized far more severely than the Defendant Funds. The law has established a mechanism designed fairly to allocate, to the extent possible, the injury that BLMIS's investors have suffered. The Trustee, in filing this lawsuit against Defendant Funds, is doing what he is authorized by law and compelled by his fiduciary duties to do.

If anything, Defendant Funds deserve less sympathy than many other victims of Bernard L. Madoff's ("Madoff") Ponzi scheme. Ariel Fund and Gabriel Fund were specifically designed for the "sophisticated" investor. No one was allowed to invest in either Fund who did not have a minimum of $1,000,000 available for investment. They were warned in big bold letters that each

---

[1] Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.* (the "Trustee").

Fund was a "HIGH RISK INVESTMENT."[2]  The Ariel Fund and Gabriel Fund investors were not ordinary people, like some of Madoff's victims, who were duped out of their retirement funds by tricks they never could have conceived.  Nor did the Ariel Fund and Gabriel Fund investors suffer the level of catastrophic loss that many other investors did.  Both Ariel Fund and Gabriel Fund were only approximately 25% invested through BLMIS,[3] while other feeder funds were 100% invested through BLMIS.  Each Fund had purported assets of over $1,300,000,000 before the collapse of BLMIS.  (MTD at 7).  Each remains a fund with substantial assets in other investments.

Defendant Funds' Memorandum tries to build an impenetrable wall between themselves and co-defendant J. Ezra Merkin ("Merkin"), the general partner and investment advisor for the Funds, the largest single investor in the Funds, and the sole decider of how Ariel Fund and Gabriel Fund dollars were invested.  (Am. Comp. ¶ 42).[4]  As set forth in Merkin's own marketing materials, Merkin as general partner of Gabriel Fund had "ultimate responsibility for the management, operations and investment decisions" of the Fund.  (Gabriel Confidential Offering Memorandum at i).  Gabriel Capital Corporation ("GCC") – a Merkin wholly-owned company – was the investment advisor for Ariel Fund, with "ultimate responsibility for the

---

[2] *E.g.*, Ariel Fund Confidential Offering Memorandum, March 2006, pages ii, 7, 31; Gabriel Fund Confidential Offering Memorandum, March 2006, pages ii, 5, 19, excerpts attached to Declaration of Marc Hirschfield ("Hirschfield Dec.") as Exhibits A and B.  Investors were also warned that they should not invest if they required liquidity in their investments, and that the Fund should not be their sole investment vehicle.

[3] Defendant Funds claim for the first time in their renewed Motion to Dismiss that the Trustee has "admitted" that investors did not know Madoff was involved with the funds' investments, citing ¶ 44(b) and (s) of the Second Amended Complaint.  (MTD at 2).  These allegations were also in the original Complaint, and do not say what Defendant Funds claim that they say.  ¶ 44(b) alleges that Madoff instructed Defendants not to inform investors he was their money manager; it does not allege Defendants complied with his request or that investors did not otherwise learn of Madoff's role.  ¶ 44(s) alleges that Defendants (including movants) misled investors and sought to conceal Madoff's role; it does not allege they were successful in doing so, or that investors did not learn of Madoff's role in other ways.

[4] For purposes of the Memorandum all references to the Amended Complaint and the paragraphs thereof are to the current version of the document, denominated the Second Amended Complaint.

management, operations and investment decisions made on behalf of the Fund." (Ariel Confidential Offering Memorandum at i, 3). All of the outstanding capital stock of GCC was owned or controlled by Merkin. *Id.* Every investor in his Funds had to consent to this total control by Merkin if he wanted to invest.

Nevertheless, Defendant Funds argue that, while Merkin as general partner and investment advisor may have had actual or constructive notice that BLMIS was not a legitimate operation, Ariel Fund and Gabriel Fund cannot be forced to shoulder any responsibility for that knowledge and their "good faith can be presumed as a matter of law." (MTD at 3). To the contrary, the law is clear that legal entities act through their agents; and the law provides that Merkin's knowledge as the general partner or investment advisor for Ariel Fund and Gabriel Fund is imputed to them, whatever Merkin's personal motivations may have been. Merkin was at all times the brain for each of the Defendant Funds. They had no other. What he knew, the Defendant Funds knew. The extensive, detailed factual allegations with respect to Merkin's notice of irregularities in the operations of BLMIS more than suffice to defeat Defendant Funds' Motion to Dismiss. (*See, e.g.,* Am. Comp. ¶¶ 32, 34, 44(a)-(t)).

Insofar as Defendant Funds' specific legal arguments, they are either ill-conceived or premature and fail:

First, Defendant Funds, seeking to purge themselves of Merkin's knowledge, argue that good faith on their part must be "presumed" in this case. There is no such presumption of good faith. Good faith is an affirmative defense to be pled and proved by the Defendant Funds. Moreover, the law is clear that as general partner or investment advisor and sole agent for Ariel Fund and Gabriel Fund, Merkin's knowledge and lack of good faith is fully imputed to them.

Second, because the Trustee has alleged that Defendant Funds had actual knowledge of the fraud, they have no restitution claim and therefore did not give reasonably equivalent value in exchange for the Transfers. Moreover, it is not enough under New York law to demonstrate that a transfer of principal took place to avoid fraudulent transfer liability. "Fair consideration" is the test, and it requires that the transferee act in good faith. The Trustee has adequately pled a lack of good faith by Defendant Funds in connection with the Transfers that the Trustee seeks to avoid. Furthermore, a "good faith" defense by the transferee is something to be demonstrated factually, not something to be resolved on a motion to dismiss.

Third, Section 546(e) of the Bankruptcy Code does not preclude the Trustee's claims. That section has no application in the context of a Ponzi scheme where no securities transactions took place and there are no settled securities transactions to unwind.

Fourth, it is appropriate to pair a turnover claim with a fraudulent transfer claim in the same action in the interests of judicial economy. Defendant Funds cite no case that has actually addressed this issue and held to the contrary.

Fifth, the Trustee's rejection of the Defendant Funds' SIPA claims is appropriate given the existence of fraudulent transfers, Defendant Funds' refusal to repay them, and the Trustee's right to avoid those transfers.[5]

---

[5] Count Two of the Amended Complaint, which asserts a claim for preferential transfers, is not directed against either Ariel Fund or Gabriel Fund, neither of which received a preferential transfer, and is directed only against co-defendant Ascot Partners, L.P. ("Ascot Partners") which did. *See* Am. Comp. Ex. B (listing dates of transfers). Count Ten of the Amended Complaint asserts a claim against co-defendants Merkin and GCC as subsequent transferees of fraudulent transfers, and not against Ariel Fund or Gabriel Fund. Count Eleven of the Amended Complaint asserts a claim against Defendant Merkin under general partnership law for the obligations of defendant Ascot Partners.

## STATEMENT OF FACTS

### A.    The BLMIS Ponzi Scheme.

The Court is well versed on the background facts to this case.  Madoff, through his company BLMIS, sold investors what he called a sophisticated "split strike conversion strategy" that would allow them to earn money on their investments in both good and bad times.  (Am. Comp. ¶¶ 18, 19).  Using his connections in the community, and those of his enablers, such as Merkin and his investment funds, Madoff perpetrated the largest Ponzi scheme in United States history.  His investment advisory business was virtually a complete fiction, and his scheme ultimately collapsed during the bear market in the autumn of 2008.  (Am. Comp. ¶¶ 20, 23).

### B.    The Defendants Ariel Fund and Gabriel Fund.

Defendants Ariel Fund and Gabriel Fund were among the many funds that invested through BLMIS.  (Am. Comp. ¶¶ 38, 40).  Merkin held himself out to potential investors as the portfolio manager of those Funds, which he claimed he personally managed, either directly or through his wholly-owned company GCC, and Merkin exercised total domination and control over the operations of the Funds.  (Am. Comp. ¶ 42).  Merkin was well situated to have discovered Madoff's fraud with even a modicum of curiosity and concern for his investors.  For more than a decade, Merkin had both a business and social relationship with Madoff.  Among other things, they sat together on the board of trustees of the Yeshiva University, one of the victims of the Ponzi scheme, which purportedly invested through BLMIS through Merkin.  (Am. Comp. ¶¶ 32, 44(t)).  If Merkin had a question for Madoff, he picked up the phone and called or visited Madoff in his offices.

Merkin was educated at Columbia University and Harvard Law School. He later worked at the New York law firm Milbank, Tweed, Hadley & McCloy, LLP.[6] He managed his hedge funds for about 20 years, and is intelligent, well educated, and has substantial investment management experience.

Merkin also profited handsomely from his management of Defendants Funds and his relationship with Madoff. (Am. Comp. ¶ 42). Merkin or his wholly owned company GCC earned a 1% fee on the (inflated) net asset value of Ariel and Gabriel at the end of each calendar year.[7] They also took an "incentive fee" of 20% of the increase, if any, in the net asset value of each Fund during the course of the year. The calculation of the increase in net asset value was not reduced by any prior year's investment losses. *Id.* Every year, Merkin and GCC took 20% out of the fictitious increases in the values of the Funds and put the money into Merkin's pocket, the total of all his fees swelling to hundreds of millions of dollars over the years.[8]

**C.    Defendants Ariel Fund and Gabriel Fund Knew Or Should Have Known That BLMIS Was Not Legitimate.**

The Trustee has made detailed allegations to support his claim that the Defendants knew or should have known that BLMIS was not legitimate. To summarize some of the key points in paragraph 44 of the Amended Complaint:

---

[6] Ariel Fund Confidential Offering Memorandum at 22; Hirschfield Dec., Ex. A. The various Offering Memoranda circulated by the Funds, while unnecessary to a consideration of Defendants' Motion, are admissions by the Ariel and Gabriel Funds and serve to offer additional detail to the allegations in the Amended Complaint.

[7] Ariel Fund Confidential Offering Memorandum at 28; Gabriel Fund Confidential Offering Memorandum at 18, Hirschfield Dec., Exs. A and B.

[8] While Defendants Ariel Fund and Gabriel Fund repeatedly cite to materials outside the pleadings, these materials extraneous to the pleadings are not appropriately considered on a motion to dismiss, *see* n.12 and 21, *infra.* That said, the Trustee's allegations in the Amended Complaint are often confirmed by outside sources. For example, according to the New York Attorney General, Merkin collected a hefty $470 million in fees from Ariel Fund, Gabriel Fund, and Ascot Partners, his third feeder fund. Am. Comp. ¶ 1, *People of the State of New York v. J. Ezra Merkin, et al*., Supreme Court, State of New York, County of New York, Index No. 450879/2009, excerpts at Hirschfield Dec., Ex. D.

1. Defendants had in their possession copies of two articles published in 2001 raising specific questions about the legitimacy of BLMIS (Am. Comp. ¶ 44(a));

2. Defendants were aware that BLMIS self-cleared its trades, and this self-clearing removed a typical and critical check and balance (Am. Comp. ¶ 44(d));[9]

3. Defendants were specifically warned that the returns from BLMIS were too consistent and too good to be true (Am. Comp. ¶ 44(e));[10]

4. Defendants received trade confirmations that were plainly fraudulent in that prices listed were outside the trading ranges for the stocks supposedly traded on the days in question (Am. Comp. ¶ 44(g));

5. Defendants knew that Madoff's "split strike conversion strategy" was impossible given the size of the options market (Am. Comp. ¶ 44(i));

6. Defendants' statements reflected a consistent ability by BLMIS to trade stocks near their monthly highs or lows, something no experienced investment professional could have reasonably believed could have been accomplished legitimately (Am. Comp. ¶ 44(k));

7. BLMIS purportedly ran the world's largest hedge fund, yet it was audited by a tiny accounting firm located in a strip mall (Am. Comp. ¶ 44(l)).

---

[9] These allegations are sufficient in and of themselves on this Motion to Dismiss. But these too are confirmed by the testimony of Victor Teicher, a confidant of Merkin and the man who managed Merkin's Ariel and Gabriel Funds until he was precluded from doing so in 1998 by virtue of a felony conviction and SEC Order, and who specifically warned Merkin that he was suspicious of the fact that BLMIS self-cleared trades. (Teicher Depo., February 9, 2009, at 44, *New York University v. Ariel Fund, Ltd., et al.*, Supreme Court, State of New York, County of New York, Index No. 08603803/2008, excerpts attached as Hirschfield Dec., Ex. G).

[10] *See also* Am. Comp. ¶ 43(r): "Victor Teicher . . . specifically warned Defendants that Madoff's purported results were impossible to achieve . . ." This allegation has also been confirmed in the Teicher Depo. at 41-44, Hirschfield Dec., Ex. G. Teicher first warned Merkin as early as 1992-93 that BLMIS's results were not plausible.

The foregoing allegations, together with the additional allegations contained in paragraph 44 of the Amended Complaint, adequately assert that Defendants Ariel Fund and Gabriel Fund knew or should have known that BLMIS was not a legitimate operation.[11]

## ARGUMENT

The Defendant Funds' Motion to Dismiss, supported by a declaration, an affidavit, 22 exhibits and numerous citations to materials outside of the pleadings, grossly distorts the function of a motion to dismiss. What the Defendant Funds are seeking is to have this Court weigh their one-sided version of the evidence against the allegations in the Second Amended Complaint and decide the merits in Defendant Funds' favor before discovery even begins. That is not the proper function of a motion to dismiss.

None of the extraneous materials cited by Defendants should be considered by the Court. On a motion to dismiss, the Court's consideration is limited to (1) the facts stated on the face of the complaint, (2) the documents attached to the complaint or incorporated by reference, and (3) matters of which the court may take judicial notice.[12] *In re Agria Corp. Secs. Litig.*, 2009 WL 4276967, at *6 (S.D.N.Y. Nov. 30, 2009). The Court's task in deciding a motion to dismiss is

---

[11] Defendants Ariel Fund and Gabriel Fund make the absurd argument (MTD at 6) that Elie Wiesel, Steven Spielberg, Larry King and others were duped by Madoff, and this proves Defendant Funds must have suspected nothing was wrong based on a new legal theory called "honesty by association." The fact that a Holocaust survivor, movie director and talk show host did not discover Madoff's scam says nothing about whether professional fund mangers, with literally billions of dollars of other people's money invested through Madoff, who had intimate knowledge of the industry, ready access to Madoff whenever they wanted it, and warnings about Madoff from other industry professionals, knew or should have known there was something amiss. In any event, to suggest that "honesty by association" is a basis for granting a motion to dismiss is silly.

[12] The Defendant Funds have requested the Court take judicial notice of statements contained in various news reports and pleadings describing the purported mechanisms by which Madoff maintained his Ponzi scheme, claiming that this excuses their failure to investigate Madoff's operations. Defendant Funds correctly cite the law as allowing the Court to take notice of the *existence* of the reports and pleadings, but repeatedly treat the allegations or statements contained in those reports as true for briefing purposes. The law, however, is crystal clear that a "court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 70 (2d Cir. 1998) (internal citations omitted).

"to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F.Supp.2d 185, 189 (S.D.N.Y. 2009) (internal citations omitted). The only issue on this motion to dismiss is whether the Trustee has adequately pled his claims. To do so, the Trustee is not required to plead detailed factual allegations, but rather "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has factual plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Naturally, this is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

Of course, in considering a motion to dismiss, all reasonable inferences must be drawn in favor of the plaintiff and against the movant. "In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint and draw all reasonable inferences in the plaintiff's favor." *In re Saba Enters., Inc.*, 2009 WL 3049651, at *4 (Bankr. S.D.N.Y. Sept. 18, 2009). *See also In re Agria*, 2009 WL 4276967, at *6; *Air Atlanta*, 637 F. Supp. 2d at 189. "Where there are well-pleaded factual allegations, a court should assume their veracity." *Iqbal*, 129 S.Ct. at 1950.

Thus, this Court is to assume that the facts alleged in the complaint are true, draw all reasonable inferences in favor of the Trustee, and simply determine whether the complaint states a claim for relief. *Iqbal* and *Twombly* do not require a heightened standard of fact pleading unless such additional facts are needed "to render the claim *plausible*." *Boykin v. KeyCorp.*, 521 F.3d 202, 213 (2d Cir. 2008) (emphasis in original). Notwithstanding Defendant Funds' repeated, conclusory assertions to the contrary, there is nothing inherently implausible about the

Trustee's allegations that the Defendant Funds (through their manager) knew or should have

known that something was amiss with the Madoff operation.

I.    **THE TRUSTEE HAS SUFFICIENTLY PLED A CLAIM TO AVOID THE FRAUDULENT TRANSFERS RECEIVED BY ARIEL FUND AND GABRIEL FUND**

Ariel Fund and Gabriel Fund's principal argument is that the Trustee's "actual fraud"

claims should be stricken because the Funds qualify *as a matter of law* for the good faith takings

defense of 11 U.S.C. § 548(c).  Defendant Funds' argument is faulty and unpersuasive –

particularly at the pleading stage of the case.  Whether Defendant Funds acted in good faith is an

issue of fact which should not be considered on a motion to dismiss where the plaintiff Trustee

has adequately alleged his claims.[13]  *Rahl v. Bande*, 328 B.R. 387, 418, n.14 (S.D.N.Y. 2005).

*See also*, *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 400

(Bankr. S.D.N.Y. 2007) (disputed facts precluded determination, on motion to dismiss, of issue

whether defendant acted in good faith in connection with claimed fraudulent transfers); *N.F.L.*

*Ins. Ltd. v. B & B Holdings, Inc.*, 874 F. Supp. 606, 615 (S.D.N.Y. 1995) (finding that issue

whether defendant acted in good faith is issue of fact, not even appropriate at summary judgment

stage); *Smith v. Arthur Andersen L.L.P.*, 175 F. Supp. 2d 1180, 1204 (D. Ariz.

2001) ("The essential determination of whether . . . Defendants acted in good faith is a question

of fact that cannot be decided in the context of a motion to dismiss."); *accord*, *In re Luxottica*

*Group S.p.A., Secs. Litig.*, 293 F. Supp. 2d 224, 238 (E.D.N.Y. 2003); *F.D.I.C. v. Daniel*, 158

F.R.D. 101, 103 (E.D. Tex. 1994); *Resolution Trust Corp. v. Heiserman*, 839 F. Supp. 1457,

---

[13] As elaborated in Section III, *infra*, Defendant Funds' arguments also fail the "taking for value" prong of the defense.  Because the Trustee has alleged that Defendant Funds had actual knowledge of the fraud, they have no restitution claim and therefore did not give reasonably equivalent value in exchange for the Transfers.  Furthermore, the NYDCL's definition of value – "fair consideration" – requires that the transferee exchange consideration for the transfer "*in good faith.*"   *N.Y. Debt. & Cred. Law* § 272 (McKinney 2009) (emphasis added).

1464 (D. Colo. 1993); *Wieboldt Stores, Inc. v. Schottenstein*, 111 B.R. 162, 174 (N.D. Ill. 1990); *Fed. Sav. & Loan Ins. Corp. v. Musacchio,* 695 F. Supp. 1053, 1064 (N.D. Cal. 1988); *Gilbert v. Bagley,* 492 F. Supp. 714, 738 (M.D.N.C. 1980).

Defendant Funds' argument regarding the issue of good faith relies mainly on *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In Re Bayou Group, LLC),* 396 B.R. 810 (Bankr. S.D.N.Y. 2008) ("*Bayou III*") (MTD at 14-17). But *Bayou III* was decided on a motion for summary judgment. The parties had had the benefit of full discovery, and the Court was not required to accept the plaintiff's allegations as true, as it must here. In fact, when the Bayou Group defendants originally sought dismissal of the claims against them by filing motions to dismiss, the Court easily rejected the notion that such a ruling would ever be appropriate:

> Little need be said of defendants' contentions that they received
> the redemption payments in good faith and without knowledge of
> any fraud, and that the amended complaints do not adequately
> plead want of good faith on their part. It is sufficient to point out
> that the defendants' good faith is an affirmative defense under
> Section 548(c) which must be pleaded in the first instance as a
> defense by the defendants. It is not incumbent on the plaintiffs to
> plead lack of good faith on the defendants' part because lack of
> good faith is not an element of plaintiff's claim under Section 548
> (a)(1). Moreover, the plaintiffs are entitled to conduct discovery
> on the issue of defendants' good faith and, if the plaintiffs discover
> evidence which they believe may be sufficient to rebut the defense
> under Section 548(c), the issue generally would entail disputed
> issues of fact requiring a trial.

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P.* (*In re Bayou Group, LLC*), 362 B.R. 624, 638-39 (Bankr. S.D.N.Y. 2007) ("*Bayou I*").

Defendant Funds also baldly misrepresent the holdings of the cases they cite to support their argument that courts "routinely" grant motions to dismiss fraudulent transfer claims "based on the defendant's good faith." (MTD at 17). In *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.)*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000), the complaint was

dismissed solely based on the value exchanged for the transfer – defendants' good faith was not

even an issue. Similarly, in *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 249 (2d

Cir. 1987), the complaint was dismissed based on the effect of the transfer, not based on

defendant's good faith. Finally, in *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re

Sharp Int'l Corp.)*, 403 F.3d 43, 55 (2d Cir. 2005), the transfers at issue were on account of a

loan that all parties agreed occurred prior to the commencement of the fraud. Indeed, this Court

has recognized that *In re Sharp* is "factually distinguishable from the typical transfers in a Ponzi

scheme case." *Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1,

11 (S.D.N.Y. 2007).

Defendant Funds' arguments on the issue of good faith are largely devoted to disputing

the Trustee's factual allegations, which underscores that these contested issues of fact involving

Defendant Funds' good faith, knowledge and intent cannot be decided at this stage. Defendant

Funds cite no authority which supports dismissing a complaint like the Trustee's, which is

replete with specific allegations that Defendant Funds did not act in good faith. These

allegations must be taken as true for purposes of Defendant Funds' Motion to Dismiss and

Defendant Funds' Motion, therefore, must be denied.

Furthermore, Ariel Fund and Gabriel Fund's good faith defense is based on the false

premise that the Defendant Funds and the Fund investors can divorce themselves from the

knowledge and actions of their general partner and investment advisor, Merkin. That is not the

case. The knowledge and intent of the Funds – not the knowledge of the Funds' various

investors – is the relevant inquiry with respect to the Trustee's claims against the Funds.

Merkin's knowledge and actions are imputed to Defendant Funds because Merkin was the sole

agent with investment discretion for the Defendant Funds.  The pleadings amply set out Merkin's lack of good faith.

A.  **Ariel Fund And Gabriel Fund Are Liable For The Knowledge And Actions Of Merkin.**

Merkin was the general partner, investment advisor, and agent for the Defendant Funds from the time of their inception until the arrest of Madoff, and even thereafter.  Indeed, Merkin – individually and through his wholly owned company GCC – was the *sole* agent with investment discretion for the Defendant Funds.  (Am. Comp. ¶¶ 34-37, 42-43).

Ariel Fund's most recent Offering Memorandum clearly states that its investment advisor is GCC, that GCC has sole investment discretion for Ariel Fund, and that Merkin owns or controls all stock in GCC.  (Hirschfield Dec., Ex. A at i, 3-4, 44-46).  The very first page of the document declares:

> J. Ezra Merkin owns and manages Gabriel Capital Corporation which serves as the Investment Advisor of the Fund (the "Investment Advisor").  The Investment Advisor has ultimate responsibility for the management, operations, and *investment decisions* on behalf of the Fund.

(*Id.,* at i) (emphasis supplied).  Similarly, Gabriel Fund's Offering Memorandum states:

> J. Ezra Merkin serves as the general partner of the Partnership (the "General Partner").  The General Partner has ultimate responsibility for the management, operations and *investment decisions* made on behalf of the Partnership.  Gabriel Capital Corporation, a Delaware corporation, (the "Management Company"), provides administrative and managerial services to the Partnership.  All of the outstanding capital stock of the Management Company is owned or controlled by J. Ezra Merkin.

(Hirschfield Dec., Ex. B at i) (emphasis supplied). These facts are clearly set forth in the Amended Complaint. (Am. Comp. ¶¶ 34-37, 42).[14]

The Amended Complaint further alleges that there was an array of "red flags" flying, but that Merkin averted his eyes. From BLMIS's self-custody of investors' assets, to its willingness to forgo the customary fee for providing investment services, to the general and specific warnings about BLMIS that Merkin received, neither Merkin nor the Defendant Funds have any ground on which to argue a lack of inquiry notice. (*See Id*. at ¶ 44).

Ariel Fund and Gabriel Fund are charged with this knowledge possessed by Merkin, their general partner and investment manager. "Under fundamental principles of New York agency law, the acts and knowledge of an agent acting within the scope of his agency are imputed to the agent's principal." *Mirror Group Newspapers, PLC v. Maxwell Newspapers, Inc.* (*In re Maxwell Newspapers, Inc.*), 164 B.R. 858, 866 (Bankr. S.D.N.Y. 1994) (citing New York State law); *see also, Apollo Fuel Oil v. U.S.*, 195 F.3d 74, 76 -77 (2d Cir. 1999) (labeling the principle "elementary"); *CompuDyne Corp. v. Shane*, 453 F.Supp. 2d 807, 824 (S.D.N.Y. 2006) (the principle applies even if the agent never communicated the information to the principal). "In the case of a corporation, which can act only through its agents, the rule is that the actions of corporate directors and officers are attributable to the corporate entity." *In re Maxwell*, 164 B.R. at 866 (citation omitted).

What Merkin knew, what he did, and his motivations are all factual issues that are inappropriate for resolution on a motion to dismiss. The Trustee has alleged that Defendants

---

[14] The Offering Memoranda contain additional language clarifying the complete dominance that Merkin exercised over the Defendant Funds. For instance, as the investment advisor, Merkin could place fund assets with third parties, but even then he continued to maintain "overall investment responsibility," including the duty to review those investments and the ability to withdraw from or add to the investments without notice to or the consent of the Defendant Funds' investors. (*See* Hirschfield Dec., Ex. A at 20, Ex. B at 14).

Ariel Fund and Gabriel Fund were investment funds created and controlled by Merkin; and that for roughly two decades they relied on Merkin – and Merkin alone – as their agent for investment decisions.[15]  As such, they are bound by what Merkin knew or should have known and by what he did or did not do.

        1.       The "Adverse Interest" Exception Is A Fact-Intensive Question That Cannot Be Considered At This Time.

Concerned that they are bound by Merkin's knowledge and actions (and lack of actions), Ariel Fund and Gabriel Fund seek shelter under the adverse interest exception.  Their attempt fails for numerous reasons.  First, the adverse interest exception is a highly fact intensive inquiry focusing on the *intent* of the agent.  It cannot serve as a basis for a motion to dismiss, particularly when discovery has not even begun.  *See In re Maxwell*, 164 B.R. at 866; *Bankr. Servs. v. Ernst & Young* (*In re CBI Holding Co.*), 529 F.3d 432, 449 (2d Cir. 2008); *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997); *Cobalt Multifamily Investors I, LLC v. Shapiro*, 2009 WL 2058530, at *6 (S.D.N.Y. July 15, 2009).  Each of the four cases cited by Defendant Funds was either a summary judgment or summary judgment appellate decision.  Defendant Funds evidently could not find a single decision in which a court granted a motion to

---

[15] The Offering Memoranda of Defendant Funds actually require the dissolution of the Funds in the event that Merkin's role as the investment advisor is altered – whether through Merkin's death or through the termination of the Investment Advisor agreement.  (*See* Hirschfield Dec., Ex. A at 14, Ex. B at 32-33).  The lone caveat, pertaining to Ariel Fund, is that a new Investment Advisor agreement may be signed provided that new advisor is "J. Ezra Merkin or an entity legally or beneficially owned as to 51% by J. Ezra Merkin or any family member of J. Ezra Merkin."  (Hirschfield Dec., Ex. A at 14).

dismiss a fraudulent transfer claim based on the adverse interest exception.[16]  On this basis alone, Defendant Funds' argument must fail.

Second, Defendant Funds' Motion is premised on the false argument that the Trustee must show that Merkin knew of Madoff's scheme.  (MTD at 20).  The Trustee does not need to show that Merkin had actual knowledge of Madoff's fraud in order to defeat Defendant Funds' good faith defense.  Rather, as explained below, Trustee need show only that Merkin was on inquiry notice and that he failed diligently to investigate.  Defendant Funds' argument that "[t]he Trustee cannot have it both ways" is therefore a straw man.  (*Id.* at 20).

Lastly, Defendant Funds' argument is irreconcilable with the fact that Merkin himself was the largest single shareholder in the Ariel and Gabriel Funds.  In order for the adverse interest exception to apply, Defendants will need to demonstrate that Merkin (as agent for the Funds) was acting adversely *to his own personal interests* (as an investor in the Funds).  Defendants plainly lack any basis for such mental gymnastics, particularly at this preliminary stage of the litigation.

2. The "Sole Actor" Exception Also Prevents Defendant Funds From Taking Shelter Under the "Adverse Interest" Exception.

Even if it were appropriate to consider the "adverse interest" exception at this stage, it would not apply here as a matter of law.  The Second Circuit recognizes an exception to the adverse-interest exception, namely, the "sole actor" exception.  "This rule imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should

---

[16] Defendants' cause is not aided by the string of cases they cite in footnote 14 of their Brief.  Contrary to Defendants' suggestion, none of these cases holds that a court may find that the adverse interest exception applies in a motion to dismiss.  Rather, two of the cases stand for the *precise opposite* – that the adverse interest exception does not apply in a motion to dismiss.  *See In re Mediators*, 105 F.3d 822; *Official Comm. Of Unsecured Creditors of Grumman Olson Indus., Inc. v. McConnell (In re Grumman Olson Indus., Inc.)*, 329 B.R. 411 (Bankr. S.D.N.Y. 2005).  The remaining decisions are completely silent as to the adverse interest exception.

have been informed was the agent itself albeit in its capacity as principal." *In re CBI Holding*, 529 F.3d at 453, n.9, citing *In re Mediators*, 105 F.3d at 827. "[T]he sole actor rule applies 'where the principal and agent are one and the same' or, in the corporate context, where 'the principal is a corporation and the agent is its sole shareholder.'" *Id.* The rule also applies to entities with multiple agents so long as there is not "at least one 'innocent' decision maker among management or the shareholders who could have stopped the fraud." *Grubin v. Rattet (In re Food Mgmt. Group, LLC)*, 380 B.R. 677, 697 (Bankr. S.D.N.Y. 2008).

Merkin was the sole actor for the Defendant Funds. He made all investment decisions, either directly or through his wholly-owned GCC. He decided where to put the Defendant Funds' money, and no dollar was invested without his approval. (Am. Comp. ¶¶ 42-43).[17] While Merkin at times delegated varying proportions of his investment authority to third parties – primarily BLMIS, Cerberus Capital, and Cohanzick – only Merkin possessed ultimate authority to act for the Defendant Funds.[18] Thus, even if Merkin had been acting to defraud the Defendant Funds, there was no one other than Merkin who had the ability to stop his purported fraud. Merkin's knowledge and actions are therefore imputed to the Defendant Funds regardless of whether he acted adversely to them.

---

[17] In addition to Merkin, GCC employed a small staff of accountants and other professionals to handle GCC's business affairs. Each of these employees operated under Merkin's direction. None of them possessed authority to direct the investments of the Defendant Funds, except as specifically delegated to them by Merkin. At all times Merkin alone possessed the ultimate investment making authority.

[18] Defendant Funds anticipate this argument and attempt to refute it by submitting an Affidavit of Laura Hatfield, a lawyer from the Cayman Islands who purports to opine on the law of the Cayman Islands. *See* MTD at 20-21 fn. 15. Her affidavit is inadmissible on a motion to dismiss and should be disregarded. Moreover, she purports to give an expert opinion when no expert report has been issued and expert discovery conducted. Third, she is incompetent to testify about the governing law here, which is New York and not Cayman Islands law. Fourth, the issue of whether Merkin was in fact sole actor for Ariel Fund, whether the board of the Ariel Fund had any investment authority or not and the like are issues to be decided on a full factual record. Thus, Hatfield's Affidavit is both irrelevant and incompetent. The fact Gabriel Fund had a lawyer and auditor, another argument raised by Defendant Funds, is of no consequence to any of these issues.

**B.** **Defendant Funds Cannot Establish Merkin's "Good Faith" Because He Had Inquiry Notice And Failed To Diligently Pursue All Red Flags Until Those Concerns Were Reasonably Allayed.**

For the reasons stated above, the issue of good faith is not appropriately decided on a motion to dismiss.  Furthermore, Defendant Funds' argument does not address the correct standard.  Ariel Fund and Gabriel Fund correctly state that, in questions of good faith, "courts look to what the transferee objectively 'knew or should have known." (MTD at 14, *citing Bayou III, 396 B.R. at 844*).  But Defendant Funds fail to grasp that this means the inquiry necessarily focuses on the knowledge of Merkin, the Defendant Funds' general partner and investment advisor.  In order to prove good faith, an investor [Merkin] who has "objective notice of some infirmity in the fund" must prove that he "conducted a diligent investigation which, judged under a "reasonable man" standard, allayed or set to rest the concerns aroused by the red flag . . . ." *Bayou III*, 396. B.R. at 851-52.

Elaborating on the notice or "red flags" prong, courts in this district have made clear that "a transferee may be on 'inquiry notice' without actual knowledge of a fraud or other circumstance. . . .  Rather, a transferee is on 'inquiry notice' if it knew or should have known of information placing it objectively '*on alert that there was a potential problem with the Fund*' such that the transferee 'should have attempted to learn more.'" *Id.* at 845, *citing In re Manhattan*, 397 B.R. at 23 (emphasis in original).  "The rule does not require that the 'red flag' be of such specificity as to put the recipient on 'inquiry notice' of the actual fraud, or embezzlement, or looting, or whatever ultimately proves to be the cause of loss." *Bayou III*, 396 B.R. at 848.

In order to satisfy the "diligent investigation" prong,  an investigation must continue until it "actually disclosed no reason to suspect financial embarrassment." *Jobin v. McKay (In re M &*

*L Bus. Mach. Co.)*, 84 F.3d 1330, 1335-36 (10th Cir. 1996) (internal citations omitted). This Court has specifically taught that a transferee is "required to do more than simply ask the wrongdoer if he was doing wrong." *Gredd v. Bear, Stearns Sec. Corp.* (*In re Manhattan Inv. Fund, Ltd.*), 359 B.R. 510, 526 (Bankr. S.D.N.Y. 2007) (J. Lifland), *aff'd in part & rev'd in part,* 397 B.R. at 25 (diligent investigation had to include something more than just speaking to hedge fund's principal, even where the principal's explanation of suspicious circumstances was "not only facially plausible, but also comforting.").

### C.    The Trustee Has Sufficiently Pled That Defendants Ariel Fund And Gabriel Fund Were On Inquiry Notice And Failed To Diligently Investigate.

The Amended Complaint includes an abundant list of "indicia of irregularity and fraud" which placed Defendant Funds on inquiry notice, and for which the Defendant Funds "failed to make sufficient inquiry." (*See* Am. Comp. ¶ 44). These include:

- Defendants were placed on notice of the underlying fraud occurring at BLMIS through press reports (¶ 44(a)), monthly account statements (¶ 44(g)-(h)), knowledge of third parties who refused to invest with BLMIS (¶ 44(p)), and warnings from a trusted former fund money manager (¶ 44(r));

- Defendants were placed on notice of highly unusual circumstances at BLMIS through knowledge of the firm's self-custodying of assets (¶ 44(d)), use of an auditor without the ability to conduct a competent review (¶ 44(l)), willingness to forgo money management fees for the purported services (¶ 44(m)), and purported placement of assets in cash prior to each quarterly report (¶ 44(q));

- Madoff avoided inquiries by Defendants into the practices of BLMIS, and when he did provide answers they were vague and non-responsive (¶ 44(b)).

In an effort to side-step these allegations, Defendant Funds mischaracterize the law and facts, attempt to divorce themselves from the actions of their investment advisor, and – under the banner of "equity" – request that the Court give them preferential treatment over all other BLMIS investors. None of these arguments can withstand scrutiny.

First, Ariel Fund and Gabriel Fund suggest the Trustee's position requires them to investigate all red flags "at peril of becoming an active participant in a fraudulent scheme." (MTD at 14). This is neither the law nor the Trustee's position. The Trustee need not show bad faith in order to defeat a defense of good faith. As the court in *Bayou III* made clear:

> Where the rule of law holds that an investor may not be able to establish his statutory good faith defense because he requested redemption of his investment after becoming aware of a "red flag" putting him on "inquiry notice" of possible infirmity in his investment, that does not necessarily entail a finding or carry an imputation that he was guilty of any sort of *mala fides* or otherwise deserving of opprobrium.

96 B.R. at 848. Indeed, the *Bayou III* court surmised that a "rational investor" may very well redeem without conducting an investigation, "[b]ut if he does so, the courts have held that he cannot invoke the good faith defense under Section 548(c)." *Id.*

Ariel Fund and Gabriel Fund next argue that they could not be expected to diligently investigate suspicious circumstances when other BLMIS investors did not. This is, of course, a fact issue appropriately dealt with on summary judgment or at trial, not something to be decided on a motion to dismiss. The pleadings allege that the Defendant Funds invested over $1 billion through BLMIS and that through their investment advisor they not only had access to Madoff, but "unusually intimate access." (Am. Comp. ¶¶ 40, 44(t)). Certain financial reporters, money managers and potential BLMIS investors who did not have Merkin's intimate access to Madoff were nonetheless able to investigate him well enough to issue warnings and avoid investing through BLMIS. With their access to Madoff and billions of dollars at stake, Defendant Funds had the ability and resources to do more than most others to examine his operations fully. It is disingenuous for Defendant Funds to claim they could not have performed an investigation. They simply chose not to.

The third argument advanced by Ariel Fund and Gabriel Fund is based on the statement by Judge Hardin that an investor should be able to meet its good faith burden by proving "by a preponderance of the credible *objective evidence* that his request for redemption was in fact the result of a good faith reason other than his knowledge of 'red flags'[.]" *Bayou III*, 396 B.R. at 849 (emphasis in original). But as elaborated in the Trustee's Opposition to the Merkin Defendants' Motion to Dismiss,[19] Judge Hardin's "supplemental" test is without precedential support, conflicts with the established objective good faith standard, is presently under appeal in the Southern District, and is a fact-intensive inquiry that cannot serve as the basis for granting a motion to dismiss.

Judge Hardin himself recognized that his supplemental test "may be thought to differ in some respects from the case law." *Id.* at 847. But even assuming the supplemental test were the law, it still would not justify granting the Merkin Defendants' Motion to Dismiss. *Bayou III* was a summary judgment decision. The defendant before that court was one whose motive for redemption was "perfectly evident" from the "undisputed facts" established through a thorough discovery process. *Id.* at 855. In other words, the issue was addressed on the facts, not on the pleadings. There has been no discovery in this case, and the facts pertinent to Defendants' Transfers are far from undisputed.[20]

Ariel Fund and Gabriel Fund assert as a fourth argument that their "good faith has to be presumed" because they left much more money with BLMIS than they withdrew. (MTD at 18).

---

[19] The Trustee's Opposition to the Merkin Defendants' Motion to Dismiss the Second Amended Complaint is being filed contemporaneously with this Opposition to the Ariel and Gabriel Funds' Motion to Dismiss the Second Amended Complaint.

[20] Defendants' reliance on the *Bayou III* treatment of defendant DB Structured Products Inc. ("DBSP") (MTD at 16) is misplaced. As Judge Hardin recognized, the plaintiff did not allege that DBSP was on notice of any "red flag"; therefore, the court's supplemental test had no possible application to that defendant. *See Bayou III*, 396 B.R. at 849, n9.

The law, however, provides no presumption of good faith, and Defendant Funds cite no authority to support this "presumption." Given the Trustee's showing that the Defendant Funds are on inquiry notice, it remains the Defendant Funds' burden to prove their "good faith" by a preponderance of the *evidence*. This case is only at the pleading stage of the case. That said, there are a myriad of reasons why Merkin may have chosen to leave the Defendant Funds' investments with BLMIS, despite the "red flags" that were flying, including a belief that Madoff would weather the financial storm in late 2008; huge profits from the BLMIS investments that were being derived by Merkin; or a belief that whatever chicanery Madoff was up to might get him in trouble, but would leave his investors unscathed.

Ariel Fund and Gabriel Fund further request the Court take judicial notice of news reports and pleadings describing the purported mechanisms by which Madoff maintained his Ponzi scheme, claiming that this excuses their failure to investigate Madoff's operations. Defendant Funds correctly cite the law as allowing the Court to take notice of the existence of the reports and pleadings, but *not* the truthfulness of the facts contained therein. Defendant Funds then go on to suggest that the Court do precisely what it may not – i.e., assume the truth of the facts

contained in those documents. The law is clear that the Court may not grant a motion to dismiss based on unsubstantiated and disputed facts lifted from third party reports and pleadings.[21]

Next, Ariel Fund and Gabriel Fund complain that avoiding the Transfers would be somehow inequitable. They claim that investors in the Funds are already victims of Madoff and should not be "punished" again. But contrary to Defendant Funds' portrayal, the Trustee's suit is not aimed at punishing anyone. Rather, it is an attempt equitably to distribute the assets of the estate in the manner contemplated by the applicable laws. Among the tools for doing so is the avoidance and recovery of preferential and fraudulent transfers. Speaking of these powers, the *Bayou III* court declared:

> [These] sections represent an equitable determination by Congress that under limited circumstances creditors must share equally in the insolvency, or in the case of Section 548, the fraud. Section 548 is not a punitive provision designed to punish the transferee, but is instead an equitable provision that places the transferee in the same position as other similarly situated creditors who did not receive fraudulent conveyances.

96 B.R. at 827.

---

[21] See, n.12, *supra*. The case Defendant Funds themselves cite, *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 424 (2d Cir. 2008) is equally clear in stating that while a court properly "took judicial notice of, *inter alia*, media reports, state court complaints, and regulatory filings . . . The court 'did not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters [had] been publicly asserted'" (internal citations omitted). *Accord*, *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 20007) (court may take judicial notice of public records to determine what statements they contain but "'not for the truth of the matters asserted'") (internal citations omitted). Defendant Funds' reliance on an allegation in the Complaint filed against Merkin by the New York Attorney General for their claim that investors with Merkin did not know their money was invested through Madoff is especially inappropriate. That mere allegation is disputed by Merkin in his motion to dismiss the Attorney General's lawsuit. *See* Memorandum of Law of Defendants J. Ezra Merkin and Gabriel Capital Corporation in support of their Motion to Dismiss Amended Complaint, *People of the State of New York v. J. Ezra Merkin, et al.*, Supreme Court, State of New York, County of New York, Index No. 450879/2009 at p. 2 ("Nor was it concealed that the highly liquid portion of the Gabriel and Ariel portfolios was invested with Madoff."). (Excerpts attached at Hirschfield Dec., Ex. E). *See also New York University v. Ariel Fund, Ltd.*, et al., Supreme Court, State of New York, County of New York, Index No. 086038031/2008, Deposition of J. Ezra Merkin, February 9, 2009, at 171, stating that there was no effort to conceal Mr. Madoff's role and that Merkin set up meetings between Madoff and investors in the Merkin funds who were interested in speaking with Madoff. (Excerpts attached as Hirschfield Dec., Ex. H).

Defendant Funds' hypothetical "Mrs. Jones," on whose behalf they make their plea, bears no resemblance to the Defendant Funds' real investors, who are sophisticated institutions and persons of great wealth. In fact, as described by Defendant Funds, "Mrs. Jones" would not qualify to invest in either Ariel Fund or Gabriel Fund. *See* discussion at p. 1, and n. 2, *supra.* Investors in Gabriel Fund also had to certify that: "The Interests are suitable investments only for sophisticated investors for whom an investment in the Partnership does not constitute a complete investment program and who fully understand, are willing to assume and who have the financial resources necessary to withstand . . . the potential loss of their entire investment in the Interests." (Gabriel Fund Confidential Offering Memorandum at 50, Hirschfield Dec., Ex. B). Plainly, then, any actual Gabriel Fund investor acknowledged up front that she could lose all of her money and still be financially secure, unlike Defendant Funds' hypothetical investor "Mrs. Jones."

Finally, Defendant Funds contend that their investors who did not ultimately obtain the fraudulent transfers should not suffer the avoidance and recovery of those transfers. This is a red herring, and not an issue for either the Trustee or this Court. The Trustee's claim is against the Defendant Funds that invested through BLMIS, not the sophisticated persons who invested in the Defendant Funds. Both Defendant Funds are now directed by a court-appointed Receiver who has broad authority to recover all property of the Defendant Funds, and to take such legal action as may be necessary to enforce the order appointing him, including asset turnover and avoidance of fraudulent transfers. *See,* Stipulation and Order Appointing Receiver, dated June 10, 2009, *People of New York v. J. Ezra Merkin*, Index No. 450879/2009, Supreme Court, State of New York, County of New York (J. Richard B. Lowe III), pp. 4, 15 (Hirschfield Dec., Ex. F). It is not the role of the Trustee to adjust relationships among the Defendant Funds' individual investors.

II.   **THE TRUSTEE HAS SUFFICIENTLY ALLEGED COUNT V OF THE COMPLAINT: NEW YORK LAW DOES NOT REQUIRE FRAUDULENT INTENT ON THE TRANSFEREE'S PART TO ALLEGE ACTUAL FRAUD**

Defendant Funds argue that Count V of the Amended Complaint should be dismissed because New York law requires fraudulent intent on the *transferee's* part to prove actual fraud. To the contrary, the plain language of Section 276 of the NYDCL establishes that the relevant intent is that of the *transferor*, not the transferee. *Bayou III*, 396 B.R. at 827, n.5 ("The statute itself makes this clear. Section 276 is concerned only with a 'conveyance made . . . with intent,' and only a transferor can be said to have 'made' a conveyance. There is no reference in this provision to the transferee or the transferee's intent."). Controlling authority confirms that the transferee's intent is irrelevant for purposes of Section 276 of the NYDCL. *In re Sharp,* 403 F.3d at 56; s*ee also, HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995) ("The 'good faith' in § 272 is the good faith of the transferee . . . By contrast, to prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor."). *Accord, Geron v. Schulman (In re Manschul Constr. Corp.)*, Nos. 96B44080(JHG), 96B44079(JHG), 97 CIV. 8851(JGK), 99 CIV. 2825(JGK), 2000 WL 1228866, at *46 (S.D.N.Y. Aug. 30, 2000) ("It is not necessary under DCL § 276 to show fraudulent intent on the part of the transferee.").[22] The Amended Complaint pleads Madoff's fraud in detail. (Am. Comp. ¶¶ 1, 8, 13, 18-29).

Defendant Funds' argument that a plaintiff must establish fraudulent intent on the transferee's part ultimately rests on a single case which since has been discredited, *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238 (Bankr. S.D.N.Y. 2000), *citations corrected*, 329 B.R. 17

---

[22]*See also Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 999 (S.D.N.Y. 1991) (under section 276 plaintiff need not prove transferee's intent); *Le Café Crème, Ltd. v. Le Roux (In re Café Crème, Ltd.*), 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (same); *Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 318 (Bankr. S.D.N.Y. 1999) (same).

(Bankr. S.D.N.Y. 2005).[23]  The Court re-opened the *In re Kovler* decision for the very purpose of correcting it, acknowledging that "the Court mistakenly misattributed a quote and misstated the propositions for which several cases stand . . . because these errors misstate and misquote decisions of other courts, they should be corrected." *In re Kovler*, 329 B.R. at 18.  *In re Kovler*, as corrected, no longer states that mutual fraudulent intent is required to recover an actual fraudulent transfer under Section 276.  The *In re Kovler* decision is most significant in that it *deletes* the sentence that read: "[m]utual fraudulent intention on the part of both parties to the transaction is required . . ." (*Id*. at 18), and clarifies that "actual intent to defraud is a prerequisite for an award of *attorneys' fees* under Section 276-a, and *that* intent must be mutual." *Id*. at 19 (emphasis added) (internal citations omitted).

Every case cited by Defendant Funds ultimately relies on the flawed, subsequently corrected statement in *In re Kovler*.[24]  Paring away Defendant Funds' flawed authority, controlling precedent unequivocally establishes that the Trustee has properly pled his claim under Section 276 of the NYDCL in Count V of the Amended Complaint, regardless of the transferee's intent.

The Defendant Funds' reliance on *In re Saba Enters., Inc.*, 2009 WL 3049651, and specifically footnote 14 of that opinion in support of their argument, is misplaced.  *In Re Saba Enters.* does no more than recognize the foregoing analysis of the case law, specifically that there are a number of cases (all of which derive from the original *In re Kovler* decision) that state

---

[23] Defendant Funds carefully avoided citing *In Re Kovler* in their first motion to dismiss, notwithstanding the fact it was the seminal case upon which all other cases that they cited was based.

[24] MTD at 22-24 (citing *In re Manhattan*, 310 B.R. 500; *Picard v. Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505 (Bankr. S.D.N.Y. 2005); *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262 (Bankr. S.D.N.Y. 2007)).  *In re Park South* merely cites to *In re Manhattan*, which makes no holding with respect to section 276 and cites *In re Kovler* for a statement, in dicta, regarding the transferee's intent. Similarly, *In re Andrew Valez* also made no holding with respect to section 276 and relied, in dicta, on *In re Park South* and *In re MarketXT Holdings*, 361 B.R. 369 (in turn relying solely on *In re Park South* and *In re Manhattan*).

transferee intent is a requirement of an actual fraud claim under Section 276. The very footnote cited by the Defendant Funds, however, specifically notes that the Second Circuit decisions of *In re Sharp* and *HBE Leasing* require only fraudulent intent on the part of the *transferor*. *Id.* In any event, *In re Saba Enters.* specifically states that the Court "does not need to decide" whether transferee intent must be alleged, since the Trustee is permitted to rely on "relevant circumstantial evidence in the form of the 'badges of fraud' discussed below, to establish intent for both the Code and the state law claims." *Id.*

Assuming, *arguendo*, that Section 276 of the NYDCL requires the Trustee to plead actual fraudulent intent on the part of the transferee, the allegations in the Amended Complaint are more than sufficient to satisfy the "badges of fraud" test mentioned in *In Re Saba Enters*. Presumably, the pleading requirements would be analogous to those applicable to pleading "badges of fraud" to show transferor intent. *See, e.g., In re Sharp*, 403 F.3d at 56.[25] In any event, actual fraudulent intent "may be inferred from the circumstances surrounding the transaction, including the relationship among the parties" and the "unusualness of the transaction." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995).

A close relationship between the parties to the transfer is among the indicia of fraud. *In re Sharp*, 403 F.3d at 56; *HBE Leasing*, 48 F.3d at 639; *In re Kaiser*, 722 F.2d at 1582-83. The Trustee alleges that the Defendant Funds' manager Merkin was a close business and social associate of Madoff and that the two worked together in various capacities (Am. Comp. ¶¶ 2, 32, 44(t)). Another badge of fraud is the questionable nature of the transaction including whether it was in the usual course of business, and the secrecy surrounding the transaction. *In re Sharp*,

---

[25] Several of the traditional badges of fraud do not precisely correlate to the conduct of a transferee because, again, the badges are aimed at showing *transferor's* fraudulent intent. *See, e.g.,* the nonexclusive list of "badges" set forth in *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d. Cir. 1983).

403 F.3d at 56; *HBE Leasing*, 48 F.3d at 639; *In re Kaiser*, 722 F.2d at 1582. The Trustee specifically alleges Defendants Funds' sophistication as investment funds, the secrecy of the Ponzi scheme, its deviation from traditionally accepted means of doing business in the investment advisory arena, and various, publicly available indicia and private warnings to Defendant Funds that BLMIS was a fraud, reported trades that could not conceivably have taken place, and paid out returns far too consistent for any experienced investment advisor to believe they were real. (Am. Comp. ¶¶ 2, 3, 20-22, 44(a)-(t)). The Trustee has exceeded what is required by adequately alleging the transferee's fraudulent intent under NYDCL Section 276. Thus, even if the Defendant Funds had not relied on flawed, outdated authority, Count V of the Amended Complaint would survive the Motion to Dismiss.

## III. THE TRANSFERS TO DEFENDANT FUNDS WERE CONSTRUCTIVELY FRAUDULENT

### A. The Transfers Were Constructively Fraudulent Under § 548.

Defendant Funds argue that the Trustee's constructive fraudulent transfer claims fail due to the "universally-accepted rule" that investors give reasonably equivalent value in exchange for distributions from an entity engaged in a Ponzi scheme to the extent of their principal investments. (MTD at 25). As Defendant Funds acknowledge, however, this "rule" rests on the premise of a defendant's right to restitution, where the transfer to such defendants satisfies an antecedent debt (i.e., the defendant's restitution claim), and the debtor receives value in exchange for the transfers. (MTD at 26).

Defendant Funds, however, are *not* entitled to restitution due to their culpable conduct, thus the Transfers to Defendant Funds did *not* satisfy any antecedent "debt," and the Debtor did *not* receive value in exchange for those Transfers. *See, e.g., Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) ("an investor having actual

knowledge of the underlying fraud may not have a claim for restitution, and will not be deemed to have given reasonably equivalent value in exchange for payments from a Ponzi scheme"). In other words, the rule that may apply universally to "innocent" investors should not apply equally to investors like Defendant Funds, who participated in and perpetuated the fraud. The cases cited by Defendant Funds do not suggest otherwise.[26]

Defendant Funds must at least make a prima facie showing of *entitlement* to restitution before they can assert that the satisfaction of such claim constitutes value. *Id.* at 880. Defendant Funds do not even set forth the elements of a state law fraudulent inducement claim, and certainly do not make a prima facie showing that they have such a claim and that they are entitled to claims for restitution against BLMIS. In any event, these issues are not appropriate for a motion to dismiss, where the Trustee's allegations, which must be taken as true, include allegations that Defendant Funds knew or should have known about the fraud and helped to perpetuate the fraud.

### B.     The Transfers Were Constructively Fraudulent Under State Law.

The Trustee's state law constructive fraudulent transfer claims under the DCL also survive dismissal. Under New York law, the Trustee may avoid transfers made without "fair consideration."  N.Y. Debt. & Cred. Law §§ 272-275; *Atlanta Shipping*, 818 F.2d at 248 ("An essential element of a claim pursuant to DCL §§ 273, 273-a, 274, 275 is lack of fair consideration.").  "Fair consideration" is defined by statute as requiring that the transferee

---

[26] For example, in *Merrill v. Abbott (In re Indep. Universal Clearing House Co.)*, 77 B.R. 843, 857 (D. Utah 1987), the court noted "'the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction'" (quoting *Gibbs & Sterrett Mfg. Co. v. Brucker*, 111 U.S. 597, 601 (1884)); *see also, Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 489 (D. Conn. 2002) (noting the "universally accepted fundamental commercial principal that, when you loan an entity money for a period of time *in good faith*, you have given value…") (emphasis added) (internal citations omitted); *In re Churchill Mortgage*, 256 B.R. at 673-74 (specifically noting that there were no allegations that the defendants had knowledge of the Ponzi scheme or that their activities were unlawful or wrongful in any respect).

exchanged consideration for the transfer "*in good faith.*"  N.Y. Debt. & Cred. Law § 272

(McKinney 2009) (emphasis added).  *See also, In re Sharp*, 403 F.3d at 54 (fair consideration

requires that the exchange not only be for equivalent value, but also that [it] be made in good

faith) (internal citations omitted); *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 662

(Bankr. E.D.N.Y. 2008).

The Trustee has adequately alleged Defendant Funds' lack of good faith.  (E.g., Am.

Comp. ¶¶ 3, 44(a)-(t), 81, 85, 90, 95, 101).  Defendant Funds, therefore, cannot defeat the

Trustee's state law constructive fraudulent transfer claims by treating them as falling within the

interpretation of "reasonably equivalent value" under 11 U.S.C. § 548(a)(1)(B)(i).  Defendant

Funds attempt this sleight of hand by stating, in a footnote, that "the NYDCL parallels Section

548," thus, courts interpret the two statutes "similarly."  (MTD at 25 n.17 (citing *In re Churchill

Mortgage*, 256 B.R. 664)).[27]  Defendant Funds fail to reconcile – or even acknowledge –  the

NYDCL's additional requirement of good faith, even though it is an express element of the

statutory definition.

"'Good faith' in a constructive fraudulent conveyance claim 'is the good faith of the

transferee.'"  *In re Sharp*, 403 F.3d at 54, n.4 (quoting *HBE Leasing*, 61 F.3d at 1059, n.5).

Moreover, when a complaint alleges constructive fraud, the heightened requirements of Federal

Rule of Civil Procedure 9(b) do not apply.  *See, e.g., Drenis v. Haligiannis*, 452 F. Supp. 2d 418,

428-29 (S.D.N.Y. 2006); *Spanierman Gallery, PSP v. Love*, 320 F. Supp. 2d 108, 113 (S.D.N.Y.

2004); *Stratton Oakmont*, 234 B.R. at 319.  The plaintiff need not provide specific facts to

---

[27] In contrast to the claims against the Defendant Funds herein, good faith was "assumed" in *In re Churchill Mortgage*, because there were no allegations in *In re Churchill Mortgage* that the defendants had knowledge of the Ponzi scheme or that their activities were unlawful or wrongful in any respect.  *Id.* at 673-74.  Thus, the Court in *In re Churchill Mortgage* noted the "parallel" between section 548 and the DCL solely in the context of the *value* of the consideration exchanged for the transfer.

support its allegations, *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007); rather, the plaintiff need only "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

The Trustee has alleged that Defendant Funds did not give fair consideration for the Transfers they received because Defendant Funds failed to act in good faith. *See In re Jacobs*, 394 B.R. at 662. As discussed above, the Amended Complaint details numerous facts demonstrating that Defendant Funds knew or should have known that they were participating in a fraudulent enterprise, an enterprise that Madoff has admitted was a Ponzi scheme. By alleging that Defendant Funds did not give consideration in good faith, the Trustee has adequately pled a lack of fair consideration under NYDCL §§ 272-275. Accordingly, Defendant Funds' Motion to Dismiss Counts IV, VI, VII and VIII of the Amended Complaint should be denied.

## IV. SECTION 546(E) DOES NOT PRECLUDE THE TRUSTEE FROM BRINGING CLAIMS TO AVOID FRAUDULENT TRANSFERS

### A. The Defendant Funds' Proposed Interpretation of Section 546(e) Must Be Rejected As Inconsistent with the Purposes of that Section and the Remedial Purposes of SIPA.

The underlying rationale of section 546(e) makes clear that it has no application in a Ponzi scheme. The "safe harbor" provided by the provision is an exception to the public policy underlying the avoidance provisions of the Bankruptcy Code, which are intended to prevent a debtor from diminishing funds that are generally available for distribution to creditors. *See Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 849 (10th Cir. 1990). That limitation becomes apparent when section 546(e) is considered in context.

As the cases make clear, a court must "look to the provisions of the whole law, and to its object and policy," and not just its literal language to determine whether section 546(e) applies to a transaction. *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan*, 878 F. 2d

742, 750 (3d Cir. 1989) (internal citations omitted); *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 478-479 (S.D.N.Y. 2001). The rationale for the section 546(e) "safe harbor" is to maintain stability in the securities market. Specifically, the legislative intent of that section was "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy involving those industries." H.R. Rep. No. 97-420, at 1 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 583; *Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 513 (Bankr. S.D.N.Y. 2002); *Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 198 B.R. 352, 356 (D. Colo. 1996). Thus, the goal of section 546(e) is to preserve the stability of settled transactions to the extent they are not fraudulent. *In re Adler, Coleman*, 263 B.R. at 477. If legitimate settled transactions could be reversed, it would undermine confidence in the system of guarantees and could lead to the "ripple effect" of bankruptcy filings by other participants in the chain of guarantees. *Id.*

None of these concerns are implicated in this case. Avoidance of the Transfers from BLMIS to or for the benefit of the Defendant Funds would have absolutely no impact on the commodities and securities market because no securities were purchased by BLMIS on behalf of the Defendant Funds. (*See* Am. Comp. ¶ 20). There are simply no settled transactions to disturb. There will be no "displacement" in the markets, nor will there be an undermining of guarantees that could lead to a "ripple effect" of bankruptcy filings by other participants in the market. In fact, the application of section 546(e) to protect the withdrawals made by the Defendant Funds would have the absurd effect of sanctioning phantom trades at fabricated prices which would undermine instead of strengthen the financial markets. Accordingly, there is no legitimate rationale for allowing the Defendant Funds to circumvent and undermine one of the

core foundations of the Bankruptcy Code and SIPA – that is, the equitable distribution of assets of all similarly-situated creditors.

The Southern District of New York has recently identified the factors relevant to a consideration of whether section 546(e) applies. These factors include:

(1)     the transactions have long settled by means of actual transfers of consideration, so that subsequent reversal of the trade may result in disruption of the securities industry, creating a potential chain reaction that could threaten collapse of the affected market;

(2)     consideration was paid out in exchange for the securities or property interest as part of the settlement of the transaction;

(3)     the transfer of cash or securities effected contemplates consummation of a securities transaction;

(4)     the transfers were made to financial intermediaries involved in the national clearance and settlement system; and

(5)     the transaction implicated participants in the system of intermediaries and guarantees which characterize the clearing and settlement process of public markets and therefore would create the potential for adverse impacts on the functioning of the securities market if any of those guarantees in the chain where invoked.

*Alfa, S.A.B. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.)*, 2009 WL 5174119, at *16 (S.D.N.Y. 2009) (*citing In re Adler, Coleman*, 263 B.R. at 479-80).[28]

---

[28] The court in *In re Enron Creditors Recovery* was concerned with determining whether certain transfers could be considered "settlement payments" for purposed of section 546(e). In the instant case, the Defendant Funds argue that the transfers they received were in connection with a "securities contract." The "securities contract" clause is a relatively recent addition to section 546(e), and there are few cases construing the clause. (The Financial Netting Improvements Act of 2006 amended section 546(e) by, *inter alia*, inserting "or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7) . . . ." Pub. L. No. 109-390, 120 Stat. 2692 (2006)). However, the legislative history of this clause does not indicate any intention to alter the underlying purpose of section 546(e). *See* H.R. Rep. No. 109-648, Pt. 1 (2006).

An examination of these factors makes clear that section 546(e) does not apply in this case. The transfers for which the Defendant Funds seek safe harbor protection are withdrawals of funds from customer accounts. Customer withdrawals are not the type of transactions intended to fall within the ambit of the section. The section was intended to enable brokers to protect themselves in the event of the insolvency of one of their customers or a financial counterparty. *See, e.g.* 6 *Collier's on Bankruptcy* ¶ 741.07 (15th rev. ed. 2009); *In Re Grafton*, 321 B.R. at 539. Further, as discussed above, no securities were actually purchased, so there can be no concern with a "ripple effect" impacting on financial markets. Finally, not only are the kinds of market participants and transactions at which section 546(e) is directed not present here, but there was also no consideration paid for the fake securities trades.

This case shares relevant similarities with *In re Adler, Coleman*, a case in which a trustee appointed pursuant to SIPA was able to avoid constructively fraudulent transfers to creditors, notwithstanding section 546(e). The trustee sought to avoid certain stock trades made by an introducing broker dealer in the weeks preceding the commencement of a SIPA liquidation that had been made in an attempt to gain a larger recovery from SIPC for certain preferred customers. The district court, after noting that it was appropriate to consider the policy and overall scheme

---

Therefore, prior case law examining the purpose of section 546(e) remains instructive in interpreting the "securities contract" language. For example, in determining whether a particular transaction should be considered a "settlement payment," courts have focused consistently on the fact that section 546(e) was designed to protect public markets. *In re Adler, Coleman,* 263 B.R. at 478-80; *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.*), 321 B.R. 527, 539 (B.A.P. 9th Cir. 2005). In that context, "[t]he few decisions that involve outright illegality or transparent manipulation reject [section] 546(e) protection." *In re Grafton*, 321 B.R. at 539; *Wider v. Wootton*, 907 F.2d 570, 572-73 (5th Cir. 1990); *In re Adler, Coleman*, 263 B.R. at 478-80; *see also Enron Corp. v. JP Morgan Secs., Inc.* (*In re Enron Corp.*), Nos. M-47 (GBD), 01-6034 (AJG), Adv. Nos. 03-92677(AJG), 03-92682(AJG), 2008 WL 281972, at *5 (S.D.N.Y. Jan. 25, 2008) ("Where transactions are not merely unorthodox, but rather are fundamentally tainted by misconduct or impropriety," safe harbor protection is contrary to the objectives of section 546(e) and undermines the spirit of the Bankruptcy Code "by allowing a few individuals to reap the preferential benefit of the transfers, thereby diminishing the available assets for equitable distribution."). In *Wider*, the court considered an earlier version of the provision at issue in the context of a Ponzi scheme. The court held that to allow the transfers in question to have the protection of the section "would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims." 907 F.2d at 573 (internal citations omitted).

underlying the Bankruptcy Code and SIPA, held that section 546(e) could not insulate the transfers and stated:

> Protecting the claims of a few customers at the expense of the many other creditors under the circumstances surrounding this case would not inspire stability and confidence in the capital markets. [Rather, i]t would give a blessing to an introducing broker's massive, integrated scheme specifically intended to defraud its clearing house and SIPC and to benefit selected customers.

*In re Adler, Coleman*, 263 B.R. at 482-83.

The same conclusion is warranted here to avoid preferring one investor over others, an outcome which would run afoul of the equitable principles underlying SIPA. Permitting the Defendant Funds to wedge themselves into the protection afforded by the "safe harbor" would allow them to benefit unfairly from Madoff's Ponzi scheme. The unfairness of such a windfall would be particularly manifest here because allowing the Defendant Funds to keep the millions of dollars that they received during the avoidance period would significantly diminish the assets available to the Trustee for equitable distribution to *all* customers of BLMIS who were harmed by the fraud. Such a result would be in direct conflict with the principles underlying SIPA.

Furthermore, applying section 546(e) in the manner urged by the Defendant Funds is not consistent with Congressional intent and would, in fact, lead to an absurd result. Were the safe harbor interpreted to apply in this case, the loophole created would eliminate the majority of the avoidance powers granted to the Trustee under SIPA and negate the remedial purpose of SIPA's (and as incorporated by SIPA the Bankruptcy Code's) provisions for avoiding preferential and constructively fraudulent transfers. *See* 15 U.S.C. §§ 78fff(b), 78fff-2(c)(3); 11 U.S.C. §§ 544, 546(e), 547, 548(a)(1)(B). This would mean that in all cases other than actual fraud, no transfers of customer property could be recovered for equitable distribution, and SIPA's remedial purpose would be thwarted. In this case, for example, the Trustee would be prevented from recovering

*any* preference, constructively fraudulent transfer or state law fraudulent transfer.[29]  Such a severe limitation of the Trustee's avoidance powers is a perverse result that Congress cannot have intended.

In any event, assuming *arguendo* that the Defendant Funds' proposed interpretation of section 546(e) is correct, then that section would be inconsistent with SIPA and inapplicable here.  *See* 15 U.S.C. § 78fff(b).  SIPA incorporates by reference provisions of the Bankruptcy Code, but only to the extent that those provisions are consistent with SIPA.  *Id.*  The corollary to this provision is that inconsistent provisions of the Bankruptcy Code are not incorporated by SIPA and do not apply.  Consequently, even were the Defendant Funds' argument correct, it would render section 546(e) inconsistent with SIPA, and the "safe harbor" provision still would be inapplicable in this case.

**B.      The Transfers Were Not Made in Connection with a "Securities Contract" as that Term Is Defined for Purposes of a SIPA Proceeding**

The Defendant Funds assert that the avoidable Transfers they received from BLMIS fall into the "safe harbor" provided by section 546(e) of the Bankruptcy Code because the Transfers were made "in connection with a securities contract."  (MTD at 28).  But the only documents that the Defendant Funds claim constitute "securities contracts" are a Customer Agreement, a Trading Authorization and an Option Agreement (collectively the "Agreements").  *Id*. at 28.  First of all, these documents are not part of the pleadings nor were they incorporated into the

---

[29] This case also involves section 548(a)(1)(A) – actual fraud – which is not one of the sections listed in the "notwithstanding" clause of section 546(e).

pleadings.  The documents and Defendant Funds' arguments based on them should therefore be disregarded.[30]

Furthermore, even if the Court were to consider these Agreements, they do not meet the definition of "securities contract" referenced in section 546(e).  A "securities contract" for purposes of section 546(e) is defined in section 741(7) of the Bankruptcy Code.  11 U.S.C. § 741(7)(A).  Section 741(7) states that a "securities contract" is "a contract for the purchase, sale or loan of a security" – in other words, a specific agreement to buy, sell or loan a particular security.  While the Defendant Funds may have given Madoff the authority to purchase and sell securities and options on their behalf, much like a power of attorney, no such trades occurred.  If Madoff actually sold or purchased a security, that sale or purchase agreement would have a buyer, a seller, a price, a quantity and a specification of what security was being sold.  The Agreements at issue here are mere trading authorizations, and do not reflect actual securities transactions.  Moreover, the transactions in question – the Transfers received from BLMIS – were proceeds of a Ponzi scheme, not proceeds from the sale of securities.  As such, the Transfers were not "in connection with a securities contract" and therefore are outside of the protection of the "safe harbor," and are avoidable and recoverable by the Trustee.

---

[30] At a minimum, this is a factual issue inappropriate for a motion to dismiss.  *See Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 107 (S.D.N.Y. 2004) (denying motion to dismiss because factual issues existed regarding whether transfers at issue would result in the disruption of the securities market, or whether the transactions implicated participants in the system of intermediaries and guarantees such that there was the potential for an adverse impact on the functioning of the market if any of the guarantees in the chain were invoked).

**V. THE TRUSTEE CAN AVOID THE TRANSFERS UNDER SECTION 548(A)(1)(A) AND NY DCL § 276 WITHOUT REGARD TO WHETHER THEY SATISFIED ANY OUTSTANDING OBLIGATION TO THE FUNDS, BECAUSE DEFENDANT FUNDS DID NOT TAKE IN GOOD FAITH AND DID NOT EXCHANGE VALUE IN GOOD FAITH.**

Defendant Funds either misunderstand or deliberately misstate the Second Circuit's analysis in *In re Sharp*, 403 F.3d 43.[31] *In re Sharp* simply does not apply to this case. The Second Circuit dismissed the actual fraudulent transfer claims in *In re Sharp* solely because the debtor did not plead actual intent to hinder, delay and defraud creditors with respect to the transfer it sought to avoid. *Id.* at 56. Rather, the fraud alleged in *In re Sharp* related to a separate transaction with third parties, rather than the alleged fraudulent transfer to the defendant. *Id.* Here, in a Ponzi scheme case, actual intent to defraud is presumed as a matter of law. *See, e.g.*, *In re Manhattan*, 397 B.R. at 8; *Drenis*, 452 F. Supp. 2d at 429. Madoff has publicly admitted that his entire enterprise was a fraud, and the Amended Complaint amply alleges facts establishing that Defendant Funds did not take in good faith, but rather with actual or constructive knowledge that they were participating in a fraudulent scheme, for the purpose of benefitting from that fraud.

*In re Sharp* also does not apply to the constructive fraudulent transfer claims in this case. The Second Circuit ruled in *In re* Sharp that the defendant-transferree's good faith in giving consideration is the critical issue under NYDCL §§ 272-275. *In re Sharp* involved an "innocent" lender, "State Street," which made a bona fide loan to the debtor in good faith before the debtor even started the alleged fraud. Thus, the loan constituted "fair consideration" within the meaning

---

[31] Defendant Funds' confusion, whether or not deliberate, is apparent from the fact that they misrepresent statements that the Second Circuit made in its analysis of the *constructive* fraudulent transfer claims asserted in *In re Sharp* as supporting the Court's holding with respect to the *actual* fraudulent transfer claims. *See* MTD at 30 (erroneously citing the analysis of constructive fraudulent transfers in *In Re Sharp*, 403 F.3d at 54-55 as supporting the holding regarding actual fraudulent transfer claims set forth in *In Re Sharp*, 403 F.3d at 56).

of DCL § 272. *Id*. at 55. In *In re Sharp,* the Second Circuit noted this crucial distinction as follows:

> In *HBE Leasing I*, the original lender knew *when it extended the credit to the borrower* that the funds advanced might not be used for legitimate corporate purposes, and that knowledge was held to be sufficient notice that the debtor "might improperly funnel" the proceeds "to third parties." . . . . This rule has no applicability where, as here, it is undisputed that State Street's loan [to the debtor] was made in good faith *long before the purportedly fraudulent transfer.*

403 F.3d at 55 (citing *HBE Leasing*, 48 F.3d 623 (emphasis added)). This Court, relying on this very distinction, expressly held that a trustee who alleged that "the debt repaid . . . was incurred in connection with transactions that were, at a minimum, irregular" had thereby adequately alleged the defendant had "'actual or constructive knowledge of [a] fraudulent scheme' in connection with the incurrence of the debt." *Silverman v. Actrade Capital, Inc. (In Re Actrade Financial Technologies, Ltd.)*, 337 B.R. 791, 805-06 (S.D.N.Y. 2005).

Here, the unusual returns and other red flags signaled or should have signaled to sophisticated investors like Defendant Funds, *at the time the consideration [i.e., the investment] was given*, that they were participating in a fraudulent scheme. Defendant Funds' decision to proceed with investing with BLMIS in the face of this constructive or actual knowledge obviates any finding that Defendant Funds gave consideration in good faith within the meaning of § 272. *See* argument at Section III. B., *supra*.

Defendant Funds' proposition that *In re Sharp* did not "carve out any exceptions" for Ponzi schemes is absurd. (MTD at 31, n.20). Since *In re Sharp* did not involve a Ponzi scheme, it is no surprise that the Court did not "carve out any exceptions" for facts not before it. Furthermore, the Second Circuit *did* acknowledge an exception by distinguishing as factually inapplicable cases like this one, where the debtor affirmatively swore that the transaction was intended to evade his creditors. *In re Sharp*, 403 F.3d at 54 (citing *Ede v. Ede*, 193 A.D.2d 940,

942 (N.Y. Ct. App. 1993)).  This Court has expressly negated *In re Sharp*'s application to Ponzi schemes as follows:

> The contrast with the redemption payments at issue in these adversary proceedings is stark and crystallizes the fundamental difference between *Sharp* and the Section 548(a)(1)(A) claims here.  In contrast to the lawful and disclosed payment of a valid contractual antecedent debt in *Sharp,* the redemption payments at issue here of non-existent investor account balances as misrepresented in fraudulent financial statements were themselves inherently fraudulent and constituted an integral and essential component of the fraudulent Ponzi scheme alleged in the amended complaints. The payments alleged here of fictitious account balances and profits were inherently deceitful and unlawful and were necessarily made with intent to "hinder, delay or defraud" present and future creditors. No such allegation was made in *Sharp*, which involved only a disclosed repayment of a valid antecedent debt actually owed to State Street.

*Bayou I*, 362 B.R. at 638.

Finally, *In re Sharp* involved only state law fraudulent transfer claims, not claims under 11 U.S.C. § 548.  Defendant Funds erroneously argue that the Transfers they received cannot be avoided as intentional fraudulent transfers because they satisfied outstanding obligations to Defendant Funds.  (MTD at 29).  However, the exchange of reasonably equivalent value does not, in the absence of good faith, provide a defense for a transfer made with actual fraudulent intent.  *See* 11 U.S.C. §§ 548(a)(1)(A), 548(c) and discussion at Sections I and II, *supra*. Defendant Funds also did not exchange reasonably equivalent value under section 548(a)(1)(B) because Defendant Funds are not entitled to avail themselves of the "universally accepted rule" applicable to innocent investors and, therefore, are not entitled to claims for rescission or damages in respect of their principal investments.  *See* argument at Section III. A., *supra*.

Defendant Funds' reliance on *In re Sharp* is misplaced.  The Amended Complaint pleads that BLMIS operated a Ponzi scheme.  It is presumed as a matter of law that the Transfers to Defendant Funds were made with actual intent to hinder, delay and defraud creditors.  The Amended Complaint also pleads that Defendant Funds acted with knowledge of, and participated

in, the fraud.  Defendant Funds, therefore, did not act in good faith and did not give reasonably equivalent value or fair consideration in exchange for the Transfers they received as a matter of law.  Defendant Funds state no plausible grounds on which to dismiss the Trustee's actual and constructive fraudulent transfer claims under the Bankruptcy Code and state law.

## VI.    THE TRUSTEE'S TURNOVER CLAIM IS PROPERLY PAIRED WITH HIS AVOIDANCE CLAIMS

Defendant Funds argue in Point VI of their Motion that the Trustee's claim for turnover of the Transfers is inappropriate because property that is the subject of an avoidance action is not property subject to the turnover and accounting remedies of Section 542(a).  They argue further that the Trustee is required to prove he can avoid those transfers pursuant to Sections 548 and 550 of the Bankruptcy Code, 11 U.S.C. §§ 548, 550 (2009), before they can be recovered in a turnover claim.  Each of the transfers in question, however, is also the subject of separate avoidance counts in this same action.  The inclusion of a turnover count is therefore appropriate.

Defendant Funds' argument ignores the express provisions of the SIPA statute concerning the status of property transferred by a SIPA debtor when funds are insufficient to satisfy in full the claims of customers in the SIPA liquidation proceeding.  In relevant part, SIPA provides:

> . . . the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11. . . .  For purposes of such recovery, *the property so transferred shall be deemed to have been the property of the debtor* . . .

15 U.S.C. § 78fff-2(c)(3) (2009) (emphasis added).  SIPA makes plain that as to property that was customer property prior to the transfer, that property when "so transferred" is deemed to have been property of the estate and therefore subject to the turnover provisions of Section 542.

- 41 -

*See* 11 U.S.C. § 542 (2009).  In other words, if there were any doubt about the nature of customer property, this SIPA provision makes clear that for Chapter 5 claims, customer property is always property of the estate.  Here, in the context of a Ponzi scheme, it could not be otherwise.

Even aside from the SIPA statute, however, it is appropriate under the Bankruptcy Code to pair a turnover claim with an avoidance action.  The core function of a turnover claim pursuant to Section 542 is to permit the Trustee to recover "property that the trustee may use, sell, or lease" from any persons holding that property.  *See* 11 U.S.C. § 542(a).  While the case law pertaining to this subject is not uniform, *see, e.g., In re Andrew Velez Constr.*, 373 B.R. at 273, a number of cases hold that a turnover claim may be properly paired with an avoidance claim.  For example, in *In re Jacobs*, the court granted summary judgment to the trustee in an avoidance action and held that a transfer of property from the debtors to the defendants was both actually and constructively fraudulent.  394 B.R. at 664-72.  In the same ruling, the court also granted summary judgment on the trustee's turnover and accounting claim for that property.  *Id.*  In so ruling, the court observed that by virtue of its ruling on the avoidance claim, the property was a transfer of property of the debtor and subject to turnover and avoidance.  *Id.* at 674.  This basic principle was also set forth in *Doyle v. Paolino (In re Energy Sav. Ctr., Inc.)*, 61 B.R. 732, 735 (E.D. Pa. 1986), where the court noted that:

> A claim made under Section 542, however, is not necessarily distinct from claims under other sections.  For example, if a particular transfer of property is voidable as a fraudulent transfer under Section 548, then this property, now deemed property of the estate, becomes subject to the "turnover" authority contained in Section 542.

In challenging the Trustee's claim for turnover, Ariel Fund and Gabriel Fund rely on dicta in the Second Circuit's decision in *FDIC v. Hirsch (In re Colonial Realty Co.)*, where the

court noted that only after a transfer is avoided and recovered does the property that was subject to that claim become "property of the estate" within the meaning of Section 541(a)(3).  980 F.2d 125, 131 (2d. Cir. 1992); 11 U.S.C. § 541(a)(3) (2009).  *In re Colonial Realty*, however, was not a turnover case.  Rather, the issue the court determined in that case was that the automatic stay applied to a prepetition fraudulent transfer claim regardless of whether the fraudulently transferred property was, or was not, property of the estate.  980 F.2d at 131-32.  *In re Colonial Realty* thus does not address the issue here:  whether a turnover claim may be properly paired with an avoidance claim.[32]

The pairing of these claims is also appropriate for reasons of judicial economy.  By the Defendant Funds' logic, the Trustee could not bring a recovery claim under Section 550 until the transfer is avoided.  But it is commonly recognized that this can be done, *see* 5 *Colliers on Bankruptcy* ¶ 550.07 (2009), since requiring the Trustee to bring one adversary proceeding to avoid the transfer and then a separate proceeding to recover the transfer or its value would be a waste of resources.  *See generally Woods & Erickson, LLP. v. Leonard (In re Avi, Inc.)*, 389 B.R. 721, 734-35 (B.A.P. 9th Cir. 2008) (holding that an avoidance and recovery action may be brought simultaneously to "avoid[] absurd results" and to "protect[] the trustee from attempts to impede recovery" and to "afford[] flexibility when a transferee or its assets have disappeared.").

---

[32] Nor do the other two cases cited by Defendant Funds address the issue before the Court.  *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 553-54 (Bankr. D.Del. 2005) simply states that a turnover claim is premature if there is a dispute over whether property was fraudulently transferred.  It never addresses the logic or propriety of pairing a turnover claim with a fraudulent transfer claim in one action.  *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005) is even further afield.  The decision was on a motion for reconsideration and subject to the many restrictions on such motions that the court sets out, 325 B.R. at 136; it did no more than cite in dicta *In re Colonial Realty* and *In re Student Fin. Corp.* for the proposition that under section 542(a) only property of the estate is subject to a turnover order; and it deals with the question of when a debt is subject to turnover under section 542(b).  The actual holding in that case is that the claim at issue was a common law claim that had to be separately prosecuted, and the case has no application to the issues herein.

The same rationale should apply to permit Section 542 claims to be paired with avoidance claims.

For these reasons, the Trustee requests that this Court follow the SIPA statute, and the reasoning of *In re Jacobs* and *In re Energy Sav. Ctr.*, and deny the Defendant Funds' Motion to Dismiss Count One of the Amended Complaint.

## VII. THE TRUSTEE HAS PROPERLY ALLEGED DISALLOWANCE OF DEFENDANTS' SIPA CLAIMS

Defendant Funds argue that the Trustee is not entitled to avoid the transfers, so he cannot disallow their SIPA claims. They add that the Trustee should use the final, bogus account statements made up by BLMIS to compute their claims. At no point in their Motion to Dismiss do the Defendant Funds argue that the allegations fail to state a claim for relief. Count Twelve of the Amended Complaint alleges that the Defendants' SIPA claims should not be allowed because (i) they are not supported by the books and records of BLMIS nor the claims materials submitted by Defendant Funds, and (ii) pursuant to section 502(d) of the Bankruptcy Code, the claims must be disallowed because the Defendant Funds have received transfers of BLMIS' property which are recoverable under sections 547, 548, and 550 of the Bankruptcy Code. (Am. Comp. ¶¶ 120 – 21). The only issue for this Court at this time is whether the Trustee has adequately alleged a basis for disallowance of the SIPA claims. As set forth above, the Trustee has adequately plead multiple grounds for avoiding the transfers in question. Thus, Defendant Funds' initial argument fails.

Defendant Funds next dispute the Trustee's interpretation of "net equity" and "customer," issues that have been fully briefed and were argued to the Court on February 2, 2010. These issues will be decided by the Court on a global basis. Meanwhile, the issues have nothing to do

with the question of whether the Trustee has adequately pled a claim for disallowance of

Defendant Funds' SIPA claims.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants' Motion to Dismiss should be denied.


Date:  New York, New York
       February 24, 2010

Respectfully submitted,


Of Counsel:

*s/Marc E. Hirschfield*
Baker & Hostetler LLP
45 Rockefeller Plaza

Louis A. Colombo
Joseph F. Hutchinson, Jr.
Kelly S. Burgan
David E. Kitchen
Baker & Hostetler LLP
1900 East Ninth Street, Suite 3200
Cleveland, Ohio  44114-3485
Telephone: (216) 632-0200
Facsimile: (216) 696-0740
Louis A. Colombo
Email: lcolombo@bakerlaw.com
Joseph F. Hutchinson, Jr.
Email: jhutchinson@bakerlaw.com
Kelly S. Burgan
Email: kburgan@bakerlaw.com
David E. Kitchen
Email: dkitchen@bakerlaw.com

New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Marc D. Powers
Email: mpowers@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*

300070230.8