**EXHIBIT A**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Oren J. Warshavsky
Anjula Garg
Adam B. Oppenheim
Jennifer M. Walrath
Geoffrey A. North
Keith R. Murphy
Marc S. Skapof

*Attorneys for Irving H. Picard, Trustee for*
*the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated)<br><br>**AMENDED COMPLAINT** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff, | Adv. Pro. No. 09-1364 (BRL) |

v.

HSBC BANK PLC; HSBC HOLDINGS PLC; HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.; HSBC INSTITUTIONAL TRUST SERVICES (IRELAND) LIMITED; HSBC SECURITIES SERVICES (IRELAND) LIMITED; HSBC INSTITUTIONAL TRUST SERVICES (BERMUDA) LIMITED; HSBC BANK USA, N.A.; HSBC SECURITIES SERVICES (BERMUDA) LIMITED; HSBC BANK (CAYMAN) LIMITED; HSBC PRIVATE BANKING HOLDINGS (SUISSE) S.A.; HSBC PRIVATE BANK (SUISSE) S.A.; HSBC FUND SERVICES (LUXEMBOURG) S.A.; HSBC BANK BERMUDA LIMITED; HERALD FUND SPC; HERALD (LUX) SICAV; PRIMEO FUND; ALPHA PRIME FUND LIMITED; SENATOR FUND SPC; HERMES INTERNATIONAL FUND LIMITED; LAGOON INVESTMENT LIMITED; THEMA FUND LTD.; THEMA WISE INVESTMENTS LTD.; THEMA INTERNATIONAL FUND PLC; GEO CURRENCIES LTD. S.A.; HERALD ASSET MANAGEMENT LIMITED; 20:20 MEDICI AG; UNICREDIT BANK AUSTRIA AG; BA WORLDWIDE FUND MANAGEMENT LIMITED; EUROVALEUR, INC.; PIONEER ALTERNATIVE INVESTMENT MANAGEMENT LIMITED; ALPHA PRIME ASSET MANAGEMENT LTD.; REGULUS ASSET MANAGEMENT LIMITED; CARRUBA ASSET MANAGEMENT LIMITED; GENEVALOR, BENBASSAT ET CIE; HERMES ASSET MANAGEMENT LIMITED; THEMA ASSET MANAGEMENT (BERMUDA) LTD.; THEMA ASSET MANAGEMENT LTD.; EQUUS ASSET MANAGEMENT LTD.; EQUUS ASSET MANAGEMENT PARTNERS, L.P.; AURELIA FUND MANAGEMENT LIMITED; URSULA RADEL-LESZCZYNSKI; SONJA KOHN; ERWIN KOHN; MARIO BENBASSAT; ALBERTO BENBASSAT; STEPHANE BENBASSAT; DAVID T. SMITH; ROBERTO NESPOLO; LAURENT MATHYSEN-GERST; OLIVIER ADOR; PASCAL CATTANEO; VLADIMIR STEPCZYNSKI; JEAN-MARC

WENGER; LAGOON INVESTMENT TRUST; UNICREDIT S.p.A.; INTER ASSET MANAGEMENT, INC.; GTM MANAGEMENT SERVICES CORP. N.V.; T+M TRUSTEESHIP & MANAGEMENT SERVICES S.A.; AURELIA ASSET MANAGEMENT PARTNERS; CAPE INVESTMENT ADVISORS LIMITED; AND TEREO TRUST COMPANY LIMITED,

Defendants.

# TABLE OF CONTENTS

Pages

TABLE OF ABBREVIATIONS ............................................................................. 1

NATURE OF THE ACTION ............................................................................... 9

JURISDICTION AND VENUE ......................................................................... 17

BACKGROUND .............................................................................................. 19

THE PONZI SCHEME ..................................................................................... 20

THE TRUSTEE'S POWERS AND STANDING ............................................... 23

THE DEFENDANTS ....................................................................................... 25

      Sonja Kohn and The Benbassat Family ................................................. 25

      The Funds and Related Investment Vehicles ........................................ 27

      The Management Defendants ................................................................. 31

      Management Defendants Primarily Associated With Medici Funds ...... 31

      Management Defendants Associated with the Benbassat Funds ............ 35

      Beneficial Owners ................................................................................. 38

      The HSBC Defendants ........................................................................... 39

      Other Individuals .................................................................................. 44

PERSONAL JURISDICTION .......................................................................... 46

      Individual Defendants ........................................................................... 46

      Feeder Fund Defendants ....................................................................... 47

      Management Defendants ....................................................................... 48

      Beneficial Owners of Management Defendants .................................... 49

      HSBC Defendants ................................................................................. 50

RED FLAGS STRONGLY SUGGESTED THAT BLMIS'S IA BUSINESS WAS A FRAUD ......................................................................................... 52

      Madoff's Secrecy .................................................................................. 52

      Madoff's Purported Trade Volumes Were Too High to Be Believed ..... 53

      There Were Not Enough Options to Implement Madoff's Purported Strategy ............... 55

      Many Trades Appeared to Have Been Executed Outside the Daily Price Range .......... 61

      Madoff Insisted on Acting as His Own Custodian ............................... 63

      Negative Cash Balances ........................................................................ 64

      Inadequacy of Madoff's Auditors ........................................................ 67

      Madoff's Returns Did Not Mirror Market Conditions ......................... 67

Madoff Was Able to Execute Trades at the Perfect Time, Every Time ......................... 68

Madoff Did Not Provide Real-Time Access to IA Business Accounts ........................... 71

Madoff's Account Statements Purported to Transact With Non-Existent Funds ........... 71

Madoff Never Identified His Options Counterparties ................................................... 72

Madoff's Options Transactions Were Frequently Inconsistent With SSC Strategy ....... 73

BLMIS's Paper Trade Confirmations Were Archaic and Replete with
Inconsistencies ................................................................................................. 77

Madoff Walked Away From Hundreds of Millions of Dollars by Employing a
Bizarre Fee Structure ........................................................................................ 79

Many Financial Professionals Publicly Questioned Madoff's Legitimacy .................... 80

BLMIS Account Statements and Confirmations Often Reflected Settlement
Anomalies in Options Transactions ................................................................... 82

Madoff Purported to Execute Trades That Settled on Days When the Market Was
Closed ............................................................................................................... 84

THE DEFENDANTS' RELATIONSHIP WITH MADOFF .................................................. 84

Kohn and the Benbassats Established a Complex Network Connecting Foreign
Investors and Madoff ........................................................................................ 84

The Benbassats Solicited Madoff Investors .............................................................. 90

HSBC Helped Funnel Foreign Investors into the Feeder Fund Defendants ................. 93

The Defendants Created Structured Products to Facilitate Additional Investment
in the IA Business ............................................................................................. 94

The HSBC Swaps ...................................................................................................... 97

The Rye XL Fund Swap .............................................................................................. 97

The Wickford Fund Swap ........................................................................................... 98

The Santa Clara II Fund Options Swap ..................................................................... 98

The BNP Paribas Accreting Strike Call Option Transaction ....................................... 99

The Gaspee Offshore Swap ....................................................................................... 99

The Rye Select Broad Market XL Portfolio Limited Swap .......................................... 99

The Wailea Swap ..................................................................................................... 100

The Leveraged Note Programs ................................................................................. 101

The STAIRS Note Programs ...................................................................................... 101

The Defendants Enabled Madoff to Act as His Own Custodian ................................ 102

HSBC As Administrator of the Feeder Fund Defendants .............................................. 105

HSBC Marketed Madoff to its Private Banking Clients .............................................. 107

HSBC Bank Engaged KPMG to Assess Fraud and Operational Risk at BLMIS and then Ignores its Findings ..................................... 110

KPMG Engaged Again and Uncovers HSBC's Failure to Heed Earlier Warnings ...... 112

THE AFTERMATH: THE DEFENDANTS UNDERSTATED THEIR FAILURE TO PERFORM DUE DILIGENCE ..................................................................... 113

THE TRANSFERS ............................................................................................. 114

Initial Transfers from BLMIS to the Feeder Fund Defendants ................................ 114

The Transfers Were Subsequently Transferred to Other Defendants ........................ 120

INITIAL TRANSFERS FROM BLMIS TO NON-PARTY FUNDS ....................... 121

THE NON-PARTY INITIAL TRANSFERS FROM BLMIS WERE SUBSEQUENTLY TRANSFERRED TO THE HSBC DEFENDANTS ..................... 127

CUSTOMER CLAIMS ........................................................................................ 129

COUNT ONE: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREES) 11 U.S.C. §§ 547(B), 550(A)(1), AND 551 AGAINST ALL FEEDER FUND DEFENDANTS EXCEPT PRIMEO ............................................ 129

COUNT TWO: PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREES) 11 U.S.C. §§ 547(B), 550(A), AND 551 AGAINST THE MANAGEMENT DEFENDANTS, THE HSBC DEFENDANTS, THE BENEFICIAL OWNERS, THE INDIVIDUAL DEFENDANTS PRIMEO, AND, IN THE ALTERNATIVE, HERMES, LAGOON, AND LAGOON TRUST ......................................................... 131

COUNT THREE: FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(A)(1)(A), 550(A), AND 551 AGAINST THE FEEDER FUND DEFENDANTS ................................. 132

COUNT FOUR: FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(A)(1)(B), 550(A), AND 551 AGAINST THE FEEDER FUND DEFENDANTS ................................. 133

COUNT FIVE: FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278 AND/OR 279, AND U.S.C. §§ 544, 550(A)(1), AND 551 AGAINST THE FEEDER FUND DEFENDANTS .................. 134

COUNT SIX: FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE FEEDER FUND DEFENDANTS ....................... 135

COUNT SEVEN: FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE FEEDER FUND DEFENDANTS ..................................... 136

COUNT EIGHT: FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND
CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A),
AND 551 AGAINST THE FEEDER FUND DEFENDANTS ................................... 137

COUNT NINE: RECOVERY OF ALL FRAUDULENT TRANSFERS NEW YORK
CIVIL PRACTICE LAW AND RULES 203(G) AND 213(8),  AND NEW
YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278  AND/OR 279, 11
U.S.C. §§ 544, 550(A), AND 551 AGAINST THE FEEDER FUND
DEFENDANTS ................................................................................................ 137

COUNT TEN: RECOVERY OF SUBSEQUENT TRANSFERS NEW YORK DEBTOR
AND CREDITOR LAW §§ 273-279 AND 11 U.S.C. §§ 544, 547, 548, 550(A),
AND 551 AGAINST THE MANAGEMENT DEFENDANTS, THE HSBC
DEFENDANTS,  THE BENEFICIAL OWNERS, THE INDIVIDUAL
DEFENDANTS PRIMEO AND, IN THE ALTERNATIVE, HERMES, THEMA
FUND, AND LAGOON TRUST .............................................................. 139

COUNT ELEVEN: DISALLOWANCE OF CUSTOMER CLAIMS AGAINST ALPHA
PRIME, GEO CURRENCIES, HERALD, HERALD (LUX),  LAGOON,
SENATOR, THEMA INTERNATIONAL, AND THEMA WISE .............................. 140

COUNT TWELVE: EQUITABLE SUBORDINATION AGAINST ALPHA PRIME,
GEO CURRENCIES, HERALD, HERALD (LUX),  LAGOON, SENATOR,
THEMA INTERNATIONAL, AND THEMA WISE ................................... 141

COUNT THIRTEEN:  PREFERENTIAL TRANSFERS (SUBSEQUENT
TRANSFEREE) 11 U.S.C. §§ 547(B), 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ............................................................................................ 142

COUNT FOURTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
11 U.S.C. §§ 548(A)(1)(A), 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ............................................................................................ 144

COUNT FIFTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) 11
U.S.C. §§ 548(A)(1)(B), 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ............................................................................................ 145

COUNT SIXTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278 AND/OR
279, AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ............................................................................................ 147

COUNT SEVENTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT
TRANSFEREE) NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND
278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE
HSBC DEFENDANTS .................................................................................. 148

# TABLE OF CONTENTS
## (CONTINUED)

Pages

COUNT EIGHTEEN:  FRAUDULENT TRANSFERS (SUBSEQUENT
TRANSFEREE) NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278,
AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ................................................................................................... 150

COUNT NINETEEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE)
NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279,
AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ................................................................................................... 151

COUNT TWENTY: UNJUST ENRICHMENT AGAINST THE MANAGEMENT
DEFENDANTS, THE HSBC DEFENDANTS, THE BENEFICIAL OWNERS,
AND THE INDIVIDUAL DEFENDANTS (THE "NON-FUND
DEFENDANTS") ................................................................................................ 152

COUNT TWENTY-ONE: MONEY HAD AND RECEIVED AGAINST THE NON-
FUND DEFENDANTS ...................................................................................... 154

COUNT TWENTY-TWO: AIDING AND ABETTING BREACH OF FIDUCIARY
DUTY AGAINST THE NON-FUND DEFENDANTS ................................... 155

COUNT TWENTY-THREE: AIDING AND ABETTING FRAUD AGAINST THE
NON-FUND DEFENDANTS .............................................................................. 157

COUNT TWENTY-FOUR: CONTRIBUTION AGAINST THE NON-FUND
DEFENDANTS ................................................................................................... 158

| | |
|---|---|
| A. Benbassat | **Alberto Benbassat:** Partner in Genevalor and Equus Partners; Son of M. Benbassat; director and primary manager of feeder funds affiliated with Genevalor, including Hermes, Thema Fund, Thema International, and Geo Currencies, as well as certain of those funds' investment managers and other service providers. |
| Ador | **Olivier Ador:** Partner in Aurelia Partners; managed, administered, and marketed Hermes and Lagoon Trust. |
| Alpha Prime | **Alpha Prime Fund Limited:** (Bermuda) Investment fund created by Bank Austria and Sonja Kohn to facilitate direct investment in BLMIS. |
| Alpha Prime Management | **Alpha Prime Asset Management Ltd.:** (Bermuda) Investment manager to Alpha Prime. |
| Aurelia | **Aurelia Fund Management Limited:** (Bermuda) Part owner of Hermes Management, to which it provided administrative support services. |
| Aurelia Partners | **Aurelia Asset Management Partners:** (Bermuda) The partnership that owned Aurelia, which provided administrative support services to Hermes. |
| BA Worldwide | **BA Worldwide Fund Management Ltd.:** (British Virgin Islands) Offshore subsidiary of Bank Austria that served as investment adviser to Primeo, Alpha Prime, and Thema International before being voluntarily liquidated on or about February 22, 2008. |
| Bank Austria | **UniCredit Bank Austria AG:** (Austria) Financial institution that helped create and control Madoff Feeder Funds Primeo, Alpha Prime, and Senator. |
| Bank Medici | **20:20 Medici AG:** (Austria) Entity owned by Kohn and Bank Austria that acted as investment manager to Herald, Herald (Lux), and Thema International, and which created, controlled, and marketed Madoff Feeder Funds, including Herald, Herald (Lux), and Primeo. |
| Benbassat Funds | **Benbassat Funds:** Madoff Feeder Funds created and/or controlled by the Benbassat Family: Hermes, and its subsidiary, Lagoon, Geo Currencies, Thema Fund, and its subsidiary, Thema Wise, and Thema International. |

| | |
|---|---|
| Beneficial Owners | **Beneficial Owners:**  Includes Bank Austria, UniCredit, Tereo Trust, Eurovaleur, Genevalor, Equus, Equus Partners, Cape Investment, Inter Asset, GTM Management, T+M, Aurelia, Aurelia Partners, Kohn, E. Kohn, M. Benbassat, A. Benbassat, S. Benbassat, Nespolo, D. Smith, Velay, Mathysen-Gerst, Ador, Cattaneo, Stepczynski, and Wenger. |
| Cape Investment | **Cape Investment Advisors Limited:**  (Bermuda) Entity holding an ownership interest in Thema Management Bermuda, investment manager to Thema Fund. |
| Carruba | **Carruba Asset Management Limited:**  (Bermuda) Investment adviser to Senator, a Madoff Feeder Fund. |
| Cattaneo | **Pascal Cattaneo:**  Partner in Aurelia Partners, managed and marketed Hermes and Lagoon, two Madoff Feeder Funds, and was a director and vice-president of Aurelia and general partner of Aurelia Partners. |
| Defender | **Defender Limited:**  (British Virgin Islands) Madoff Feeder Fund. |
| D. Smith | **David T. Smith:**  General partner of Genevalor and Equus Partners; managed, administered, and marketed Madoff Feeder Funds created by the Benbassat family with Genevalor, including Hermes, Thema International, and Thema Fund; director of Thema Fund, Hermes, Lagoon, Lagoon Trust, Thema International, Hermes Management, Thema Management Bermuda; President and a director of Cape Investment; and former employee of HSBC Bank Bermuda. |
| E. Kohn | **Erwin Kohn:**  Owner of Herald Management and husband of Sonja Kohn. |
| Equus | **Equus Asset Management Ltd.:**  (Bermuda) Entity owned substantially by the Benbassat family; provided administrative services to Thema Management Bermuda; part owner of Hermes Management and Thema Management Bermuda. |
| Equus Partners | **Equus Asset Management Partners, L.P.:**  (Bermuda) Entity principally formed by the Benbassat family; provided administrative support services to Hermes Management; holds an ownership interest in Equus. |

Eurovaleur            **Eurovaleur, Inc.:** (USA) Company owned by Sonja Kohn that
                      served as investment sub-adviser to Primeo, and which holds an
                      ownership interest in Thema Management BVI.

Feeder Fund Defendants **Feeder Fund Defendants:** Primeo, Herald, Herald (Lux),
                      Alpha Prime, Senator, Hermes, Lagoon, Thema Fund, Thema
                      Wise, Thema International, Geo Currencies, and Lagoon Trust.

Genevalor             **Genevalor, Benbassat et Cie:** (Switzerland) Partnership
                      created and controlled by the Benbassat Family and that created
                      and controlled many Madoff Feeder Funds, including Hermes,
                      Thema International, Thema Fund, and Geo Currencies.

Geo Currencies        **Geo Currencies Ltd. S.A.:** (Panama) Madoff Feeder Fund
                      created by the Benbassat Family.

GTM Management        **GTM Management Services Corp. N.V.:** (Curacao) Part
                      owner of Hermes Management, which managed Madoff Feeder
                      Funds.

Harley                **Harley International (Cayman) Limited:** A Madoff Feeder
                      Fund that was the reference fund for the structured products
                      created by the HSBC Defendants.

Herald                **Herald Fund SPC:** (Cayman Islands) Madoff Feeder Fund
                      created by Kohn and Bank Medici.

Herald (Lux)          **Herald (Lux) SICAV:** (Luxembourg) Madoff Feeder Fund
                      created by Kohn and Bank Medici.

Herald Management     **Herald Asset Management Limited:** (Cayman Islands)
                      Investment manager to Herald, a Madoff Feeder Fund owned by
                      Erwin Kohn.

Hermes                **Hermes International Fund Limited:** (British Virgin Islands)
                      Madoff Feeder Fund created by the Benbassat Family.

Hermes Management     **Hermes Asset Management Limited:** (Bermuda) Company
                      co-founded by the Benbassat Family that served as investment
                      manager to Hermes and Lagoon Trust.

HITSB                 **HSBC Institutional Trust Services (Bermuda) Limited:**
                      Custodian for Madoff Feeder Funds Alpha Prime, Hermes, and
                      Thema Fund.

| | |
|---|---|
| HITSI | **HSBC Institutional Trust Services (Ireland) Ltd.:** (Ireland) Custodian to Madoff Feeder Funds Defender, Optimal, Landmark and Thema International. |
| HSBC Administrator Defendants | **HSBC Administrator Defendants:** HSSI, HSBC Bank Bermuda, HSBC (Cayman), HSSB, HSSL, and HSBC Fund Services, which served as administrators and sub-administrators. |
| HSBC Bank | **HSBC Bank plc:** (England/Wales) Banking institution that served as payee bank for the Madoff feeder funds named herein. |
| HSBC Bank Bermuda | **HSBC Bank Bermuda Limited:** (Bermuda) Custodian to the Kingate Funds, which facilitated direct investment in BLMIS; former administrator and custodian to Madoff Feeder Funds Alpha Prime, Square One, Hermes, and Thema Fund. |
| HSBC Bank USA | **HSBC Bank USA, N.A.:** (USA) Entity which created derivative investment products based upon returns generated by Madoff Feeder Funds |
| HSBC (Cayman) | **HSBC Bank (Cayman) Limited:** (Cayman Islands) Banking institution that served as administrator of Primeo. |
| HSBC Custodian Defendants | **HSBC Custodian Defendants:** HITSI, HSSL, HITSB, and HSBC Bank Bermuda, which served as custodians and sub-custodians of Madoff Feeder Funds. |
| HSBC Defendants or HSBC | **HSBC Defendants:** HSBC Holdings, HSBC Bank, HSBC Bank USA, HITSB, HITSI, HSBC Private Bank Holdings (Suisse), HSBC Private Bank (Suisse), HSSB, HSSI, HSSL, HSBC (Cayman), HSBC Bank Bermuda, and HSBC Fund Services. |
| HSBC Fund Services | **HSBC Fund Services (Luxembourg) S.A.:** (Luxembourg) Sub-administrator and sub-registrar of Madoff Feeder Fund Hermes. |
| HSBC Holdings | **HSBC Holdings plc:** (England/Wales) Parent company of HSBC Group and all the HSBC entities named herein. |
| HSBC Private Bank (Suisse) | **HSBC Private Bank (Suisse) S.A.:** (Switzerland) Entity which marketed Madoff Feeder Funds to investors. |
| HSBC Private Banking Holdings (Suisse) | **HSBC Private Banking Holdings (Suisse) SA:** (Switzerland) Entity which owned HSBC Private Bank (Suisse) and marketed Madoff Feeder Funds to investors. |

| | |
|---|---|
| HSSB | **HSBC Securities Services (Bermuda) Limited:** (Bermuda) Administrator to Madoff Feeder Funds Alpha Prime, Hermes, and Thema Fund. |
| HSSI | **HSBC Securities Services (Ireland) Limited:** (Ireland) Administrator for Madoff Feeder Funds Defender, Optimal, Landmark, and Thema International. |
| HSSL | **HSBC Securities Services (Luxembourg) S.A.:** (Luxembourg) Administrator to Madoff Feeder Funds Lagoon, Thema Wise, Herald, Herald (Lux), and Senator; sub-administrator to Madoff feeder funds Thema Fund, Alpha Prime, Hermes, and Primeo; custodian to Lagoon, Herald, Herald (Lux), Primeo, and Senator; and sub-custodian to Alpha Prime, Hermes, and Thema Fund. |
| Individual Defendants | **Individual Defendants:** Kohn, E. Kohn, Radel-Leszczynski, M. Benbassat, A. Benbassat, S. Benbassat, Nespolo, D. Smith, Velay, Mathysen-Gerst, Ador, Cattaneo, Stepczynski, and Wenger. |
| Inter Asset | **Inter Asset Management, Inc.:** (British Virgin Islands) Part owner of Hermes Management. |
| Kingate Euro | **Kingate Euro Fund, Ltd.:** (Bermuda) Madoff feeder fund. |
| Kingate Funds | **Kingate Funds:** Kingate Euro and Kingate Global. |
| Kingate Global | **Kingate Global Fund Ltd.:** (Bermuda) Madoff feeder fund. |
| Kohn | **Sonja Kohn:** Marketed Madoff Feeder Funds to new investors; held a majority interest in Bank Medici; director of Alpha Prime. Wife of Erwin Kohn, owner of Herald Management. |
| Lagoon | **Lagoon Investment Limited:** (British Virgin Islands) Nominal holder of accounts at BLMIS's IA Business created by the Benbassat family, which held investments of Hermes and Lagoon Trust. |
| Lagoon Trust | **Lagoon Investment Trust:** (British Virgin Islands) Entity created by Aurelia—associates of the Benbassat family—for purpose of investing in BLMIS through Lagoon. |
| Madoff Feeder Funds | **Madoff Feeder Funds:** Investment funds with the principal or primary purpose of investing funds with BLMIS's IA Business. |

| | |
|---|---|
| Madoff Structured Products | **Madoff Structured Products:** Derivative investment vehicles which offered investors an opportunity to earn the returns of BLMIS and/or a Madoff feeder fund. HSBC Defendants which swapped an interest in Rye XL, Greenwich, Harley, Thema International, and Senator. |
| Management Defendants | **Management Defendants:** Bank Medici, Bank Austria, Genevalor, Herald Management, BA Worldwide, Pioneer, Eurovaleur, Alpha Prime Management, Regulus, Carruba, Hermes Management, Thema Management BVI, Thema Management Bermuda, Equus, Equus Partners, and Aurelia. |
| Mathysen-Gerst | **Laurent Mathysen-Gerst:** General partner in Aurelia Partners; president of Aurelia; founder and director of Hermes and Lagoon; director of Hermes and Lagoon. |
| M. Benbassat | **Mario Benbassat:** Founding partner of Genevalor who created Madoff feeder funds Hermes, Thema Fund, Thema International, and Geo Currencies. |
| Medici Funds | **Medici Funds:** Primeo, Alpha Prime, Herald, Herald (Lux), and Senator |
| Nespolo | **Roberto Nespolo:** General partner of Genevalor and Equus Partners; director of Thema Fund, Thema Management BVI, and Equus; managed Madoff feeder funds Hermes, Thema International, and Thema Fund. |
| Pioneer | **Pioneer Alternative Investment Management Limited:** (Ireland) Investment adviser to Madoff feeder fund Primeo. |
| Primeo | **Primeo Fund:** (Cayman Islands) Kohn, Bank Medici, and Bank Austria investment fund that invested directly in BLMIS and indirectly in BLMIS through Herald and Alpha Prime. Currently in liquidation. |
| Radel-Leszczynski | **Ursula Radel-Leszczynski:** President of BA Worldwide; director of Madoff Feeder Funds Primeo and Alpha Prime; co-founder of Madoff Feeder Funds Alpha Prime and Senator; manager of Madoff Feeder Funds Primeo, Alpha Prime, and Senator. |
| Regulus | **Regulus Asset Management Limited:** (Bermuda) Investment adviser to Madoff Feeder Fund Senator. |

| | |
|---|---|
| Rye XL | **Rye Select Broad Market XL Fund, L.P.:** Madoff Feeder Fund which served as a reference fund for structured financial products created by the HSBC Defendants. |
| S. Benbassat | **Stephane Benbassat:** Partner in Genevalor and Equus Partners; son of Mario Benbassat, brother of Alberto Benbassat; managed and directed Madoff Feeder Funds Hermes, Thema Fund, Thema International, and Geo Currencies. |
| Senator | **Senator Fund SPC:** (Cayman Islands) Madoff Feeder Fund created by Radel-Leszczynski and Bank Austria and/or BA Worldwide. |
| Sentry | **Greenwich Sentry, L.P.:** One of the largest Madoff Feeder Funds, created and controlled by the Fairfield Greenwich Group. |
| Square One | **Square One Fund Limited:** (British Virgin Islands) Madoff Feeder Fund that is not named as a party herein. |
| SSC Strategy | **Split-strike conversion strategy:** The purported investment strategy of BLMIS's IA Business. |
| Stepczynski | **Vladimir Stepczynski:** General partner in Aurelia Partners and manager of Hermes and Lagoon. |
| T+M | **T+M Trusteeship & Management Services S.A.:** (Switzerland) Part owner of Thema Management BVI. |
| Tereo Trust | **Tereo Trust Company Limited:** (Bermuda) Owner of Alpha Prime Management, Regulus, and Carruba. |
| Thema Fund | **Thema Fund Ltd.:** (British Virgin Islands) Investment fund created by the Benbassat family that invested in the IA Business through its wholly-owned subsidiary, Thema Wise. |
| Thema International | **Thema International Fund plc:** (Ireland) Madoff Feeder Fund created by the Benbassat family. |
| Thema Management Bermuda | **Thema Asset Management (Bermuda) Ltd.:** (Bermuda) Investment manager of Madoff Feeder Fund, Thema Fund. |
| Thema Management BVI | **Thema Asset Management Ltd.:** (British Virgin Islands) Investment manager of Madoff Feeder Fund, Thema International. |

| | |
|---|---|
| Thema Wise | **Thema Wise Investments Ltd.:** (British Virgin Islands) Nominal holder of an account of BLMIS's IA Business created by the Benbassat family, which held investments of Thema Fund. |
| UniCredit | **UniCredit S.p.A.:** (Italy) Parent company of Bank Austria and Pioneer. |
| Wenger | **Jean-Marc Wenger:** General partner of Aurelia Partners who managed Madoff Feeder Funds Hermes and Lagoon. |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and substantively consolidated estate of Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] by and through his undersigned counsel, for his Complaint against the above-named defendants (the "Defendants"), states as follows:

## NATURE OF THE ACTION

1. Madoff did not act alone in perpetrating the largest financial fraud in history. For more than a decade, HSBC Holdings plc, HSBC Bank plc, and their affiliates (collectively, the "HSBC Defendants" or "HSBC") enabled Madoff's Ponzi scheme by encouraging investment into an international network of feeder funds, including several named as defendants herein (the "Feeder Fund Defendants"). Ultimately, the HSBC Defendants directed over $8.9 billion into BLMIS's fraudulent investment advisory business (the "IA Business"). A September 2008 report commissioned by the HSBC Defendants estimated that at least 33% of all moneys turned over to Madoff were funneled by and through the HSBC Defendants. The HSBC Defendants aided, enabled, and sustained the massive Ponzi scheme masterminded by Madoff in order to reap an extraordinary financial windfall. The HSBC Defendants are liable for the damage they caused, in an amount to be proven at trial, which, upon information and belief, will be no less than $6.6 billion. The Trustee also seeks to recover nearly $2 billion in fraudulent transfers from BLMIS and more than $400 million in fees received by the other Defendants in this action.

2. For years, Madoff attracted investors through a mix of staggering results and quiet gamesmanship; his legendary secrecy did not decrease his popularity among the investors intoxicated by his unparalleled performance. Madoff expanded the fortunes of prominent New

---

[1] Subsequent references to SIPA shall omit "15 U.S.C."

Yorkers whose confidence he had gained. His reputation spread to other areas, such as Palm Beach, Florida, and Hollywood, California. But his reputation was, as the world now knows, based on a lie: Madoff was no whiz-kid, he was a criminal using the investments of new customers to satisfy withdrawals by earlier investors. As his pool of investors threatened to run dry, Madoff was on the verge of exhausting the sources from which he had drawn money for his Ponzi scheme. His attention turned to potential investors abroad.

3.      Foreign investors were, in many ways, ideal targets for Madoff. An ocean away, these investors were a vast resource of fuel for the Ponzi scheme. The Defendants named herein came to Madoff's rescue by introducing him to European—and American—investors, many of whom thought they were investing in diverse and thoroughly vetted European funds when, in fact, they were simply depositing their money into the greatest fraud in history.

4.      The Defendants engineered a labyrinth of hedge funds, management companies, and service providers that, to unsuspecting outsiders, seemed to compose a formidable system of checks and balances. Yet the purpose of this complex architecture was just the opposite: it provided different modes for directing money to Madoff while avoiding scrutiny and maximizing fees. At the core of this architecture was a remarkably small group of individuals and the bank on which they all relied to help project an air of credibility and respectability, HSBC.

5.      Beginning in the 1980s, Sonja Kohn ("Kohn") became one of Madoff's top ambassadors, introducing him to a wide array of potential investors. In the early 1990s, Kohn introduced Madoff to the Benbassat Family, commencing in earnest the foreign feeder fund business that ultimately would fuel and sustain Madoff's Ponzi scheme. Beginning in 1992, the Benbassat Family, along with other Defendants, set up a variety of feeder funds, including defendants Hermes International Fund Limited ("Hermes") and its subsidiary, Lagoon

Investment Limited ("Lagoon"), Lagoon Investment Trust ("Lagoon Trust"), Geo Currencies Ltd. S.A. ("Geo Currencies"), Thema Fund Ltd. ("Thema Fund") and its subsidiary, Thema Wise Investments Ltd. ("Thema Wise"), and Thema International Fund plc ("Thema International") (collectively, the "Benbassat Funds").  The Benbassat Funds funneled more than $1.9 billion into BLMIS.

6.　　　　Kohn brokered introductions between Madoff and Carlo Grosso and Federico Ceretti, who created the Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro") (collectively, the "Kingate Funds," both of which are defendants in another action brought by the Trustee).  The Kingate Funds funneled more than $1.7 billion into BLMIS.

7.　　　　In the early 1990s, Kohn moved back to Austria and, along with defendant UniCredit Bank Austria AG ("Bank Austria"), set up a series of funds, associated with defendant 20:20 Medici AG ("Bank Medici").  These included Primeo Fund ("Primeo"), Alpha Prime Fund Limited ("Alpha Prime"), Herald Fund SPC ("Herald"), Herald (Lux) SICAV ("Herald (Lux)"), and Senator Fund SPC ("Senator") (collectively, the "Medici Funds").  The Medici Funds directed more than $2.8 billion to BLMIS.

8.　　　　The Feeder Fund Defendants and their managers were able to rely primarily on one financial institution—HSBC—to act as their marketer, custodian, and administrator.  All of these funds bore HSBC's imprimatur, as did other feeder funds not named herein, including Defender Limited (which deposited over $530 million with BLMIS), and funds associated with Optimal Multiadvisors Ltd. (which deposited more than $1.7 billion with BLMIS).  The HSBC imprimatur was the perfect endorsement to convince foreign (and, ultimately, other American) investors to pour money into BLMIS.  To unknowing investors, the Feeder Fund Defendants

appeared to be sound, legitimate investment vehicles because the documents describing those investments were emblazoned with HSBC's brand.

9.      The HSBC brand was backed not by reasonable due diligence, but by the explanation—to which several Feeder Fund Defendants subscribed—that BLMIS's performance in the market was the result of "magic."  One Feeder Fund Defendant official explained that the feeder fund with which he was associated had "confirmed" that BLMIS's returns were, in fact, the product of a "magic formula" because others in the industry had tried to replicate Madoff's returns, but were unable to do so.

10.      The Feeder Fund Defendants believed that Madoff had graced them with the opportunity to invest in BLMIS and to receive returns generated by the magic formula.  Even when the HSBC Defendants were granted permission to perform due diligence on BLMIS, certain Feeder Fund Defendants feared that an intrusive due diligence process by HSBC would jeopardize the Feeder Fund Defendants' relationships with Madoff.  The Feeder Fund Defendants warned HSBC that it had to exhibit appropriate reverence toward Madoff and BLMIS staff during the due diligence process.  Probing the magic formula too deeply might evoke Madoff's wrath and spell the end of the Feeder Fund Defendants' access to BLMIS. HSBC acquiesced.

11.      The Defendants were well aware of the indicia of fraud surrounding BLMIS.  In yearly due diligence reports, certain of the HSBC Defendants identified numerous badges of fraud, including: Madoff's secrecy, his insistency on retaining custody of all its assets under management, his seemingly supernatural trading performance, BLMIS's untraditional fee structure, and the lack of a qualified auditor.

12.     Despite being armed with knowledge of the serious risks of fraud that Madoff posed, the HSBC Defendants delegated many of their most critical roles and responsibilities to BLMIS.  For example, certain HSBC Defendants purported to serve as custodian of the assets of the Medici Funds, the Benbassat Funds, and the Kingate Funds, as well as others, but without any public disclosure to investors, they surrendered all custodial duties to BLMIS.  By doing so, the HSBC Defendants helped Madoff create a system devoid of checks and balances—a system ripe for fraud.  Remarkably, when conducting due diligence on other Madoff Feeder Funds, HSBC explicitly noted that BLMIS's role as custodian of assets created a serious risk of theft.

13.     Madoff's scheme could not have been accomplished or perpetuated unless the HSBC Defendants agreed to look the other way and to pretend that they were ensuring the existence of assets and trades when, in fact, they did no such thing.  Instead, the HSBC Defendants merely delegated their responsibilities to BLMIS.  The fees they received for their various roles were nothing more than kickbacks paid for looking the other way while legitimizing BLMIS through their name and brand, making it attractive to investors.

14.     The HSBC Defendants twice retained KPMG to perform due diligence on BLMIS; KPMG twice reported serious fraud risks and deficiencies, many already known to the HSBC Defendants.  Knowing that BLMIS was likely a fraud, the HSBC Defendants nevertheless continued to enable Madoff's fraud for their own gain.  No longer satisfied with being a mere marketing tool, the HSBC Defendants developed derivative structured financial products that poured even more money into BLMIS's IA Business, providing Madoff with the substantial assistance he needed to keep the Ponzi scheme going.

15.     The remaining defendants named herein are the management companies and service providers of the Medici Funds and the Benbassat Funds, as well as their directors.  Given

that Madoff did all of the "managing," these other defendants truly provided no services at all. Their overlapping ownership, and their receipt of fees for doing nothing, demonstrate that they were merely profit vehicles for Kohn, the Benbassats, and their associates.

16.     These Defendants are financial institutions, hedge funds, investment advisers, managers, and/or promoters whose financial sophistication gave them unparalleled insight into Madoff's fraud long before his confession and arrest in December 2008.  Each possessed a strong financial incentive to participate in, perpetuate, and stay silent about Madoff's fraudulent scheme.  The Defendants received management, administrative, performance, advisory, distribution, custodial, and/or other fees for driving new investors into BLMIS's IA Business. Every cent of the fees they collected is either stolen Customer Property,[2] as defined by statute, which must be returned to the Trustee for distribution, or represents the unjust enrichment of the Defendants, and must also be returned to the Trustee for the benefit of the victims of Madoff's fraud.

17.     These Defendants recklessly disregarded the numerous indicia of fraud that surrounded BLMIS.  Because of their institutional avarice, what was already a terrible crime was transformed into one of the largest thefts in history.

18.     The Defendants' financial incentives led them to turn a blind eye to numerous indicia of illegitimate trading activity and fraud, including:

(a)     Madoff refused to meet with HSBC despite the billions of dollars HSBC helped funnel into BLMIS's IA Business;

---

[2] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

(b)     BLMIS purported to trade equities and options in volumes so implausibly high that they often exceeded the *entire daily reported volume* of such options and equities traded on the world's exchanges;

(c)     BLMIS account statements sometimes showed securities trades executed outside of the daily price range;

(d)     BLMIS served as custodian of its customers' funds, *i.e.*, there was no independent third-party that could verify either that BLMIS's assets existed or that customer funds were maintained in segregated accounts;

(e)     BLMIS was too good of a deal; Madoff walked away from hundreds of millions of dollars by not charging industry standard management and performance fees. BLMIS also purported to execute trades in a manner that would have required the IA Business to front at least hundreds of millions of dollars to its customers, yet Madoff never charged the Defendants for this remarkable accommodation;

(f)     BLMIS, which had domestic and international operations with tens of billions of dollars under management, was audited by an unknown and unsophisticated auditor;

(g)     BLMIS was insulated from performance volatility even in the most volatile markets.  Madoff seemed to possess a near-perfect ability to time purchases and sales of stocks and options, so that BLMIS always managed to enter and exit the markets at the precise right time on the precise right day to maximize returns and avoid losses;

(h)     BLMIS refused to allow its customers real-time access to their accounts, instead transmitting paper trade confirmations days after trades were purportedly made—a significant departure from industry practice, and an inexplicable practice at a firm that publicly proclaimed its early adoption of cutting-edge technologies;

(i)      BLMIS's billions of dollars in purported trades never caused observable price displacement or liquidity disruptions in the market;

(j)      Madoff refused to identify any of BLMIS's options trading counterparties to any of the Defendants and their customers who, collectively, risked billions of dollars in exposure to such counterparties;

(k)      BLMIS's reported trading activity frequently deviated from the purported investment strategy of the IA Business;

(l)      From the end of 2005 until Madoff's arrest, BLMIS's account statements showed transactions with the "Fidelity Spartan U.S. Treasury Money Market Fund" even though that fund had changed its name in August 2005; and

(m)      BLMIS's trade confirmations did not comport with industry standards and often used improper or incorrect terminology to describe trades.

19.      The Defendants observed all these red flags of fraud and others, but ignored them. In a 2001 due diligence report, HSBC noted that the investment community was "baffled" by Madoff and doubted that the split-strike conversion strategy (the "SSC Strategy") that he purported to employ could generate the returns he claimed.  Upon information and belief, the Defendants suspected that Madoff might be illegally front-running the market using information he gleaned from his market-making operations or the "potentially greater risk" that Madoff was not, in fact, implementing the SSC Strategy.  However, driven by the steady returns BLMIS purported to produce, and the profits it generated, the HSBC Defendants looked the other way.

20.      Instead of reacting to these red flags with any modicum of suspicion, skepticism, or candor, the Defendants reacted with sarcasm.  In February 2006, two ███████ officials, ███ ██████████████████████████, wrote:



"It's the magic of Madoff."

21.     Ultimately, as custodians and administrators, the HSBC Defendants oversaw the infusion of no less than $8.9 billion into BLMIS's IA Business through a network of feeder funds.  The HSBC Defendants funneled even more money into BLMIS in connection with derivative structured financial products that they issued and sold to their customers.

22.     For their efforts, the Defendants received billions of dollars to which they are not entitled.  Many of these Defendants received tens, if not hundreds, of millions of dollars by selling, marketing, lending to, and investing in financial instruments designed to substantially assist Madoff by pumping money into BLMIS and prolonging the Ponzi scheme.

23.     Through this Complaint, the Trustee seeks the return of Customer Property belonging to the BLMIS estate, including redemptions, fees, compensation, and assets, as well as compensatory and punitive damages caused by the Defendants' misconduct, and the disgorgement of all amounts by which the Defendants were unjustly enriched at the expense of BLMIS's customers.

## JURISDICTION AND VENUE

24.     The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 510(c), 544, 547, 548, 550,

and 551 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.*) ("DCL"), New York Civil Practice Law and Rules ("N.Y. C.P.L.R."), and other applicable law, for the avoidance and recovery of preferences and fraudulent conveyances, unjust enrichment, money had and received, contribution, aiding and abedding breaches of fiduciary duty, aiding and abetting fraud, disallowance and/or equitable subordination of customer claims, and damages in connection with property BLMIS transferred, directly or indirectly, to or for the benefit of the Defendants, or other activities of the Defendants in connection with BLMIS investment. Among other things, the Trustee seeks to set aside and recover all avoidable transfers, collect damages caused by the Defendants, preserve the Customer Property for the benefit of BLMIS's defrauded customers, and recover from the Defendants all Customer Property, in whatever form it may exist now or in the future.

25. This is an adversary proceeding brought in this Court, where the main underlying SIPA case, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending. The SIPA case originally was brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"), on December 11, 2008 (the "Filing Date"), and thereafter was removed to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA §§ 78eee(b)(2)(A) and (b)(4).

26. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O).

27. Venue in this district is proper under 28 U.S.C. § 1409.

28.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court commencing the District Court Proceeding against Madoff and BLMIS.  The District Court Proceeding remains pending.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment advisory activities of BLMIS.

29.    On December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

30.    On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

31.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

(c)    removed the case to this Bankruptcy Court pursuant to SIPA § 78eee(b)(4); and

(d)     removed the Receiver for BLMIS.

32.     By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

33.     At a Plea Hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."

34.     Another former BLMIS employee, Frank DiPascali, also subsequently pleaded guilty to participating and conspiring to perpetuate the Ponzi scheme at a Plea Hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS). Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS at least as early as the 1980s. *See* Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

## THE PONZI SCHEME

35.     BLMIS was founded in 1959 by Madoff and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934 (the "1934 Act"),

15 U.S.C. § 78*o*(b).  By virtue of that registration, BLMIS is a member of SIPC.  BLMIS had

three business units:  the IA Business, market-making, and proprietary trading.

36.     Outwardly, Madoff ascribed the consistent success of the IA Business to the SSC

Strategy.  Pursuant to that strategy, Madoff purported to invest BLMIS customers' funds in a

basket of common stocks within the S&P 100 Index—a collection of the 100 largest publicly

traded companies.  Madoff claimed that this basket of stocks would mimic the movement of the

S&P 100 Index.  He also asserted that he would carefully time purchases and sales to maximize

value and, correspondingly, BLMIS customers' funds would, intermittently, be out of the

market.  While out of the market, those funds were purportedly invested in United States

Treasury bills or in funds holding Treasury bills.  The second part of the SSC Strategy was the

hedge of Madoff's stock purchases with S&P 100 Index option contracts.  Those option contracts

functioned as a "collar" limiting both the potential gains and the potential losses on the baskets

of stocks.  Madoff purported to use proceeds from the sale of S&P 100 Index call options to

finance the cost of purchasing S&P 100 Index put options.  Madoff also told IA Business

customers, including the Defendants named herein, that he would enter and exit the market

between eight and twelve times each year.

37.     BLMIS's IA Business customers received fabricated monthly or quarterly

statements showing that securities were held in, or had been traded through, their accounts.

However, the securities purchases and sales shown in those account statements never occurred,

and the reported profits were entirely fictitious.  At the Plea Hearing, Madoff admitted that he

never purchased any of the securities he claimed to have purchased for the IA Business's

customer accounts.  In fact, there is no record of BLMIS having cleared a *single* purchase or sale

of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Madoff's SSC Strategy was entirely fictitious.

38. At times prior to his arrest, Madoff told customers and regulators that he purchased and sold the put and call options over-the-counter rather than through an exchange. Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold *any* of the options described in customer statements. Additionally, the Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100 companies, has no record of the IA Business having bought or sold *any* exchange-listed options on behalf of any IA Business customers.

39. For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options. Rather BLMIS used its IA Business customers' deposits to pay other customers' redemptions and to make other transfers, which are, of course, avoidable by the Trustee.

40. The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was able to survive for as long as it did only because it used the stolen principal invested by some customers to pay other customers. Indeed, entities like the Feeder Fund Defendants and the HSBC Defendants, by introducing billions in capital, assisted Madoff and BLMIS in extending the life of the Ponzi scheme.

41. At all times relevant hereto, the liabilities of BLMIS were greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it

could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

42. Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

43. This and similar complaints are being brought to recapture moneys paid to, or for the benefit of, BLMIS's customers, including moneys that were subsequently transferred by BLMIS's investors to other entities, so that these recovered funds can be placed in the Customer Property fund and be distributed *pro rata* in accordance with SIPA § 78fff-2(c)(1).

## THE TRUSTEE'S POWERS AND STANDING

44. As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers and others who received avoidable transfers to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

45. To this end, the Trustee is bringing this action against the Defendants to recover no less than $2.3 billion in avoidable transfers received from BLMIS by the Defendants and/or persons or entities on their behalf, for the six year period ending on the filing date.

46. The Trustee is also seeking to recover subsequent transfers and other moneys received by the Defendants in their roles as investment managers, investment advisers, administrators, custodians, and providers of back-office support to the funds, and further subsequent transfers of other moneys received by the beneficial owners of these entities, all of whom facilitated the growth of the Ponzi scheme. These subsequent transfers and moneys arose, *inter alia*, from: withdrawals; management, performance advisory, and administrative fees; fees from the marketing and sale of structured products; and other distributions. The Trustee is seeking from Defendants an amount to be proven at trial, which, upon information and belief, will be no less than $400 million.

47. The Trustee brings this action against the Defendants to, among other things, recover all Customer Property received, directly or indirectly, from BLMIS.

48. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff-1(b). Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case.

49. In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

50. The Trustee has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

    (a)    Defendants received Customer Property;

    (b)    BLMIS incurred losses as a result of the claims set forth herein;

    (c)    BLMIS's customers were injured as a result of the conduct detailed herein;

(d)     SIPC cannot, by statute, advance funds to the Trustee to fully reimburse all customers for all of their losses;

(e)     the Trustee will not be able to satisfy fully all claims;

(f)     the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

(g)     as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted.  As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

(h)     SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

(i)     the Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

## THE DEFENDANTS

### *Sonja Kohn and The Benbassat Family*

51.     <u>Sonja Kohn</u> ("Kohn") is responsible for facilitating all of the Feeder Fund Defendants' investments with BLMIS, and was instrumental in marketing those funds to investors across Europe and around the world.  She also served various functions with respect to a number of the Medici Funds, including managing their relationships with BLMIS, and regularly traveled to New York City to meet with Madoff.  Upon information and belief, not only

did Kohn introduce all of the Feeder Fund Defendants to Madoff, she also ushered other funds, such as Harley International (Cayman) Ltd. ("Harley") and the Kingate Funds to Madoff.

52.     Kohn and/or members of her family are majority shareholders of defendant Bank Medici, which provided "services" to a number of the Feeder Fund Defendants, and the direct or beneficial "owners" of a variety of companies that generated fees from Madoff Feeder Funds. In these roles, upon information and belief, Kohn received fees and/or distributions to which she is not entitled and/or which are composed, in part, of Customer Property. In addition, upon information and belief, Kohn also received and benefited from payments directly from BLMIS and its sister company in London, Madoff Securities International Ltd. Upon information and belief, Kohn received fees and/or distributions to which she was not entitled and/or which are composed, in part, of Customer Property.

53.     <u>Mario Benbassat</u> ("M. Benbassat"), a friend of Kohn, helped create the Benbassat Funds and directed those funds' investments into the IA Business. Upon information and belief, M. Benbassat was a director of a number of, and controlled, the Benbassat Funds, and regularly traveled to New York City to meet with Madoff. Also upon information and belief, M. Benbassat received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

54.     <u>Alberto Benbassat</u> ("A. Benbassat"), M. Benbassat's son, helped manage and served as a director of the Benbassat Funds. He also managed the Benbassat Funds' relationship with Madoff and regularly traveled to New York City to meet with Madoff. Upon information and belief, A. Benbassat received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

55.     Stephane Benbassat ("S. Benbassat"), M. Benbassat's son and A. Benbassat's brother, also helped manage and served as a director of a number of the Benbassat Funds. He also managed the Benbassat Funds' relationship with Madoff, and regularly traveled to New York City to meet with Madoff. Upon information and belief, S. Benbassat received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

56.     As detailed further herein, A. Benbassat, M. Benbassat, and S. Benbassat (collectively, the "Benbassat Family") created a variety of entities that purported to provide services to the Benbassat Funds. Likewise, Kohn and defendant UniCredit Bank Austria AG set up a variety of entities that claim to have provided services to the Medici Funds. Upon information and belief, as further detailed herein, all of these entities were established principally for the purpose of investing in BLMIS and further extracting fees from investors placed in the Feeder Fund Defendants.

### The Funds and Related Investment Vehicles

57.     Primeo Fund ("Primeo") is an investment fund organized under the laws of the Cayman Islands with a registered address at the offices of Zolfo Cooper (Cayman) Ltd., P.O. Box 1102, Cayman Financial Center, Bermuda House, Cayman Islands. Primeo invested, directly and indirectly, with BLMIS. Upon information and belief, defendants Kohn, Bank Medici, and UniCredit Bank Austria AG created and controlled Primeo. Primeo is currently in liquidation in the Cayman Islands. Primeo received approximately $145 million in avoidable direct and/or indirect transfers from BLMIS.

58.     Herald Fund SPC ("Herald") is an investment fund organized under the laws of the Cayman Islands. Its registered agent is M&C Corporate Services Limited, P.O. Box 309 GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands. Herald

invested directly with BLMIS. Upon information and belief, defendants Bank Medici and Kohn created and controlled Herald for the purpose of investing assets with BLMIS. Herald received approximately $578 million in avoidable direct and/or indirect transfers from BLMIS.

59.     Herald (Lux) SICAV ("Herald (Lux)") is an investment fund organized under the laws of the Grand Duchy of Luxembourg, with a registered office at 6, place de Nancy, L-2212 Luxembourg. Upon information and belief, since its inception, Herald (Lux) was qualified as an Undertaking for Collective Investment in Transferable Securities ("UCITS") fund within the meaning of the UCITS regulations in Luxembourg. Herald (Lux) invested directly with BLMIS. Upon information and belief, defendants Kohn and Bank Medici created and controlled Herald (Lux) for the purpose of investing assets with BLMIS. Herald (Lux) is currently in liquidation in Luxembourg. Herald (Lux) received the benefit of approximately $134,000 in direct and/or indirect avoidable transfers from BLMIS.

60.     Alpha Prime Fund Limited ("Alpha Prime") is an investment fund organized under the laws of Bermuda, with a registered address at Bank of Bermuda Building, 6 Front Street, Hamilton HM 11, Bermuda. Alpha Prime invested directly with BLMIS. Upon information and belief, defendant UniCredit Bank Austria AG, and Ursula Radel-Leszczynski, with the help of Kohn, created and controlled Alpha Prime for the purpose of investing assets with BLMIS. Alpha Prime received approximately $86 million in avoidable direct and/or indirect transfers from BLMIS.

61.     Senator Fund SPC ("Senator") is an investment fund organized under the laws of the Cayman Islands. Its registered agent is DMS Corporate Services Ltd., P.O. Box 1344, DMS House, 20 Genesis Close, Grand Cayman KY1-1108, Cayman Islands. Senator invested directly with BLMIS. Upon information and belief, defendant UniCredit Bank Austria AG and its

subsidiary, BA Worldwide Fund Management Limited, as well as Ursula Radel-Leszczynski—whom Kohn introduced to Madoff—created and controlled Senator for the purpose of investing assets with BLMIS. Senator received approximately $95 million in avoidable direct and/or indirect transfers from BLMIS.

62. Hermes International Fund Limited ("Hermes") is an investment fund organized under the laws of Bermuda and later redomiciled under the laws of the British Virgin Islands. Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands. Hermes was invested with BLMIS through its wholly-owned subsidiary, Lagoon Investment Limited, in whose name accounts were held at BLMIS. Upon information and belief, Hermes was created and run by the Benbassat Family and related individuals and entities, identified below. Hermes received approximately $250 million in avoidable direct and/or indirect transfers from BLMIS.

63. Lagoon Investment Limited ("Lagoon") is a company organized under the laws of the British Virgin Islands on or about January 7, 1992. Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands. Lagoon is a wholly-owned subsidiary of Hermes that, upon information and belief, was created by the Benbassat Family and related entities and individuals, identified below, for the purpose of investing assets with BLMIS. Lagoon was the nominal holder of five BLMIS accounts (account numbers 1FN021, 1FN066, 1FN096, 1FR015, and 1FR016) and received approximately $250 million in direct and/or indirect avoidable transfers from BLMIS.

64. Thema Fund Ltd. ("Thema Fund") is an investment fund organized under the laws of the British Virgin Islands. Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

Thema Fund invested with BLMIS through its wholly-owned subsidiary, Thema Wise Investments Ltd., in whose name an account was held at BLMIS. Upon information and belief, Thema Fund was created and controlled by the Benbassat Family and their related entities for the purpose of investing a substantial portion of its assets with BLMIS. Thema Fund received approximately $132 million in direct and/or indirect avoidable transfers from BLMIS.

65. Thema Wise Investments Ltd. ("Thema Wise") is a company organized under the laws of the British Virgin Islands. Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands. Thema Wise is a wholly-owned subsidiary of Thema Fund that, upon information and belief, was created and controlled by the Benbassat Family and their related entities for the purpose of investing assets of Thema Fund with BLMIS. Thema Wise was the holder of BLMIS account number 1FR093, and received approximately $132 million in direct and/or indirect avoidable transfers from BLMIS.

66. Thema International Fund plc ("Thema International") is an investment fund organized under the laws of Ireland. Its registered agent is William Fry, Solicitors, Fitzwilton House, Wilton Place, Dublin 2, Ireland. Upon information and belief, since at least December 31, 2006, Thema International has been authorized to operate as a UCITS fund within the meaning of the UCITS regulations in Ireland. Upon information and belief, the Benbassat Family and their related entities created and controlled Thema International for the purpose of investing assets with BLMIS. Thema International received approximately $692 million in direct and/or indirect avoidable transfers from BLMIS.

67. Geo Currencies Ltd. S.A. ("Geo Currencies") is an investment fund organized under the laws of Panama. Its registered agent is B. Arias & Asociados, Banco General Tower,

15th Floor, Aquilino de la Guardia Street, Marbella, Panamá 5, Republic of Panama. Geo Currencies received the benefit of approximately $416,000 in avoidable direct and/or indirect transfers from BLMIS.

68. <u>Lagoon Investment Trust</u> ("Lagoon Trust") was created pursuant to a trust deed between defendants Lagoon and Hermes Asset Management Limited, and is a professional fund recognized in the British Virgin Islands. Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands. Upon information and belief, defendant Aurelia Fund Management Limited, along with the Benbassat Family and their related entities, created and controlled Lagoon Trust for the purpose of investing with BLMIS. Upon information and belief, Lagoon Trust received approximately $250 million in direct and/or indirect avoidable transfers from BLMIS.

69. Collectively, Primeo, Herald, Herald (Lux), Alpha Prime, Senator, Hermes, Lagoon, Thema Fund, Thema Wise, Thema International, Geo Currencies, and Lagoon Trust are referred to herein as the "Feeder Fund Defendants."

### *The Management Defendants*

### *Management Defendants Primarily Associated With Medici Funds*

70. <u>20:20 Medici AG</u> ("Bank Medici") is a company organized under the laws of Austria, with a registered address at Hegelgasse 17/17, 1010 Vienna, Austria. Defendant UniCredit Bank Austria AG founded Bank Medici in 1994. Later that year, Kohn purchased a majority interest in Bank Medici. In 2003, Bank Medici was granted a banking license and was renamed Bank Medici AG. Upon information and belief, Bank Medici's banking license was revoked on or about May 28, 2009. On or about June 19, 2009, it changed its name to 20:20 Medici AG and, upon information and belief, continues to operate without a banking license. Also upon information and belief, Bank Medici helped create and control two of the Feeder Fund

Defendants, Herald and Herald (Lux), and helped create and market Primeo. In addition, at various times, Bank Medici acted as the investment manager to Herald, Thema International, and Herald (Lux), and marketed Herald and Herald (Lux) to investors across the globe. Upon information and belief, Bank Medici received at least $15 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

71.     UniCredit Bank Austria AG ("Bank Austria") is a company organized under the laws of Austria, with a registered address at Schottengasse 6-8, 1010 Vienna, Austria. Upon information and belief, during a portion of the relevant period, Bank Austria maintained a branch office at 150 E. 42nd Street, New York, New York. Bank Austria is a subsidiary of defendant UniCredit S.p.A. Upon information and belief, Bank Austria helped create, control, and/or market Primeo, Alpha Prime, and Senator. Upon information and belief, Bank Austria received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

72.     BA Worldwide Fund Management Ltd. ("BA Worldwide") was a company organized under the laws of the British Virgin Islands with a registered address at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. BA Worldwide was a subsidiary of defendant Bank Austria and was voluntarily liquidated on or about February 22, 2008. At various times, BA Worldwide served as the investment adviser to Primeo, Alpha Prime, and Thema International. Upon information and belief, BA Worldwide received at least $68 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

73.     UniCredit S.p.A. ("UniCredit") is a company organized under the laws of Italy, with a registered address at Via Alessandro Specchi, 16, 00186, Rome, Italy, and a general

management headquarter office at Piazza Cordusio, 20123, Milan, Italy. Upon information and belief, UniCredit has a branch office at 150 E. 42nd Street, New York, New York. UniCredit is the parent company of defendants Bank Austria and Pioneer and, at various times, upon information and belief, helped control the activities of Primeo. Upon information and belief, UniCredit received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

74.     Herald Asset Management Limited ("Herald Management") is a company organized under the laws of the Cayman Islands with a last known registered address at Whitehall House, 238 North Church Street, P.O. Box 31362, Seven Mile Beach, George Town, Grand Cayman, Cayman Islands. Upon information and belief, Herald Management is wholly-owned by Kohn's husband, defendant Erwin Kohn, via a trust. Herald Management served as investment manager to Herald. Upon information and belief, Herald Management received at least $99 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

75.     Eurovaleur, Inc. ("Eurovaleur") is a company organized under the laws of the State of New York with multiple last known addresses at 230 Park Avenue, Room 539, New York, New York 10169, and 767 5th Avenue, 5th Floor, Room 507, New York, New York 10022. Eurovaleur is wholly-owned by Kohn and members of her family. Upon information and belief, Eurovaleur served as the investment sub-adviser to Primeo and received 20% of the fees that BA Worldwide received in connection with Primeo. Upon information and belief, Eurovaleur holds an ownership interest in defendant Thema Asset Management Limited. Upon information and belief, Eurovaleur received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

76.     <u>Pioneer Alternative Investment Management Limited</u> ("Pioneer") is a company organized under the laws of Ireland with a registered address at 1, George's Quay Plaza, George's Quay, Dublin 2, Ireland.  Pioneer is a wholly-owned subsidiary of Pioneer Global Asset Management S.p.A., a subsidiary of UniCredit.  Pioneer served as an investment adviser to Primeo.  Upon information and belief, Pioneer received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

77.     <u>Alpha Prime Asset Management Ltd.</u> ("Alpha Prime Management") is a company organized under the laws of Bermuda with a registered address at 83 Front Street, Hamilton HM 12, Bermuda.  Alpha Prime Management served as the investment manager to Alpha Prime. Upon information and belief, Alpha Prime Management received fees and/or distributions of at least $16 million to which it is not entitled and/or which are composed, in part, of Customer Property.

78.     <u>Regulus Asset Management Limited</u> ("Regulus") is a company organized under the laws of Bermuda with a registered address at 83 Front Street, Hamilton HM 12, Bermuda. Regulus served as an investment manager to Senator.  Upon information and belief, Regulus received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

79.     <u>Carruba Asset Management Limited</u> ("Carruba") is a company organized under the laws of Bermuda with a registered address at 83 Front Street, Hamilton HM 12, Bermuda. Carruba served as investment adviser to Senator.  Upon information and belief, in connection with that role, Carruba received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

80.    Tereo Trust Company Limited ("Tereo Trust") is a company organized under the laws of Bermuda with a principal place of business at Swiss Fund Services, 83 Front Street, Hamilton HM 12, Bermuda.  Tereo Trust wholly owns Alpha Prime Management, Regulus, and Carruba.  Upon information and belief, Tereo Trust received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

### *Management Defendants Associated with the Benbassat Funds*

81.    Genevalor, Benbassat et Cie ("Genevalor") is a partnership formed under the laws of Switzerland with a registered address at rue 6 Place Camoletti, CH 1207, Geneva, Switzerland.  Upon information and belief, defendant M. Benbassat co-founded Genevalor.  The following are partners in Genevalor:  A. Benbassat, S. Benbassat, Nespolo, D. Smith, M. Benbassat, and Union Bancaire Privée.  Upon information and belief, Genevalor helped control and create Hermes, Lagoon, Thema International, Thema Fund, Thema Wise, and Geo Currencies.  Genevalor, at various times, served as the distributor and sub-distributor of Thema International.  Upon information and belief, Genevalor received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

82.    Hermes Asset Management Limited ("Hermes Management") is a company organized under the laws of Bermuda with a registered address at Ecosse Ltd., Bermudiana Arcade, 3rd Floor, 27 Queen Street, Hamilton HM 11, Bermuda.  Upon information and belief, Hermes Management is owned and controlled, in part, by the Benbassat Family and/or Genevalor.  Hermes Management served as the investment manager of Hermes and Lagoon Trust.  Upon information and belief, in connection with those roles, Hermes Management received at least $79 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

83. <u>Thema Asset Management (Bermuda) Ltd.</u> ("Thema Management Bermuda") is a company organized under the laws of Bermuda with a registered address at Ecosse Ltd., Bermudiana Arcade, 3rd Floor, 27 Queen Street, Hamilton HM 11, Bermuda. Upon information and belief, members of the Benbassat Family are co-owners and directors of Thema Management Bermuda. Thema Management Bermuda served as the investment manager of Thema Fund. Upon information and belief, Thema Management Bermuda received approximately $10 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

84. <u>Thema Asset Management Limited</u> ("Thema Management BVI") is a company organized under the laws of the British Virgin Islands with best known registered addresses at Codan Trust Company (B.V.I) Ltd., Romasco Place, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, and at Harneys Corporate Services, Ltd., Craigmuir Chambers, P.O. Box 71, Road Town, Tortola VG1110, British Virgin Islands. Upon information and belief, members of the Benbassat Family formed and are the directors of Thema Management BVI and, along with Kohn's company, Eurovaleur, are owners of the company. Thema Management BVI served as the investment manager and global distributor for Thema International. Upon information and belief, Thema Management BVI received at least $105 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

85. <u>Equus Asset Management Limited</u> ("Equus") is a company organized under the laws of Bermuda with a registered address at Warner Building, 85 Reid Street, Hamilton HM 12, Bermuda. Equus is owned, in substantial part, by entities owned by members of the Benbassat Family and other partners in Genevalor. Upon information and belief, principals of Equus co-founded and were active in controlling Hermes, Thema Fund, Thema International, and Geo

Currencies.  Equus provided administrative support to Thema Management Bermuda in its capacity as investment manager of Thema Fund.  In addition, Equus holds ownership interests in Hermes Management and Thema Management Bermuda.  Upon information and belief, Equus received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

86.     Equus Asset Management Partners, L.P. ("Equus Partners") is a partnership formed under the laws of Bermuda with a registered office at Warner Building, 85 Reid Street, Hamilton HM 12, Bermuda.  Defendants A. Benbassat, S. Benbassat, M. Benbassat, Nespolo, and D. Smith hold, or have held, partnership interests in Equus Partners.  Equus Partners is an owner of defendant Equus and, ultimately, holds interests in Hermes Management and Thema Management Bermuda by virtue of its ownership interest in Equus.  Equus Partners also provided administrative support to Hermes Management, in its capacity as investment manager of Hermes and Lagoon Trust.  Upon information and belief, Equus Partners received fees and/or other distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

87.     Aurelia Fund Management Limited ("Aurelia") is a company organized under the laws of Bermuda with a registered address at Conyers, Dill & Pearman, Clarendon House, 2 Church Street, Hamilton HM 11, Bermuda.  Upon information and belief, Aurelia has wound up, or is in the process of winding up, its operations in Bermuda and no longer is a going concern.  Upon information and belief, Aurelia holds an ownership interest in Hermes Management, and principals of Aurelia co-founded and were active in controlling Hermes and Lagoon Trust.  Aurelia provided administrative support to Hermes Management, the investment manager of Hermes and Lagoon Trust.  Aurelia was also the investment adviser of Lagoon Trust.  Upon

information and belief, Aurelia received fees and/or other distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

88.     Bank Medici, Bank Austria, Genevalor, Herald Management, BA Worldwide, Pioneer, Eurovaleur, Alpha Prime Management, Regulus, Carruba, Hermes Management, Thema Management BVI, Thema Management Bermuda, Equus, Equus Partners, and Aurelia are referred to collectively herein as the "Management Defendants."

### *Beneficial Owners*

89.     Inter Asset Management Inc. ("Inter Asset") is a company organized under the laws of the British Virgin Islands.  Its registered agent is Citco B.V.I. Limited, Citco Building, P.O. Box 662, Wickhams Cay, Road Town, Tortola, British Virgin Islands.  Upon information and belief, Inter Asset has an ownership interest in Hermes Management, and received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

90.     T+M Trusteeship & Management Services S.A. ("T+M") is a company organized under the laws of Switzerland with a registered address at rue de Prince 9-11, 1204 Geneva, Switzerland.  Upon information and belief, T+M has an ownership interest in Thema Management BVI, and received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

91.     GTM Management Services Corp. N.V. ("GTM Management") is a company organized under the laws of Curaçao with a registered address at c/o Holland Intertrust (Antilles) N.V., De Ruyterkade 58A, Curaçao, Netherlands Antilles.  Upon information and belief, GTM Management has an ownership interest in Hermes Management, and received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

92.     <u>Aurelia Asset Management Partners</u> ("Aurelia Partners") was a partnership organized under the laws of Bermuda with a registered address at Chevron International Limited, Chevron House, 11 Church Street, Hamilton HM 11, Bermuda.  The partnership was dissolved on October 12, 2009.  Upon information and belief, partnership interests in Aurelia Partners were held by defendants Laurent Mathysen-Gerst, Olivier Ador, Pascal Cattaneo, Vladimir Stepczynski, and Jean-Marc Wenger.  Aurelia Partners was the owner of Aurelia.  Upon information and belief, Aurelia Partners received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

93.     <u>Cape Investment Advisors Limited</u> ("Cape Investment") is a company organized under the laws of Bermuda with a registered address at Warner Building, 85 Reid Street, Hamilton, HM 12, Bermuda.  Cape Investment holds an ownership interest in Thema Management Bermuda.  Upon information and belief, Cape Investment received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

94.     Bank Austria, UniCredit, Tereo Trust, Eurovaleur, Genevalor, Equus, Equus Partners, Cape Investment, Inter Asset, GTM Management, T+M, Aurelia, and Aurelia Partners, as well as the Individual Defendants named herein, are referred to collectively herein as the "Beneficial Owners."

### The HSBC Defendants

95.     <u>HSBC Holdings plc</u> ("HSBC Holdings") is a public limited corporation, incorporated under the laws of England and Wales, with a principal place of business at 8 Canada Square, London E14 5HQ, United Kingdom.  HSBC Holdings is the parent company of what is known as the HSBC Group, including all of the HSBC entities named as Defendants herein.  Upon information and belief, HSBC Holdings received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

96. <u>HSBC Bank plc</u> ("HSBC Bank") is a banking institution incorporated under the laws of England and Wales with a principal place of business at 8 Canada Square, London E14 5HQ, United Kingdom. HSBC Bank was the payee bank for all of the Feeder Fund Defendants. Upon information and belief, all moneys that were deposited with BLMIS by the Feeder Fund Defendants went through HSBC Bank. Upon information and belief, all moneys which were withdrawn from BLMIS by the Madoff Feeder Fund Defendants went through HSBC Bank. Upon information and belief, HSBC Bank received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

97. <u>HSBC Bank USA, N.A.</u> ("HSBC Bank USA") is a national bank chartered by the Office of the Comptroller of the Currency with a principal executive office at 452 Fifth Avenue, New York, New York 10018 and also with a corporate headquarters at 1800 Tysons Boulevard, Suite 50, McLean, VA. HSBC Bank USA operates over 50 branches in Manhattan alone. HSBC Bank USA created structured financial products and entered into transactions involving those structured products, which ultimately served to increase the amount of money invested with BLMIS's IA Business. Upon information and belief, HSBC Bank USA received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

98. <u>HSBC Securities Services (Bermuda) Limited</u> ("HSSB"), is incorporated under the laws of Bermuda with a principal place of business at 6 Front Street, Hamilton HM 11, Bermuda. Upon information and belief, HSSB served as administrator to Thema Fund, Hermes, and Alpha Prime, and directed and facilitated the transfer of millions of dollars into and out of BLMIS's IA Business. Upon information and belief, HSSB received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

99.     <u>HSBC Institutional Trust Services (Bermuda) Limited</u> ("HITSB") is a corporation organized and existing under the laws of Bermuda with a principal place of business at 6 Front Street, Hamilton HM 11, Bermuda.  HITSB served as the custodian for Alpha Prime, Hermes, and Thema Fund.  Upon information and belief, HITSB received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

100.    <u>HSBC Bank Bermuda Limited</u> ("HSBC Bank Bermuda"), formerly known as The Bank of Bermuda Limited, is a banking institution with a principal place of business at 6 Front Street, Hamilton HM 11, Bermuda.  HSBC Bank Bermuda formerly served as the administrator and custodian of Alpha Prime, Thema Fund, Hermes, and Square One Fund Limited ("Square One"), which is a defendant in a separate action being brought by the Trustee.  HSBC Bank Bermuda also served as custodian for the Kingate Funds, both of which are defendants in a separate action being brought by the Trustee.  Upon information and belief, HSBC Bank Bermuda entered into at least one sub-custodian agreement with BLMIS.  Upon information and belief, HSBC Bank Bermuda received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

101.    <u>HSBC Securities Services (Luxembourg) S.A.</u> ("HSSL"), formerly known as Bank of Bermuda (Luxembourg) S.A., is a limited liability company incorporated as a société anonyme under the laws of the Grand Duchy of Luxembourg, and maintains its principal place of business at 16, boulevard d'Avranches, L-1160 Luxembourg.  HSSL served as administrator to Lagoon, Herald, Herald (Lux), and Senator, and, upon information and belief, served as the sub-administrator to Thema Fund, Alpha Prime, Hermes, and Primeo.  HSSL also served as custodian to Lagoon, Herald, Herald (Lux), Primeo, and Senator, and served as sub-custodian to Alpha Prime, Hermes, and Thema Fund.  Also, upon information and belief, HSSL engaged

BLMIS to act as its sub-custodian to those Madoff Feeder Funds for which the bank served as custodian or sub-custodian. Upon information and belief, HSSL received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

102. <u>HSBC Bank (Cayman) Limited</u> ("HSBC (Cayman)"), which merged into Bank of Bermuda (Cayman) Limited, is a banking institution incorporated and existing under the laws of the Cayman Islands with a principal place of business at HSBC House, 68 West Bay Road, Grand Cayman, KY1-1102, Cayman Islands. HSBC (Cayman) served as the administrator of Primeo. Upon information and belief, HSBC (Cayman) received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

103. <u>HSBC Private Banking Holdings (Suisse) S.A.</u> ("HSBC Private Banking Holdings (Suisse)") is a majority-owned subsidiary of HSBC Bank existing under the laws of Switzerland, with a principal place of business at Quai du Général Guisan, 2, P.O. Box 3580, CH-1211, Geneva 3, Switzerland. Upon information and belief, HSBC Private Banking Holdings (Suisse)—and/or entities under its control—marketed and directed investor moneys to the Madoff Feeder Funds, including the Feeder Fund Defendants. Upon information and belief, HSBC Private Banking Holdings (Suisse) received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

104. <u>HSBC Private Bank (Suisse) S.A.</u> ("HSBC Private Bank (Suisse)") is a public company incorporated and existing under the laws of Switzerland, with a principal place of business at Quai du Général Guisan, 2, P.O. Box 3580, CH-1211 Geneva 3, Switzerland. It is a subsidiary of HSBC Private Banking Holdings (Suisse). Upon information and belief, HSBC Private Banking Holdings (Suisse)—and/or entities under its control—marketed Madoff Feeder Funds, including the Feeder Fund Defendants to investors. Upon information and belief, HSBC

Private Bank (Suisse) received fees and/or distributions to which it was not entitled and/or which are composed, in part, of Customer Property.

105.    HSBC Institutional Trust Services (Ireland) Ltd. ("HITSI") is a limited liability company incorporated under the laws of Ireland with a principal place of business at One Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland.  HITSI served as custodian to Thema International, and other Madoff Feeder Funds, including Defender, Landmark, and Optimal. Upon information and belief, HITSI appointed BLMIS to act as its sub-custodian for those Madoff Feeder Funds for which it served as custodian.  Upon information and belief, HITSI received fees and/or distributions to which it was not entitled and/or which are composed, in part, of Customer Property.

106.    HSBC Securities Services (Ireland) Ltd. ("HSSI") is a limited liability company incorporated under the laws of Ireland with a registered office at One Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland.  HSSI served as administrator to Thema International, Defender, Landmark, and Optimal.  Upon information and belief, HSSI received fees and/or distributions to which it was not entitled and/or which are composed, in part, of Customer Property.

107.    HSBC Fund Services (Luxembourg) S.A. ("HSBC Fund Services"), formerly known as Management International (Luxembourg) S.A., is a wholly-owned subsidiary of HSBC Holdings incorporated under the laws of the Grand Duchy of Luxembourg, and has a registered address at 16, boulevard d'Avranches, L-1160 Luxembourg.  HSBC Fund Services acted as sub-administrator and sub-registrar for Hermes.  Upon information and belief, HSBC Fund Services received fees and/or distributions to which it was not entitled and/or which are composed, in part, of Customer Property.

108. HSBC Holdings, HSBC Bank, HSBC Bank USA, HITSB, HITSI, HSBC Private Banking Holdings (Suisse), HSBC Private Bank (Suisse), HSSB, HSSI, HSSL, HSBC (Cayman), HSBC Fund Services, and HSBC Bank Bermuda are referred to collectively herein as the "HSBC Defendants."

109. In addition to the fees and/or distributions described above, the HSBC Defendants are liable to the Trustee for damages caused by actions that enabled, prolonged, and worsened the Ponzi scheme, in amounts to be determined at trial but, in any event, no less than the subscriptions which the HSBC Defendants facilitated into BLMIS and/or the Feeder Fund Defendants.

### *Other Individuals*

110. <u>Erwin Kohn</u> ("E. Kohn") is the husband of Kohn, and owns Herald Management through a trust vehicle.

111. <u>Ursula Radel-Leszczynski</u> ("Radel-Leszczynski") served as a director of Primeo and Alpha Prime. Radel-Leszczynski also was the President of BA Worldwide from 2000 until at least 2007 and, upon information and belief, was subsequently employed by Pioneer or one of its affiliates. Also upon information and belief, Radel-Leszczynski co-founded Alpha Prime and Senator; was actively involved in the management of Primeo, Alpha Prime, and Senator; and managed Madoff's relationship with Primeo, Alpha Prime, and Senator. Upon information and belief, Radel-Leszczynski received fees and/or distributions to which she was not entitled and/or which are composed, in part, of Customer Property.

112. <u>Roberto Nespolo</u> ("Nespolo") is a general partner of Genevalor and, upon information and belief, managed, administered, and marketed Hermes, Thema International, and Thema Fund for many years. Nespolo also served as a director of Thema Fund, Thema Management Bermuda, and Equus, and is a general partner of Equus Partners. Upon information

and belief, Nespolo received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

113.     David T. Smith ("D. Smith") is a general partner of Genevalor and, upon information and belief, managed, administered, and marketed Hermes, Thema International, and Thema Fund for many years.  D. Smith served as a director of Thema Fund, Hermes (and its subsidiary, Lagoon), Thema International, Hermes Management, and Thema Management Bermuda; was the President and a director of Equus; was the President and a Director of Cape Investment; and was a general partner of Equus Partners.  Upon information and belief, D. Smith received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

114.     Laurent Mathysen-Gerst ("Mathysen-Gerst"), upon information and belief, co-founded and managed, administered, and marketed Hermes and Lagoon Trust.  Mathysen-Gerst also served as a director of Hermes (and its subsidiary, Lagoon); was an authorized signatory for Hermes; served on Hermes's investment committee (which decided with which managers the fund invested); was a director and the President of Aurelia; and was a general partner of Aurelia Partners.  Upon information and belief, Mathysen-Gerst received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

115.     Olivier Ador ("Ador"), upon information and belief, co-founded, managed, administered, and marketed Hermes and Lagoon Trust.  Ador also was a general partner of Aurelia Partners.  Upon information and belief, in connection with those roles, Ador received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

116.     Pascal Cattaneo ("Cattaneo"), upon information and belief, co-founded and managed, administered, and marketed Hermes and Lagoon Trust.  Cattaneo served as a director and Vice-President of Aurelia, and was a general partner of Aurelia Partners.  Upon information and belief, Cattaneo received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

117.     Vladimir Stepczynski ("Stepczynski"), upon information and belief, co-founded, managed, administered, and marketed Hermes and Lagoon Trust.  Stepczynski served as a director of Aurelia; was an authorized signatory for Hermes; served on Hermes's investment committee (which decided with which managers the fund invested); and was a general partner of Aurelia Partners.  Upon information and belief, Stepczynski received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

118.     Jean-Marc Wenger ("Wenger"), upon information and belief, co-founded, managed, administered, and marketed Hermes and Lagoon Trust.  Wenger served as a director of Aurelia, and was a general partner of Aurelia Partners.  Upon information and belief, Wenger received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

119.     Kohn, E. Kohn, Radel-Leszczynski, M. Benbassat, A. Benbassat, S. Benbassat, Nespolo, D. Smith, Mathysen-Gerst, Ador, Cattaneo, Stepczynski, and Wenger are referred to collectively herein as the "Individual Defendants."

## PERSONAL JURISDICTION

### *Individual Defendants*

120.     This Court has personal jurisdiction over all of the Individual Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004.  All of the Individual Defendants have maintained minimum contacts with New York in connection with the claims

alleged herein. All of the Individual Defendants provided substantial assistance to Madoff in perpetrating a massive fraud and, thereby, committed tortious acts, both within and outside of New York, causing injury within New York. In addition, all of the Individual Defendants and/or their agents have traveled to New York to meet with Madoff, undertaken significant commercial activities in New York, and derived significant revenue from New York.

121. Kohn, Radel-Leszczynski, M. Benbassat, A. Benbassat, S. Benbassat, and Mathysen-Gerst regularly communicated with persons in New York regarding BLMIS.

122. A. Benbassat, D. Smith, and Radel-Leszczynski entered into agreements with BLMIS on behalf of Thema Wise, Thema International, Lagoon, and/or Alpha Prime, and delivered the agreements, or caused the agreements to be delivered, to BLMIS's headquarters in New York.

123. Upon information and belief, all of the Individual Defendants routinely assisted in transferring investor funds to BLMIS for the express purpose of investing with BLMIS.

124. Upon information and belief, Radel-Leszczynski and Ador have filed customer claims in this action seeking to recover assets allegedly lost through BLMIS, and thus have submitted to this Court's jurisdiction.

### *Feeder Fund Defendants*

125. This Court has personal jurisdiction over the Feeder Fund Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004. All of the Feeder Fund Defendants have maintained minimum contacts with New York in connection with the claims alleged herein. The Feeder Fund Defendants all invested, directly or indirectly, with BLMIS, which operated its principal place of business in New York, New York. Additionally, BLMIS maintained accounts for the benefit of the Feeder Fund Defendants in New York, New York. The Feeder Fund Defendants and/or their agents sent, and/or directed others to send, funds to BLMIS, and

received funds from BLMIS.  The Feeder Fund Defendants used New York banks when redeeming funds distributed to them by BLMIS and when investing additional funds with BLMIS.  All of the Feeder Fund Defendants and/or their agents routinely directed the transfer of their investors' funds to, and received moneys and receipts from, BLMIS's account at JPMorgan Chase, Account #xxxxxxxxxxxx'703 (the "703 Account"), in New York, New York to conduct trading activities.

126.     Alpha Prime, Herald, Herald (Lux), Geo Currencies, Hermes, Lagoon, Primeo, Senator, Thema Fund, Thema Wise, and Thema International, and/or their agents, executed and/or caused to be executed a variety of agreements relating to BLMIS accounts they maintained and/or that were maintained on their behalf.  Specifically, the Feeder Fund Defendants executed, or caused to be executed, Customer Agreements, Option Agreements, and Trading Authorizations Limited to Purchases and Sales of Securities and Options, and delivered those agreements to BLMIS at BLMIS's headquarters in New York, New York.  By their terms, those agreements were to be performed by BLMIS in New York through activities that were to take place in New York.

127.     Further, certain Feeder Fund Defendants—specifically, Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise— filed SIPA claims seeking to recover funds that they allegedly lost on their investments in BLMIS, and thus have submitted to this Court's jurisdiction.

### **Management Defendants**

128.     This Court has personal jurisdiction over all of the Management Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004.  All of the Management Defendants maintained minimum contacts with New York in connection with the claims alleged herein.  In addition, all of the Management Defendants routinely directed the transfer of investor

funds to, and the receipt of investor funds from, BLMIS in New York; derived significant revenue from the purported sales and purchases of securities in New York; and committed tortious acts, both within and outside of New York, causing injury within New York. The Management Defendants reasonably should have expected those acts to have consequences in New York, and derived substantial revenue from interstate or international commerce.

129. Upon information and belief, the Management Defendants and/or their agents communicated regularly with persons in New York regarding BLMIS, and their agents communicated with BLMIS on multiple occasions in connection with the allegations herein.

130. Upon information and belief, certain Management Defendants delivered to BLMIS's headquarters in New York account opening documents, including agreements, relating to BLMIS accounts maintained for the Feeder Fund Defendants.

131. Upon information and belief, the Management Defendants all received BLMIS account statements and trade confirmations, and derived substantial revenue based on the purported trading activities of BLMIS.

### *Beneficial Owners of Management Defendants*

132. This Court has personal jurisdiction over all of the Beneficial Owners pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004. All the Beneficial Owners have maintained minimum contacts with New York in connection with the claims alleged herein. At all relevant times, all of the Beneficial Owners have derived significant revenue from New York and committed tortious acts, both within and outside of New York, causing injury within New York.

133. Upon information and belief, during at least a portion of the relevant period, Bank Austria, Eurovaleur, and UniCredit maintained offices in New York, New York, and regularly transacted business in New York.

134.    Upon information and belief, all of the Beneficial Owners have assisted in directing the transfer of funds into, and the receipt of funds from, the 703 Account for the explicit purpose of investing with BLMIS, and they and/or their agents regularly transacted business in New York.

135.    Upon information and belief, all of the Individual Defendants who are Beneficial Owners, and/or their agents, traveled to New York, New York to meet with Madoff in the offices of BLMIS, and transacted business in New York.  These Defendants have purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York and by receiving Customer Property to their benefit.

### *HSBC Defendants*

136.    This Court has personal jurisdiction over all of the HSBC Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004.  All of the HSBC Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.

137.    Acting in their capacity as fund administrators and sub-administrators, HSSI, HSBC Bank Bermuda, HSBC (Cayman), HSSB, HSSL, and HSBC Fund Services (collectively, the "HSBC Administrator Defendants") transmitted instructions to BLMIS, and received from BLMIS trade confirmations, account statements, and other information.  The HSBC Administrator Defendants communicated with BLMIS in connection with their "duties" as fund administrators and were compensated for such communications.  The HSBC Administrator Defendants transmitted the false information provided by BLMIS to customers located around the world, including within the United States.  The HSBC Administrator Defendants have availed themselves of the laws of the State of New York by undertaking substantial commercial activities in New York and by receiving Customer Property to their benefit.

138.     Acting in their capacity as fund custodians and sub-custodians, HITSI, HSSL, HITSB, and HSBC Bank Bermuda (collectively, the "HSBC Custodian Defendants") directed and facilitated the transfer of hundreds of millions of dollars to and from BLMIS in New York for the purported purchase and sale of securities in New York.  Through these activities, the HSBC Custodian Defendants purposely availed themselves of the laws of the State of New York by undertaking substantial commercial activities in New York and by receiving Customer Property to their benefit.  The HSBC Custodian Defendants committed tortious acts both within and outside of New York, causing injury in New York, and reasonably should have expected those acts to have consequences in New York and elsewhere in the United States.

139.     Each HSBC Custodian Defendant that entered into a sub-custodian agreement with BLMIS engaged BLMIS as its agent to act as the sub-custodian of fund assets.  BLMIS, acting as an agent on behalf of the HSBC Custodian Defendants, committed multiple torts in the State of New York causing substantial injury to persons in the State of New York and elsewhere in the United States.

140.     Acting in their capacity as payee banks, certain HSBC Defendants, including HSBC Bank, received and facilitated the transfer of stolen Customer Property out of BLMIS in New York or for the benefit of the Feeder Fund Defendants, and facilitated the transfer of funds from certain Feeder Fund Defendants to BLMIS in New York.

141.     Further, certain of the HSBC Defendants, including HSBC Bank and HSBC Bank USA, increased the flow of funds into Madoff's Ponzi scheme by creating and marketing structured financial products.  Those products facilitated the investment of hundreds of millions of dollars into the Madoff Feeder Funds.  The inflow of funds from those structured products

helped to perpetuate Madoff's Ponzi scheme, thus deepening the insolvency of BLMIS and perpetuating Madoff's fraud.

142.    HSBC Bank USA is domiciled in the United States, and maintains offices and regularly transacts business in the State of New York.

143.    The HSBC Defendants have purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York, and by receiving Customer Property to their benefit.  The HSBC Defendants derived significant revenue from New York.  The HSBC Defendants have committed tortious acts both within and outside of New York, causing injury in New York, and the HSBC Defendants expected or should have reasonably expected those acts to have consequences in New York.

## RED FLAGS STRONGLY SUGGESTED
## THAT BLMIS'S IA BUSINESS WAS A FRAUD

144.    For years, the Defendants invested—and encouraged others to invest—through BLMIS's IA Business notwithstanding explicit awareness of myriad red flags indicating that Madoff was engaged in a massive fraud.  Despite observing and even internally reporting many signs that, at the very least, Madoff was not investing the way he purported to, the Defendants abandoned all candor and skepticism in order to profit from the supernaturally consistent returns of BLMIS's IA Business.  The red flags were shocking not only for what they demonstrated about Madoff's investment strategy, but also for what they demonstrated about the depth of the Defendants' awareness of the fraud.

### *Madoff's Secrecy*

145.    Although Madoff touted the simplicity of his investment strategy, he refused to provide even the most basic details about how he implemented that strategy.  Madoff's secrecy was a red flag.  As HSBC noted in a 2001 report regarding Greenwich Sentry, L.P. ("Sentry"):

"transparency issues prevent us from conducting a proper due diligence." Yet HSBC had no problem encouraging its customers to invest in a wide array of identical Madoff funds and products. This concern repeatedly was identified by the Defendants, who ultimately ignored Madoff's inexplicable secrecy and the implication that there was something to hide.

146. The HSBC Defendants, Management Defendants, and Feeder Fund Defendants all acquiesced to Madoff's demands and kept Madoff's name out of offering documents relating to the Feeder Fund Defendants. In addition, to assist in maintaining Madoff's secrecy, the Feeder Fund Defendants were established in domiciles that permitted them to omit mention of both Madoff and BLMIS in offering materials.

147. The Defendants acknowledged that they were concealing Madoff's identity and role in managing the Madoff Feeder Funds. In August 2005, ███████████ of ██████ told ██████ ██████ of ██████, ████████████████████████████████████████████ ████████████████████████████████████████████████████

148. Similarly, Bank Medici employees were instructed never to mention Madoff when discussing the funds with unsophisticated investors.

### *Madoff's Purported Trade Volumes Were Too High to Be Believed*

149. Although for many years Madoff was not willing to disclose BLMIS's assets under management, the Defendants knew that the IA Business was too big to plausibly execute the SSC Strategy: with *at least* billions under management, there were not enough shares of stock to enable Madoff's supposedly seamless entry into and exit out of the market. Madoff purported to purchase baskets of stocks and options which were then allocated to each customer account. When BLMIS registered as an investment adviser in August 2006, it disclosed (inaccurately) that it had $11.7 billion in assets under management at the end of July 2006. Despite the inaccuracy of this disclosure, the Defendants should have recognized that a fund of

that size would entail trading immense percentages of some of the most highly-traded stocks in the world. At times, BLMIS's purported trades in stocks on behalf of its IA customers approached or exceeded the entire volume of trades in those stocks on the composite tape, which includes all listed and unlisted market volumes.

150. For example, on November 26, 2007, BLMIS purportedly traded 8,608 shares of Abbott Laboratories (ABT) in Senator's account, an amount which, when extrapolated to the entire IA Business, would have exceeded the daily volume of that stock traded on the composite index by 407%.

151. In fact, across all of the accounts of the funds for which the HSBC Administrator Defendants served as administrator, there were 484 purported trades in stocks which, when extrapolated across the entire IA Business, would have exceeded the entire volume of trades in those stocks on the composite tape, and an additional 445 which, if similarly extrapolated, would have represented more than 50% of the volume traded in those stocks on the composite tape. Across all of the accounts of the funds for which HSBC served as custodian there were 454 purported transactions where BLMIS's trades represented more than 50% of the purportedly traded stock's volume on the composite tape and an additional 484 where BLMIS's trades exceeded the entire volume of the purportedly traded stock on the composite tape.

152. Aside from the implausibility of effecting trades comprising more than half of the daily trading volume in a particular stock, the Defendants should have—at the very least—been concerned with the fact that these massive trades never caused *any market displacement whatsoever*.

153. Despite the large volumes that Madoff purported to trade, BLMIS's IA Business never caused the slightest ripple in the market. Madoff purported to fully exit and re-enter the

market eight to twelve times every year, each time in just a few days, trading billions of dollars worth of stocks without causing any price displacement or other market effect. As the world now knows, this displacement was never observed because the trading did not occur. Based on the lack of observable market reaction, the Defendants knew or should have known that Madoff's trades were not happening as he claimed.

154.    At the very least, these observations should have caused the Defendants to inquire further about Madoff's purported trading activity. Despite these signs that BLMIS was not trading in the manner represented to its customers, the Defendants buried their heads in the sand, and the Management Defendants and HSBC Defendants continued to receive fees for their "efforts."

### *There Were Not Enough Options to Implement Madoff's Purported Strategy*

155.    The Defendants were on notice of the impossibility of executing the number of options contracts required by the SSC Strategy. It should have been obvious that there was insufficient open interest in the listed options contracts required to hedge the billions of dollars under management at BLMIS's IA Business. Additionally, it would be, practically speaking, impossible to find OTC counterparties to supply the required option liquidity.

156.    While, at times, Madoff claimed to purchase options over-the-counter, at other times he claimed to purchase the option contracts on the Chicago Board Options Exchange ("CBOE"). Either method was, on its face, impossible on numerous occasions, the option volume reported to BLMIS's customers exceeded the total volume of comparable options contracts traded on the CBOE by many hundreds and even thousands of times. The volume of the purported options trading in the Feeder Fund Defendants' accounts alone warranted further investigation by sophisticated financial entities such as the Defendants. However, the Defendants ignored this red flag and continued to market the funds.

157.    In addition, there were days on which Madoff purportedly executed options trades, but publicly available records show no options that had the same purchase date, strike price, and expiration date as those Madoff purportedly traded on the CBOE on those days.  The Defendants also ignored this red flag.

158.    The purported options trading in each of the Funds' accounts was far beyond worldwide reported volume.  As set forth in the following table, the volume of options contracts which BLMIS reported to the Defendants and the Madoff Feeder Funds exceeded the total volume of contracts for options with the same purchase date, strike price, and expiration date traded on the CBOE:

|  | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|
| Alpha Prime/Alpha Prime Management | 153 | 440 | 34.77% |
| Aurelia/Equus Partners | 381 | 844 | 45.14% |
| BA Worldwide | 561 | 837 | 67.03% |
| Bank Medici | 236 | 399 | 59.15% |
| Defender | 72 | 102 | 70.59% |
| Eurovaleur | 272 | 714 | 38.10% |
| Genevalor | 613 | 860 | 71.28% |
| Geo Currencies | 55 | 631 | 8.72% |
| Herald/Herald Management | 223 | 399 | 55.89% |
| Herald (Lux) | 31 | 57 | 54.39% |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 381 | 844 | 45.14% |
| HITSB | 141 | 161 | 87.58% |
| HSBC Administrator | 780 | 871 | 89.55% |
| HSBC Bank Bermuda | 784 | 861 | 91.06% |
| HSBC (Cayman) | 275 | 724 | 37.98% |
| HSBC Custodian | 813 | 875 | 92.91% |
| HSSB | 392 | 844 | 46.45% |
| HSSI/HITSI | 727 | 839 | 86.65% |
| HSSL | 562 | 859 | 65.42% |
| Kingate Euro | 422 | 843 | 50.06% |
| Kingate Global | 740 | 838 | 88.31% |
| Landmark | 43 | 80 | 53.75% |

| | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|
| Optimal | 654 | 837 | 78.14% |
| Pioneer | 3 | 10 | 30.00% |
| Primeo Fund | 275 | 724 | 37.98% |
| Senator/Regulus/Carruba | 52 | 138 | 37.68% |
| Square One | 64 | 822 | 7.79% |
| Thema International | 502 | 825 | 60.85% |
| Thema Management BVI | 366 | 674 | 54.30% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 126 | 553 | 22.78% |

159.     Similarly, as described in the following graphs, from 2001 to 2008, BLMIS purported to trade—on behalf of accounts serviced by the HSBC Administrator Defendants—volumes that regularly were many hundreds of times greater than the total number of put and call options for options executed on the CBOE with the same purchase date, strike price, and expiration date:



-58-



HSBC - Administrator Historic Quarterly Average Option Activity compared to CBOE 2001 - 2008 (Puts Only)

160.    Similarly, as set forth in the following graphs, from 2001 to 2008, BLMIS

purported to trade—on behalf of accounts serviced by the HSBC Custodian Defendants—

volumes that regularly were many thousands of times greater than the total number of put and

call options executed on the CBOE with the same purchase date, strike price, and expiration date

options:





### *Many Trades Appeared to Have Been Executed Outside the Daily Price Range*

161.    Many of the trades described in the Defendants' account statements appeared to have been executed outside the daily price range. The Management Defendants and HSBC Defendants, as administrators, sub-administrators, custodians, and/or sub-custodians of the Feeder Fund Defendants, should have reviewed trade confirmations on a regular basis in connection with these duties. Yet these Defendants simply ignored that these trade confirmations often reflected average trade values that were outside the daily price range for such securities.

162.    For example, Lagoon's account statement for January 2001 reported the purchase of 33,120 shares of Pfizer Inc. (PFE) with a settlement date of January 8, 2001. BLMIS's records indicate that these shares were purchased on January 3, 2001 at a price of $40.56. However, the price range for Pfizer Inc. stock on January 3, 2001 ranged only between $46.44 and $42.50. Upon information and belief, the Defendants reviewed these trade confirmations and took no action in response to this anomaly. There are a total of 142 unique instances where Lagoon's account bought or sold securities outside of the daily price range.

163.    As set forth in the following table, BLMIS regularly purported to execute equities transactions on behalf of the Feeder Fund Defendants' and Madoff Feeder Funds' accounts that were outside the transacted security's daily price range:

|  | Equities Total Trades Out of Range |
| --- | --- |
| Alpha Prime/Alpha Prime Management | 26 |
| Aurelia/Equus Partners | 277 |
| BA Worldwide | 304 |
| Bank Medici | 22 |
| Defender | 0 |
| Eurovaleur | 141 |
| Genevalor | 568 |

|  | Equities Total Trades Out of Range |
|---|---|
| Geo Currencies | 52 |
| Herald/Herald Management | 22 |
| Herald (Lux) | 0 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 277 |
| HITSB | 3 |
| HSBC Administrator | 1,116 |
| HSBC Bank Bermuda | 815 |
| HSBC (Cayman) | 141 |
| HSBC Custodian | 1,396 |
| HSSB | 278 |
| HSSI/HITSI | 417 |
| HSSL | 566 |
| Kingate Euro | 140 |
| Kingate Global | 140 |
| Landmark | 0 |
| Optimal | 278 |
| Pioneer | 0 |
| Primeo Fund | 141 |
| Senator/Regulus/Carruba | 0 |
| Square One | 134 |
| Thema International | 139 |
| Thema Management BVI | 139 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 100 |

164. Any one of these facially impossible trades should have, at the very least, put these Defendants on notice that Madoff was not doing what he purported to do. In fact, across all of the HSBC Administrator Defendants' accounts, there were 1,116 equity transactions executed at a price above the daily high or below the daily low for the purportedly traded security.

165. Across all of the accounts for which the HSBC Defendants served as custodian, there were 1,396 equity transactions executed at a price above the daily high or below the daily low for the purportedly traded security.

## *Madoff Insisted on Acting as His Own Custodian*

166.     The HSBC Custodian Defendants were responsible for insuring that Madoff had the customer funds he purported to have. Their independence was critical to the integrity and trustworthiness of the customer statements. Of course, had there been a reliable custodian, it would have been obvious that Madoff did not have the assets he purported to have. Therefore, Madoff insisted that he act as his own custodian. Always willing to play the lapdog, HSBC delegated to BLMIS the safekeeping of the assets of a number of Madoff Feeder Funds, including, but not limited to, Thema International, Thema Fund and its subsidiary, Thema Wise, Primeo, Hermes and its subsidiary, Lagoon, Alpha Prime, Herald, Herald (Lux), Kingate Euro, Kingate Global, Square One, Senator, Defender, and Landmark.

167.     HSBC's delegation of its custodial duties violated industry practices requiring that assets be held by an independent custodian. Without an independent custodian, there could be no independent verification of assets. Madoff was able to conceal his trading—or the lack thereof—because BLMIS acted as prime broker, custodian, and portfolio manager. The Defendants should have recognized Madoff's insistence on keeping custody of the assets he managed for what it was—a hallmark of fraud.

168.     This was pointed out in stark terms by KPMG, the company that HSBC Defendants retained to review fraud risks at Madoff. KPMG wrote that allowing BLMIS to act as custodian for its own funds created the potential that the trades were "a sham in order to divert client cash."

169.     HSBC itself recognized this as a serious problem. In its own due diligence reviews, HSBC repeatedly pointed to BLMIS's role as a sub-custodian as a fraud risk. For example, HSBC identified as a risk the lack of "independent custody and verification of trading

activity away from the investment manager (unlike a standard hedge fund that has a prime broker)." HSBC identified this risk every year from at least 2003 through 2008, yet did nothing.

170. Further, upon information and belief, the Defendants never publicly disclosed that BLMIS acted as sub-custodian of investor assets. Instead, the HSBC Custodian Defendants allowed their names to be used by the Feeder Fund Defendants to indicate—inaccurately—that HSBC exercised control over and care of investor assets. Despite having no control over the assets and providing no supervision over BLMIS, the HSBC Custodian Defendants collected fees for these "services."

171. Armed with knowledge of this red flag and its implications, the Defendants nonetheless handed unsupervised responsibility over the safekeeping of the assets to BLMIS and Madoff. By giving BLMIS unchecked control over all of the assets, the HSBC Custodian Defendants played an indespensible role in allowing Madoff's scheme to grow and function for as long as it did.

### Negative Cash Balances

172. At times, Madoff appeared to execute the SSC Strategy in a manner which, had it been true, would have left his accountholders with a negative cash balance. This could occur for one of three principal reasons: (i) Madoff did not liquidate a sufficient number of Treasury bills to generate enough cash to purchase a basket of equities; (ii) the account satisfied a redemption request while in the market (BLMIS typically did not purport to sell anything to provide a withdrawal, but simply withdrew money, creating a negative cash event); or (iii) the purported purchase of put options occurred *before* the sale of corresponding call options, the sale of which was supposed to finance those put options according to the SSC Strategy.

173. In fact, on 832 separate occasions, the Feeder Fund Defendants' BLMIS accounts went into a negative cash position. This was clear based upon a cursory review of the relevant

customer statements.  For example, on January 11, 2006, Madoff purported to purchase a basket of equities on behalf of Primeo's BLMIS account but had not liquidated a sufficient number of Treasuries to finance the purchase, resulting in a negative cash balance in Primeo's account in the amount of $78,289,845.  Essentially, that meant that Madoff provided Primeo with a $78 million interest-free loan.  Similarly, over a fourteen-day period in November 2005, Primeo had an average negative balance of $39,786,011.  On 129 separate occasions, for a total of 573 days, Primeo's cash balances with Madoff had a negative value, yet Primeo was charged no interest, nor did Primeo have a margin agreement with BLMIS.  No legitimate institution could advance this amount of money without a margin account, for Primeo's benefit, and none would have failed to charge interest during these periods.  Madoff did not do so.  Madoff's failure to require a margin account and/or charge interst was an alarming red flag.  Primeo never questioned it.

174.    Madoff never charged the Feeder Fund Defendants any interest for what appeared to be the extension of huge lines of credit to finance the SSC Strategy for their benefit.  That the Defendants failed to inquire into or acknowledge this unorthodox practice speaks volumes of their disregard for principles of independent, meaningful, and reasonable due diligence.  The Defendants should have been suspicious of Madoff's willingness to advance them hundreds of millions of dollars in interest-free loans.

175.    As set forth in the following table, the Defendants' BLMIS accounts had negative cash balances for thousands of days, yet BLMIS never charged them interest for these extensions of credit:

|  | Number of Days with Negative Cash Balances | Number of Instances of Negative Balances |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 112 | 34 |
| Aurelia/Equus Partners | 1,085 | 327 |

|  | Number of Days with Negative Cash Balances | Number of Instances of Negative Balances |
|---|---|---|
| BA Worldwide | 1,045 | 264 |
| Bank Medici | 93 | 34 |
| Defender | 3 | 3 |
| Eurovaleur | 661 | 150 |
| Genevalor | 1,978 | 617 |
| Geo Currencies | 289 | 108 |
| Herald/Herald Management | 64 | 24 |
| Herald (Lux) | 2 | 2 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 1,085 | 327 |
| HITSB | 57 | 15 |
| HSBC Administrator | 3,508 | 1,053 |
| HSBC Bank Bermuda | 2,349 | 740 |
| HSBC (Cayman) | 662 | 151 |
| HSBC Custodian | 4,232 | 1,308 |
| HSSB | 1,104 | 333 |
| HSSI/HITSI | 1,106 | 373 |
| HSSL | 2,101 | 591 |
| Kingate Euro | 375 | 128 |
| Kingate Global | 349 | 127 |
| Landmark | 10 | 4 |
| Optimal | 651 | 233 |
| Pioneer | 1 | 1 |
| Primeo Fund | 662 | 151 |
| Senator/Regulus/Carruba | 14 | 4 |
| Square One | 312 | 93 |
| Thema International | 442 | 133 |
| Thema Management BVI | 415 | 125 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 162 | 49 |

176.    Upon information and belief, the Defendants did not ever question where Madoff

obtained the money he loaned to them.  As one of the world's largest lenders, the HSBC

Defendants had to recognize the absurdity that Madoff was—literally—lending HSBC's clients

hundreds of millions of dollars for no charge whatsoever.  But for the numerous incentives to

look the other way, the Defendants would have known that Madoff was not executing the trades described on customer statements.

### *Inadequacy of Madoff's Auditors*

177.    The Defendants knew that BLMIS relied on Friehling & Horowitz—an unknown, three-person accounting firm based in a strip mall in Rockland County, New York—to audit a multi-billion dollar investment fund.  The Defendants were on notice that BLMIS's auditors did not have the competence, resources, technological capabilities, or expertise to perform the domestic and international auditing functions associated with BLMIS and its billions under management.  That BLMIS, with billions of dollars under management, relied on an auditor like Friehling & Horowitz should have raised a warning sign with the Defendants.  The Defendants, instead, acted as if nothing were out of the ordinary and continued to expand their relationships with BLMIS.

178.    The absurdity of this situation was not lost on the Defendants; HSBC Private Bank identified as a concern "Madoff's lack of [a] realistically independent auditor—Friehling & Horowitz is a very small firm with Madoff as its only major client."  Despite being explicitly aware of this red flag, the Defendants did nothing.

### *Madoff's Returns Did Not Mirror Market Conditions*

179.    BLMIS's IA Business appeared to be immune from any market instability, enjoying consistent rates of return at all times.  For example, through the burst of the dotcom bubble in 2000, September 11th, and the market downturn in 2008, the SSC Strategy produced consistent and positive returns.  Even during the last 14 months of BLMIS's existence, the IA Business generated positive returns while the S&P 100 fell nearly 40%.  Overall, from January 2000 through November 2008, the Madoff Feeder Funds experienced no more than five months

of negative returns, while the S&P 100 experienced 53 months of negative returns over the same period.

180.     Despite these logic-defying returns, the Defendants failed to conduct even a cursory review of how Madoff's SSC Strategy could achieve these results, and ignored clear evidence that Madoff could not possibly be generating the purported returns using the SSC Strategy.  Genevalor employees tried to replicate Madoff's performance by using monthly account statements from BLMIS to reconstruct the SSC Strategy and BLMIS's returns, but were unable to do so.  Yet Genevalor did not take any steps to inquire further, or to have any of its funds—Hermes, Thema Fund, or Thema International—cease investing in, or withdraw its investments from, BLMIS.  The Defendants turned a blind eye to the fact that a strategy purportedly tied to the S&P 100 produced results that bore virtually no correlation to that index.

### *Madoff Was Able to Execute Trades at the Perfect Time, Every Time*

181.     Madoff appeared to have a near-perfect ability to buy low and sell high not only from day to day, but *within* each trading day.  The Defendants were on notice that this was, practically speaking, impossible.  Pricing reflected on trade confirmations and account statements demonstrated the implausibility of Madoff's trades, which almost always occurred at precisely the right time of the day.  With remarkable consistency, when Madoff was purchasing shares, the reported average purchase price was in the lower half of the daily range, and when selling shares, the sale price was in the upper half of the daily range.

182.     Madoff's routine ability to get the best price was, itself, a red flag.  But Madoff further represented to investors that he was time-slicing (that is, entering the market at specific intervals over the course of a trading day).  This meant that the reported trade prices were an *average*, and therefore should have gravitated toward the daily midpoint.  Instead, they gravitated toward Madoff's optimal (and fictional) price point—a statistical impossibility that

should have spurred the Defendants to undertake the independent, reasonable, and meaningful due diligence they eschewed.

183.    In fact, each of the Feeder Funds consistently received trade confirmations which showed purported executions of favorable price points within the day.  This was impossible given Madoff's purported time slicing execution process, which should have led to execution at or near the midpoint of the daily trading range.  A summary of these staggering results across all the Feeder Fund Defendants is set forth in the following table:

| | Total Below Midpoint | Total Buys | Percentage Below Midpoint | Total Above Midpoint | Total Sells | Percentage Above Midpoint |
|---|---|---|---|---|---|---|
| Alpha Prime/Alpha Prime Management | 2,709 | 3,269 | 82.87% | 2,127 | 2,851 | 74.61% |
| Aurelia/Equus Partners | 10,832 | 14,171 | 76.44% | 8,852 | 12,673 | 69.85% |
| BA Worldwide | 10,911 | 13,858 | 78.73% | 9,029 | 12,431 | 72.63% |
| Bank Medici | 3,755 | 4,650 | 80.75% | 2,754 | 3,837 | 71.77% |
| Defender | 654 | 845 | 77.40% | 454 | 661 | 68.68% |
| Eurovaleur | 4,360 | 5,645 | 77.24% | 3,628 | 5,124 | 70.80% |
| Genevalor | 22,734 | 29,391 | 77.35% | 18,493 | 26,194 | 70.60% |
| Geo Currencies | 3,462 | 4,454 | 77.73% | 2,699 | 3,858 | 69.96% |
| Herald/Herald Management | 2,526 | 3,060 | 82.55% | 1,992 | 2,671 | 74.58% |
| Herald (Lux) | 267 | 395 | 67.59% | 133 | 210 | 63.33% |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 10,832 | 14,171 | 76.44% | 8,852 | 12,673 | 69.85% |
| HITSB | 3,848 | 4,780 | 80.50% | 2,884 | 4,277 | 67.43 |
| HSBC Administrator | 44,967 | 57,806 | 77.79% | 36,351 | 51,071 | 71.18% |
| HSBC Bank Bermuda | 27,006 | 34,928 | 77.32% | 22,764 | 31,819 | 71.54% |
| HSBC (Cayman) | 4,490 | 5,795 | 77.48% | 3,628 | 5,124 | 70.80% |
| HSBC Custodian | 55,105 | 70,921 | 77.70% | 44,740 | 63,004 | 71.01% |
| HSSB | 12,756 | 16,561 | 77.02% | 10,231 | 14,735 | 69.43% |
| HSSI/HITSI | 16,212 | 21,011 | 77.16% | 13,069 | 18,493 | 70.67% |
| HSSL | 25,040 | 31,967 | 78.33% | 20,135 | 28,188 | 71.43% |
| Kingate Euro | 5,049 | 6,534 | 77.27% | 4,165 | 5,962 | 69.86% |
| Kingate Global | 5,089 | 6,581 | 77.33% | 4,129 | 5,833 | 70.79% |
| Landmark | 429 | 595 | 72.10% | 304 | 458 | 66.38% |
| Optimal | 10,149 | 13,130 | 77.30% | 8,252 | 11,654 | 70.81% |
| Pioneer | 130 | 150 | 86.67% | | | |
| Primeo Fund | 4,490 | 5,795 | 77.48% | 3,628 | 5,124 | 70.80% |
| Senator/Regulus/Carruba | 756 | 952 | 79.41% | 520 | 716 | 72.63% |
| Square One | 4,885 | 6,317 | 77.33% | 4,069 | 5,730 | 71.01% |
| Thema International | 4,980 | 6,441 | 77.32% | 4,059 | 5,720 | 70.96% |

| | Total Below Midpoint | Total Buys | Percentage Below Midpoint | Total Above Midpoint | Total Sells | Percentage Above Midpoint |
|---|---|---|---|---|---|---|
| Thema Management BVI | 4,018 | 5,246 | 76.59% | 3,430 | 4,764 | 72.00% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 3,460 | 4,325 | 80.00% | 2,883 | 3,943 | 73.12% |

184.     Across all of the accounts for which the HSBC Defendants served as administrator, BLMIS purported to purchase equities on 57,806 occasions; 44,967 of these were in the lower half of the daily price range.  On behalf of these accounts BLMIS purported to sell equities on 51,071 occasions; 36,351 of these occurred in the upper half of the daily price range.  In other words, Madoff was buying low 77.79% of the time and selling high 71.18% of the time.

185.     Across all of the accounts for which the HSBC Defendants served as custodian, BLMIS purported to purchase equities on 70,921 occasions; 55,105 of these were in the lower half of the daily price range.  On behalf of these accounts BLMIS purported to sell equities on 63,004 occasions; 44,740 of these occurred in the upper half of the daily price range.  In other words, Madoff was buying low 77.70% of the time and selling high 71.01% of the time.  Common sense dictates that such a success rate is impossible, especially since Madoff represented that he was time slicing.  Yet, the HSBC Defendants did nothing.

186.     Instead, HSBC routinely identified—and then ignored—red flags concerning Madoff's supernatural trading ability.  As early as 2001, HSBC recognized the improbability of Madoff being able to generate such consistent, positive returns with such a simplistic strategy:

> Bernie Madoff's 12 year track record trading a split strike conversion strategy on the S&P 100, is quite simply astounding. His annualized return of 15%, (net of a 20% performance fee), at a risk of 3%, yields a sharpe ratio of 3.3.  Over this period the fund has endured only 4 down months, (the maximum of which was down 0.5%), and has now gone almost 6 years without a drawdown.

With this track record, seemingly derived from such a <u>simple</u> <u>investment strategy</u>, certain members of the investment community are <u>baffled</u>, as to how such a return stream has been earned.

(emphasis in original).

187.    In January 2003, HSBC again admitted that "[i]t is unclear how [Madoff's] strategy has generated a track record with almost no down months."  Upon information and belief, HSBC did nothing to inquire further, and did not cease investing in BLMIS or advising its clients to invest with the Feeder Fund Defendants.

### *Madoff Did Not Provide Real-Time Access to IA Business Accounts*

188.    Despite Madoff's reputation as an early adopter of advanced trading technology, BLMIS did not provide real-time access to IA Business accounts and sent only paper trade confirmations to its customers.  By the mid-2000s, electronic access and immediate investment performance information were industry standard, and routinely required by funds of funds which engaged in real-time hedging.  BLMIS, however, transmitted paper copies of trade confirmations to the Defendants and/or their affiliates or representatives three to four days *after* trades purportedly occurred.  Upon information and belief, the HSBC Defendants sought to receive trade confirmations electronically, yet, Madoff refused to do so.  His nonsensical explanation was a fear that these service providers would steal his "strategy."  Like the other red flags, this was ignored by the Defendants.

### *Madoff's Account Statements Purported to Transact With Non-Existent Funds*

189.    The SSC Strategy purported to invest IA Business customers' funds in U.S. Treasury bills or mutual funds holding Treasury bills.  One such fund was, until 2005, called the "Spartan U.S. Treasury Money Market Fund."  However, on August 15, 2005, that fund changed its name to Fidelity U.S. Treasury Money Market Fund.  Despite that, Madoff's account statements continued to indicate that customers' funds had been invested in Fidelity Spartan U.S.

Treasury Money Market Fund, which no longer existed at the time. The Defendants' failure to investigate this error speaks to the short shrift they gave their responsibilites as administrators, custodians, managers, and advisers.

### *Madoff Never Identified His Options Counterparties*

190. Madoff never identified the parties on the other side of the thousands of hedging options transactions he purported to effect each month. This should have been an intolerable practice to the Defendants, who bore the risk if those counterparties defaulted on the options agreement.

191. The SSC Strategy purportedly involved the purchase of a basket of between 35 and 50 S&P 100 equities together with a collar of S&P 100 Index put and call options on those stocks to limit the up-side potential and down-side risks. BLMIS purportedly executed agreements with third parties on behalf of account holders pursuant to the "Master Agreement for OTC Options."

192. At times, Madoff claimed simply to execute over-the-counter options trades with a network of unidentified counterparties, claiming that their identities were proprietary. At other times, he claimed simply that the counterparties were large, European financial institutions. And at still other times, Medici employees were told that Madoff's counterparties were American pension funds. The Defendants had excellent reasons to care about the identity of Madoff's purported counterparties as, in those options contracts, they understood that it was the Feeder Fund Defendants—not BLMIS—that bore the risk. Thus, the Defendants could be regularly exposed to hundreds of millions of dollars in potential risk. Had the purported counterparties been unable to meet their obligations, not only would there have been no collar, but the account would have been left exposed to the market without the protections that were so central to the SSC Strategy and they would not have been able to collect on the value of the options contracts.

193.    Despite this potential exposure, the Feeder Fund Defendants, the Management Defendants, and the HSBC Defendants, acting as the Funds' administrator and/or custodian, all failed to perform any reasonable, meaningful, or independent inquiry into the counterparties' ability to perform under the contracts.  Given the hundreds of millions of dollars at risk had those purported option counterparties been unable to deliver cash as required by the puts and calls, the Defendants' lack of inquiry or skepticism evinces a disregard for the reasonable, meaningful, and independent due diligence demanded.  Upon information and belief, the Defendants did not review, comment on, modify, negotiate, or reject any form of draft or final counterparty agreement or OTC transaction confirmation.  Despite bearing the risk of the counterparties' failure to perform, the Defendants had no knowledge of the counterparties' identities.  The Defendants chose to blindly accept Madoff's nonsensical explanations in order to continue to collect their fees.  Additionally, these Defendants should have recognized that under the 1934 Act, Rule 10b-10, states that upon written request, the identity of the counterparty must be disclosed; BLMIS's refusal to provide this information was, in fact, unlawful.

### *Madoff's Options Transactions Were Frequently Inconsistent With SSC Strategy*

194.    The Defendants' account statements frequently showed short-term, one-sided, speculative options trades that did not hedge any existing equity investment.  These trades were inconsistent with the SSC Strategy and should have sounded alarms because they created precisely the market exposure that the SSC Strategy purported to avoid and were inconsistent with the offering memoranda, prospectuses, and marketing materials of the Feeder Fund Defendants which promised strict compliance with the SSC Strategy and no speculations in options.  This was a glaring red flag to sophisticated financial entities such as the Defendants.  The Defendants' customer accounts revealed regular deviations from the much vaunted SSC Strategy, yet the Defendants raised no objections.

195.     For example, on August 14, 2002, on behalf of Thema International, BLMIS purported to purchase 13,938 S&P 100 call option contracts with a strike price of 450 at $5.30 per option contract, which was the exact opposite of how the typical SSC Strategy opened. These options did not correspond to the purchase or sale of any equities in Thema International's BLMIS equities trading account, and was therefore a high-risk, stand alone position, far exceeding the implied risk of the SSC Strategy.  This position was closed on August 19, 2002 with the purported sale of these options at $18.44 per option, resulting in a gain of $18,305,532. Obviously, Madoff deviated from the SSC Strategy to smooth out his returns—he deviated when he needed to meet his goal and other trading activity failed to do so.  There were a total of 44 such speculative option transactions on Thema International's BLMIS account, creating a total net gain of $51,569,327.75.

196.     As set forth in the following table, BLMIS purported to engage in hundreds of these speculative options transactions, virtually all of which were profitable, generating purported gains of hundreds of millions of dollars:

|  | Total Speculative Option Trades | Net Gain or Loss |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 12 | $4,191,723 |
| Aurelia/Equus Partners | 120 | $27,083,399 |
| BA Worldwide | 94 | $60,966,609 |
| Bank Medici | 16 | $38,411,760 |
| Defender | 4 | $4,659,731 |
| Eurovaleur | 58 | $20,009,432 |
| Genevalor | 220 | $83,376,629 |
| Geo Currencies | 42 | $1,395,283 |
| Herald/Herald Management | 8 | $23,000,802 |
| Herald (Lux) | 4 | $1,419,670 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 120 | $27,083,399 |
| HITSB | 22 | $15,301,450 |
| HSBC Administrator | 387 | $231,240,773 |
| HSBC Bank Bermuda | 275 | $191,256,924 |
| HSBC (Cayman) | 58 | $20,009,432 |

| | Total Speculative Option Trades | Net Gain or Loss |
|---|---|---|
| HSBC Custodian | 513 | $400,554,344 |
| HSSB | 130 | $33,410,936 |
| HSSI/HITSI | 148 | $148,987,012 |
| HSSL | 220 | $81,188,258 |
| Kingate Euro | 50 | $32,920,758 |
| Kingate Global | 76 | $136,392,813 |
| Landmark | 4 | $1,195,313 |
| Optimal | 96 | $91,562,641 |
| Pioneer | 0 | – |
| Primeo Fund | 58 | $20,009,432 |
| Senator/Regulus/Carruba | 4 | $2,154,612 |
| Square One | 21 | $1,212,781 |
| Thema International | 44 | $51,569,328 |
| Thema Management BVI | 40 | $37,578,040 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 14 | $3,328,620 |

197.    Across all of the accounts for which the HSBC Defendants served as administrator, there were 387 such speculative options transactions, creating a total net gain of $231,240,773.  In reviewing the account statements of the funds for which they served as administrator, the HSBC Administrator Defendants should have raised questions about these speculative option transactions as they left the funds dangerously exposed to downside risk and were inconsistent with the SSC Strategy.  But, because these speculative events almost always created gains, smoothed out the returns, and ultimately generated fees, the HSBC Administrator Defendants chose to ignore these readily apparent red flags.

198.    Across all of the accounts for which the HSBC Defendants served as custodian, there was a total of 513 speculative options transactions, creating a total net gain of $400,554,344.  In reviewing the account statements of the funds for which they served as custodian, the HSBC Custodian Defendants should have raised questions about these speculative option transactions as they left the funds dangerously exposed to downside risk and were inconsistent with the SSC Strategy.

199.    Additionally, Madoff engaged in options transactions that were often unbalanced in that changes to Madoff's basket of equities did not result in corresponding changes to the hedging options.  Such "unbalanced hedges" were also inconsistent with the SSC Strategy and should have caused Defendants to inquire about deviations from that strategy.

200.    One such unbalanced hedge is evident on the January and February 2004 BLMIS account statements of Kingate Global, Kingate Euro, Primeo, Thema International, Lagoon, Thema Wise, Square One, and Optimal.  On January 8, 2004, Madoff purported to purchase two baskets of S&P 100 stocks, each of which included shares of Texas Instruments Inc. (TXN). However, according to the account statements, the shares of Texas Instruments were not sold between February 20 and 25, 2004, as were the other equities contained in the baskets, but rather on January 22, 2004.  Despite this early sale of the Texas Instruments shares, the corresponding option hedges did not change.  Madoff's failure to rebalance the hedge on these baskets was a deviation from the SSC Strategy that should have put Defendants on inquiry notice as to the purpose of the inconsistency.

201.    As set forth in the following table, the Defendants and Madoff Feeder Funds' BLMIS account statements indicate that Madoff regularly did not make changes to the corresponding hedges when he purportedly sold one equity before the rest of the basket:

| | Sells Without Hedge Adjustment |
|---|---|
| Alpha Prime/Alpha Prime Management | 22 |
| Aurelia/Equus Partners | 34 |
| BA Worldwide | 73 |
| Bank Medici | 9 |
| Defender | 0 |
| Eurovaleur | 22 |
| Genevalor | 116 |
| Geo Currencies | 38 |
| Herald/Herald Management | 6 |

| | Sells Without Hedge Adjustment |
|---|---|
| Herald (Lux) | 0 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 34 |
| HITSB | 8 |
| HSBC Administrator | 202 |
| HSBC Bank Bermuda | 151 |
| HSBC (Cayman) | 22 |
| HSBC Custodian | 266 |
| HSSB | 39 |
| HSSI/HITSI | 80 |
| HSSL | 99 |
| Kingate Euro | 31 |
| Kingate Global | 33 |
| Landmark | 0 |
| Optimal | 48 |
| Pioneer | 0 |
| Primeo Fund | 22 |
| Senator/Regulus/Carruba | 3 |
| Square One | 24 |
| Thema International | 32 |
| Thema Management BVI | 29 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 12 |

202.     Across all of the accounts for which HSBC was administrator, Madoff did not rebalance the hedge on 202 occasions.  By leaving the hedge unbalanced, Madoff deviated from his stated SSC Strategy, but HSBC did not question Madoff about these inconsistencies.

203.     Across all of the accounts for which HSBC was custodian, Madoff did not rebalance the hedge on 266 occasions.  By leaving the hedge unbalanced, Madoff deviated from his stated SSC Strategy, but HSBC did not question Madoff about these inconsistencies.

### **_BLMIS's Paper Trade Confirmations Were Archaic and Replete with Inconsistencies_**

204.     The Defendants and/or their affiliates and representatives received trade confirmations from BLMIS containing numerous inconsistencies that should have raised a red flag that Madoff was not implementing the SSC Strategy as he purported to do.  However, the

Defendants ignored these troubling trade confirmations and instead continued to market the Feeder Fund Defendants to their customers.

205. For example, the trade confirmations did not reflect either the reporting or payment of the "Section 31" fees required by NASD and FINRA rules. This should have raised a red flag with the HSBC Defendants.

206. BLMIS's trade confirmations erroneously characterized options as "trade origins," rather than transactions, on checklists that appeared on the trade confirmations. The trade confirmations did not indicate the origin of those options trades. BLMIS's trade confirmations accurately characterized other transactions, such as purchases of stocks, as "transactions" and accurately indicated the origins of those other transactions. The inaccurate reporting of options transactions on BLMIS's trade confirmations should have raised a red flag with the Defendants that there were irregularities with BLMIS's options trading; however, the Defendants failed to make any inquiries into this anomaly.

207. The trade confirmations also frequently indicated that BLMIS had effected the same trades as both principal and agent. Upon information and belief, the Defendants saw, but did not question, this paradox. At times, the front of the BLMIS trade confirmations coded purported trades as "principal transactions" while the backs of the trade confirmations stated, "[w]e have acted in the capacity of Agent for your transaction." Upon information and belief, the Feeder Fund Defendants and HSBC Defendants were aware of this conflicting language, yet failed to made any inquiries to resolve these inconsistencies.

208. Finally, BLMIS's option trade confirmations often contradicted Madoff's claim that, from time to time, he purchased options in the over-the-counter market. All of the options trade confirmations contained Committee on Uniform Security Identification Procedures

("CUSIP") identification numbers, which indicated that the options Madoff utilized were S&P 100 Index options that were traded on the CBOE. Because the BLMIS options trade confirmations contained a CUSIP numbers tied to the CBOE, the Defendants should have recognized that BLMIS's purported options trades were not purchased on the over-the-counter market, as Madoff represented.

### *Madoff Walked Away From Hundreds of Millions of Dollars by Employing a Bizarre Fee Structure*

209. In addition to providing interest-free loans on billions of dollars, Madoff imposed an unusual fee structure that, when compared to the fees charged by most investment funds, including those charged by the Defendants here, meant that Madoff walked away from hundreds of millions, if not billions, of dollars in fees. Instead of charging a 1% - 2% management fee and a 10% - 20% performance fee typical of investment funds, Madoff charged only $0.04 per share on stock transactions, and $1.00 per option contract.

210. HSBC's Private Bank Due Diligence Team, the Feeder Fund Defendants, the Management Defendants, and other investment professionals all were aware that the largesse of this fee structure was an aberration.

211. In a September 2005 email to ███, ████, a ████████████, and a ████████████████████, acknowledged that Madoff's fee structure, under which ████ paid no management fees ████████████ was unusual. ████ justified the fee structure—as well as Madoff's insistence to allowing Madoff Feeder Funds to engage independent custodians—by explaining that Madoff was attempting to protect his "magic formula":

212.     ████'s explanation of Madoff's fee structure and resistance to independent custodians was specious.  Madoff's fee structure effectively abandoned between $255 million and $682 million each year in fees that the Defendants should have expected to pay.  Madoff's explanation, that he was "perfectly happy to just earn commissions" should never have passed serious muster, and was another red flag.  The Defendants own fees were a powerful incentive to overlook Madoff's absurdly generous fee structure.

213.     HSBC Private Bank highlighted Madoff's fee structure as a red flag on at least nine occasions in reports issued between 2001 and 2008.  In 2007, for example, HSBC Private Bank noted, "[t]he lack of transparency involving fees paid to Madoff was disturbing."  HSBC Private Bank later reached the same conclusion as other investment professionals, stating, "Things do not add up in terms of Bernie's compensation structure."  The Defendants ignored these warnings, and continued to funnel money into BLMIS through the Feeder Fund Defendants.

214.     The Feeder Fund Defendants were happy to accept Madoff's minimal commission policy, because the fees went directly into the pockets of those funds' managers and service providers.  As HSBC Private Bank noted, "[t]he 20% performance fee goes to Fairfield Sentry."  The more money the Feeder Fund Defendants were making, the more money the HSBC Administrator Defendants, the HSBC Custodian Defendants, and the Management Defendants— and, ultimately, the Beneficial Owners—were taking in fees.  These Defendants continued to procure billions of dollars to fuel the Madoff Ponzi scheme so that they could continue to reap their enormous fees.

### *Many Financial Professionals Publicly Questioned Madoff's Legitimacy*

215.     The Defendants ignored not only the red flags obvious from their relationship with BLMIS's IA Business, but also the warnings of many industry professionals.  In May 2001,

two industry analysts published articles specifically questioning the legitimacy of BLMIS's operations and its investment performance. A *MAR/Hedge* newsletter, entitled "Madoff tops charts; skeptics ask how," reported on industry experts' bewilderment regarding Sentry's consistent returns and how such returns could be achieved so consistently and for so long. The article also observed that "others who use or have used the strategy . . . are known to have had nowhere near the same degree of success."

216.    On May 7, 2001, *Barron's* published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum." In that article, *Barron's* reported widespread Wall Street skepticism about BLMIS's IA Business, and noted the lack of transparency regarding the SSC Strategy as a result of Madoff's unwillingness to answer questions.

217.    Both articles suggested that BLMIS had between $6 billion and $7 billion in assets under management. The articles noted that some industry experts speculated that Madoff used information gleaned from his market-making business, such as the bid-ask spreads, to front-run the IA Business's trades and to subsidize and smooth the IA Business's returns.

218.    By the time these articles were published, the Defendants had already invested with BLMIS. The Defendants, however, performed no meaningful, independent, or reasonable inquiry or due diligence in response to assertions questioning Madoff's legitimacy or raising the possibility of fraud. Upon information and belief, the Defendants did not speak to the principals or anyone at Sentry regarding the contents of the articles and the serious red flags raised therein. The Defendants instead chose to deliberately ignore these serious indicia of fraud.

219.    Upon information and belief, the *Barron's* article was circulated among the Defendants, yet, upon information and belief, none who saw the article attempted to follow up on

any of the issues it raised. Upon information and belief, Defendants' only response to these articles was to invent their own "answers"—without any independent inquiry—to the troubling questions the articles raised, including whether Madoff was front-running, how Madoff was able to purportedly trade such volumes without noticeably affecting the market, the overall lack of transparency, and why Madoff did not charge industry standard management and performance fees.

220. In fact, HSBC appended the *MAR/Hedge* articles to various due diligence reports and often quoted from that article. Upon information and belief, all the Defendants were aware of the *Barron's* and *MAR/Hedge* articles and simply chose to ignore the red flags raised therein.

### BLMIS Account Statements and Confirmations
### Often Reflected Settlement Anomalies in Options Transactions

221. The Defendants also ignored that a high percentage of options transactions in their BLMIS accounts settled in a time range outside of industry norms. It is common industry practice for options trades to settle on the business day following execution. However, BLMIS's trade confirmations regularly showed options transactions that purportedly settled as much as three days after execution. This allowed Madoff ample time to fabricate trades days after they purportedly took place. The Defendants should have been concerned that Madoff's very late settlement policies were enabling fraud. The frequency with which this occurred was staggering. For example, Herald (Lux)'s BLMIS account statements and trade confirmations indicate that out of 57 options transactions purportedly entered into on behalf of Herald (Lux)'s BLMIS account, only six settled on the business day following execution, meaning that 89.47% of all of the purported options activity in Herald (Lux)'s account did not comply with standard trading practices.

222.    As set forth in the following table, BLMIS purported to enter into thousands of options transactions on behalf of the Defendants' and the Madoff Feeder Funds' accounts that did not settle on the business day following the execution of the trade:

| | Options- Trades not Settling T+1 | Options - Percentage not Settling T+1 |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 233 | 51.89% |
| Aurelia/Equus Partners | 479 | 25.36% |
| BA Worldwide | 468 | 24.43% |
| Bank Medici | 434 | 69.89% |
| Defender | 98 | 94.23% |
| Eurovaleur | 118 | 16.05% |
| Genevalor | 1,203 | 29.93% |
| Geo Currencies | 231 | 35.76% |
| Herald/Herald Management | 233 | 57.11% |
| Herald (Lux) | 51 | 89.47% |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 479 | 25.36% |
| HITSB | 626 | 96.31% |
| HSBC Administrator | 2,511 | 31.60% |
| HSBC Bank Bermuda | 941 | 18.58% |
| HSBC (Cayman) | 130 | 17.40% |
| HSBC Custodian | 3,072 | 30.42% |
| HSSB | 785 | 35.57% |
| HSSI/HITSI | 975 | 31.95% |
| HSSL | 1,497 | 35.17% |
| Kingate Euro | 239 | 27.47% |
| Kingate Global | 316 | 24.71% |
| Landmark | 76 | 92.68% |
| Optimal | 543 | 27.90% |
| Pioneer | 12 | 100.00% |
| Primeo Fund | 130 | 17.40% |
| Senator/Regulus/Carruba | 136 | 95.77% |
| Square One | 237 | 28.18% |
| Thema International | 258 | 28.04% |
| Thema Management BVI | 108 | 14.14% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 235 | 41.67% |

223. The Administrator and Custodian accounts did not settle on T + 1 close to one-third of the time.

224. Settlement anomalies in such high percentages were clear red flags that should have prompted sophisticated financial entities such as the Defendants to conduct further investigations, request verifications of the trades, and demand more transparency into BLMIS's operations.

### *Madoff Purported to Execute Trades That Settled on Days When the Market Was Closed*

225. Many of the Defendants' BLMIS account statements and trade confirmations reflected trades for which the settlement date and/or the trade date occurred on a weekend. Because the markets are closed on weekends, trade dates are unlikely to fall on weekends, and settlement dates require banks to be open.

226. For example, the account statements for Lagoon, Optimal, Primeo, Square One, Geo Currencies, Kingate Global, Kingate Euro, and Thema International for January 2000 all reported the execution of S&P 100 Index put options and S&P 100 Index call options with a trade date of January 7, 2000 (a Friday) and a settlement date of January 8, 2000 (a Saturday), which was impossible. The relevant Defendants reviewed this trade confirmation and took no action in response to this anomaly. Rather, this too was ignored by the Defendants, more than suggests they knew it was a Ponzi scheme.

## THE DEFENDANTS' RELATIONSHIP WITH MADOFF

### *Kohn and the Benbassats Established*
### *a Complex Network Connecting Foreign Investors and Madoff*

227. Together, the Management Defendants, Individual Defendants, and HSBC Defendants built the infrastructure that would lead to an explosion of European and other foreign investment into BLMIS's IA Business beginning in the 1990s. These Defendants worked

together to create, manage, and administer the Feeder Fund Defendants, and to solicit investors for these funds. Their efforts perpetuated and deepened the Ponzi scheme and, as the Feeder Fund Defendants grew, enabled the Management Defendants, the Individual Defendants, and the HSBC Defendants to collect even greater fees for services they purported to provide.

228.     Kohn portrayed herself as an investment banker with connections to wealthy investors throughout Europe, including, among others, the members of the Benbassat Family, Federico Ceretti, and Carlo Grosso. These individuals were the hub of the foreign network that Madoff used to solicit new investors. Altogether, the funds with which Kohn, the Benbassats, Ceretti, and Grosso were involved funneled billions of dollars into BLMIS's IA Business. Kohn used the entities that she controlled, including Bank Medici, and entities with which she was affiliated, such as Bank Austria, coupled with the imprimatur of HSBC, to cultivate an aura of legitimacy for the Feeder Fund Defendants that she helped create.

229.     Kohn benefited from the increased investment into BLMIS's IA Business. As the size of those feeder funds grew, so too did the fees she received. Moneys flowed to Kohn through Bank Medici and the other entities composing the investment network that funneled money to BLMIS.

230.     In November 1993, after a meeting of Madoff, Kohn, and Bank Austria officials, Kohn and Bank Austria were given an opportunity to open an account with BLMIS, and together formed Primeo. Primeo opened its first account with BLMIS (account number 1FN060) on or about December 30, 1993. Shortly thereafter, Kohn, Bank Medici, and Bank Austria began to solicit investors for Primeo for the purpose of investing in BLMIS's IA Business.

231.     After successfully soliciting investors for Primeo, Kohn and Bank Austria expanded Primeo's base of investors in 1996 by publicly offering a new class of Primeo shares,

known as the "Primeo Select Fund." Upon information and belief, Primeo Select Fund invested

one hundred percent of its assets in BLMIS. Later that year, Primeo Select Fund opened a

second account with BLMIS (account number 1FN092). The following chart depicts the

structure of Primeo:



232. In March 2003, two European investment bankers whom Kohn had introduced to

Madoff, including Radel-Leszczynski, founded Alpha Prime, another fund that invested in

BLMIS. On or about June 13, 2003, Alpha Prime opened BLMIS account number 1FR097. The

following chart depicts the structure of Alpha Prime:

# Alpha Prime Fund Ltd. Structure



233.     In March 2004, Kohn and Bank Medici created Herald Fund for the purpose of investing its assets into BLMIS.  In 2004, Herald Fund opened BLMIS account number 1FR109. Herald Fund, by itself, fed over $1.5 billion into the Ponzi scheme.  The following chart depicts the structure of Herald Fund:

# Herald Fund Structure



234.     In or around September 2006, Radel-Leszczynski and, upon information and belief, Bank Austria, created Senator which thereafter opened BLMIS account number 1FR128. Upon information and belief, Senator was one hundred percent invested in BLMIS. The following chart depicts the structure of Senator:



235.     Even as the Ponzi scheme neared its demise, Kohn and Bank Medici continued to

create new funds in order to provide new sources of investment to Madoff.  Bank Medici created

Herald (Lux) in March 2008, which, on or about March 17, 2008, opened BLMIS account

number 1FR135.  Upon information and belief, Herald (Lux) was one hundred percent invested

in BLMIS.  The following chart depicts the structure of Herald (Lux):

# Herald (Lux) Structure



236.     In total, the Feeder Fund Defendants that Kohn helped funnel over $2.8 billion into the Ponzi scheme.  Upon information and belief, for their role in soliciting investors and providing administrative services to the Feeder Fund Defendants, Kohn and Bank Austria received significant fees.

### *The Benbassats Solicited Madoff Investors*

237.     After Kohn introduced the members of the Benbassat Family to Madoff, the Benbassats, who had access to their own network of potential European investors, created several investment vehicles that funneled money into the Ponzi scheme.  The Benbassats and related parties marketed these investment opportunities, hoping to profit from management, administrative, and other fees generated by steering money into BLMIS's IA Business.

238.     In May 1992, the Benbassat Family's investment firm, Genevalor, co-founded Hermes.  Hermes, through Lagoon, opened BLMIS account number 1FN021 and then opened

four other accounts with BLMIS between 1994 and 1997 (account numbers 1FN066, 1FN096, 1FR015, and 1FR016). The following chart depicts the structure of Hermes:



239.    Upon information and belief, in May 1984, Genevalor created Geo Currencies, another fund that invested its assets into BLMIS. On or about June 8, 1995, Geo Currencies opened account number 1FN079 with BLMIS.

240.    In December 2002, Genevalor created Thema International for the purpose of investing its assets into BLMIS. On July 1, 1996, Thema International opened account number 1FN095 with BLMIS. The following chart depicts the structure of Thema International:



**Thema International Structure**

241.    In February 2003, Genevalor created Thema Fund, which also invested in Madoff. On or about February 3, 2003, Thema Fund, through Thema Wise, opened account number 1FR093 with BLMIS.  The following chart depicts the structure of Thema Fund:

# Thema Fund/ Thema Wise Structure



242. In total, the Benbassat Funds funneled over $1.9 billion—approximately ten percent of the principal invested in BLMIS's IA Business—into the Ponzi scheme. The Benbassat Family and related parties collected millions of dollars for the variety of roles that they purported to undertake in connection with the operation of these funds. In fact, they did little other than simply turn money over to Madoff.

### HSBC Helped Funnel Foreign Investors into the Feeder Fund Defendants

243. All of the Feeder Fund Defendants relied on HSBC to act as their custodian, administrator, manager, and promoter. The goodwill attached to HSBC's name provided an air of legitimacy to the Feeder Fund Defendants. HSBC's name appeared in offering materials and, upon information and belief, also on the account statements sent out for the Feeder Fund Defendants. As further detailed herein, HSBC's imprimatur played a key role in the expansion

of the Ponzi scheme, convincing investors in the Madoff Feeder Funds that these funds were a safe place to invest their money.

244.     In their various roles as administrators, custodians, and investment managers of the Feeder Fund Defendants, the HSBC Defendants received over $25 million in fees.

### *The Defendants Created Structured Products to Facilitate Additional Investment in the IA Business*

245.     Beginning in approximately 2006, the HSBC Defendants created structured financial products (the "Madoff Structured Products"), which directed hundreds of millions of dollars into Madoff's Ponzi scheme through the Feeder Fund Defendants.  Because of the leverage employed, the Madoff Structured Products offered investors the opportunity to earn a multiple of the returns generated by a Madoff Feeder Fund without the upfront capital necessary for a direct investment of that size.

246.     The Madoff Structured Products created a "win-win-win" situation, as all participants exploited Madoff's "success" for their own gains.  The HSBC Defendants, who internally stated that these transactions involved "close to nil risk," earned significant structuring and financing fees in connection with the Madoff Structured Products.  The Feeder Fund Defendants earned significant management and performance fees because their assets under management increased as the HSBC Defendants invested in the Feeder Fund Defendants to hedge their exposure under the Madoff Structured Products.  Investors, using borrowed funds, received multiples of the returns generated by the reference asset.

247.     There were two main types of Madoff Structured Products:  total return swaps ("swaps") and structured notes ("notes").  A swap is a bilateral financial transaction created to "swap" the cash flows of an asset or basket of assets for cash flows of another asset.  Swaps enable investors to achieve multiples of the returns from a reference asset—here, a Madoff

Feeder Fund—without having to own the asset.  In exchange for paying the leveraged return on the reference fund at maturity, the financing institution—here, HSBC—collected significant structuring and financing fees on the leveraged amount.  A structured note is a financial transaction in which a financial institution issues a note to an investor in exchange for a future payment based on the performance of an underlying reference fund, or index.  Like swaps, notes typically employ leverage to provide investors with the possibility of multiples of the returns from the reference asset.

248.    Typically, in both swaps and notes, the financing institution that has promised a leveraged return on the performance of a reference funds will hedge its risk by investing both its own money and the cash collateral provided by the swap counterparty or note purchaser directly in the reference fund.  A note or swap investor makes a synthetic investment in a reference fund, because it is entitled at maturity to the leveraged returns generated by the reference fund, but it is the financing institution that is the actual owner of the reference fund shares.

249.    In connection with the marketing and sale of the Madoff Structured Products, the HSBC Defendants were once again confronted by serious red flags that BLMIS's IA Business— and the Madoff Feeder Funds which served as reference funds to the Madoff Structured Products—were not what they purported to be.  For example, HSBC admitted its inability to confirm trade data by comparison to an independent data set.

> Calculations on investment guidelines for the underlying funds for these transactions such as risk measures, position and sector concentration percentages are being calculated by Madoff and sent to Product Control [at HSBC].  This process, which differs from the normal process . . . is due to lack of transparency of detailed fund information.

250.     Similarly, HSBC Bank conceded that a swap done in 2007 needed to be hedged "entirely (no delta exposure) . . . [because] we do not currently monitor Madoff Strategy trades with sufficient granularity to meet restrictions outlined in the risk mandate . . . ."

251.     In 2008, members of HSBC's Structured Products Group visited Fix Asset Management ("FIX") to conduct a due diligence review of Harley and FIX.  Harley was a Madoff Feeder Fund and was the reference fund of the structured product transaction under review.  HSBC concluded that it was "very familiar" with Madoff's operations and SSC Strategy and was "comfortable with the strategy's risk", so it could "proceed with the transaction."  This recommendation came despite the fact that, on multiple occasions, HSBC's own due diligence had raised significant concerns about investing in BLMIS through other channels.  Upon information and belief, HSBC turned a blind eye to red flags of possible fraud at BLMIS, and moved forward with the creation of Madoff Structured Products.

252.     HSBC was aware of ongoing and significant concerns regarding Madoff, yet continued to solicit investors for the Madoff Structured Products.  In 2005, D. Smith, an officer of a Madoff Feeder Fund that served as a reference fund for one of the total return swaps discouraged HSBC from intruding upon BLMIS through due diligence, and warned that doing so would risk angering Madoff and could endanger the Madoff Feeder Funds' ability to invest in BLMIS.

253.     Upon information and belief, that Madoff Feeder Fund did not perform adequate due diligence upon BLMIS and invested in BLMIS, despite being aware of many significant red flags.  In an email to HSBC, D. Smith acknowledged that Madoff was not a registered investment adviser, that Madoff declined to work with custodians, and that experts in the industry had repeatedly tried, but were unable to replicate BLMIS's strategy and returns.

Although the Madoff Feeder Fund advised HSBC of these red flags, HSBC continued to solicit funds for the Madoff Structured Products.

***The HSBC Swaps***

254.     Between June 2006 and September 2007, HSBC Bank USA and HSBC Bank entered into seven financing swaps for which the reference funds were Feeder Fund Defendants. The Madoff Structured Products caused hundreds of millions to be invested with the Feeder Funds, and, ultimately, into the IA Business, thereby prolonging Madoff's Ponzi scheme and deepening the insolvency of BLMIS.

255.     The seven Madoff Structured Products used the following Madoff Feeder Funds as reference assets:  (i) Rye Select Broad Market Fund, L.P. ("Broad Market"); (ii) Greenwich Sentry; (iii) Harley; (iv) Thema International; (v) Senator; and (vi) Rye Select Broad Market Portfolio Limited ("Broad Market Portfolio").

***The Rye XL Fund Swap***

256.     In September 2006, HSBC Bank USA entered into a swap with Rye Select Broad Market XL Fund, L.P. ("Rye XL") with shares of Rye Select Broad Market Fund, a Madoff Feeder Fund, serving as the reference fund (the "Rye XL Fund Swap").  As part of the Rye XL Fund Swap, Rye XL received a notional exposure to Broad Market of $140 million.  Upon information and belief, HSBC funded this exposure by charging Rye XL a fee of LIBOR plus 90 basis points.

257.     Initially, the Rye XL Fund Swap had a maximum notional exposure of $300 million, however, due to increased interest in Broad Market, the size of the swap was increased to $350 million in October 2006, and then to $450 million in January 2007.  Upon maturity, the Rye XL Swap contemplated a payout to Rye XL of up to 3.5 times the leveraged performance of Broad Market.

258.     Upon information and belief, HSBC Bank USA redeemed $50 million from Broad Market in the fall of 2007, and an additional $13.5 million in the summer of 2008, at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### *The Wickford Fund Swap*

259.     In March 2007, HSBC Bank USA entered into a swap transaction with Wickford Fund L.P. ("Wickford"), which provided levered exposure to the returns generated by Sentry (the "Wickford Fund Swap").

260.     Wickford received a notional exposure to Sentry of $10 million in the swap transaction. HSBC Bank USA funded this exposure by charging Wickford a financing fee of LIBOR plus 110 basis points.

261.     Upon maturity, the Wickford Fund Swap contemplated a payout to Wickford of up to 3.5 times the leveraged performance of Sentry. Upon information and belief, HSBC Bank USA redeemed $13 million from Sentry on August 29, 2008, at a time when it knew or deliberately avoiding knowing of Madoff's fraud.

### *The Santa Clara II Fund Options Swap*

262.     In June 2007, HSBC Bank entered into a swap transaction with Santa Clara II Fund ("Santa Clara") that provided Santa Clara with levered exposure to the returns generated by Harley (the, "Santa Clara Options Swap"). Santa Clara received a maximum notional exposure to Harley of $300 million in the swap transaction. Upon maturity, the Santa Clara Options Swap contemplated a payout to Santa Clara of up to 4.5 times the leveraged performance of Harley. HSBC Bank funded this exposure by charging Santa Clara a financing fee of LIBOR plus 110 basis points.

263.     Upon information and belief, HSBC Bank made redemptions from Harley and received transfers at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### The BNP Paribas Accreting Strike Call Option Transaction

264.     In September 2007, HSBC Bank USA entered into an accreting strike call option transaction, which had the same economics as a total return swap, with BNP Paribas that provided BNP Paribas with levered exposure to the returns generated by Harley.  As part of the BNP Paribas transaction, BNP Paribas received a notional exposure to Harley of $70 million.  Upon information and belief, HSBC Bank USA funded this exposure by charging BNP Paribas a financing fee.

265.     Upon information and belief, HSBC Bank USA made redemptions and received transfers from Harley at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### The Gaspee Offshore Swap

266.     Also in July 2007, HSBC Bank entered into a swap transaction with Gaspee Offshore Fund Ltd. ("Gaspee"), which provided levered exposure to Thema International Fund (the "Gaspee Offshore Swap").  As part of the Gaspee Offshore Swap, Gaspee received a notional exposure to Thema International of $12.8 million.  HSBC Bank funded this exposure by charging Gaspee a financing fee of LIBOR plus 110 basis points.  In 2008, when Thema International was redeemed in full, Senator replaced Thema International as the reference fund.

267.     Upon maturity, the Gaspee Offshore Swap contemplated a payout to Gaspee of up to 3.5 times the leveraged performance of Senator.

268.     Upon information and belief, HSBC Bank made redemptions and received transfers from Thema International and Senator at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### The Rye Select Broad Market XL Portfolio Limited Swap

269.     HSBC Bank entered into a swap transaction in August 2007, with Rye Select Broad Market XL Portfolio Limited ("Rye XL Portfolio"), in which Class D shares of Broad

Market Portfolio served as the reference fund (the "Rye XL Portfolio Swap"). As part of the Rye XL Portfolio Swap, Rye XL Portfolio received a notional exposure to Broad Market Portfolio of $56 million. Upon maturity, the Rye XL Portfolio Swap agreement contemplated a payout to Rye XL Portfolio of up to 3.5 times the leveraged performance of Broad Market Portfolio.

270.     HSBC Bank funded this exposure by charging Rye XL Portfolio a fee of LIBOR plus 90 basis points.

271.     Upon information and belief, HSBC Bank redeemed $15.9 million from Rye XL Portfolio during the fourth quarter of 2008, a time when it knew or deliberately avoided knowing of Madoff's fraud.

### *The Wailea Swap*

272.     In September 2007, HSBC Bank USA entered into two swap agreements with Wailea Partners L.P. ("Wailea Partners") and Wailea Offshore Fund Ltd. ("Wailea Offshore Fund"). In both swap transactions, Senator served as the reference fund (respectively, the "Wailea Offshore Swap" and the "Wailea Partners Swap"). As part of the Wailea Partners Swap, Wailea Partners received a notional exposure of $31 million to Senator. As part of the Wailea Offshore Swap, Wailea Offshore Fund received a notional exposure of $14 million to Senator. Upon maturity, both these swap agreements contemplated a payout to Wailea Partners and Wailea Offshore Fund of up to 3.5 times the leveraged performance of Senator.

273.     HSBC Bank USA funded this exposure by charging Wailea Partners and Wailea Offshore Fund a financing fee of LIBOR plus 110 basis points.

274.     Upon information and belief, HSBC Bank USA made redemptions from and received transfers from Senator at a time when it knew or deliberately avoided knowing of Madoff's fraud.

## *The Leveraged Note Programs*

275.    By 2006, a number of different financial institutions' leveraged investment vehicles had emerged that, like the Madoff Structured Products, increased investments in the BLMIS IA Business.  Between 2005 and 2008, ███████████████████████████, ██████, Capital Bank–GRAWE Gruppo AG ("Capital Bank"), and ████████████████ ████████████ had all created leveraged note programs that offered note purchasers multiples on the returns of an underlying Madoff Feeder Fund to which the note program was linked. ████████████ created leveraged notes programs linked to the returns of ████████████; ████████████ created leveraged notes programs linked to the returns of ██████ and funds managed by ██████; and Capital Bank created leveraged notes programs linked to the returns of Herald.

276.    The leveraged note purchasers received multiples of the returns of an underlying fund, without actually owning the asset.  Most of these leveraged note programs had notional values in excess of ████████ and required initial investments of ██████████████ ████████.  These notes created an additional access point through which investors could gain exposure to Madoff Feeder Funds that they otherwise could not invest in due to capacity limitations or minimum investment requirements.

277.    The HSBC Defendants and Management Defendants benefited from leveraged note programs that were linked to the performance of Feeder Fund Defendants.  As investments in the Feeder Fund Defendants increased, through investment in the leveraged note programs, the fees the HSBC Defendants and Management Defendants received also increased.

## *The STAIRS Note Programs*

278.    The HSBC Defendants also sought to create leveraged products through which individual high-net worth investors could invest in hedge funds, including gaining exposure to certain Madoff Feeder Funds.  Under these leveraged products, which HSBC Bank USA called

"leveraged hedge fund basket-linked STAIRS Notes" (the "STAIRS Notes"), individual investors would receive multiples of the returns generated by a basket of hedge funds selected by HSBC Bank USA. The STAIRS Notes products would have provided yet another avenue by which investors could access BLMIS and by which Madoff could tap into a new source of funds.

279. For example, as of January 9, 2007, HSBC Bank USA was attempting to create a seven-year STAIRS Notes program, with a notional exposure of $40 million to a reference portfolio comprising two hedge funds—Permal FX Financial and Futures, and Broad Market, a feeder fund that was wholly invested in BLMIS. An investor participating in this STAIRS Note program would have received returns of up to three times that of the referenced fund, less the fees collected by HSBC Bank USA.

280. The HSBC Defendants also would have benefited from the STAIRS Note programs. For example, in connection with the program described above, HSBC Bank USA would have received net revenues of at least $588,492 in fees during each of the seven years of the STAIRS Note program.

### The Defendants Enabled Madoff to Act as His Own Custodian

281. The HSBC Custodian Defendants entered into custodian agreements with the Feeder Fund Defendants (and with a number of other fund families that directed Customer Property to Madoff such as the Kingate funds, Defender, Landmark, and Optimal). The following chart depicts these relationships, and additional illustrative details are provided in Exhibit F:



In connection with these agreements, the HSBC Custodian Defendants committed to undertaking significant responsibilities, including maintaining segregated accounts; overseeing the administration of the payment and redemption of funds; and otherwise transferring, exchanging, or delivering securities as directed by the Madoff Feeder Funds.

282. The HSBC Custodian Defendants did not discharge these responsibilities. Instead, they delegated these responsibilities to Madoff either informally or by entering into formal sub-custody agreements with BLMIS. Even after delegating these duties, the HSBC Custodian Defendants continued to collect fees and, in total, collected millions in fees for these services.

283. The HSBC Custodian Defendants' delegation of their duties as custodian of the Feeder Fund Defendants meant that there was no independent oversight over BLMIS's activities, which was critical to sustaining the Ponzi scheme. Obviously, BLMIS did not perform the duties HSBC delegated, and the HSBC Custodian Defendants did not even pretend to supervise BLMIS

to ensure that BLMIS performed these duties.  Although, as the custodians of the Feeder Fund Defendants, they were obligated to do so.  The HSBC Custodian Defendants never even questioned why BLMIS was willing to perform these duties without compensation, and did not question the fact that BLMIS insisted on keeping custody of the assets.

284.    The HSBC Custodian Defendants also failed to notify investors that they had delegated their custodial duties to BLMIS.  Instead, they continued to allow investors to believe that HSBC was acting as custodian.  Although the HSBC Custodian Defendants had relinquished their custodial duties, the "HSBC" name continued to be emblazoned upon the Feeder Fund Defendants' documents and gave the appearance that the HSBC Custodian Defendants approved of the manner in which BLMIS segregated and monitored its customers' investments.

285.    At least two of the funds for which the HSBC Defendants acted as custodians– Herald (Lux) and Thema International–were governed by UCITS.  This means that the funds were created under the Undertakings for Collective Investments in Transferable Securities, a set of directives and laws issued by the European Union.  UCITS funds are also governed by the relevant national law.

286.    Herald (Lux) was incorporated in Luxembourg as a UCITS compliant *Société d'Investissement À Capital Variable* ("SICAV") fund, and thus was open to investments from the public at large, rather than being limited to investments from sophisticated investors.  Thema International was authorized in 2006 by the Irish Financial Regulator to operate as a UCITS compliant fund in Ireland.

287.    HSSL acted as the custodian of Herald (Lux), and HITSI acted as custodian to Thema International.

288.     UCITS regulations require custodians of fund assets to ensure that the sale, issue, repurchase, and cancellation of securities are carried out in accordance with the law and with the company's articles of incorporation.  UCITS regulations also prohibit companies from acting as both investment adviser and custodian, and UCITS regulations require custodians of fund assets to act solely in the interest of the fund's investors.

289.     HSSL and HITSI failed to carry out their duties in compliance with UCITS regulations.  HSSL and HITSI did not ensure that BLMIS's investment activities were carried out in accordance with the law.  HSSL and HITSI violated UCITS regulations when they entered into sub-custody agreements with BLMIS, the entity that acted as an investment adviser to Herald (Lux) and Thema International.  HSSL and HITSI also failed to act solely in the interest of the funds' investors.  Indeed, despite being confronted with all of the badges of BLMIS's fraud, the HSBC Custodian Defendants yielded to BLMIS, surrendering billions of dollars to its custody and enabling Madoff's scheme to continue and expand.

### *HSBC As Administrator of the Feeder Fund Defendants*

290.     The HSBC Administrator Defendants served as administrators, registrars, and service agents pursuant to agreements with the Feeder Fund Defendants.  The following chart depicts the relationships between the HSBC Administrator Defendants and the Feeder Fund Defendants, and additional illustrative details are provided in Exhibit F:



HSBC Administrator Relationships

The HSBC Administrator Defendants were responsible for the day-to-day administration of the funds, which entailed, among other things, issuing and redeeming fund shares, and maintaining the books and records of those funds.

291.    The HSBC Administrator Defendants failed to discharge their responsibility of valuing over-the-counter options contracts.  To value over-the-counter options contracts, the HSBC Administrator Defendants needed to obtain at least weekly quotations from options trading counterparties, which was never done.  Because Madoff would not reveal the identities of purported counterparties, even if the HSBC Administrator Defendants had attempted to verify the value, volume, or existence of any over-the-counter transactions purportedly made by BLMIS, they would not have been able to do so.  The HSBC Administrator Defendants' failure to identify the counterparties, despite the obligation to do so, enabled the continuation of the Ponzi scheme.

### *HSBC Marketed Madoff to its Private Banking Clients*

292.     On top of the fact that HSBC served as administrators and custodians to the Feeder Fund Defendants, HSBC Private Banking, HSBC Private Bank Suisse, HSBC Bank USA, and their related affiliates ("HSBC Private Bank") marketed the Feeder Fund Defendants to their clients.  Even though HSBC issued overwhelmingly negative due diligence reports noting the many red flags associated with BLMIS, HSBC Private Bank still persuaded wealthy clients to invest in BLMIS, through the Feeder Fund Defendants.  These efforts provided additional assets that perpetuated and worsened the Ponzi scheme.

293.     Upon information and belief, HSBC Private Bank's high net-worth clients had relationships of trust and confidence with HSBC Private Bank.  These clients trusted HSBC Private Bank and relied on HSBC's reputation when deciding among investment strategies.  Upon information and belief, but for the recommendations of HSBC Private Bank, these individuals would not have invested with BLMIS through the Feeder Fund Defendants.

294.     Upon information and belief, HSBC Private Bank began marketing Sentry to its high net-worth clients as early as 1999.  This occurred even though HSBC Private Bank failed to conduct any meaningful due diligence on Sentry, and the fund was not a part of the HSBC Private Bank platform.  Upon information and belief, HSBC violated internal policies by marketing and recommending a fund not on its official platform.  On at least nine separate occasions between 2001 and 2009, HSBC Bank USA conducted due diligence on Sentry for the purpose of including the fund on its official platform.

295.     In July 2001, the HSBC Private Bank due diligence team met with Fairfield Greenwich ("Fairfield") officers.  At this meeting, Stephen Kinne, a high-ranking member of HSBC Bank USA's due diligence team, inquired about the many obvious red flags, including Madoff's choice to forego lucrative fees, the identities of the counterparties to Madoff's over-

the-counter options transactions, and the percentage of securities that Madoff held at the Depositary Trust Corporation. Upon information and belief, none of the Fairfield representatives provided adequate responses to HSBC Bank USA's questions.

296. On August 7, 2001, HSBC Bank USA issued a due diligence report on Sentry ("2001 Report"). The 2001 Report stated that the due diligence team had been unable to meet with Madoff and that, therefore, the team formed its "opinions" solely on the basis of meetings with Fairfield representatives and a MAR/Hedge article on Madoff. The 2001 Report noted that, without meeting Madoff, there was no way for HSBC to assess Madoff's trading system, risk controls, or compliance procedures. As a result, HSBC Bank USA stated that it was "very difficult" to understand how Madoff was able to make money in such a consistent fashion. The 2001 Report also noted multiple red flags associated with Madoff, including his taking custody of securities and refusal to accept fees at the fund level.

297. In January of 2003, HSBC Bank USA issued another due diligence report on Sentry, which noted many of the same concerns addressed in the 2001 Report. According to Research Committee Minutes, David Mullane, a member of the due diligence team, warned, "I would not invest in [Sentry] nor would I want investors to invest."

298. Also in 2003, HSBC Bank USA issued a due diligence report for Ascot Fund, another Madoff Feeder Fund. The report noted similarities between the investment strategies employed by Ascot Fund and Sentry. HSBC Bank USA gave Ascot Fund a 1 rating, the worst possible score.

299. In 2004, HSBC Bank USA issued yet another report regarding Sentry. In addition to noting the previously-mentioned red flags, HSBC Bank USA noted the concern that Madoff's track record was "[t]oo good to be true."

300. HSBC Bank USA's comprehensive knowledge of these many red flags did not prevent HSBC Private Bank from simultaneously encouraging high-net worth investors to invest in Madoff Feeder Funds, including the Feeder Fund Defendants. In 2004, an HSBC Private Bank adviser in Geneva represented to at least one investor that Kingate Global was part of HSBC's diversified funds and that HSBC was, itself, invested in Kingate Global. Two years later, HSBC Private Bank forwarded marketing materials to the same investor recommending Kingate Global and Sentry for investment. In 2008, when the investor inquired further about Kingate Global, HSBC Private Bank informed the investor that HSBC had completely divested from Kingate due to "problems" with the fund.

301. In November of 2004, HSBC Private Bank in Geneva recommended Kingate Global to another investor, touting its 10% to 12% returns. HSBC Private Bank informed the investor that HSBC had sent its own inspectors to confirm that those funds were operating properly, and that they tracked the performance of all hedge funds its clients were invested in, including Kingate.

302. HSBC Private Bank informed another investor in 2004 that HSBC Private Bank did not sell every available fund, but only those that passed HSBC Private Bank's due diligence requirements. At each meeting, the HSBC Private Bank adviser confirmed that HSBC performed due diligence on all recommended funds. Upon information and belief, these recommendations led these investors to invest in Kingate Global and Sentry.

303. In early 2005, based on the recommendations of an HSBC Private Bank adviser in Zurich, one investor placed $300,000 in Sentry. At the time, HSBC Private Bank did not inform the investor of its significant concerns regarding Sentry, any other Madoff Feeder Funds, or

BLMIS's IA Business.  In 2007 the investor was finally informed by his adviser to "get out" because HSBC had conceded that it did not understand the investment strategy.

304.    HSBC Private Bank in New York recommended Sentry to another investor in 2005, assuring him that HSBC was in contact with the fund, was confident in the fund, and was performing due diligence.  In September 2005, HSBC provided an "Investment View and Proposal" listing Sentry as one of the proposed funds.  HSBC Private Bank never warned the investor about its concerns regarding Sentry, other Madoff Feeder Funds, or BLMIS.  After Madoff's arrest, however, the same HSBC Private Bank adviser stated that he, in fact, disliked Sentry.

### HSBC Bank Engaged KPMG
### to Assess Fraud and Operational Risk at BLMIS and then Ignores its Findings

305.    The red flags signaling Madoff's fraud were apparent to the Defendants in September 2005, when HSBC Bank engaged KPMG to review BLMIS for fraud and related operational risk.  KPMG's review focused on fraud risks in BLMIS's methods of recording and reporting client funds held by BLMIS, HSBC's ability to detect suspected fraud or misconduct in client funds for which HSBC served as primary custodian.  These funds included Thema International, Thema Fund, Hermes, Primeo, Herald, Alpha Prime, and Square One.

306.    KPMG's findings were encapsulated in a February 16, 2006 report, titled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2006 Report").  In the 2006 Report, KPMG identified a laundry list of fraud and related operational risks related to BLMIS's operations including:

- falsification of client mandates;

- embezzlement of client funds;

- use of fabricated client instructions to disguise poor proprietary positions;

- failure to segregate client funds from BLMIS funds;

- diversion of client funds for Madoff's personal gain;

- inaccurate allocation of reinvested funds from Fidelity across individual accounts;

- manipulation of option prices to maximize commissions;

- use of BLMIS claim funds to settle options exercised against HSBC;

- practice of exercising options without informing the client that the option was set to expire;

- use of client funds to make opportunistic trades that deviated from the SSC Strategy;

- diversion of cash resulting from the sale of equities and Treasury bills;

- systematic over-valuing of positions and the failure to report positions to HSBC in order to manipulate control relationships;

- stocks were not held in client names;

- inflation of call values to disguise misappropriation or poor positions;

- unauthorized trading in client accounts;

- trades executions made by unauthorized BLMIS staff members;

- sham trades to divert client cash;

- front-running order flow in the market-making business;

- false reporting of trades without execution to collect commissions; and

- falsification of trade confirmations.

307. KPMG was particularly concerned that it could not identify the owners of individual HSBC client assets, and that controls in place at BLMIS might not prevent fraud or errors in client accounts.

308.     Despite the litany of fraud and operational risks identified by KPMG, the HSBC Defendants continued their relationship with Madoff, delegated custodial duties to BLMIS, and took no steps to implement KPMG's recommendations.

### *KPMG Engaged Again and Uncovers HSBC's Failure to Heed Earlier Warnings*

309.     After ignoring KPMG's dire warnings in 2006, the HSBC Defendants asked KPMG to conduct another review of BLMIS in March 2008.  The terms and scope of the review were identical to the 2006 review, except that KPMG was also asked to assess the risk of placing HSBC investments with BLMIS.  The relevant HSBC custodial clients were identified as Primeo, Lagoon (Hermes), Alpha Prime, Herald, Herald (Lux), Senator, Thema Wise (Thema Fund), Thema International, Defender, Landmark, and Kingate Global.

310.     KPMG's conclusions were contained in a September 8, 2008, report entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2008 Report").  KPMG wrote that, according to Madoff, HSBC's client investments represented an astonishing 33% of BLMIS's assets under management.

311.     In the 2008 Report, KPMG identified three additional fraud concerns at BLMIS, not previously identified in the 2006 Report:

- •     Client cash is diverted—signatures falsified on *client* instruction in an attempt to legitimize an unauthorized transaction (*i.e.*, redemption).

- •     Madoff LLC claim funds have been used to settle options exercised against HSBC.

- •     Stocks are intentionally not allocated a fair price from the bulk trade.

312.     Yet again, the HSBC Defendants ignored KPMG's warnings and recommendations.  The HSBC Defendants, instead, perverted the 2008 Report and used it as a marketing tool to encourage additional investment in the IA Business.  Upon information and belief, in mid-2008, HSBC was asked to explain Madoff's investment strategy to Andreas

Pirkner, an employee of Bank Medici. In response, HSBC forwarded to Pirkner the 2008 Report with the comment that the Feeder Fund Defendants were in good shape. The HSBC Defendants continued to exploit their many relationships with Madoff and BLMIS, burying their heads in the sand, and effectively giving Madoff a "clean bill of health."

**THE AFTERMATH:**
**THE DEFENDANTS UNDERSTATED**
<u>**THEIR FAILURE TO PERFORM DUE DILIGENCE**</u>

313. After Madoff's arrest on December 11, 2008, in a desperate attempt to preserve their public image with investors, the Defendants quickly attempted to hide their failure to investigate the obvious signs of fraud at BLMIS.

314. Hours after Madoff's arrest, ███████████, a ███████ employee, wrote, "███████████████████████████████████████████!" Her fellow employee, ███████████, replied, "████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

315. Four days later, HSBC Holdings issued a press release attempting to play down the involvement and economic exposure of the HSBC Defendants, commenting:

> In the interests of clarity, HSBC confirms that it has provided financing to a small number of institutional clients who invested in funds with Madoff. On the basis of information presently available, HSBC is of the view that the potential exposure under these financing transactions is in the region of US$1 billion. Also, in the context of its normal global custody business, HSBC has custody clients who have invested with Madoff. HSBC does not believe that these custodial arrangements should be a source of exposure to the Group.

316. In response to the press release, ███████████ succinctly described the tension between what HSBC knew and what they did with that knowledge:

**THE TRANSFERS**

*__Initial Transfers from BLMIS to the Feeder Fund Defendants__*

317. According to BLMIS's records, the Feeder Fund Defendants maintained and/or placed assets into multiple accounts with BLMIS (numbers 1FR097, 1FN079, 1FR109, 1FR135, 1FN021, 1FN066, 1FN096, 1FR015, 1FR016, 1FN060, 1FN092, 1FR128, 1FR093, and 1FN095), as set forth on <u>Exhibit A</u> (collectively, the "Account(s)").

318. Prior to the Filing Date, BLMIS transferred approximately $2.2 billion to, or for the benefit of, the Feeder Fund Defendants in the form of withdrawals from the Accounts (the "Transfers"), as is set forth in <u>Exhibits A</u> and <u>B</u>, under circumstances which should have put the Feeder Fund Defendants on notice that the Transfers were fraudulent. Of this amount, approximately $83.8 million constituted non-existent profits supposedly earned in the Accounts ("Fictitious Profits"), and approximately $2.1 billion constituted the return of principal. <u>See</u> <u>Exhibit A</u>, columns 8 and 9, and <u>Exhibit B</u>, columns 14 and 15. The Fictitious Profits received by the Feeder Fund Defendants were other people's money.

319. The accountholder Defendants listed on Exhibit A were initial transferees of the avoidable transfers set forth above. In addition, because a number of the Feeder Fund Defendants routinely disregarded corporate formalities and freely transferred funds among themselves, upon information and belief, several Defendants that were not BLMIS accountholders—namely, defendants Hermes, Thema Fund, and Lagoon Trust—also, or in the alternative, received direct transfers from accounts held by defendants Lagoon and Thema Wise. Upon further information and belief, some or all of the Defendants may have received direct

transfers from BLMIS accounts not held in their names, but held in other accountholder Defendants' names, and therefore are initial transferees of those avoidable transfers.

320. The Transfers are avoidable and recoverable under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of N.Y. C.P.L.R. 203(g) and 213(8) and DCL sections 273 – 279.

321. During the two years prior to the Filing Date, BLMIS made transfers to the Feeder Fund Defendants totaling at least $1.6 billion, of which approximately $1.5 billion constituted a return of principal (the "Two Year Principal Transfers"), and $82.2 million represented fictitious profits from the Ponzi scheme (the "Two Year Fictitious Profit Transfers," and, together with the Two Year Principal Transfers, the "Two Year Transfers"). See Exhibit A, columns 4 and 5.

322. Defendant Primeo (account numbers 1FN060 and 1FN092) received two year transfers totaling approximately $16.2 million, of which $16.19 million constituted a return of principal (the "Two Year Principal Transfers"), and $27,942 represented fictitious profits from the Ponzi scheme (the "Two Year Fictitious Profit Transfers," and, together with the Two Year Principal Transfers, the "Two Year Primeo Transfers"). See Exhibit B, columns 10 and 11.

323. Defendant Alpha Prime (account number 1FR097) received two year transfers totaling approximately $78.2 million, of which the entire amount constituted a return of principal (the "Two Year Alpha Prime Transfers"). See Exhibit B, columns 10 and 11.

324. Defendant Herald (account number 1FR109) received two year transfers totaling approximately $563.5 million, of which the entire amount constituted a return of principal (the "Two Year Herald Transfers"). See Exhibit B, columns 10 and 11.

325. Defendant Senator (account number 1FR128) received two year transfers totaling approximately $95.4 million, of which the entire amount constituted a return of principal (the "Two Year Senator Transfers"). See Exhibit B, columns 10 and 11.

326. Defendant Herald (Lux) (account number 1FR135) received the benefit of two year transfers totaling approximately $134,000, of which the entire amount constituted a return of principal (the "Two Year Herald (Lux) Transfers"). See Exhibit B, columns 10 and 11.

327. Defendants Hermes, Lagoon, and/or Lagoon Trust (account numbers 1FN021, 1FN066, 1FN096, 1FR015, and 1FR016) received two year transfers totaling approximately $166.8 million, of which approximately $84.6 million constituted a return of principal (the "Two Year Hermes/Lagoon Principal Transfers"), and $82.2 million represented fictitious profits from the Ponzi scheme (the "Two Year Hermes/Lagoon Fictitious Profit Transfers," and, together with the Two Year Hermes/Lagoon Principal Transfers, the "Two Year Hermes/Lagoon Transfers"). See Exhibit B, columns 10 and 11.

328. Defendants Thema Fund and/or Thema Wise (account number 1FR093) received two year transfers totaling approximately $117.6 million, of which the entire amount constituted a return of principal (the "Two Year Thema Fund/Thema Wise Transfers"). See Exhibit B, columns 10 and 11.

329. Defendant Thema International (account number 1FN095) received two year transfers totaling approximately $565.7 million, of which the entire amount constituted a return of principal (the "Two Year Thema International Transfers"). See Exhibit B, columns 10 and 11.

330. Defendant Geo Currencies (account number 1FN079) received the benefit of two year transfers totaling approximately $130,000, of which the entire amount constituted a return of principal (the "Two Year Geo Currencies Transfers"). See Exhibit B, columns 10 and 11.

331.     The Two Year Transfers are avoidable and recoverable under sections 548,

550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section

78fff-2(c)(3) and applicable provisions of DCL sections 273 – 279.

332.     During the six years prior to the Filing Date, BLMIS made transfers to the Feeder

Fund Defendants totaling approximately $2 billion, of which approximately $1.9 billion

constituted a return of principal (the "Six Year Principal Transfers"), and approximately $82.2

million represented fictitious profits from the Ponzi scheme (the "Six Year Fictitious Profit

Transfers," and, together with the Six Year Principal Transfers, the "Six Year Transfers").  See

Exhibit A, columns 6 and 7.

333.     Defendant Primeo (account numbers 1FN060 and 1FN092) received six year

transfers totaling approximately $145 million, of which approximately $144.9 million constituted

a return of principal (the "Six Year Primeo Principal Transfers"), and $27,942 represented

fictitious profits from the Ponzi scheme (the "Six Year Primeo Fictitious Profit Transfers," and,

together with the Six Year Primeo Principal Transfers, the "Six Year Primeo Transfers").  See

Exhibit B, columns 12 and 13.

334.     Defendant Alpha Prime (account number 1FR097) received six year transfers

totaling approximately $85.8 million, of which the entire amount constituted a return of principal

(the "Six Year Alpha Prime Transfers").  See Exhibit B, columns 12 and 13.

335.     Defendant Herald (account number 1FR109) received six year transfers totaling

approximately $578 million, of which the entire amount constituted a return of principal (the

"Six Year Herald Transfers").  See Exhibit B, columns 12 and 13.

336.    Defendant Senator (account number 1FR128) received six year transfers totaling approximately $95.4 million, of which the entire amount constituted a return of principal (the "Six Year Senator Transfers").  See Exhibit B, columns 12 and 13.

337.    Defendant Herald (Lux) (account number 1FR135) received the benefit of six year transfers totaling approximately $134,000, of which the entire amount constituted a return of principal (the "Six Year Herald (Lux) Transfers").  See Exhibit B, columns 12 and 13.

338.    Defendants Hermes, Lagoon, and/or Lagoon Trust (account numbers 1FN021, 1FN066, 1FN096, 1FR015, and 1FR016) received six year transfers totaling approximately $249.6 million, of which approximately $167.4 million constituted a return of principal (the "Six Year Hermes/Lagoon Principal Transfers"), and approximately $82.2 million represented fictitious profits from the Ponzi scheme (the "Six Year Hermes/Lagoon Fictitious Profit Transfers," and together with the Six Year Principal Transfers, the "Six Year Hermes/Lagoon Transfers").  See Exhibit B, columns 12 and 13.

339.    Defendants Thema Fund and/or Thema Wise (account number 1FR093) received six year transfers totaling approximately $132 million, of which the entire amount constituted a return of principal (the "Six Year Thema Fund/Thema Wise Transfers").  See Exhibit B, columns 12 and 13.

340.    Defendant Thema International (account number 1FN095) received six year transfers totaling approximately $692.3 million, of which the entire amount constituted a return of principal (the "Six Year Thema International Transfers").  See Exhibit B, columns 12 and 13.

341.    Defendant Geo Currencies (account number 1FN079) received the benefit of six year transfers totaling approximately $417,000, of which the entire amount constituted a return of principal (the "Six Year Geo Currencies Transfers").  See Exhibit B, columns 12 and 13.

342.     The Six Year Transfers are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of DCL sections 273 – 279.

343.     During the 90 days prior to the Filing Date, BLMIS made payments or other transfers totaling approximately $1.3 billion to the Feeder Fund Defendants.  Of that amount, approximately $1.2 billion constituted preference payments (the "Preference Period Transfers").  See Exhibit A, column 3.

344.     Defendant Alpha Prime (account number 1FR097) received 90 day transfers totaling approximately $49 million, of which the entire amount constituted preference payments (the "Alpha Prime Preference Period Transfers").  See Exhibit B, column 9.

345.     Defendant Herald (account number 1FR109) received 90 day transfers totaling approximately $537.5 million, of which the entire amount constituted preference payments (the "Herald Preference Period Transfers").  See Exhibit B, column 9.

346.     Defendant Senator (account number 1FR128) received 90 day transfers totaling approximately $95.2 million, of which the entire amount constituted preference payments (the "Senator Preference Period Transfers).  See Exhibit B, column 9.

347.     Defendants Hermes, Lagoon, and/or Lagoon Trust (account numbers 1FN021, 1FN066, 1FN096, 1FR015, and 1FR016) received 90 day transfers totaling approximately $135.1 million, of which approximately $52.9 million constituted preference payments (the "Hermes/Lagoon Preference Period Transfers").  See Exhibit B, column 9.

348.     Defendants Thema Fund and/or Thema Wise (account number 1FR093) received 90 day transfers totaling approximately $104 million, of which the entire amount constituted

preference payments (the "Thema Fund/Thema Wise Preference Period Transfers"). See Exhibit B, column 9.

349. Defendant Thema International (account number 1FN095) received 90 day transfers totaling approximately $355.5 million, of which the entire amount constituted preference payments (the "Thema International Preference Period Transfers"). See Exhibit B, column 9.

350. Defendant Geo Currencies (account number 1FN079) received 90 day transfers totaling approximately $17,000, of which the entire amount constituted preference payments (the "Geo Currencies Preference Period Transfers"). See Exhibit B, column 9.

351. The Preference Period Transfers are avoidable and recoverable under sections 547, 550 and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

### *The Transfers Were Subsequently Transferred to Other Defendants*

352. Upon information and belief, the Management Defendants, the HSBC Defendants, the Beneficial Owners, the Individual Defendants Primeo, and, in the alternative, also Hermes, Thema Fund, and Lagoon Trust (the "Subsequent Transferee Defendants") received subsequent transfers of the avoidable transfers referenced above (the "Subsequent Transfers").

353. The Subsequent Transfers, or the value thereof, are recoverable from the Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

354. The Transfers and Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA.

355. To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

356. The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Transfers and any additional transfers, and (ii) seek recovery of such additional transfers.

## INITIAL TRANSFERS FROM BLMIS TO NON-PARTY FUNDS

357. The HSBC Defendants received subsequent transfers from Madoff Feeder Funds that are not named as defendants herein, including Sentry, Broad Market, Broad Market Portfolio, Harley, Kingate Global, Kingate Euro, Landmark, Defender, and Square One (collectively, the "Non-Party Funds")—each of which maintained one or more accounts with BLMIS.

358. The Trustee has filed an action against Sentry to avoid and recover the initial transfers of Customer Property. *See Picard v. Fairfield Sentry Ltd., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1239 (Bankr. S.D.N.Y filed May 18, 2009), as amended on July 20, 2010 (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully rewritten herein.

359. During the six years preceding the Filing Date, BLMIS made transfers to Sentry (account number 1G0092) of approximately $206 million (the "Sentry Six Year Initial Transfers"). The Sentry Six Year Initial Transfers include approximately $81.7 million that BLMIS transferred to Sentry during the two years preceding the Filing Date (the "Sentry Two Year Initial Transfers"). The Sentry Six Year Initial Transfers and Sentry Two Year Initial Transfers include approximately $23 million which BLMIS transferred to Sentry during the 90 days preceding the Filing Date (the "Sentry Preference Period Initial Transfers"). The Sentry Six Year Initial Transfers, the Sentry Two Year Initial Transfers, and the Sentry Preference Period Initial Transfers (collectively, the "Sentry Initial Transfers") are set forth more fully in Exhibits D and E1.

360.     The Trustee intends to file an action against Broad Market and Broad Market Portfolio, to be styled *Picard v. Rye Select Broad Market Fund, L.P., et al. (In re Bernard L. Madoff Inv. Sec. LLC)* (the "Tremont Complaint"), to avoid and recover the initial transfers of Customer Property.  The Trustee incorporates by reference the allegations contained in the Tremont Complaint as if fully rewritten herein.

361.     During the six years preceding the Filing Date, BLMIS made transfers to Broad Market (account number 1T0027) of approximately $252 million (the "Broad Market Six Year Initial Transfers").  The Broad Market Six Year Initial Transfers include approximately $60 million that BLMIS transferred to Broad Market during the two years preceding the Filing Date (the "Broad Market Two Year Initial Transfers"). The Broad Market Six Year Initial Transfers and Broad Market Two Year Initial Transfers include approximately $30 million which BLMIS transferred to Broad Market during the 90 days preceding the Filing Date (the "Broad Market Preference Period Initial Transfers").  The Broad Market Six Year Initial Transfers, the Broad Market Two Year Initial Transfers, and the Broad Market Preference Period Initial Transfers (collectively, the "Broad Market Initial Transfers") are set forth more fully in Exhibits D and E2.

362.     During the six years preceding the Filing Date, BLMIS made transfers to Broad Market Portfolio (account number 1FR080) of approximately $618 million (the "Broad Market Portfolio Six Year Initial Transfers").  The Broad Market Portfolio Six Year Initial Transfers include approximately $354.6 million that BLMIS transferred to Broad Market Portfolio during the two years preceding the Filing Date (the "Broad Market Portfolio Two Year Initial Transfers"). The Broad Market Portfolio Six Year Initial Transfers and Broad Market Portfolio Two Year Initial Transfers include approximately $275.7 million which BLMIS transferred to Broad Market Portfolio during the 90 days preceding the Filing Date (the "Broad Market

Portfolio Preference Period Initial Transfers"). The Broad Market Portfolio Six Year Initial Transfers, the Broad Market Portfolio Two Year Initial Transfers, and the Broad Market Portfolio Preference Period Initial Transfers (collectively, the "Broad Market Portfolio Initial Transfers") are set forth more fully in Exhibits D and E3.

363. The Trustee has filed an action against Harley to avoid and recover the initial transfers of Customer Property. *See Picard v. Harley International (Cayman) Limited (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1187 (Bankr. S.D.N.Y filed May 12, 2009) (the "Harley Complaint"). The Trustee incorporates by reference the allegations contained in the Harley Complaint as if fully rewritten herein.

364. During the six years preceding the Filing Date, BLMIS made transfers to Harley (account number 1FN094) of approximately $1.1 billion (the "Harley Six Year Initial Transfers"). The Harley Six Year Initial Transfers include approximately $1.08 billion that BLMIS transferred to Harley during the two years preceding the Filing Date (the "Harley Two Year Initial Transfers"). The Harley Six Year Initial Transfers and Harley Two Year Initial Transfers include approximately $427 million which BLMIS transferred to Harley during the 90 days preceding the Filing Date (the "Harley Preference Period Initial Transfers"). The Harley Six Year Initial Transfers, the Harley Two Year Initial Transfers, and the Harley Preference Period Initial Transfers (collectively, the "Harley Initial Transfers") are set forth more fully in Exhibits D and E4.

365. On November 10, 2010, summary and default judgments were entered against Harley avoiding the Harley Two Year Initial Transfers and the Harley Preference Period Initial Transfers. *See Order Granting Entry of Summary and Default Judgments Against Harley International (Cayman) Limited* (Docket No. 00015).

366.     The Trustee has filed an action against Kingate Global and Kingate Euro to avoid and recover the initial transfers of Customer Property.  *See Picard v. Kingate Global Fund, Ltd., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1161 (Bankr. S.D.N.Y filed April 17, 2009), as amended on July 21, 2009 (the "Kingate Amended Complaint").  The Trustee incorporates by reference the allegations contained in the Kingate Amended Complaint as if fully rewritten herein.

367.     During the six years preceding the Filing Date, BLMIS made transfers to Kingate Global (account number 1FN061) of approximately $398.7 million (the "Kingate Global Six Year Initial Transfers").  The Kingate Global Six Year Initial Transfers include approximately $163.4 million that BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Six Year Initial Transfers and Kingate Global Two Year Initial Transfers include approximately $101.8 million which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers").  The Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers (collectively, the "Kingate Global Initial Transfers") are set forth more fully in Exhibits D and E5.

368.     During the six years preceding the Filing Date, BLMIS made transfers to Kingate Euro (account number 1FR086) of approximately $475.5 million (the "Kingate Euro Six Year Initial Transfers").  The Kingate Euro Six Year Initial Transfers include approximately $249 million that BLMIS transferred to Kingate Euro during the two years preceding the Filing Date (the "Kingate Euro Two Year Initial Transfers").  The Kingate Euro Six Year Initial Transfers and Kingate Euro Two Year Initial Transfers include approximately $155.6 million which

BLMIS transferred to Kingate Euro during the 90 days preceding the Filing Date (the "Kingate Euro Preference Period Initial Transfers").  The Kingate Euro Six Year Initial Transfers, the Kingate Euro Two Year Initial Transfers, and the Kingate Euro Preference Period Initial Transfers (collectively, the "Kingate Euro Initial Transfers") are set forth more fully in Exhibits D and E6.

369.    The Trustee intends to file an action against Landmark, to be styled *Picard v. UBS AG, et al. (In re Bernard L. Madoff Inv. Sec. LLC)* (the "Landmark Complaint"), to avoid and recover the initial transfers of Customer Property.  The Trustee incorporates by reference the allegations contained in the Landmark Complaint as if fully rewritten herein.

370.    During the six years preceding the Filing Date, BLMIS made transfers to Landmark (account number 1FR133) of approximately $52.4 million (the "Landmark Six Year Initial Transfers").  The Landmark Six Year Initial Transfers include approximately $52.4 million that BLMIS transferred to Landmark during the two years preceding the Filing Date (the "Landmark Two Year Initial Transfers").  The Landmark Six Year Initial Transfers and Landmark Two Year Initial Transfers include approximately $27.6 million which BLMIS transferred to Landmark during the 90 days preceding the Filing Date (the "Landmark Preference Period Initial Transfers").  The Landmark Six Year Initial Transfers, the Landmark Two Year Initial Transfers, and the Landmark Preference Period Initial Transfers (collectively, the "Landmark Initial Transfers") are set forth more fully in Exhibits D and E7.

371.    The Trustee intends to file an action against Defender, to be styled *Picard v. Defender Limited, et al. (In re Bernard L. Madoff Inv. Sec. LLC)* (the "Defender Complaint") to avoid and recover the initial transfers of Customer Property.  The Trustee incorporates by reference the allegations contained in the Defender Complaint as if fully rewritten herein.

372. During the six years preceding the Filing Date, BLMIS made transfers to Defender (account number 1FR132) of approximately $93.9 million (the "Defender Six Year Initial Transfers"). The Defender Six Year Initial Transfers include approximately $93.9 million that BLMIS transferred to Defender during the two years preceding the Filing Date (the "Defender Two Year Initial Transfers"). The Defender Six Year Initial Transfers and Defender Two Year Initial Transfers include approximately $30.3 million which BLMIS transferred to Defender during the 90 days preceding the Filing Date (the "Defender Preference Period Initial Transfers"). The Defender Six Year Initial Transfers, the Defender Two Year Initial Transfers, and the Defender Preference Period Initial Transfers (collectively, the "Defender Initial Transfers") are set forth more fully in Exhibits D and E8.

373. The Trustee has filed an action against Square One to avoid and recover the initial transfers of Customer Property. *See Picard v. Square One Fund Ltd., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 10-04330 (Bankr. S.D.N.Y filed Nov. 29, 2010) (the "Square One Complaint). The Trustee incorporates by reference the allegations contained in the Square One Complaint as if fully rewritten herein.

374. During the six years preceding the Filing Date, BLMIS made transfers to Square One (account number 1FR048) of approximately $24.7 million (the "Square One Six Year Initial Transfers"). The Square One Six Year Initial Transfers include approximately $6.5 million that BLMIS transferred to Square One during the two years preceding the Filing Date (the "Square One Two Year Initial Transfers"). The Square One Six Year Initial Transfers and Square One Two Year Initial Transfers include approximately $17,300 which BLMIS transferred to Square One during the 90 days preceding the Filing Date (the "Square One Preference Period Initial Transfers"). The Square One Six Year Initial Transfers, the Square One Two Year Initial

Transfers, and the Square One Preference Period Initial Transfers (collectively, the "Square One Initial Transfers") are set forth more fully in Exhibits D and E9.

375.     The Sentry Initial Transfers, the Broad Market Initial Transfers, the Broad Market Portfolio Initial Transfers, the Harley Initial Transfers, the Kingate Global Initial Transfers, the Kingate Euro Initial Transfers, the Landmark Initial Transfers, the Defender Initial Transfers, and the Square One Initial Transfers (collectively, the "Non-Party Initial Transfers"), were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 547, 548(a)(1), 550, and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and DCL sections 273-279.

## THE NON-PARTY INITIAL TRANSFERS FROM BLMIS WERE SUBSEQUENTLY TRANSFERRED TO THE HSBC DEFENDANTS

376.     A sizeable portion of the Non-Party Initial Transfers was subsequently transferred by the Non-Party Funds to the HSBC Defendants.

377.     A portion of the Sentry Initial Transfers, or the value thereof, was subsequently transferred, either directly or indirectly, to or for the benefit of the HSBC Defendants (the "Sentry Subsequent Transfers").

378.     A portion of the Broad Market Initial Transfers, or the value thereof, was subsequently transferred, either directly or indirectly, to or for the benefit of the HSBC Defendants (the "Broad Market Subsequent Transfers").

379.     A portion of the Broad Market Portfolio Initial Transfers, or the value thereof, was subsequently transferred, either directly or indirectly, to or for the benefit of the HSBC Defendants (the "Broad Market Portfolio Subsequent Transfers").

380.     A portion of the Harley Initial Transfers, or the value thereof, was subsequently transferred, either directly or indirectly, to or for the benefit of the HSBC Defendants (the "Harley Subsequent Transfers").

381.     A portion of the Kingate Global Initial Transfers, or the value thereof, was subsequently transferred, either directly or indirectly, to or for the benefit of the HSBC Defendants (the "Kingate Global Subsequent Transfers").

382.     A portion of the Kingate Euro Initial Transfers, or the value thereof, was subsequently transferred, either directly or indirectly, to or for the benefit of the HSBC Defendants (the "Kingate Euro Subsequent Transfers").

383.     A portion of the Landmark Initial Transfers, or the value thereof, was subsequently transferred, either directly or indirectly, to or for the benefit of the HSBC Defendants (the "Landmark Subsequent Transfers").

384.     A portion of the Defender Initial Transfers, or the value thereof, was subsequently transferred, either directly or indirectly, to or for the benefit of the HSBC Defendants (the "Defender Subsequent Transfers").

385.     A portion of the Square One Initial Transfers, or the value thereof, was subsequently transferred, either directly or indirectly, to or for the benefit of the HSBC Defendants (the "Square One Subsequent Transfers").

386.     The Sentry Subsequent Transfers, the Broad Market Subsequent Transfers, the Broad Market Portfolio Subsequent Transfers, the Harley Subsequent Transfers, the Kingate Global Subsequent Transfers, Kingate Euro Subsequent Transfers, the Landmark Subsequent Transfers, the Defender Subsequent Transfers, and the Square One Subsequent Transfers

(collectively, the "Non-Party Subsequent Transfers"), or the value thereof, are recoverable from the HSBC Defendants pursuant to section 550 of the Bankruptcy Code.

## CUSTOMER CLAIMS

387. Certain Defendants filed customer claims (the "Customer Claims") as reflected in Exhibit C.

388. The Trustee has not yet determined the Customer Claims on Exhibit C.

389. On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12). The Claims Procedure Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to resolve the Customer Claims and any related objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedure Order.

## COUNT ONE:
## PREFERENTIAL TRANSFERS (INITIAL TRANSFEREES)
## 11 U.S.C. §§ 547(b), 550(a)(1), AND 551

### *Against All Feeder Fund Defendants Except Primeo*

390. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

391. At the time of each of the Preference Period Transfers, the Feeder Fund Defendants each were a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

392.     Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

393.     Each of the Preference Period Transfers was to or for the benefit of the Feeder Fund Defendants.

394.     Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

395.     Each of the Preference Period Transfers was made while BLMIS was insolvent.

396.     Each of the Preference Period Transfers was made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

397.     The Preference Period Transfers enabled each of the Feeder Fund Defendants to receive more than it would receive if: (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferees received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

398.     Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants as initial transferees, or from the entities for whose benefit such transfers were made, pursuant to section 550(a).

399.     As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Preference Period Transfers; (b) directing that the Preference Period Transfers be set aside; and (c) recovering the Preference Period Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

COUNT TWO:

**COUNT TWO:**
**PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREES)**
**11 U.S.C. §§ 547(b), 550(a), AND 551**

*Against The Management Defendants, The HSBC Defendants,*
*The Beneficial Owners, The Individual Defendants Primeo, and, in the Alternative,*
*Hermes, Lagoon, and Lagoon Trust*

400.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

401.     Each of the Preference Period Transfers is avoidable under section 78fff-2(c)(3) of SIPA and section 547(b) of the Bankruptcy Code.  Furthermore, each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

402.     Upon information and belief, the Management Defendants, the HSBC Defendants, the Beneficial Owners, the Individual Defendants Primeo and, in the alternative, Hermes, Lagoon, and Lagoon Trust were immediate or mediate transferees of some portion of the Preference Period Transfers pursuant to section 550(a) of the Bankruptcy Code (the "Preference Period Subsequent Transfers").

403.     Each of the Preference Period Subsequent Transfers was made directly or indirectly to or for the benefit of the Management Defendants, the HSBC Defendants, the Beneficial Owners, the Individual Defendants Primeo or, in the alternative, Hermes, Lagoon, or Lagoon Trust.

404.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Preference Period Subsequent Transfers, or the value thereof, from the Management Defendants, the HSBC Defendants, the Beneficial Owners, the Individual Defendants Primeo and, in the alternative, Hermes, Lagoon, and Lagoon Trust for the benefit of the estate of BLMIS.

**COUNT THREE:**
**FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551**

*Against The Feeder Fund Defendants*

405.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

406.     Each of the Two Year Transfers were made on or within two years before the Filing Date.

407.     Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

408.     Each of the Two Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two Year Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

409.     Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

410.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT FOUR:
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

### *Against The Feeder Fund Defendants*

411.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

412.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

413.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

414.    BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers.

415.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent, as a result of the Two Year Transfers.

416.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

417.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

418.    Each of the Two Year Transfers constitutes fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

419.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers to be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT FIVE:
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 276, 276-a, 278 AND/OR 279, AND U.S.C. §§ 544, 550(a)(1), AND 551

### *Against The Feeder Fund Defendants*

420.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

421.    At all times relevant to the Six Year Transfers, there have been one or more creditors have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that are not allowable only under section 502(e) of the Bankruptcy Code.

422.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

423.    Each of the Six Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to, or for the benefit, of the Madoff Fund Defendants in furtherance of a fraudulent investment scheme.

424.    The Six Year Transfers were received by the Feeder Fund Defendants with actual intent to hinder, delay, or defraud creditors and/or future creditors of BLMIS at the time of each of the transfers.

425.    As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the

Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorney's fees from the Feeder Fund Defendants.

**COUNT SIX:**
**FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

***Against The Feeder Fund Defendants***

426.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

427.    At all relevant times, there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

428.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

429.    BLMIS did not receive fair consideration for the Six Year Transfers.

430.    BLMIS was insolvent at the time that it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

431.    As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

# COUNT SEVEN:
## FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against The Feeder Fund Defendants*

432.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

433.     At all relevant times, there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

434.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

435.     BLMIS did not receive fair consideration for the Six Year Transfers.

436.     At the time that BLMIS made each of the Six Year Transfers, BLMIS was engaged or about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

437.     As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT EIGHT:
## FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against The Feeder Fund Defendants*

438.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

439.    At all relevant times, there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

440.    BLMIS did not receive fair consideration for the Six Year Transfers.

441.    At the time that BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

442.    As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT NINE:
## RECOVERY OF ALL FRAUDULENT TRANSFERS
## NEW YORK CIVIL PRACTICE LAW AND RULES 203(g) AND 213(8),
## AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
## AND/OR 279, 11 U.S.C. §§ 544, 550(a), AND 551

### *Against The Feeder Fund Defendants*

443.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

444.     At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

445.     At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code, or that are not allowable only under section 502(e) of the Bankruptcy Code.

446.     Each of the Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

447.     Each of the Transfers was made by BLMIS with the actual intend to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

448.     Each of the Transfers was received by the Feeder Fund Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Transfers, and/or future creditors of BLMIS.

449.     As a result of the foregoing, pursuant to N.Y. C.P.L.R. 203(g), 213(8), DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants:  (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; and (d) recovering attorney's fees from the Feeder Fund Defendants.

# COUNT TEN:
## RECOVERY OF SUBSEQUENT TRANSFERS
## NEW YORK DEBTOR AND CREDITOR LAW §§ 273-279
## AND 11 U.S.C. §§ 544, 547, 548, 550(a), AND 551

### *Against The Management Defendants, The HSBC Defendants,*
### *The Beneficial Owners, The Individual Defendants Primeo and, In The Alternative,*
### *Hermes, Thema Fund, and Lagoon Trust*

450. The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

451. Each of the Transfers are avoidable under sections 544, 547, and 548 of the Bankruptcy Code, DCL sections 273-279, and SIPA § 78fff-2(c)(3).

452. Upon information and belief, the Subsequent Transferee Defendants received Subsequent Transfers, which are recoverable pursuant to Section 550(a) of the Bankruptcy Code.

453. Each of the Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Subsequent Transferee Defendants.

454. The Subsequent Transferee Defendants are immediate or mediate transferees of the Subsequent Transfers.

455. Each of the Subsequent Transfers was received by the Subsequent Transferee Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS, and/or future creditors of BLMIS, at the time of each of the Subsequent Transfers.

456. As a result of the foregoing, pursuant to DCL sections 278 and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, and attorneys' fees, for the benefit of the estate of BLMIS.

# COUNT ELEVEN:
## DISALLOWANCE OF CUSTOMER CLAIMS

### *Against Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, And Thema Wise*

457.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

458.    Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise have filed Customer Claims which have not yet been determined, or which were the subject of timely filed objections.  See Exhibit C.

459.    Such Customer Claims should not be allowed pursuant to section 502(d) of the Bankruptcy Code because Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise, who filed the Customer Claims, are the recipients of transfers of BLMIS's property which are avoidable and recoverable under sections 544, 547, 548 and/or 550(a) of the Bankruptcy Code, DCL sections 273-279, and SIPA § 78fff-2(c)(3) as set forth above, and Alpha Prime, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise have not returned the transfers to the Trustee.

460.    The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee intends to resolve the Customer Claims of Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise, and any related objections, through the mechanisms contemplated by the Claims Procedures Order.

## COUNT TWELVE:
## EQUITABLE SUBORDINATION

### *Against Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise*

461.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

462.    Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise engaged in inequitable conduct, including behavior described in this Complaint, that has resulted in injury to the customers and creditors of the estate and has conferred an unfair advantage on these Feeder Fund Defendants.

463.    Based on the inequitable conduct of Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise, as described above, the customers and/or of BLMIS have been misled as to the true financial condition of the debtor; have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition; and/or are less likely to recover the full amounts due to them because of the conduct of Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise.

464.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought, directly or indirectly against the estate, by Alpha Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise—and only to the extent that such claims are allowed—are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

465.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

*Against The HSBC Defendants*

466.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

467.     At the time of each of the Sentry Preference Period Initial Transfers, the Broad Market Preference Period Initial Transfers, the Broad Market Portfolio Preference Period Initial Transfers, the Harley Preference Period Initial Transfers, the Kingate Global Preference Period Initial Transfers, the Kingate Euro Preference Period Initial Transfers, the Landmark Preference Period Initial Transfers, the Defender Preference Period Initial Transfers, and the Square One Preference Period Initial Transfers (collectively, the "Non-Party Preference Period Initial Transfers"), each of the Non-Party Funds was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

468.     Each of the Non-Party Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

469.     Each of the Non-Party Preference Period Initial Transfers was to, or for the benefit of, the Non-Party Funds.

470.     Each of the Non-Party Preference Period Initial Transfers was made for, or on account of, an antecedent debt owed by BLMIS to the Non-Party Funds before such transfer was made.

471.     Each of the Non-Party Preference Period Initial Transfers was made while BLMIS was insolvent.

472.     Each of the Non-Party Preference Period Initial Transfers was made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

473.     Each of the Non-Party Preference Period Initial Transfers enabled the Non-Party Funds to receive more than they would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferee received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

474.     Each of the Non-Party Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code.

475.     The Trustee has filed lawsuits against the Non-Party Funds to avoid the Non-Party Preference Period Initial Transfers pursuant to section 547(b) of the Bankruptcy Code, and to recover the Non-Party Preference Period Initial Transfers, or the value thereof, from the Non-Party Defendants pursuant to section 550(a) of the Bankruptcy Code.

476.     Upon information and belief, the HSBC Defendants were immediate or mediate transferees of some portion of the Non-Party Preference Period Initial Transfers pursuant to section 550(a) of the Bankruptcy Code (the "Non-Party Preference Period Subsequent Transfers").

477.     Each of the Non-Party Preference Period Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the HSBC Defendants.

478.     As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Non-Party Preference Period Subsequent Transfers, or the value thereof, from the HSBC Defendants for the benefit of the estate of BLMIS.

**COUNT FOURTEEN:**
**FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)**
**11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551**

*Against The HSBC Defendants*

479.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

480.     The Sentry Two Year Initial Transfers, the Broad Market Two Year Initial Transfers, the Broad Market Portfolio Two Year Initial Transfers, the Harley Two Year Initial Transfers, the Kingate Global Two Year Initial Transfers, the Kingate Euro Two Year Initial Transfers, the Landmark Two Year Initial Transfers, the Defender Two Year Initial Transfers, and the Square One Two Year Initial Transfers (collectively, the "Non-Party Two Year Initial Transfers") were made on or within two years before the Filing Date.

481.     Each of the Non-Party Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

482.     Each of the Non-Party Two Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing and/or future creditors.  BLMIS made the Non-Party Two Year Initial Transfers to or for the benefit of the Non-Party Funds in furtherance of a fraudulent investment scheme.

483.     Each of the Non-Party Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

484.     The Trustee has filed lawsuits against the Non-Party Funds to avoid the Non-Party Two Year Initial Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code, and

to recover the Non-Party Two Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

485. The HSBC Defendants were immediate or mediate transferees of some portion of the Non-Party Two Year Initial Transfers (the "Non-Party Two Year Subsequent Transfers").

486. Each of the Non-Party Two Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the HSBC Defendants.

487. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 550(a) and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Non-Party Two Year Subsequent Transfers, or the value thereof, from the HSBC Defendants for the benefit of the estate.

### COUNT FIFTEEN:
### FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
### 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

#### *Against The HSBC Defendants*

488. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

489. The Non-Party Two Year Initial Transfers were made on or within two years before the Filing Date.

490. Each of the Non-Party Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

491. BLMIS received less than a reasonably equivalent value in exchange for each of the Non-Party Two Year Initial Transfers.

492. At the time of each of the Non-Party Two Year Initial Transfers, BLMIS was insolvent, or became insolvent, as a result of each of the Non-Party Two Year Initial Transfers.

493. At the time of each of the Non-Party Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

494. At the time of each of the Non-Party Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

495. Each of the Non-Party Initial Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

496. The Trustee has filed lawsuits against the Non-Party Funds to avoid the Non-Party Initial Two Year Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and to recover the Non-Party Initial Two Year Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

497. The HSBC Defendants were immediate or mediate transferees of some portion of the Non-Party Initial Two Year Transfers (the "Non-Party Two Year Subsequent Transfers").

498. Each of the Non-Party Two Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the HSBC Defendants.

499. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Non-Party Two Year Subsequent Transfers, or the value thereof, from the HSBC Defendants for the benefit of the estate.

**COUNT SIXTEEN:**
**FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)**
**NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278**
**AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

*Against The HSBC Defendants*

500.　　The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

501.　　At all times relevant to the Sentry Six Year Initial Transfers, the Broad Market

Six Year Initial Transfers, the Broad Market Portfolio Six Year Initial Transfers, the Harley Six

Year Initial Transfers, the Kingate Global Six Year Initial Transfers, the Kingate Euro Six Year

Initial Transfers, the Landmark Six Year Initial Transfers, the Defender Six Year Initial

Transfers, and the Square One Six Year Initial Transfers (collectively, the "Non-Party Six Year

Initial Transfers"), there have been one or more creditors who have held and still hold matured or

unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the

Bankruptcy Code or that were and are not allowable under section 502(e).

502.　　Each of the Non-Party Six Year Initial Transfers constituted a conveyance by

BLMIS as defined under DCL section 270.

503.　　The Non-Party Six Year Initial Transfers were made by BLMIS with the actual

intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Non-Party Six Year

Initial Transfers to or for the benefit of the Non-Party Funds in furtherance of a fraudulent

investment scheme.

504.　　Each of the Non-Party Six Year Initial Transfers were received by the Non-Party

Funds with actual intent to hinder, delay, or defraud creditors and/or future creditors of BLMIS

at the time of each of the Non-Party Six Year Initial Transfers.

-147-

505. The Trustee has filed lawsuits against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and DCL sections 276, 276-a, 278, and/or 279, and to recover the Non-Party Initial Transfers, or the value thereof, and attorney's fees from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

506. The HSBC Defendants were immediate or mediate transferees of some portion of the Non-Party Six Year Initial Transfers pursuant to section 550(a) of the Bankruptcy Code (the "Non-Party Six Year Subsequent Transfers").

507. Each of the Non-Party Six Year Subsequent Transfers was made, directly or indirectly, to or for the benefit of the HSBC Defendants.

508. Each of the Non-Party Six Year Subsequent Transfers was received by the HSBC Defendants with actual intent to hinder, delay, or defraud creditors and/or future creditors of BLMIS at the time of each of the Non-Party Six Year Subsequent Transfers.

509. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Non-Party Six Year Subsequent Transfers, or the value thereof, and attorney's fees from the HSBC Defendants for the benefit of the estate.

### COUNT SEVENTEEN:
### FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
### AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

#### *Against The HSBC Defendants*

510. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

511.     At all relevant times, there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

512.     Each of the Non-Party Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

513.     BLMIS did not receive fair consideration for the Non-Party Six Year Initial Transfers.

514.     BLMIS was insolvent at the time it made each of the Non-Party Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Non-Party Six Year Initial Transfers.

515.     The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and DCL sections 273, 278, and/or 279, and to recover the Non-Party Six Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

516.     The HSBC Defendants were immediate or mediate transferees of some portion of the Non-Party Six Year Initial Transfers pursuant to section 550(a) of the Bankruptcy Code (the "Non-Party Six Year Subsequent Transfers").

517.     Each of the Non-Party Six Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the HSBC Defendants.

518.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and

SIPA § 78fff-2(c)(3) recovering the Non-Party Six Year Subsequent Transfers, or the value

thereof, from the HSBC Defendants for the benefit of the estate.

## COUNT EIGHTEEN:
## FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE)
## NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278,
## AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against The HSBC Defendants*

519.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

520.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section

502(e).

521.    Each of the Non-Party Six Year Initial Transfers constituted a conveyance by

BLMIS as defined under DCL section 270.

522.    BLMIS did not receive fair consideration for the Non-Party Six Year Initial

Transfers.

523.    At the time BLMIS made each of the Non-Party Six Year Initial Transfers,

BLMIS was engaged or was about to engage in a business or transaction for which the property

remaining in its hands after each of the Non-Party Six Year Initial Transfers was an

unreasonably small capital.

524.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-

Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and DCL

sections 274, 278, and/or 279, and to recover the Non-Party Six Year Initial Transfers, or the

value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

525. The HSBC Defendants were immediate or mediate transferees of some portion of the Non-Party Six Year Initial Transfers pursuant to section 550(a) of the Bankruptcy Code (the "Non-Party Six Year Subsequent Transfers").

526. Each of the Non-Party Six Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the HSBC Defendants.

527. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Non-Party Six Year Subsequent Transfers, or the value thereof, from the HSBC Defendants for the benefit of the estate.

**COUNT NINETEEN:**
**FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE)**
**NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278,**
**AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

*Against The HSBC Defendants*

528. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

529. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable under section 502(e).

530. Each of the Non-Party Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

531. BLMIS did not receive fair consideration for the Non-Party Six Year Initial Transfers.

532. At the time BLMIS made each of the Non-Party Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

533. The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and DCL sections 275, 278, and/or 279, and to recover the Non-Party Six Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

534. The HSBC Defendants were immediate or mediate transferees of some portion of the Non-Party Six Year Initial Transfers pursuant to section 550(a) of the Bankruptcy Code.

535. Each of the Non-Party Six Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the HSBC Defendants.

536. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Non-Party Six Year Subsequent Transfers, or the value thereof, from the HSBC Defendants for the benefit of the estate.

## COUNT TWENTY:
## UNJUST ENRICHMENT

### *Against The Management Defendants, The HSBC Defendants, The Beneficial Owners, and The Individual Defendants (The "Non-Fund Defendants")*

537. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein. This count is asserted against the Non-Fund Defendants for unjust enrichment pursuant to New York common law.

538. The Non-Fund Defendants have all been unjustly enriched. They have wrongfully and unconscionably benefited from the receipt of stolen money from BLMIS and the

Feeder Fund Defendants' investors, for which they did not, in good faith, provide fair value. These Non-Fund Defendants further were unjustly enriched from the acts described herein, including substantially enabling the Ponzi scheme through, at the very least, conscious avoidance of and willful blindness to Madoff's fraudulent activities in the Ponzi scheme. These acts perpetuated Madoff's fraud and deepened the insolvency of BLMIS. All of the money received by the Non-Fund Defendants came at the expense of BLMIS's victims.

539. Upon information and belief, the Management Defendants and the HSBC Defendants, collectively, received hundreds of millions of dollars in management fees, advisory fees, custodial fees, distribution and performance fees, and administrative fees for furthering and expanding the Ponzi scheme. Upon information and belief, certain of the Individual Defendants, certain of the Management Defendants, and the Beneficial Owners received substantial payments in the form of partnership distributions, salaries, bonuses, dividends, and/or other forms of payment. All of this money rightfully belongs to the BLMIS estate for equitable distribution by the Trustee in accordance with his statutory authority. None of this money has been returned to the Trustee for equitable distribution to BLMIS customers who lost billions of dollars in the Ponzi scheme.

540. The Non-Fund Defendants constantly were faced with evidence that BLMIS was a fraud. Yet, instead of warning their investors and Madoff's other customers, the Non-Fund Defendants continued to market BLMIS to their investors and funneled money into BLMIS. Faced with the prospect of losing substantial fees, the Non-Fund Defendants chose to cover up and ignore the compelling evidence of Madoff's fraud. As a result, they have been unjustly enriched by millions of dollars that rightfully belongs to BLMIS customers.

541.    Equity and good conscience require full restitution of the moneys received, directly or indirectly, from BLMIS by the Non-Fund Defendants, as well as any assets derived from that money.

**COUNT TWENTY-ONE:**
**MONEY HAD AND RECEIVED**

*Against The Non-Fund Defendants*

542.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.  This count is asserted against the Non-Fund Defendants for money had and received pursuant to New York common law.

543.    The Non-Fund Defendants all have received money that rightfully belongs to the victims of BLMIS.  They likewise have benefited from the receipt of this money from BLMIS, which was taken from the Madoff Fund Defendants' investors.

544.    Upon information and belief, the Management Defendants and the HSBC Defendants, collectively, received hundreds of millions of dollars in fees.  Upon information and belief, certain of the Individual Defendants, certain of the Management Defendants, and the Beneficial Owners received millions of dollars in dividends, distributions, and/or other forms of payment.  None of this money has been returned to the Trustee for equitable distribution to BLMIS customers who lost billions of dollars in the Ponzi scheme.

545.    As described above, the Non-Fund Defendants were constantly faced with evidence that BLMIS was a fraud.  However, the Non-Fund Defendants ignored this evidence and continued to market BLMIS to their investors, funneling substantial assets into BLMIS.  As a result of this ongoing pattern of behavior, the Non-Fund Defendants have received money that rightfully belongs to BLMIS customers.

546.     Equity and good conscience require full restitution of the moneys received, directly or indirectly, from BLMIS by the Non-Fund Defendants, as well as any assets derived from that money.

## COUNT TWENTY-TWO:
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### *Against The Non-Fund Defendants*

547.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.  This count is asserted against the Non-Fund Defendants for actions which aided and abetted the breach of BLMIS's fiduciary duty pursuant to New York law.

548.     BLMIS owed a fiduciary duty to act in the best interests of investors and funds, and to perform its services with the degree of care, caution, and prudence expected in the financial services industry.  BLMIS failed to fulfill its fiduciary duties by perpetrating a massive Ponzi scheme.

549.     All of the Non-Fund Defendants, as described above, had actual knowledge of the breaches of fiduciary duty committed by BLMIS, were aware of numerous red flags strongly suggesting that BLMIS was engaged in fraudulent activity, and/or consciously avoided BLMIS's breach of fiduciary duty.  By virtue of their long-standing relationships with BLMIS, their multiple investigations into BLMIS, their communications with clients and investors of the Feeder Fund Defendants, and their roles as managers, advisers, administrators and custodians of the Feeder Fund Defendants, the Non-Fund Defendants knew that BLMIS was engaged in fraudulent activity.

550.     The Non-Fund Defendants were confronted with myriad red flags and indicia of fraud on the part of BLMIS, and by failing to investigate further, consciously avoided the clear

deficiencies and evident falsities associated with BLMIS. To the extent that the Non-Fund Defendants consciously avoided facts that, if confirmed, would have laid bare the fraudulent nature of the Ponzi scheme, the Non-Fund Defendants had actual knowledge of BLMIS's breach.

551. HSBC Private Bank (Suisse) substantially assisted BLMIS in its breach of fiduciary duty by marketing funds invested in BLMIS, encouraging clients to invest in BLMIS on the basis of purported due diligence, and funneling significant assets into BLMIS. The HSBC Custodian Defendants substantially assisted BLMIS in its breach of fiduciary duty by providing custody services to the funds invested in BLMIS and delegating their control of assets to BLMIS, which eliminated independent oversight of fund assets. The HSBC Administrator Defendants substantially assisted BLMIS in its breach of fiduciary duty by calculating the Feeder Fund Defendants' net asset value and disseminating the net asset value to customers. HSBC Bank (USA) substantially assisted BLMIS in its breach of fiduciary duty by leveraging feeder fund investments in BLMIS through swap agreements, thereby enabling BLMIS to attract more investor principal. The actions of the HSBC Defendants furthered the Ponzi scheme and deepened the insolvency of BLMIS.

552. The Management and Individual Defendants substantially assisted BLMIS in its breach of fiduciary duty by funneling billions of dollars into BLMIS, deepening the insolvency of BLMIS, and allowing BLMIS to continue its Ponzi scheme.

553. As a direct and reasonably foreseeable result of (a) BLMIS's breach of fiduciary duty and (b) the Non-Fund Defendants aiding and abetting in that breach, investors in BLMIS have suffered substantial injury.

## COUNT TWENTY-THREE:
## AIDING AND ABETTING FRAUD

### *Against The Non-Fund Defendants*

554. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein. This count is asserted against the Non-Fund Defendants for actions which aided and abetted BLMIS's fraud pursuant to New York law.

555. As set forth above, BLMIS was engaged in a complex and longstanding plan to enrich itself at the expense of investors. As part of this plan, BLMIS repeatedly made false statements regarding the sale and repurchase of securities and other financial instruments, the value of investor accounts, and the total value of assets under management.

556. All of the Non-Fund Defendants, as set forth above, had actual knowledge of the fraud committed by BLMIS, were aware of numerous red flags strongly suggesting that BLMIS was engaged in fraudulent activity, and/or consciously avoided BLMIS's fraud. By virtue of their long-standing relationships with BLMIS, their multiple investigations into BLMIS, their communications with clients and investors of the Feeder Fund Defendants, and their roles as managers, advisers, administrators and custodians of the Feeder Fund Defendants, the Non-Fund Defendants knew that BLMIS was engaged in fraudulent activity.

557. The Non-Fund Defendants were confronted with myriad red flags and indicia of fraud on the part of BLMIS, and by failing to investigate further, consciously avoided the clear deficiencies and evident falsities associated with BLMIS. To the extent that the Non-Fund Defendants consciously avoided facts that, if confirmed, would have laid bare the fraudulent nature of the Ponzi scheme, the Non-Fund Defendants had actual knowledge of BLMIS's breach.

558. HSBC Private Bank (Suisse) substantially assisted BLMIS in its fraud by marketing funds invested in BLMIS, encouraging clients to invest in BLMIS on the basis of

purported due diligence, and funneling significant assets to BLMIS. The HSBC Custodian Defendants substantially assisted BLMIS in its fraud by providing custody services to the funds invested in BLMIS and delegating their control of assets to BLMIS, which eliminated independent oversight of fund assets. The HSBC Administrator Defendants substantially assisted BLMIS in its fraud by calculating the Feeder Fund Defendants' net asset value and disseminating the net asset value to customers. HSBC Bank (USA) substantially assisted BLMIS in its fraud by leveraging feeder fund investments in BLMIS through swap agreements, thereby enabling BLMIS to attract more investor principal. The actions of the HSBC Defendants furthered the Ponzi scheme and deepened the insolvency of BLMIS.

559. The Management and Individual Defendants substantially assisted BLMIS in its fraud by funneling billions of dollars into BLMIS, deepening the insolvency of BLMIS, and allowing BLMIS to continue its Ponzi scheme.

560. As a direct and reasonably foreseeable result of (a) BLMIS's fraud and (b) the Non-Fund Defendants aiding and abetting in that fraud, investors in BLMIS have suffered substantial injury.

### COUNT TWENTY-FOUR:
### CONTRIBUTION

#### *Against The Non-Fund Defendants*

561. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

562. As set forth above, all of the Non-Fund Defendants engaged in fraud, engaged in conspiracy to commit fraud, aided and abetted BLMIS's breach of fiduciary duty, aided and abetted BLMIS's fraud, and acted in concert with BLMIS in its breach of fiduciary duty.

563. The Non-Fund Defendants' tortious conduct funneled assets to BLMIS, expanded the Ponzi scheme, and deepened BLMIS's insolvency. All of these actions facilitated the harm committed by BLMIS, and the actions augmented the injury suffered by the victims of BLMIS's fraudulent activities.

564. The Non-Fund Defendants are therefore liable to the extent that they contributed to the damages suffered by investors in BLMIS, and the Trustee seeks contribution from the Non-und Defendants for its proportionate share and in an amount to be determined at trial.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

(i) On the First Claim for Relief, pursuant to sections 547(b), 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Preference Period Transfers; (b) directing that the Preference Period Transfers be set aside; and (c) recovering the Preference Period Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(ii) On the Second Claim for Relief, pursuant to sections 547(b), 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Preference Period Subsequent Transfers; (b) directing that the Preference Period Subsequent Transfers be set aside; and (c) recovering the Preference Period Subsequent Transfers, or the value thereof, from the Management Defendants, the HSBC Defendants, the Beneficial Owners, the Individual Defendants, Primeo, and, in the alternative, Hermes, Lagoon, and Lagoon Trust for the benefit of the estate of BLMIS;

(iii) On the Third Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving

the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(iv)     On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (a) avoiding and preserving the Two Transfers; (b) directing that the Two Year Transfers be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(v)     On the Fifth Claim for Relief, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544, 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; and (d) recovering attorney's fees from the Feeder Fund Defendants;

(vi)     On the Sixth Claim for Relief, pursuant to DCL sections 273, 278 and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(vii)     On the Seventh Claim for Relief, pursuant to DCL sections 274, 278 and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers; (b) directing the Six Year Transfers be set

aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund

Defendants for the benefit of the state of BLMIS;

(viii)    On the Eighth Claim for Relief, pursuant to DCL sections 275, 278

and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (a)

avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set

aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund

Defendants for the benefit of the estate of BLMIS;

(ix)      On the Ninth Claim for Relief, pursuant to N.Y. C.P.L.R. 203(g)

and 213(8), DCL sections 276, 276-a, 278 and/or 279, sections 544, 550(a)(1), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (a) avoiding and preserving the Transfers; (b)

directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from

the Feeder Fund Defendants for the benefit of the estate of BLMIS; and (d) recovering attorney's

fees from the Feeder Fund Defendants;

(x)       On the Tenth Claim for Relief, pursuant to DCL sections 273-279,

sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (a) avoiding

and preserving the Subsequent Transfers; (b) directing that the Subsequent Transfers be set

aside; and (c) recovering the Subsequent Transfers, or the value thereof, from the Management

Defendants, the HSBC Defendants, the Beneficial Owners, the Individual Defendants, Primeo,

and, in the alternative, Hermes, Lagoon, and Lagoon Trust for the benefit of the estate of

BLMIS;

(xi)      On the Eleventh Claim for Relief, that the claims filed by Alpha

Prime, Geo Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema

Wise be disallowed;

(xii)    On the Twelfth Claim for Relief, the Trustee is entitled to a judgment that the Customer Claims filed by and of the Defendants be equitably subordinated for distribution purposes pursuant to §§ 510(c)(1) and 105(a) of the Bankruptcy Code;

(xiii)    On the Thirteenth Claim for Relief, pursuant to §547(b), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xiv)    On the Fourteenth Claim for Relief, pursuant to §548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xv)    On the Fifteenth Claim for Relief, pursuant to §548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xvi)    On the Sixteenth Claim for Relief, pursuant to DCL §§ 276, 276-A, 278 and/or 279, § 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xvii)    On the Seventeenth Claim for Relief, pursuant to DCL §§ 273, 278 and/or 279, § 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xviii)  On the Eighteenth Claim for Relief, pursuant to DCL §§ 274, 278 and/or 279, § 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xix)  On the Nineteenth Claim for Relief, pursuant to DCL §§ 275, 278 and/or 279, § 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xx)  On the Twentieth through the Twenty-Fourth Claims for Relief, compensatory, exemplary, and punitive damages of at least $2 billion, with an exact amount too be proven at trial;

(xxi)  On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers and/or Subsequent Transfers were received by the Defendants;

(xxii)  On all Claims for Relief, establishment of a constructive trust over the proceeds of Initial Transfers, Subsequent Transfers, and unjust enrichment of the Defendants in favor of the Trustee for the benefit of BLMIS's estate;

(xxiii)  On all Claims for Relief, assignment of the Defendants' rights to seek refunds from the government for federal, state, and local taxes paid on fictitious profits during the course of the scheme;

(xxiv)  Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

(xxv)   Granting the Trustee such other, further, and different relief as the Court deems just, proper and equitable.

Dated: New York, New York
       December 5, 2010

                                        _____
                                        Baker & Hostetler LLP
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone:  (212) 589-4200
                                        Facsimile:  (212) 589-4201
                                        David J. Sheehan
                                        Email:  dsheehan@bakerlaw.com
                                        Oren J. Warshavsky
Of Counsel:                             Email:  owarshavsky@bakerlaw.com
                                        Anjula Garg
Frederick W. Chockley, III              Email:  agarg@bakerlaw.com
Email:  fchockley@bakerlaw.com          Adam B. Oppenheim
John J. Burke                           Email:  aoppenheim@bakerlaw.com
Email:  jburke@bakerlaw.com             Geoffrey A. North
Jennifer M. Walrath                     Email:  gnorth@bakerlaw.com
Email:  jwalrath@bakerlaw.com
Baker & Hostetler LLP
1050 Connecticut Avenue, NW             *Attorneys for Irving H. Picard, Trustee for*
Suite 1100                              *the Substantively Consolidated SIPA*
Washington, D.C.  20036                 *Liquidation of Bernard L. Madoff Investment*
Telephone:  (202) 861-1680              *Securities LLC and Estate of Bernard L.*
Facsimile:  (202) 861-1783              *Madoff*