**EXHIBIT E**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Fernando A. Bohorquez, Jr.
Regina L. Griffin
Tracy L. Cole
Keith R. Murphy

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>               Plaintiff-Applicant,<br><br>      v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br><br>               Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated)<br><br><br>**TRUSTEE'S MEMORANDUM IN OPPOSITION TO THE STERLING DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>               Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>               Plaintiff,<br><br>      v.<br><br>SAUL B. KATZ, et al.,<br><br>               Defendants. | Adv. Pro. No. 10-5287 (BRL) |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

I.    THE TRUSTEE'S PRE-FILING INVESTIGATION SHOWS THAT THE
      STERLING DEFENDANTS DELIBERATELY IGNORED INDICIA OF
      FRAUD AT BLMIS SINCE AT LEAST 2001 ................................................... 5

      A.    By 2001, The Sterling Partners Were Shopping For Insurance To Protect
            Their Madoff Investments From Fraud, Including A Ponzi Scheme .................. 6

      B.    By 2001-2002 Sterling Partner David Katz Was "Screaming" For
            Diversification Away From Madoff Because "We Don't Know What He
            Does" ............................................................................................... 10

      C.    The Sterling Partners Formed Their Own Hedge Fund In 2002 With The
            Express Mission Of Recreating Madoff-Like Returns While Diversifying
            Away From The Risk Of Madoff ...................................................... 11

      D.    The Sterling Partners Entirely Restructured Sterling Stamos For The Sole
            Purpose Of Accommodating Madoff's Requirements For Complete
            Secrecy About The Sterling Partners' Investment Relationships..................... 13

      E.    Sterling Stamos Reportedly Warned The Sterling Partners Of Concerns
            About Madoff And Recommended That They Redeem Their Investments
            Out Of BLMIS ................................................................................ 16

            1.    Sterling Stamos Warned The Sterling Partners About Madoff's
                  Lack Of Transparency .......................................................... 16

            2.    The Sterling Partners And Sterling Stamos Discussed The Prospect
                  That Madoff Could Be Illegally Front Running, And The Danger
                  That Their Accounts Could Be Frozen If Madoff Were
                  Investigated.......................................................................... 18

            3.    The Sterling Partners Knew That Sterling Stamos' Due Diligence
                  Would Have Stopped Madoff At The Door, And "For Years"
                  Failed To Heed Sterling Stamos' Recommendations To Redeem
                  From BLMIS ....................................................................... 21

            4.    Sterling Stamos Emails Confirm That It Had Openly Questioned
                  Madoff's Legitimacy Since As Early As 2001....................... 23

      F.    Other Trusted Industry Professionals, Including A Merrill Lynch
            Executive, Also Warned The Sterling Partners Of Madoff Concerns................. 25

# TABLE OF CONTENTS
(continued)

Page

G.    The Bayou Ponzi Scheme Was Another Call For Independent Due Diligence On Their BLMIS Investments That The Sterling Partners Willfully Ignored ............................................................................ 27

H.    Despite The Suspicions, The Warnings, And The Bayou Ponzi Lesson, The Sterling Partners Deliberately Continued To Invest With BLMIS ............. 30

I.    The Sterling Partners Performed No Reasonable, Independent Diligence Regarding Madoff Because They Knew That Violating His Veil Of Confidentiality And Secrecy Would Jeopardize Their Ability To Continue Investing With Him ............................................................................ 33

J.    To Continue Reaping The Benefits Of Their Relationship With Madoff, The Sterling Partners Were Willing To Go Beyond Willful Blindness Into Executing A Sham Transaction .......................................................... 35

K.    Debunking The So-Called "False Allegations" ................................... 37

    1.    Debunking The Notion That Sterling Stamos Gave No Warnings To The Sterling Partners About Madoff ................................. 38

    2.    Debunking The Notion That The Sterling Partners Had No Suspicion That Madoff Was Engaged In Fraud, And Were Unsophisticated Dupes Who Could Not Have Detected Madoff Was Engaged In Fraud ......................................................... 40

    3.    Debunking The Assertion That The Sterling Partners Did Not Conduct Reasonable Due Diligence Of BLMIS Because They Were Unfamiliar With The Process .......................................... 42

    4.    Debunking The Idea That The Sterling Partners Could Ignore Cumulative Indicia And Warnings Of Fraud .......................... 43

    5.    Saul Katz' Testimony About The Restructuring Of Sterling Stamos Is Contradicted By The Testimony Of His Business Partner, Peter Stamos ............................................................. 45

    6.    Debunking The Notion That The Sterling Partners Performed Reasonable Diligence ......................................................... 45

    7.    Debunking The Notion That The Sterling Partners Did Not Substantially Benefit From The Ponzi Scheme ...................... 46

**TABLE OF CONTENTS**
(continued)

Page

II.   THE COURT SHOULD DENY THIS MOTION AND IMMEDIATELY
      ORDER DISCOVERY TO PROCEED ......................................................... 47

      A.    The Court May Treat The Sterling Defendants' Motion As Either A
            Motion To Dismiss Or As One For Summary Judgment ..................................... 47

      B.    The Court Should Deny This Motion Or Table It As Premature And Order
            Discovery To Immediately Proceed .................................................................... 47

      C.    Rule 2004 Is Not A Substitute For Discovery Under The Federal Rules ........... 50

      D.    However The Court Decides To Characterize This Motion, Discovery
            Should Commence Immediately .......................................................................... 52

III.  THE STERLING DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OR
      SUMMARY JUDGMENT AS TO THE TRUSTEE'S CLAIMS FOR
      FICTITIOUS PROFITS ............................................................................................ 53

      A.    Applicable Legal Standards ................................................................................ 53

            1.    On A Motion To Dismiss, A Court Must Accept The Facts
                  Alleged As True And Weigh All Reasonable Inferences In The
                  Plaintiff's Favor ...................................................................................... 53

            2.    Summary Judgment Is Unwarranted Because There Are Genuine
                  Issues Of Material Fact In Dispute, Viewing The Evidence In The
                  Light Most Favorable To The Trustee ..................................................... 55

      B.    The Complaint Amply Alleges The Trustee's Entitlement To
            Approximately $300 Million In Fictitious Profits Received By The
            Sterling Defendants ............................................................................................ 57

            1.    A SIPA Trustee Is Empowered To Recover Fraudulent Transfers ......... 57

            2.    Because BLMIS Was A Ponzi Scheme, The Transfers Of
                  Fictitious Profits To The Sterling Defendants Were Presumptively
                  Fraudulent ............................................................................................... 58

            3.    The Allegations In The Complaint State A Claim For Recovery Of
                  Fictitious Profits ...................................................................................... 60

      C.    The Undisputed Facts Alleged In The Complaint Entitle The Trustee To
            The Recovery Of Fictitious Profits ...................................................................... 61

## TABLE OF CONTENTS
(continued)

Page

D. The Fabricated BLMIS Customer Statements Did Not Create An "Antecedent Debt" That Would Bar The Avoidance Of Fraudulent Transfers ........................................................................................... 61

    1. The BLMIS Customer Statements Did Not Create "Obligations" Because They Were Fictitious And Reflected "Trades" That Could Never Have Been Achieved In The Marketplace .................................... 61

    2. Neither The Uniform Commercial Code Nor Rule 10b-5 Creates "Obligations" Within The Context Of A SIPA Liquidation Proceeding ............................................................................. 63

    3. Even If The Last Customer Statements Created "Obligations," These Transactions Would Still Be Avoidable ......................................... 64

    4. *Sharp* Did Not Change Fraudulent Transfer Avoidance Law ................. 66

    5. Whether The Sterling Defendants Were "Customers" Under SIPA Is Irrelevant For Avoidance Purposes ....................................... 68

IV. THE STERLING DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OR SUMMARY JUDGMENT AS TO THE TRUSTEE'S CLAIMS FOR RECOVERY OF PRINCIPAL ....................................................................... 70

A. The Trustee Has Pled Claims For Actual Fraud Under The Bankruptcy Code And The NYDCL ............................................................ 71

    1. The Trustee Has Pled That Defendants Received Actual Fraudulent Transfers Under The Bankruptcy Code ................................ 71

    2. Good Faith Is An Affirmative Defense To Claims Based On Actual Fraud Under The Bankruptcy Code And Need Not Be Pled In The Complaint ...................................................................... 72

    3. The Trustee Has Pled Claims For Actual Fraudulent Transfers Under The NYDCL ............................................................... 73

B. The Trustee Has Pled Claims For Constructively Fraudulent Transfers Under Federal And State Law ........................................................ 77

    1. The Trustee Has Alleged That The Sterling Defendants Did Not Provide Reasonably Equivalent Value Under The Bankruptcy Code ........................................................................... 77

**TABLE OF CONTENTS**
(continued)

2.   The Trustee Has Alleged That Sterling Defendants Did Not Provide Fair Consideration Under The NYDCL .................................... 78

C.   The Trustee Has Alleged And The Evidence Shows That The Sterling Defendants Did Not Receive The Transfers In Good Faith ............................... 79

1.   The Sterling Defendants Did Not Take The Transfers In Good Faith Under The Bankruptcy Code Because They Were On Inquiry Notice And Did Not Conduct A Diligent Investigation ......................... 80

(a)   The Sterling Defendants Were On Inquiry Notice Of BLMIS' Fraud ........................................................ 81

(b)   Once On Inquiry Notice, The Sterling Defendants Did Not Conduct Any Investigation, Much Less A Diligent Investigation, Into BLMIS ........................................... 83

2.   The Analysis Is Equivalent Under The NYDCL .................................... 87

3.   Nothing More Than Inquiry Notice Is Required To Recover Fraudulent Transfers Under Any Theory ................................. 88

V.   THE REMAINDER OF THE STERLING DEFENDANTS' ARGUMENTS RELATING TO THE TRUSTEE'S FRAUDULENT TRANSFER CLAIMS ARE ALSO WITHOUT MERIT .......................................................... 89

A.   As This Court Already Has Ruled, Section 546(e) Does Not Insulate The Fraudulent Transfers Received By The Sterling Defendants From Recovery By The Trustee ...................................................... 89

B.   The Avoidance Of Fraudulent Transfers Is Necessary To Effectuate The Goals Of SIPA ..................................................... 92

C.   Basic Principles Of Agency Law And This Court's Recent Decision In *Chais* Support The Trustee's Imputation Claims ................................. 93

1.   The Sterling Partners Were The Agents For All Sterling Defendants With Regard To Their BLMIS Accounts .......................... 93

2.   The Sterling Partners Are The *De Facto* Owners Of The Sterling Entity Defendants And Katz/Wilpon Trust Defendants, As Well As The BLMIS Accounts In Which The Sterling Family Member Defendants Held Interests ....................................... 98

**TABLE OF CONTENTS**
(continued)

3.    The Trustee's Allegations Here Are Substantially Similar To Those Already Found Sufficient By This Court In *Chais* ..................... 102

4.    Under Basic Principles Of Agency Law, All Of The Sterling Defendants Are Charged With The Legal Consequences Of Their Agents' Knowledge Of Red Flags Of Fraud And Willful Blindness .... 105

VI.    THE STERLING DEFENDANTS' SIPA CLAIMS SHOULD BE TEMPORARILY DISALLOWED UNDER SECTION 502(D). ................................ 111

VII.    THE TRUSTEE HAS PLED SUFFICIENT FACTS TO MAKE A COLORABLE CLAIM OF EQUITABLE SUBORDINATION AGAINST THE STERLING DEFENDANTS UNDER SECTION 510(C) ................................................ 113

A.    The Sterling Defendants Engaged In Inequitable Conduct .............................. 114

B.    The Misconduct Resulted In Injury To The Creditors And Conferred An Unfair Advantage On The Sterling Defendants ................................................ 115

C.    Equitable Subordination Is Not Inconsistent With The Bankruptcy Code ........ 116

CONCLUSION ...................................................................................................... 117

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*546-552 West 146th Street LLC v. Arfa,*
　54 A.D.3d 543, 863 N.Y.S.2d 412 (1st Dep't 2008) ............................................. 97

*Amer. Sur. Co. of N.Y. v. Sampsell,*
　327 U.S. 269 (1946) ........................................................................................... 63

*Anderson v. Liberty Lobby, Inc.,*
　477 U.S. 242 (1986) ........................................................................................... 56

*Andre Romanelli, Inc. v. Citibank, N.A,*
　60 A.D.3d 428, 875 N.Y.S.2d 14 (1st Dep't 2009) ........................................... 108

*Apollo Fuel Oil v. United States,*
　195 F.3d 74 (2d Cir. 1999) ............................................................................... 108

*Armstrong v. Collins, et al.,*
　No. 01-Civ-2437, 2010 WL 1141158 (S.D.N.Y. March 24, 2010) ................. *passim*

*Art Finance Partners, LLC v. Christie's Inc.,*
　58 A.D.3d 469, 870 N.Y.S.2d 331 (1st Dep't 2009) ........................................... 95

*Ashcroft v. Iqbal,*
　129 S. Ct. 1937 (2009) ....................................................................................... 54

*Baker v. Latham Sparrowbush Assoc.,*
　72 F.3d 246 (2d Cir. 1995) ................................................................................. 96

*Balaber-Strauss v. Sixty-Five Brokers* (*In re Churchill Mortg. Inv. Corp.*),
　256 B.R. 664 (Bankr. S.D.N.Y. 2000) ........................................................... 60, 74

*Banco De Desarrollo Agropecuario, S.A. v. Gibbs,*
　709 F. Supp. 1302 (S.D.N.Y. 1989) ................................................................... 97

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.* (*In re Bayou Group,*
　*LLC*), 396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd on other grounds,* 493 B.R. 284
　(S.D.N.Y. 2010) ......................................................................................77, 84, 85

*Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1
　(S.D.N.Y. 2007) ........................................................................................... *passim*

*Bennett v. Buchan,*
　76 N.Y. 386 (1879) ........................................................................................... 106

*Boykin v. KeyCorp.*,
   521 F.3d 202 (2d Cir. 2008) ............................................................................ 55

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................... 55, 56

*Center v. Hampton Affiliates, Inc.*,
   66 N.Y.2d 782, 497 N.Y.S.2d 898 (1985) ....................................................... 96

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ...................................................................... 47, 48

*Conley v. Gibson*,
   355 U.S. 41 (1957) .......................................................................................... 53

*Corcoran v. Messer* (*In re Corcoran*),
   246 B.R. 152 (E.D.N.Y. 2000) ....................................................................... 87

*Cunningham v. Brown*,
   265 U.S. 1 (1924) ........................................................................................... 93

*Deluca v. Accessit Group, Inc.*,
   695 F. Supp. 2d 54 (S.D.N.Y. 2010) .............................................................. 50

*Diallo v. City of New York*,
   224 A.D.2d 339, 638 N.Y.S.2d 58 (1st Dep't 1996) ..................................... 108

*Donell v. Kowell*,
   533 F.3d 762 (9th Cir. 2008) .................................................................... 65, 78

*Drenis v. Haligiannis*,
   452 F. Supp. 2d 418 (S.D.N.Y. 2006) ............................................................ 91

*Duel v. Hollins*,
   241 U.S. 523 (1916) ....................................................................................... 68

*Enron Corp. v. JP Morgan Sec., Inc.* (*In re Enron Corp.*),
   Nos. M-47 (GBD) ........................................................................................... 91

*Exch Nat'l Bank of Chicago v. Wyatt*,
   517 F.2d 453 (2d Cir. 1975) ........................................................................... 57

*F.T.C. v. Data Med. Capital, Inc.*,
   99-CIV-1266, 2010 WL 1049977 (C.D.Cal. Jan. 15, 2010) ....................... 97, 101

*F.T.C. v. Vocational Guides, Inc.*,
   No. 3:01-1070, 2009 WL 943486 (M.D. Tenn. Apr. 6, 2009) ......................... 101

*Farr v. Newman*,
18 A.D.2d 54, 238 N.Y.S.2d 204 (1963), *aff'd,* 14 N.Y.2d 183, 250 N.Y.S.2d 272 (1964) ................................................................................................................107

*Fidelity and Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*,
540 F.3d 133 (2d Cir. 2008) .....................................................................................107

*Focht v. McDermott (In re Old Naples Securities, Inc.*),
343 B.R. 310 (Bankr. M.D. Fla. 2006) ......................................................................59

*Forras v. Andros*,
470 F. Supp. 2d 283 (S.D.N.Y. 2005) ........................................................................56

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
479 F. Supp. 2d 349 (S.D.N.Y. 2007) ........................................................................89

*Freeman v. Complex Computing Co., Inc.*,
119 F.3d 1044 (2d Cir. 1997) ..................................................................................100

*Gentry v. Kovler (In re Kovler*),
249 B.R. 238 (Bankr. S.D.N.Y. 2000) .......................................................................74

*Geron v. Schulman (In re Manshul Constr. Copr.*),
No. 97-CV-8851, 2000 WL 1228866 (S.D.N.Y. Aug. 30, 2000) .....................47, 73

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.*), 310 B.R. 500
(Bankr. S.D.N.Y. 2002) ...........................................................................72, 90, 117

*Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund, Ltd.*),
359 B.R. 510 (Bankr. S.D.N.Y. 2007), *aff'd in part, rev'd in part*, 397 B.R. 1
(S.D.N.Y. 2007)...........................................................................................71, 83, 86

*Guilder v. Corinth Const. Corp.*,
235 A.D.2d 619, 651 N.Y.S.2d 706 (3d Dep't 1997)...............................................100

*Hare & Chase v. National Surety Co.*,
49 F.2d 447 (S.D.N.Y. 1931) ..................................................................................110

*Hatton v. Quad Realty Corp.*,
100 A.D.2d 609, 473 N.Y.S.2d 827 (2d Dep't 1984)...............................................107

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995) ...........................................................................84, 88, 90, 90

*HBE Leasing Corp. v. Frank*,
61 F.3d 1054 (2d Cir. 1995) .......................................................................................84

*Hellstrom v. U.S. Dep't of Veterans Affairs*,
  201 F.3d 94 (2d Cir. 2000) ................................................................... 56

*Hilton v. Federated Brokerage Group, Inc.*,
  213 N.Y.S.2d 171 (Sup. Ct. N.Y. Co. 1961) ....................................... 106

*In re 80 Nassau Assocs.*,
  169 B.R. 832 (Bankr. S.D.N.Y. 1994) ................................................ 114

*In re A.R. Baron & Co.*,
  226 B.R. 790 (Bankr. S.D.N.Y. 1998) .................................................. 68

*In re Adler Coleman Clearing Co.*,
  195 B.R. 266 (Bankr. S.D.N.Y. 1996) .................................................. 69

*In re Adler Coleman Clearing Corp.*,
  198 B.R. 70 (Bankr. S.D.N.Y. 1996) .................................................... 57

*In re Adler Coleman Clearing Corp.*,
  247 B.R. 51 (Bankr. S.D.N.Y. 1999) .................................................... 79

*In re Agape Litig.*,
  681 F. Supp. 2d 352 (E.D.N.Y. 2010) .................................................. 89

*In re Bayou Group, LLC*,
  362 B.R. 624 (Bankr. S.D.N.Y. 2007) .................................................. 59

*In re Bayou Group, LLC*,
  372 B.R. 661 (Bankr. S.D.N.Y. 2007) .................................................. 67

*In re Bayou Group, LLC*,
  439 B.R. 284 (S.D.N.Y. 2010) .....................................................*passim*

*In re Bennett Funding Group, Inc.*,
  203 B.R. 24 (Bankr. N.D.N.Y. 1996)............................................... 51, 52

*In re Bernard L. Madoff Inv. Sec. LLC*,
  424 B.R. 122 (Bankr. S.D.N.Y. 2010) .........................................*passim*

*In re Bevill, Bresler & Schulman, Inc.*,
  59 B.R. 353 (D.N.J. 1986), *appeal dismissed*, 802 F.2d 445 (3d Cir. 1986) ......... 64

*In re Blockbuster Inc.*,
  2011 WL 1042767 (Bankr. S.D.N.Y. Mar. 17, 2011) ....................... 114

*In re Carrozzella & Richardson*,
  286 B.R. 480 (D. Conn. 2002)............................................................. 68

*In re Dana Corp.*,
   574 F.3d 129 (2d Cir. 2009) ......................................................................51, 56

*In re Davis*,
   404 F.2d 312 (2d Cir. 1968) ...........................................................................100

*In re Drexel Burnham Lambert Group, Inc.*,
   123 B.R. 702 (Bankr. S.D.N.Y. 1991) ............................................................52

*In re Enron Corp.*,
   281 B.R. 836 (Bankr. S.D.N.Y. 2002) ............................................................52

*In re Enron Corp.*,
   379 B.R. 425 (S.D.N.Y. 2007) ...............................................................*passim*

*In re First Nat'l*,
   2000 U.S. Dist. LEXIS 10420 ...................................................................82, 86

*In re Good Hope Refineries, Inc.*,
   9 B.R. 421 (Bankr. D. Mass. 1981) .................................................................52

*In re Grafton Partners, L.P.*,
   321 B.R. 527 (B.A.P. 9th Cir. 2005) ...............................................................91

*In re Grumman Olson Indus., Inc.*,
   329 B.R. 411 (Bankr. S.D.N.Y. 2005) ..................................................53, 55, 97

*In re Handy Andy Home Improvement Centers, Inc.*,
   199 B.R. 376 (Bankr. N.D. Ill. 1996) ..............................................................51

*In re Hydrogen, L.L.C.*,
   431 B.R. 337 (Bankr. S.D.N.Y. 2010) ..........................................................116

*In re Independent Clearing House*,
   77 B.R. 843 (Bankr. D. Utah 1987) .................................................................60

*In re Klein, Maus & Shire, Inc.*
   301 B.R. 408 (Bankr. S.D.N.Y. 2003) ............................................................69

*In re Lake States Commodities, Inc.*,
   253 B.R. 866 (Bankr. N.D. Ill. 2000) ..............................................................59

*In re Lang*,
   107 B.R. 130 (Bankr. N.D. Ohio 1989) ...........................................................51

*In re Maghazeh*,
   310 B.R. 5 (Bankr. E.D.N.Y. 2004) ................................................................98

*In re Martin*,
    403 B.R. 359 (Bankr. D.S.C. 2009).................................................................52

*In re Mirant Corp.*,
    326 B.R. 354 (Bankr. N.D. Tex. 2005) ..........................................................51

*In re Mobile Steel Co.*,
    563 F.2d 692 (5th Cir. 1977) .....................................................113, 114, 116

*In re North Plaza LLC*,
    395 B.R. 113 (S.D. Ca. 2008)........................................................................52

*In re O.P.M. Leasing Services, Inc.*,
    40 B.R. 380 (Bankr.S.D.N.Y. 1984), *aff'd*, 44 B.R. 1023 (S.D.N.Y. 1984) ..........................47

*In re Recoton Corp.*,
    307 B.R. 751 (Bankr. S.D.N.Y. 2004) ..........................................................51

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005) ................................................................*passim*

*In re Tenn. Valley Steel Corp.*,
    183 B.R. 795 (Bankr. E.D. Tenn. 1995)..................................................51, 56

*In re Unified Commercial Capital, Inc.*,
    260 B.R. 343 (W.D.N.Y. 2002)....................................................................68

*In re Verestar, Inc.*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) .........................................................114

*Inc. v. eBay, Inc.*,
    600 F.3d 93 (2d Cir. 2010) ...........................................................................89

*Indergit v. Rite Aid Corp.*,
    No. 8-Civ-9361, 2010 WL 1327242 (S.D.N.Y. Mar. 31, 2010) ...........................56

*J.P. Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) ...........................................................89

*Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*),
    263 B.R 406 (S.D.N.Y. 2001) .................................................................90, 91

*JP Morgan Chase Bank v. Winnick*,
    350 F. Supp. 2d 393 (S.D.N.Y. 2004) ...........................................................56

*Kelleran v. Andrijevic*,
    825 F.2d 692 (2d Cir. 1987) ........................................................................113

*Kirschner v. Bennett,*
  648 F. Supp. 2d 525 (S.D.N.Y. 2009) ................................................................89

*Kirschner v. Bennett,*
  No. 07 Civ. 8165, 2010 U.S. Dist. LEXIS 132344 (S.D.N.Y. June 3, 2010) ........................89

*Le Café Crème, Ltd. v. Le Roux (In re Le Café Crème, Ltd.),*
  244 B.R. 221 (Bankr. S.D.N.Y. 2000) ...............................................................73

*Lippes v. Atlantic Bank of New York,*
  69 A.D.2d 127, 419 N.Y.S.2d 505 (1st Dep't 1979) .............................................107

*Luzinski v. Gosman (In re Gosman),*
  No. 01-30953, 2005 Bankr. LEXIS 3183 (Bankr. S.D.Fla. Mar. 1, 2005) ....................82, 86

*Marine Midland Bank v. John E. Russo Produce Co., Inc.,*
  50 N.Y.2d 31, 427 N.Y.S.2d 961 (1980)..............................................................109

*Matsumura v. Benihana Nat'l Corp.,*
  542 F. Supp. 2d 245 (S.D.N.Y. 2008) ................................................................89

*Maurillo v. Park Slope U-Haul,*
  194 A.D.2d 142, 606 N.Y.S.2d 243 (2d Dep't 1993)...............................................96

*Mendelsohn v. Jacobowitz (In re Jacobs),*
  394 B.R. 646 (Bankr. E.D.N.Y. 2008) ....................................................73, 74, 78

*Miller v. Wolpoff & Abramson, L.L.P.,*
  321 F.3d 292 (2d Cir. 2003) ..........................................................................56

*MLSMK Inv. Co. v. JP Morgan Chase & Co.,*
  737 F. Supp. 2d 137 (S.D.N.Y. 2010) ................................................................89

*Morse v. Howard Park Corp.,*
  272 N.Y.S.2d 16 (N.Y.S.Ct. 1966).......................................................................87

*Murray v. Watervliet City School Dist.,*
  130 A.D.2d 830, 515 N.Y.S.2d 150 (3d Dep't 1987)...........................................107

*Ortiz v. Guitian Music Bros, Inc.,*
  No. 07-Civ-3897, 2009 WL 2252107 (S.D.N.Y. 2009).........................................72

*Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.),*
  421 B.R. 626 (Bankr. S.D.N.Y. 2009) ...............................................................76

*Perkins v. Parise (In re Global Trading Investments LLC),*
  No. 05-1332, 2006 WL 3040918 (Bankr. D.N.J. Oct. 25, 2006) ...............58, 60, 62

*Picard v. Chais* (*In re Bernard L. Madoff Investment Securities, LLC*),
   445 B.R. 206 (Bankr. S.D.N.Y. Feb. 24, 2011) ..............................................................*passim*

*Picard v. Fox* (*In re Bernard L. Madoff*),
   429 B.R. 423 (Bankr. S.D.N.Y. 2010) ........................................................................... 57

*Picard v. Merkin* (*In re Bernard L. Madoff Inv. Secs. LLC*),
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ..........................................................................*passim*

*Polhamus v. Hines*,
   218 N.Y.S. 401 (Sup. Ct. Onondaga Co. 1926) ........................................................ 107

*Quilling v. Stark*,
   No. 05-CV-1976 (L), 2006 WL 1683442 (N.D. Tex. June 19, 2006)...................................58

*Raines v. Moran*,
   57 N.Y.S.2d 800 (N.Y. Sup. Ct. Ontario Co. 1945)................................................ 106

*Reed v. Staniero*,
   2007 WL 3430935 (D.N.J. 2007) ..................................................................................48

*S.E.C. v. Ballesteros Franco*,
   253 F. Supp. 2d 720 (S.D.N.Y. 2003) ........................................................................ 101

*S.E.C. v. Manor Nursing Centers, Inc.*,
   458 F.2d 1082 (2d Cir. 1972) ..................................................................................... 101

*Saffire Corp. v. Newkidco*,
   LLC, 286 F.Supp.2d 302 (S.D.N.Y. 2003)...................................................................56

*Salomon v. Kaiser* (*In re Kaiser*),
   722 F.2d 1574 (2d Cir. 1983) .......................................................................................76

*Saltz v. First Frontier, LP*,
   No. 10 Civ. 964, 2010 U.S. Dist. LEXIS 136140 (S.D.N.Y. Dec. 22, 2010) ........................ 89

*Scholes v. Lehmann*,
   56 F.3d 750 (7th Cir. 1995) ..........................................................................................59

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*,
   234 B.R. 293 (Bankr.S.D.N.Y. 1999), *aff'd*, 818 F.2d 240 (2d Cir. 1987) ...........................54

*Shamis v. Ambassador Factors Corp.*,
   34 F. Supp. 2d 879 (S.D.N.Y. 1999) ...........................................................................99

*Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs.*),
   337 B.R. 791 (Bankr. S.D.N.Y. 2005) ..........................................................................54

*Sims v. Bergamo*,
    3 N.Y.2d 531, 169 N.Y.S.2d 449 (1957) ........................................................... 107

*Steed Fin. LDC v. Laser Advisers, Inc.*,
    258 F. Supp. 2d 272 (S.D.N.Y. 2003) ............................................................ 89

*Sure-Snap Corp. v. State Street Bank & Trust Co.*,
    948 F.2d 869 (2d Cir. 1991) ...................................................................... 114

*Terry v. June*,
    432 F. Supp. 2d 635 (W.D. Va. 2006) .......................................................... 81

*Thomas v. N.A. Chase Manhattan Bank*,
    1 F.3d 320 (5th Cir.1993) ....................................................................... 110

*Trammell v. Keane*,
    338 F.3d 155 (2d Cir. 2003) ..................................................................... 50

*U.S. v. Evseroff*,
    270 Fed. Appx. 75 (2d Cir. 2008) ............................................................... 73

*U.S. v. Josleyn*,
    206 F.3d 144 (1st Cir. 2000) .............................................................97, 98, 99

*U.S. v. McCombs*,
    30 F.3d 310 ....................................................................................... 66

*U.S. v. Orozco-Prada*,
    636 F. Supp. 1537 (S.D.N.Y. 1986) ........................................................74, 87

*United States v. Noland*,
    517 U.S. 535 (1996) ............................................................................. 114

*Warfield v. Byron*,
    436 F.3d 551 (5th Cir. 2006) .................................................................... 65

*Weyant v. Okst*,
    101 F.3d 845 (2d Cir. 1996) ..................................................................... 56

*Wheatland v. Pryor*,
    133 N.Y. 97 (1892) .............................................................................. 110

*Wider v. Wootton*,
    907 F.2d 570 (5th Cir. 1990) .................................................................... 91

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*,
    933 F.2d 131 (2d Cir. 1991) ..................................................................... 98

*Wyle v. C.H. Rider & Family (In re United Energy Corp.),*
 944 F.2d 589 (9th Cir. 1991) ..........................................................................78

*Zalaski v. City of Bridgeport Police Dept.,*
 613 F.3d 336 (2d Cir. 2010) ..........................................................................55

**STATUTES**

11 U.S.C. § 548(a)(1) ....................................................................................72

11 U.S.C. § 548(a)(1)(A) (2010) .............................................................*passim*

11 U.S.C. § 548(a)(1)(B) ..........................................................................58, 77

11 U.S.C. § 548(a)(1)(B)(ii) ..........................................................................65

11 U.S.C. § 548(a)(1)(B)(ii)(I) ......................................................................65

11 U.S.C. § 548(a)(2) ....................................................................................78

11 U.S.C. § 548(c) ..................................................................................*passim*

11 U.S.C. § 502(d) ......................................................................46, 111, 112

11 U.S.C. § 510(c) ......................................................................................113

11 U.S.C. § 546(e) ....................................................................89, 90, 91, 111

11 U.S.C. § 553(a) ........................................................................................47

11 U.S.C. § 741(7) ........................................................................................90

15 U.S.C. § 78fff-1(a) ..............................................................................57, 59

15 U.S.C. § 78fff-2 ..................................................................................57, 69

15 U.S.C. § 78fff(b) ......................................................................................57

15 U.S.C. § 78fff-2(c)(3) ..............................................................................59

C.P.L.R. 213(8) & 203(g) ............................................................................58

McKinney's N.Y. Debt. & Cred. Law § 272 ............................................73, 79

McKinney's N.Y. Debt. & Cred. Law § 276 ..........................................*passim*

McKinney's N.Y. Debt. & Cred. Law § 276-a ..............................................75

McKinney's N.Y. Debt. & Cred. Law § 278(2) ............................................73

McKinney's N.Y. Debt & Cred. Law §§ 273-275 .................................................................*passim*

N.Y. P'ship Law § 23 ................................................................................................................ 105

Securities Exchange Act of 1934 § 10(b) ................................................................................ 91

U.C.C. § 8-503 .......................................................................................................................... 63

U.F.T.A. § 8(a) ......................................................................................................................... 87

**OTHER AUTHORITIES**

17 C.F.R. § 300.503(a) ........................................................................................................ 59, 69

17 C.F.R. § 300.503(b) ............................................................................................................ 70

Fed. R. Bankr. P. 2004 ...................................................................................................*passim*

Fed. R. Bankr. P. 7009 ............................................................................................................ 54

Fed. R. Bankr. P. 7012 ....................................................................................................... 47, 53

Fed.R.Bankr.P. 7026 *et seq.* ................................................................................................ 52

Fed. R. Civ. P. 8(a)(2) ............................................................................................................ 54

Fed. R. Civ. P. 9(b) ........................................................................................................... 54, 55

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 47, 53

Fed. R. Civ. P. 56(d) .............................................................................................................. 48

Fed. R. Civ. P. 12(d) ......................................................................................................... 47, 48

Fed. R. Civ. P. 56 .............................................................................................................. 47, 48

Restatement (Second) of Agency ......................................................................................... 110

Restatement (Third) of Agency ............................................................................................ 110

Restatement (Third) of Agency ........................................................................... 106, 108, 110

Restatement (Third) of Agency § 4.01 ................................................................................. 96

Restatement (Third) of Agency § 5.03 (2006) ................................................................... 106

Restatement (Second) of Agency § 272 ............................................................................... 110

Restatement Second, Agency § 277 ..................................................................................... 110

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L.

Madoff ("Madoff"), under the Securities Investor Protection Act  ("SIPA") 78aa *et seq*., by and

through his undersigned counsel, respectfully submits this Memorandum of Law in Opposition

to the Sterling Defendants' Motion to Dismiss the Amended Complaint ("Complaint" or

"Compl.") or, in the Alternative, Motion for Summary Judgment ("Motion").  For the reasons

discussed below, the Sterling Defendants' Motion is without merit and should be denied.

## PRELIMINARY STATEMENT

This case is one of many actions undertaken by the Trustee to fulfill his fiduciary duty to

the customers and creditors of BLMIS.  That obligation calls upon the Trustee to use all the

avenues available under SIPA and the Bankruptcy Code to recover BLMIS' largest asset—the

money Madoff stole from some investors and gave to others—so that the Trustee can equitably

redistribute those funds to the victims of Madoff's fraud.  In performing his obligations, the

Trustee has available to him the books and records of BLMIS, as well as evidence uncovered by

the pre-filing investigation undertaken by his attorneys pursuant to Rule 2004 of the Federal

Rules of Bankruptcy Procedure.  Based on this factual record, the Trustee has determined what

claims to file, against what defendants, and for what remedies.

The Trustee's Complaint against the Sterling Defendants consists of two parts.  The first

is focused on fictitious profits, or other people's money, that the Sterling Defendants received

throughout the history of the fraud.  The records of BLMIS indisputably establish that the

Sterling Defendants received approximately $300 million of fictitious profits from Madoff's

Ponzi scheme, for which they gave no value and to which they have no legal right.  The law

compels that they return this money to the Trustee so that it may be distributed to Madoff's

victims.  Many other defendants, in recognition that they are not entitled to keep money that was stolen from other people, have already returned fictitious profits to the Trustee; indeed, much of the $7.6 billion that the Trustee has recovered to date, and an additional $2.4 billion recovered together with the United States Attorney's Office, constitutes the return of fictitious profits after demand or legal action by the Trustee.  To the Trustee's fictitious profits claims, the Sterling Defendants have no defense.  And yet they continue, to this day, to refuse to turn that money over to the Trustee.

The second part of the Trustee's Complaint emanates from the bankruptcy law concept of good faith.  A lack of good faith under the law does not mean that the defendant necessarily knew that it was dealing with a Ponzi scheme.  Instead, a defendant did not act in good faith if what it knew about BLMIS gave it a reason to inquire further but it chose not to do so, choosing instead to turn a blind eye and enjoy the fruits of the fraudulent scheme.  The Trustee's pre-filing investigation revealed that the Sterling Defendants were on inquiry notice of red flags indicating that Madoff may well have been engaging in a fraud.  But because they were anxious not to "look behind the curtain" as they profited at the expense of Madoff's new victims, the Sterling Defendants deliberately failed to investigate. As a result, the law provides that the Trustee can recover the additional approximately $700 million in transfers of principal the Sterling Defendants received from BLMIS. The evidence available to the Trustee to date shows that the Sterling Defendants were well aware that BLMIS might have been a fraud, including, for example, the following:

- Handwritten notes by one of the Sterling Partners confirms that by June 2001, they were shopping for insurance to protect their Madoff investments against risks of "Fraud," including a Ponzi scheme;

2

- Sterling Partner David Katz' own testimony that by 2002, he was "screaming for diversification" of the Sterling Partners' investments away from Madoff because "we don't know what he does" and so the Sterling Partners created their own hedge fund, Sterling Stamos, to achieve "Madoff-like returns";

- Sterling Partner Arthur Friedman's testimony that he had heard Madoff might be front running, which he understood meant that Madoff might have taken "information and used it illegally . . . to his own benefit or to benefit his clients";

- Friedman's testimony that Peter Stamos, the Sterling Partners' trusted advisor and CEO of Sterling Stamos, warned the Sterling Partners of the "danger" that their hundreds of millions of dollars at BLMIS could be "frozen" "if [the government] started to look into Madoff's operation . . . if there were an investigation";

- While the Sterling Defendants trumpet Peter Stamos' praise of Madoff, Stamos admitted (and told Saul Katz) that Madoff would never have satisfied Sterling Stamos' due diligence protocols—that they would have "stopped [Madoff] at the door";

- Peter Stamos' testimony that a Merrill Lynch executive warned Saul Katz that Madoff would not pass Merrill Lynch's due diligence standards and that the executive expressed concerns about the amount of assets Wilpon and Katz had with Madoff;

- Peter Stamos' testimony that he discussed with Saul Katz the "implications" if Madoff were illegally "front-running";

- Peter Stamos' testimony that, to appease Madoff's desire to avoid disclosing the Sterling Partners' investments with BLMIS, the Sterling Partners restructured Sterling Stamos' operations and management at great time and expense;

- Emails written by Ashok Chachra and other Sterling Stamos employees confirming that Sterling Stamos had recommended "for years" that the Sterling Partners redeem their investments with Madoff, but "they kept their investment independent of our recommendation"; and

- A 2004 letter signed by Saul Katz, Fred Wilpon and Ruth Madoff purporting to "agree" to a $54 million transaction among them, which the Sterling Partners admitted under oath mischaracterized the nature of the transaction.

To distract attention away from the evidence in their own documents and testimony and that of their business partners at Sterling Stamos, the Sterling Defendants have taken the offensive, blasting the Trustee's motives in their Motion and to the media, and making spurious arguments that well-settled SIPA and bankruptcy law do not apply to them. They would also have this Court short-circuit the fact-finding process to prematurely dismiss this case before the discovery process has even begun. But the array of evidence available to the Trustee shows that the Sterling Defendants were well aware that Madoff's scheme could have been fraudulent, yet turned a blind eye to those red flags of fraud. Accordingly, there are no grounds upon which the Sterling Defendants may seek either dismissal or summary judgment. As neither the substance of their arguments nor the relief they request is supported by fact or law, the Sterling Defendants' Motion should be denied and the Trustee respectfully requests that this Court move the case forward to the discovery stage forthwith.

**I.     THE TRUSTEE'S PRE-FILING INVESTIGATION SHOWS THAT THE STERLING DEFENDANTS DELIBERATELY IGNORED INDICIA OF FRAUD AT BLMIS SINCE AT LEAST 2001**

Because BLMIS was a Ponzi scheme, the law presumes that all of the transfers were made to the Sterling Defendants with a fraudulent purpose.  Thus, basic principles of bankruptcy law set forth herein require the Sterling Defendants to return to the Trustee the nearly $300 million in fictitious profits (other people's money) they received from BLMIS, regardless of what the Sterling Defendants knew or should have known about Madoff's fraud.  But the Sterling Defendants steadfastly refuse to return this stolen money.

With respect to the approximately $700 million in principal transfers, the Sterling Defendants protest that they did not actually *know* that Madoff was operating a Ponzi scheme.  Whether or not that turns out to be true after discovery takes place remains to be seen.  But regardless, the Sterling Defendants offer up the wrong legal standard.  The question is not what they actually knew.  To keep these transfers, the Sterling Defendants must have received them in "good faith."  And they cannot establish good faith if, as the evidence to date shows, they were on *inquiry notice* that BLMIS was a fraudulent enterprise and they failed to conduct a reasonably diligent investigation in response.

Indeed, the evidence to date shows that the Sterling Defendants had knowledge of, and were expressly warned about, indicia of fraud at BLMIS.  Yet they deliberately and strategically failed to conduct any reasonable diligence in response, so that they could keep reaping the substantial returns and other benefits they obtained from their BLMIS investments.  The Sterling Defendants, at a minimum, closed their eyes to indicia of fraud at BLMIS to continue the flow of their BLMIS returns, and accordingly, there is ample evidence showing that the Sterling Defendants lacked "good faith" in their transactions with Madoff.

A.     **By 2001, The Sterling Partners Were Shopping For Insurance To Protect Their Madoff Investments From Fraud, Including A Ponzi Scheme**

By 2001, the Sterling Partners were in possession of sufficient information to put them on notice of possible fraud in connection with BLMIS, as demonstrated by the fact that they explored procuring an insurance policy that would protect their BLMIS investments against fraud and in particular a Ponzi scheme.  This fact alone supports the Trustee's allegation that the Sterling Partners were on "inquiry notice" of Madoff's fraud.

In February of 2001, Sterling Partner Arthur Friedman wrote a memorandum to Sterling Partners Fred Wilpon and Saul Katz detailing his efforts to explore obtaining "fraud" insurance for the Sterling Defendants' accounts with Madoff:

> To:    FW[1] & SBK
> From:  AF
> Date:  February 26, 2001
> Subject:  Madoff Insurance
>
> American Securities has purchase[d] a third-party fiduciary policy *covering their account at Madoff*.  I was referred to their insurance agent, Robert Duran at Frank Crystal & Co.[].  *The policy covers fraud* and has a $500,000 deductible.  The cost is 30 cents per $100.  The cost per $1.0M = $3,000.  If we were to insure $200.0M the cost would be $600,000.
>
> AF:cmm
> fw022601

How to define fraud

get Robt Duran here

Declaration of Fernando A. Bohorquez, Jr., in Support of the Trustee's Opposition to the Sterling Defendants' Motion, dated May 19, 2011 ("Bohorquez Decl.")[2] Ex. 1 (emphasis added).

---

[1] "FW" is Fred Wilpon, "SBK" is Saul Katz, and "AF" is Arthur Friedman, all of whom are Sterling Partners.

[2] The exhibits referenced herein ("Ex.") are attached to the Bohorquez Decl., all but one of which was produced or in the possession of the Sterling Defendants, or their hedge fund, Sterling Stamos.

6

Notably, Friedman's original handwritten notes on this memorandum—replicated above—regarding Madoff Insurance read "*How to define fraud   get Robt Duran here*".  (Ex. 2, Arthur Friedman Transcript, dated June 22, 2010, June 23, 2010, June 24, 2010, and June 29, 2010 ("Friedman Tr."), 423:22-24.)

Thus, by 2001, the Sterling Partners had had discussions with another BLMIS investor, American Securities, about procuring insurance coverage to protect their Madoff accounts against "fraud."  And they were not the only ones who had doubts about the legitimacy of BLMIS at that time.

Only two months after Arthur Friedman was pondering "How to define fraud" in an insurance policy for the Sterling Partners' Madoff investments, an April 2001 article was published about Madoff in an industry newsletter called Mar/Hedge.  The Mar/Hedge article entitled "Madoff Tops Charts:  Skeptics Ask How," reported that many hedge fund industry professionals were openly "skeptical" about the consistency of Madoff's returns and "baffled" by the inability of other hedge fund professionals to duplicate Madoff's strategy.  (Ex. 3.)  The experts raised the prospect that Madoff could be "subsidizing" the returns of his investment advisory business with his market-making business operations—which if true, would mean that Madoff was misrepresenting the means and strategy by which he was generating his investors' returns.  (*Id.*)

Only one week after that article was published, Barron's also published a similar article that reported industry professionals' suspicions about the legitimacy of Madoff's returns to investors, and the air of secrecy required by Madoff.  The article, entitled "Don't Ask, Don't Tell," stated that "[Madoff's] returns have been so consistent that some on the Street have begun speculating that Madoff's market-making operation subsidizes and smooths [sic] his hedge-fund

returns." (Ex. 4.)  The article reported that like the professionals referred to in the Mar/Hedge

report, "three option strategists at major investment banks told Barron's they couldn't understand

how Madoff churns out such numbers." (*Id.*)  One particular investor told Barron's that "[w]hen

[Madoff] couldn't explain (to my satisfaction) how they were up or down in a particular

month…I pulled the money out." (*Id.*)

Both the Mar/Hedge and Barron's articles concerning BLMIS were received by, and

circulated among, all of the Sterling Partners. (Ex. 3; Ex. 4.)  At that time, over 90% of the

Sterling Partners' equity investments—approximately $400 million—were with BLMIS. (Ex.

5.)

Yet, although the substantial bulk of the Sterling Partners' liquid investments were with

Madoff, the Sterling Partners apparently conducted no inquiry or due diligence even after the

Mar/Hedge and Barron's articles questioning the legitimacy of his investment strategy were

circulated among them.  (Ex. 2, Friedman Tr. 167:19-168:1.)  Instead, Arthur Friedman resumed

and escalated his exploration for fraud insurance.

A few weeks after the articles about Madoff were circulated, Friedman wrote a

memorandum to all Sterling Partners dated June 13, 2001, in which he reported on a meeting he

had with insurance broker, Robert Duran, on the subject of "Madoff Insurance":

> Michael and I met with Robert Duran of Frank Crystal & Co., Inc., the company
> used by American Securities to place insurance coverage on their Madoff
> account.
>
> The policy Covers:
>
> 1)    Fraud & Fidelity
> 2)    Insolvency for any reason

(Ex. 6; Ex. 2, Friedman Tr. 429:2-14.)

Friedman's handwritten notes of that meeting with the insurance broker, Robert Duran, indicate that the insurance policy for the Madoff investments would provide coverage for "*Fraud or Fidelity (Ponzie)*" or "*Insolvency for whatever reason*":



(Ex. 7; Ex. 2, Friedman Tr. 429:1-14.)  These handwritten notes demonstrate that the Sterling Partners themselves not only suspected Madoff might be engaging in fraudulent activity, but that they even suspected specifically that their BLMIS investments might be involved in a Ponzi scheme.[3]

The very fact that the Sterling Partners were in the market for this "one of a kind" insurance policy to protect their BLMIS investments against a Ponzi scheme establishes uncontrovertibly that the Sterling Partners were on inquiry notice of possible fraud at BLMIS as early as 2001.  Contrary to the image that the Sterling Partners seek to convey that they were unsophisticated "duped" investors, the Sterling Partners were well aware of the risks.  And faced with the knowledge that Madoff may have been running a Ponzi scheme, the Sterling Partners did not conduct due diligence, but instead set about devising a strategy to protect their Madoff investments against the risk that BLMIS was a fraud, and yet still continue to profit from Madoff along the way.

---

[3] The Sterling Defendants assert that it is "irrelevant" that another BLMIS investor had recommended to the Sterling Defendants that they obtain fraud insurance for their Madoff accounts because they ultimately did not purchase this insurance.  (Mem. of Law in Support of Sterling Defs.' Mot. to Dismiss the Am. Compl. or, in the alternative, for Summary Judgment ("Defs.' Br."), at 42.)  Sterling Partner David Katz testified that the reason Sterling did not obtain fraud insurance for its BLMIS investments was because "we couldn't get anywhere near the amount we needed to cover it."  (Ex. 8, D. Katz 276:17-278:12.)  In any event, the fact remains that in 2001, the Sterling Defendants were aware of the potential need for fraud insurance for their BLMIS accounts and went shopping for it rather than conducting any diligent investigation.

**B.    By 2001-2002 Sterling Partner David Katz Was "Screaming" For Diversification Away From Madoff Because "We Don't Know What He Does"**

For more than 17 years after they made their first investment with BLMIS, the Sterling Partners invested with Madoff substantially all of their liquid investments.[4]  By 2001, however, things had changed, as their search for Ponzi scheme insurance reflects.  By 2001, Sterling Partner David Katz was also urging his father, Saul Katz, to diversify away from Madoff because they didn't "know what he does":

> Q.    Do you recall the substance of those discussions [with your father]?
> A.    Yeah.  It was basically me suggesting, *since we don't know what he [Madoff] does*, that it's time to diversify.

(Ex. 8, D. Katz Tr. 75:1-5 (emphasis added); *see also id.* 74:17-22; 75:12-17.)

By 2002, David Katz' misgivings about Madoff were such that he was, in his own words, "screaming" for diversification away from Madoff because the Sterling Partners didn't know what Madoff did in his "black box":

> Q.    What was your role in 2002 with respect to the cash aspect of Sterling's business?
> A.    At that point I was *screaming* for diversification.
> Q.    So when you say you were screaming for diversification, what do you mean?
> A.    *We had all our liquid investments in Madoff.*
>
> * * *
>
> Q.    And just to go back, when you say diversification, how would you define that?  What do you mean?
> A.    Anything other than what money is invested in that different manager, different discipline of investing.
> Q.    What do you mean by different discipline of investing?
> A.    Bernie's black box…
> Q.    …So, what do you mean by Bernie's black box?

---

[4] (Ex. 8, David Katz Transcript, dated August 31, 2010 and September 1, 2010 ("D. Katz Tr."), 30:11-17; Ex. 2, Friedman Tr. 188:19-189:3.)

> A.    Bernie's is considered to be a black box.  Black box is basically, as I understand it, *is something that you invest in that you're not sure of the strategy*.

(Ex. 8, D. Katz Tr. 31:10-32:16 (emphasis added).)

Thus, by 2002, the Sterling Partners' reservations about Madoff's legitimacy and his lack of transparency were such that David Katz was urgently pleading with his father to diversify their investments away from BLMIS.  Any reasonably prudent investor in their shoes, with all of his liquid investments in the hands of one investment manager whose legitimacy both he and the world were openly questioning, would have conducted reasonable diligence into Madoff's operations.  But the Sterling Partners continued to deliberately refrain from asking questions that might risk jeopardizing their access to Madoff and their BLMIS returns.  Instead, the Sterling Partners formed their own hedge fund to recreate "Madoff-like returns" while diversifying away from the risk of Madoff himself.

### C.    The Sterling Partners Formed Their Own Hedge Fund In 2002 With The Express Mission Of Recreating Madoff-Like Returns While Diversifying Away From The Risk Of Madoff

In 2002, the Sterling Partners formed their own hedge fund, Sterling Stamos.[5]  Sterling Stamos was a 50-50 partnership between the Sterling Partners,[6] and Peter Stamos,[7] an Oxford

---

[5] Sterling Stamos is a "fund of funds" hedge fund that invests the capital of its limited partner-investors into a number of different funds run by a variety of investment managers.

[6] The Sterling Partners were both limited partner-investors in Sterling Stamos, as well as general partners who were ultimately responsible for the management and investment strategy of the fund.  (Ex. 8, D. Katz Tr. 109:10-22, 110:14-18; Ex. 9, Mark Peskin Transcript, dated June 29, 2010 and July 30, 2010 ("Peskin Tr."), 30:16-22.)  Further, certain Sterling Partners were actively involved in the business and investment decisions at Sterling Stamos.  Saul Katz and David Katz were members of Sterling Stamos' Senior Investment Team, two of four primary portfolio decision makers, and members of Sterling Stamos' Investment Committee.  (Ex. 10; Ex. 11; Ex. 12; *see also* Ex. 13, Peter Stamos Transcript, dated August 19, 2010 ("Stamos Tr."), 62:5-63:4.)  Fred Wilpon acted as one of several Sterling Stamos Investment Professionals.  (Ex. 12.)

[7] Peter Stamos is, among other things, the founding Chairman of the Investment Advisory Board for Major League Baseball and Chair of the Investment Committee for the Board of Stanford University Hospital and Clinics.  (Ex. 13, Stamos Tr. 21:11-24:6; 36:17-37:24; *see also* Ex. 14.)

trained economist and a long-standing personal friend and business colleague of Saul and David

Katz.  To solicit investors, Sterling Stamos leveraged the Sterling Partners' "deep expertise in

hedge funds, private equity, and real estate" and extolled the Katz and Wilpon families' due

diligence capabilities.[8]

An internal Sterling Stamos document detailing the history of the fund reported that the

founding mission of the fund was to recreate "Madoff-like" returns while at the same time

diversifying the Sterling Partners' investments away from Madoff:

> Saul, Fred and David approach Peter [Stamos] with idea that he run an investment
> company, made up largely of the assets of their families; *attempt to recreate
> Madoff-like return-risk investment alternative*; attempt to replicate 40 years of
> investment success and share it [with] select investment partners who share our
> same value; *diversify away from Madoff*.

(Ex. 15 (emphasis added); *see also* Ex. 8, D. Katz Tr. 346:23-347:25 (objection omitted).)

The Sterling Partners' driving motivation to continue the flow of "Madoff-like" returns is

a recurring theme throughout the Sterling Stamos documents the Trustee obtained in his pre-

litigation investigation.  It was this desire to retain Madoff's returns at whatever cost that, as

discussed below, nearly led Saul Katz to abandon the very hedge fund that the Sterling Partners

had created.  And it was this appetite for Madoff's returns that was the motivation behind the

Sterling Partners' deliberate and calculated strategy to continue investing hundreds of millions of

dollars with Madoff even after they formed their own hedge fund—and in spite of the advice and

warnings they received from their own hedge fund about Madoff.

---

[8] As a one-page document entitled "The Sterling Stamos Difference" stated:

> Internal Due Diligence Network:  Sterling Stamos leverages the business expertise of its
> fifty percent partner, Sterling Equities.  *Founded over 30 years ago by the Wilpon and
> Katz families, Sterling Equities has developed deep expertise in hedge funds, private
> equity, and real estate.*  In addition to providing a perspective that only experience can
> generate , *the Wilpon and Katz networks also provide unique proprietary sourcing and
> due diligence capabilities*.

(Ex. 14 (emphasis added).)

**D.     The Sterling Partners Entirely Restructured Sterling Stamos For The Sole Purpose Of Accommodating Madoff's Requirements For Complete Secrecy About The Sterling Partners' Investment Relationships**

After Sterling Stamos was launched, the fund's management discussed registering as an investment advisor in anticipation of regulations that would require them to do so.  (Ex. 13, Stamos Tr. 46:8-47:3.)  But Madoff informed Saul Katz of his concern that in the course of that process Sterling Stamos might have to make disclosures about the Sterling Partners' investments in BLMIS.  Saul Katz in turn became so concerned that he might lose access to Madoff—who demanded secrecy and confidentiality from his investors—that the Sterling Partners engineered the restructuring of Sterling Stamos at great cost and expense specifically to avoid having to make any disclosures that had so disquieted Madoff.

Peter Stamos testified that he learned from Saul Katz of Madoff's concerns about disclosures that would be required in connection with Sterling Stamos' registration process:[9]

Q.     What were the nature of those discussions with Mr. [Saul] Katz [about Sterling Stamos registering as an investment adviser]?
A.     He expressed his concern about our registering.
Q.     And what concern did Mr. Saul Katz express about Sterling Stamos registering as an investment advisor [with the SEC]?
A.     What I recall…was that he was concerned that *this would possibly interfere in his relationship with Mr. Madoff.*

* * *

Q.     So, what were [Saul Katz's] concerns?
A.     I came to understand his concern to be that *Mr. Madoff had expressed his concern* to Mr. Katz.

* * *

Q.     What did Mr. Katz tell you that Mr. Madoff's concerns were with Sterling Stamos registering as an investment advisor?

---

[9] Stamos' testimony directly contradicts Saul Katz' statement in his declaration submitted in support of the Sterling Defendants' Motion ("Katz Decl.") that the restructuring of Sterling Stamos was due to the Sterling Partners' own privacy concerns and increased legal exposure to third party investors.  (Katz Decl. ¶¶ 17-18; Defs.' Br. at 26-27.)

A.    What I recall is Mr. Katz expressing the concern that our registration, that is Sterling Stamos, would require that Mr. Katz disclose all of his investment holdings, including all business relationships with Mr. Madoff.

*  *  *

Q.    ….What did [Mr. Katz] tell you?
A.    What I recall is his expressing his concern that *Mr. Madoff was concerned about confidentiality* and things of that nature.

*  *  *

Q.    And what did [Saul Katz] tell you about his concerns with confidentiality and privacy with respect to his Madoff investments?
A.    I believe that's the only thing I recall is that Mr. Madoff is—wants our relationship private and confidential.

(*Id.* Stamos Tr. 49:15-50:1, 50:17-20, 51: 5-12, 51:17-21, 127:6-12 (objections omitted) (emphasis added).)

Thus, Saul Katz was troubled that Madoff's disclosure-related concerns could interfere with the Sterling Partners' relationship with Madoff.[10]  And Peter Stamos further explained that, because Madoff ran BLMIS as if it were like a private club to which access was difficult, Saul Katz was concerned that this disclosure issue could lead Madoff to disallow the Sterling Partners from continuing to invest in BLMIS:

. . . I do recall general conversations about understanding that that was the nature of Mr. Madoff's investment business, that it was highly confidential, highly private.  That it was a *private club* that you were only invited into, *difficult to get access to* and the like.  So that's why we had to potentially deal with this issue, if Mr. Katz had to disclose a lot of information.  If we became registered.

(*Id.* Stamos Tr. 128:18-129:1 (emphasis added).)

To better understand Madoff's disclosure concerns that arose in connection with Sterling Stamos' registration as an investment advisor, Sterling Stamos hired a large corporate law firm,

---

[10] David Katz testified that he remembered at the beginning of the Sterling Partners' investments with BLMIS, "it was like a, you know, it was a quiet—you weren't supposed to tell anyone you were invested." (Ex. 8, D. Katz Tr. 262:9-262:17.)  Madoff's demands for secrecy from his investors were reported in the Barron's article discussed above. (Ex. 4 ("What Madoff told us [investors] was, 'If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here.").)

Schulte Roth & Zabel.  (*Id.* Stamos Tr. 52:1-7; 52:10-53:5.)  It was determined that to avoid

having to make the disclosures that had so worried Madoff, a "more formal separation" had to be

created between Sterling Stamos and the Sterling Partners.  (*Id.* Stamos Tr. 56:14-56:21.)

      The separation of Sterling Stamos from the Sterling Partners required substantial time

and money.[11]  (*Id.* Stamos Tr. 56:14-21.)  The separation required, among other things,

separating the physical office space that they had previously shared, and so Sterling Stamos

moved to a new office and began utilizing their own separate information technology system.

(*Id.* Stamos Tr. 56:22-57:20.)[12]

      Another aspect of the "formal separation" required the removal of Saul Katz and David

Katz—who had been actively involved in the investment decisions as well as the management of

Sterling Stamos[13]—from making investment decisions in the hedge fund that they had created.[14]

To accomplish this, they separated Sterling Stamos' board meetings into two sessions, one for

business issues which Saul Katz would attend, and another to address investment issues.  (*Id.*

Stamos Tr. 64:9-64:24.)

---

[11] The Sterling Stamos privilege log produced to the Trustee lists over 70 privileged communications from July 2003 until April 2005 between Sterling Stamos employees, Sterling Stamos' in-house counsel, attorneys at Schulte Roth & Zabel, and oftentimes certain Sterling Partners related to Sterling Stamos' registration as an investment adviser.  As evidenced by this privilege log, it took several *years* of counsel and legal advice for Sterling Stamos to accomplish its registration in light of Madoff's concern.

[12] In 2005, Sterling Stamos moved its physical location away from Sterling's offices located at 575 Fifth Avenue to 450 Park Avenue.  (Ex. 13, Stamos Tr. 57:23-58:2.)

[13] (Ex. 11.)

[14] (Ex. 13, Stamos Tr. 57:14-20, 59:17-60:10, 62:24-63:5.)  In February 2005, Saul Katz and David Katz were listed on a "Hedge Fund Manager Questionnaire" completed by Sterling Stamos as "primary portfolio decision makers" who were "actively involved in the investment decisions as well as the management of Sterling Stamos."  (Ex. 11; *see also* Ex. 12 (Sterling Stamos marketing materials listing Saul Katz and David Katz as members of Sterling Stamos' "Senior Investment Team").)  In September 2005, however, Saul Katz and David Katz were no longer listed on an updated version of the same "Hedge Fund Manager Questionnaire" completed by Sterling Stamos.  (Ex. 16.)

The Sterling Partners did not inquire as to why Madoff was so concerned about potential disclosures of their investments at BLMIS, even though Madoff would shortly be required to make those disclosures himself.  Instead, they went to great lengths and sacrifice to appease Madoff's demands for confidentiality and secrecy in order to continue the flow of their Madoff returns—even to the point of requiring Saul and David Katz to abdicate control over their own hedge fund's investment decisions.  Indeed it was the prospect of this threat—that Madoff might cut off all Sterling Partners investments if they attempted to invade his veil of confidentiality and secrecy with any reasonable and prudent due diligence questions into his investment operations—that was behind the Sterling Partners' steadfast failure to conduct any diligence into their investments, even in the face of their suspicions and the warnings from their own trusted business partners.

> **E.    Sterling Stamos Reportedly Warned The Sterling Partners Of Concerns About Madoff And Recommended That They Redeem Their Investments Out Of BLMIS**

After Sterling Stamos was formed, the Sterling Partners' own trusted business partners began to personally convey to them concerns about BLMIS' legitimacy, including warning that Madoff might be illegally front running; recommending that they redeem their investments out of Madoff; and warning them of the "danger" to their BLMIS investments if Madoff were investigated for illegal activity.  These warnings from the Sterling Partners' trusted business partners further demonstrate that triable issues of material fact exists as to the Sterling Partners inquiry notice of Madoff's fraud.

> **1.    Sterling Stamos Warned The Sterling Partners About Madoff's Lack Of Transparency**

Sterling Stamos raised a number of concerns with the Sterling Partners about their BLMIS investments, starting with Madoff's lack of transparency.  For example, Sterling Partner

Arthur Friedman testified that Peter Stamos had an "objection" to BLMIS because of Madoff's lack of transparency, and advised the Sterling Partners "he was of the opinion that we shouldn't have as much money in Madoff as we do, as we did at the time."  (Ex. 2, Friedman Tr. 578:1-14 (emphasis added).)

Peter Stamos further told Saul Katz that this lack of transparency and Sterling Stamos' inability to understand Madoff's investment strategy would have prevented Sterling Stamos from investing in BLMIS as Sterling Stamos' own due diligence requirements would not be met:

> Q.   And when Mr. Katz expressed to you that he was going to redeem money from Sterling Stamos and invest it in Madoff, what did you say?
>
>                                        * * *
>
> A.   Generally, that we were a diversified portfolio of managers and that that was better for him than to have all his capital in one manager, and I believe I said, particularly *in a manager whose strategy we cannot explain*.
> Q.   And when you say a particular manager whose strategy you cannot explain, what are you referring to specifically?
> A.   I'm referring to specifically not only the investment due diligence that we developed post-2007, over the 2007-2008 period, which was to require of managers that *they explain their strategy in a way that we could explain to our investors* and that put a big block on us investing as fiduciaries in black boxes.  Such as D.E. Shaw, for example.
> Q.   Or such as Madoff?
> A.   *At that time, if what we heard about Madoff were true, he would not have made it into our portfolio as a—he would not have made the transparency requirements or the operational due diligence requirements, or the investment due diligence requirements because of transparency.*
> Q.   And did you share the fact that Madoff would not have passed those due diligence criteria with Mr. Katz?
> A.   …. I don't believe that I did at that particular time …. But I do recall having that conversation with him at some point over the 2007-2008 period.  2008 period, I believe.

(Ex. 13, Stamos Tr. 200:20-202:23 (emphasis added).)

Sterling Stamos told the Sterling Partners that BLMIS did not meet Sterling Stamos' operational or investment due diligence requirements and that Madoff's lack of transparency would have prevented their own hedge fund from investing with Madoff.  In spite of this advice,

17

the Sterling Partners conducted no operational or investment due diligence, and still chose to

remain invested with Madoff.

> **2.     The Sterling Partners And Sterling Stamos Discussed The
> Prospect That Madoff Could Be Illegally Front Running, And
> The Danger That Their Accounts Could Be Frozen If Madoff
> Were Investigated**

The Sterling Partners knew of the possibility that Madoff might be engaged in illegal

front running at BLMIS.  Sterling Stamos personnel not only discussed this possibility with the

Sterling Partners, they discussed the *implications* if Madoff were in fact front running.

Peter Stamos testified that he explained to the Sterling Defendants how Madoff's dual

roles as both a broker dealer and investment manager provided Madoff with the very information

that would allow him to illegally "front-run":

> Q.     And what did you tell [Saul Katz] about the kinds of [operational issues]
> that [Madoff being a broker-dealer] could raise?
> A.     I recall two issues.  One is that it was increasingly becoming not best
> practices, that in the past a number of managers had done that for
> convenience purposes, but that increasingly that was not best practice.
> And then, in particular, the issue that it could possibly raise is that if one
> were both a broker-dealer and an investment manager, *one could use
> information that when garnered from one's broker-dealership would give
> you advantages as an investment manager, and that would be
> inappropriate.*
> Q.     Is that related to the front-running issue that we discussed earlier?
> A.     That's related to having information that could allow one to possibly
> front-run.

(Ex. 13, Stamos Tr. 159:12-160:3 (emphasis added); *see also id.* Stamos Tr. 151:6-8, 151:19-22.)

Sterling Partner Arthur Friedman also admitted that he too knew of reports that Madoff

was illegally front running at BLMIS:

> Q.     Have you heard the term [front running] in the context of someone
> wondering or questioning whether Madoff was engaged in front-running?
> A.     I've heard that, too, and I think I, at one time, knew what front-running
> was, but…
> Q.     What do you recall about having heard Madoff and front-running being
> connected?

> A.   *That he took information and used it illegally.  He used it to his own*
> *benefit or to benefit his clients.*

(Ex. 2, Friedman Tr. 156:22-157:7 (emphasis added).)[15]

Peter Stamos also testified that he told the Sterling Defendants on several occasions that

the fact that Madoff was both a broker-dealer and a fund manager was a due diligence flag that

Stamos would "monitor closely" and cause him to contemplate whether he would continue

investing in that fund:

> Q.   The discussions that you had with Saul Katz concerning…the possible
> broker-dealer issues with Madoff…what did you discuss?
> A.   Post-2005, I believe, post-2005, late 2005, early 2006, the existence of *a*
> *manager who was both a broker-dealer and a fund manager* became not a
> red flag for us but a yellow flag,[16] one of the operational due diligence
> issues that we looked at, *and was one of the indications for us that we*
> *should monitor it closely and consider whether we should continue to be*
> *an investor in that fund.*
>
> * * *
>
> Q.   Did you also have a discussion with [Saul Katz] about the broker-dealer
> issue as being a yellow flag vis-à-vis Madoff?
> A.   Yes.
> Q.   And what did you tell him in that discussion?
> A.   It raised an operational issue for us that suggested to us that we needed—*if*
> *we had a manager who did that, we would monitor it very closely.*"

(Ex. 13, Stamos Tr. 156:19-157:6; 157:13-19; 158:4-14; 158:22-159:7 (emphasis added)

(objection omitted).)

Stamos also testified that he discussed with Saul Katz the "implications" in the event

Madoff *was* front running or *accused* of front running:

> Q.   What else did you discuss with Mr. Saul Katz concerning the possibility
> that Madoff may be front-running.

---

[15] (Ex. 8, D. Katz Tr. 259:22-260:1 (David Katz testifying that he recalled hearing of reports that Madoff may be subsidizing his returns).)

[16] Notably, the presence of this same flag of a broker-dealer also acting as investment advisor was one of the reasons Sterling Stamos redeemed its investments from the Bayou Fund, which was later found to be a Ponzi scheme.  *See* Section I.G below.

> A.      If he were front-running, what would the implications be.  Or if he were
> accused of front-running, what could the implications be.

(*Id.* Stamos Tr. 152:21-153:2.)

Stamos warned the Sterling Partners that their BLMIS funds could be frozen if Madoff or

his operations were investigated.  Friedman testified that:

> The only *danger* that [Peter Stamos] put forth was that if anything ever
> happened…a problem…that Sterling might encounter, would be *if accounts were
> frozen and while any kind of—if they started to look into Madoff's operation—*
> again not saying that they'd find anything, but just saying, *just creating a fear of
> just an investigation.  And our accounts were frozen*, would we—and at the same
> time the banks said, well, pay us the money, you're in default, we might have a
> problem.
>
> So that was the only—that was the basis of his *warning*, we'll say, or saying that
> you should have less money.  Again, not that he could point to and say there's
> something wrong or an investigation would turn up anything wrong.  Just that if
> there were an investigation and if the money was tied up, then we might run into a
> problem.

(Ex. 2, Friedman Tr. 579:5-23 (emphasis added).)[17]

Neither the prospect of criminal activity[18] at BLMIS nor the potential danger posed to

their Madoff investments was enough to convince the Sterling Partners to investigate further so

as not to risk jeopardizing their Madoff investments and returns.  Nor did the admonition of

Sterling Stamos that they would closely monitor any broker such as Madoff prompt the Sterling

Partners to look into BLMIS' operations in any way.

---

[17] Stamos' warnings about the possibility of an investigation of Madoff and the potential freezing of the
Sterling Partners' BLMIS accounts occurred somewhere between 2002 and 2005 (Ex. 2, Friedman Tr.
579:24-580:12), and was reported to the Sterling Partners at a partners meeting.  (*Id.* Friedman Tr.
580:22-580:25.)

[18] The Sterling Defendants admittedly had no idea what Madoff was doing, were being warned that he
might be generating investment returns not based on his purported strategy by through criminal activity,
and yet did no independent investigation.  These facts defeat their Motion.

**3.    The Sterling Partners Knew That Sterling Stamos' Due
Diligence Would Have Stopped Madoff At The Door, And
"For Years" Failed To Heed Sterling Stamos'
Recommendations To Redeem From BLMIS**

The Sterling Partners continued to invest with BLMIS despite knowing that Sterling

Stamos' due diligence protocols "stopped Madoff at the door."  Stamos testified that [a]s a

fiduciary," Stamos "couldn't put" BLMIS in his portfolio "for all kinds of reasons."  (Ex. 13,

Stamos Tr. 211:20-212:17.)  "[B]y 2007, 2008 with the new sets of requirements and operational

due diligence, risk management and investment due diligence that we would have imposed,

[Madoff] would have been stopped at the door the moment we found any of these issues."  (*Id.*)

Both Stamos and another Sterling Stamos board member, Kevin Dunleavy (a Merrill

Lynch executive), told the Sterling Partners that Madoff would not pass Sterling Stamos' due

diligence requirements.[19]  (*Id.* Stamos Tr. 212:5-25.)

Moreover, internal emails show that Sterling Stamos' decision not to invest in Madoff—

and their advice to the Sterling Defendants to redeem their Madoff investments—had occurred

well before 2007-2008.  These include:

- A December 2008 email by Sterling Stamos' Chief Investment Strategist, Ashok
  Chachra: [20]

  [Sterling Stamos] didn't have any exposure [to Madoff.]  It was actually
  the Wilpon and Katz families' exposure on a direct basis.  In fact, *we had
  recommended to them to redeem for years but they kept their investment
  independent of our recommendation.*

---

[19] It was for this reason that Sterling Stamos ultimately decided not to take Saul Katz' suggestion in early
2008 to create a fund of all black boxes, in which Madoff would be "the anchor tenant."  (Ex. 13, Stamos
Tr. 202:24-204:3.)

[20] These two emails and other contemporaneous documents written by Ashok Chachra and others at
Sterling Stamos at the time of the events in question flatly contradict Chachra's statement in his
declaration in support of the Sterling Defendants' Motion ("Chachra Decl.") that: "To my knowledge no
one at SSCM [Sterling Stamos] told any Sterling Partner not to invest with Madoff or BLMIS."  (Chachra
Decl. ¶ 7.)  This question concerning the credibility of Chachra's testimony at a very minimum creates an
issue of fact warranting the denial of the Sterling Defendants' motion.

(Ex. 17 (emphasis added).)

- Another December 2008 email by Chachra:

  Sterling Stamos does not have any exposure to any funds managed by
  Madoff and never has had any exposure.

  *In fact, we turned down the Madoff Funds more than 6 years ago and told
  many of our investors including the Wilpon and Katz families about our
  concerns.*

  Notwithstanding our concerns, the Wilpon and Katz families continued to
  invest with Madoff Securities.

  Please let me know if you would like to discuss this further as we are
  trying to inform all of our investors that our due diligence process rejected
  Madoff but, *unfortunately, the Katz and Wilpon families maintained their
  investment independent of our advice.*

(Ex. 18 (emphasis added).)

- A December 2008 email written by Peter Stamos:

  Fortunately, our firm did not invest with Madoff.  That firm and fund
  wouldn't make it through our risk and ops controls—lack of transparency,
  no third party administrator, etc……. .  Unfortunately, our partners—Saul
  and Fred—against our recommendations[21] invested as individuals and
  through their real estate firm.

(Ex. 19 (emphasis added).)

---

[21] Contrary to the Sterling Defendants' suggestion that Peter Stamos "never… suggested that Saul Katz
redeem his Madoff investments" (Defs.' Br. at 8), Stamos testified to the contrary:

> Q.    So you never recommended to Saul Katz to withdraw his money from Madoff?
> A.    To be clear, recommended is the word that I'm pausing on.  Did I suggest him to
>       do that?  Yes.  Did I ask him to do that?  Yes, But recommendation would
>       assume that I had an investment recommendation about the fund and I didn't
>       have—I couldn't make an investment recommendation about that fund.  It was
>       not under our purview.
> Q.    Okay.  So putting aside the term of art of recommendation, you suggested to him
>       or you asked him to withdraw money from Madoff?
>
>                                    * * *
>
> A.    Yes.

(Ex. 13, Stamos Tr. 164:12-165:2.)

After Madoff's fraud was publicly announced in December 2008, Sterling Stamos used the fact that they had refused to invest with Madoff because he would not pass its due diligence procedures to provide assurance to its investors.  The December 16, 2008 Sterling Stamos "Investor Talking Points" that were used for Sterling Stamos' call with its investors reported:

- Sterling Stamos has No Money Invested in Any Funds of Bernie Madoff

  —We are following up with our managers to make sure they have no Madoff exposure—we will notify investors of any material impact, if we find any

  —*We declined to invest with Madoff a few years ago; from a DD [due diligence] perspective we weren't comfortable.*

(Ex. 20 (emphasis added).)

### 4.    Sterling Stamos Emails Confirm That It Had Openly Questioned Madoff's Legitimacy Since As Early As 2001

In December 2008, Sterling Stamos employees and colleagues spread the word by email that they had "called" Madoff's fraud years earlier.  Peter Stamos' brother, Basil Stamos, sent multiple emails in December 2008, pointing out that Peter Stamos had "called" Madoff's fraud "over 7 years" before it was revealed to the world: [22]

Madoff Securities was just charged with fraud, perhaps the biggest in Wall Street history.  *Fortunately my brother Peter called it over 7 years ago.*  The man is good at what he does.

(Ex. 21 (emphasis added).)

In a similar email, Basil Stamos wrote:

---

[22] The Sterling Defendants' argument that "Peter Stamos never questioned Madoff's legitimacy" and that he testified under oath "to exactly the opposite" (Defs.' Br. at 6, 8) confirms why the Sterling Defendants' motion is without merit or credibility.  Even the few documents set forth herein that the Trustee obtained from Sterling Stamos in his pre-litigation investigation squarely and unmistakably refute this assertion and confirm the Trustee's allegations that Sterling Stamos had for years been aware of the prospect that Madoff might be engaged in fraudulent activities and had so warned the Sterling Partners.

I don't know if you've been following the news on Wall Street, but here's a press release [concerning Sterling Stamos not Invested in Madoff Securities] for your interest. *My brother Peter made this call many years ago*.

(Ex. 22 (emphasis added).)

Emails written by another Sterling Stamos employee, Jia Ou-Yang, further confirmed

Sterling Stamos' long-held view that Madoff was likely a fraud or a "scam":[23]

[V]ery very ironically, a lot of our investors *gave us crap about not generating returns like Madoff's*…… and I guess *our CIO always said it was a scam, 'too good to be true'* […] Well there u go, it was too good to be true[.]

(Ex. 29 (emphasis added).)

Still yet another email by another Sterling Stamos employee, Sophie Laurence, not only

confirms that Sterling Stamos had refused to invest with Madoff because of its concerns, but

moreover that it withstood significant criticism from its investors for refusing to do so:

[Madoff] is a wall street icon and the sterling guys have lots of $$$$ with his firm
His son works upstairs with Gabriel
We have several clients who have lots of money with him …..*and got sh$t for not investing with him …. Looks like our gut instinct paid off*

(Ex. 30 (emphasis added).)

Thus, even at this preliminary stage of the litigation, the evidence produced to date

demonstrates that there is a triable issue of fact as to the Trustee's claims that the Sterling

Partners exhibited ostrich-like blindness to flags of fraud at BLMIS and disregarded the advice

of their own hedge fund-business partners.

---

[23] From 2004-2008, on several different occasions, Sterling Stamos employees circulated via email the Barron's "Don't Ask Don't Tell" May 2001 article that had questioned Madoff's legitimacy years earlier. (Ex. 23; Ex. 24; Ex. 25; Ex. 26; Ex. 27; Ex. 28.)

**F.      Other Trusted Industry Professionals, Including A Merrill Lynch Executive, Also Warned The Sterling Partners Of Madoff Concerns**

Kevin Dunleavy, a Merrill Lynch executive who became involved with Sterling Stamos in or around 2004,[24] and eventually became a member of Sterling Stamos' board, made clear to the Sterling Defendants that Madoff failed basic due diligence.

Peter Stamos testified that Dunleavy expressed his own concerns to Saul Katz that Madoff might be illegally front running at BLMIS:

> A.      . . .Mr. Dunleavy expressed the concern that [Madoff] was a broker-dealer and cleared his own trades, as well as being an investment manager
> Q.      …Did Mr. Dunleavy raise any other concerns with you that he had with Madoff?
> A.      At some point, yes.  I'm not sure if it was at that meeting or at some prior—or, some later meeting.
> Q.      And what were those other concerns?
> A.      Generally, that Merrill Lynch or any other institutional entity like Merrill Lynch would not invest in a manager that cleared his own trades, because of operation of due diligence issues.  More specifically, *he expressed concern of a rumor that he had heard that it was possible that Mr. Madoff was using information from his broker-dealer to help him as an investment manager.  And I believe the phrase he used was that it could be in the context of something like front-running.*
>
> *      *      *
>
> Q.      Do you know if Mr. Dunleavy shared [the] two concerns [about Madoff as a broker-dealer and Madoff possibly front-running] that he had…with Saul Katz?
> A.      I believe he did.
> Q.      When did he share those concerns with Mr. Katz?
> A.      I believe contemporaneous, in the contemporaneous time frame that he shared it with me, it may have been in the same meeting and it may have been in a follow-up meeting with Mr. Katz, alone or a follow-up phone conversation with him.

(Ex. 13, Stamos Tr. 83:11-14; 83:17-84:8; 205:12-206:10 (objection omitted) (emphasis added).)

---

[24] Kevin Dunleavy was the Merrill Lynch point person when it became a distribution agent for Sterling Stamos, meaning Merrill Lynch acted as a third-party marketer of Sterling Stamos funds to potential investors.  (Ex. 31, Ashok Chachra Transcript, dated October 8, 2010 ("Chachra Tr."), 64:22-65:10; 65:18-25.)

Dunleavy told the Sterling Defendants that a black box fund like Madoff would not pass *Merrill Lynch's* due diligence standards.  (*Id.* Stamos Tr. 202:24-203:16.)  Dunleavy also expressed concern that Defendants Fred Wilpon and Saul Katz had a substantial amount of assets invested with Madoff.  (*Id.* Stamos Tr. 82:10-13.)

Just as the Sterling Partners had rejected Sterling Stamos' suspicions about Madoff, they also blindly rejected Dunleavy's arguments about Madoff:

> Q.   Well, do you know what Saul Katz's reaction was to Dunleavy's
>        concerns?
> A.   I don't know, I can't say with certainty.  I can say what Mr. Dunleavy said
>        to me.
> Q.   What did he say?
> A.   I believe at some time during, prior to that—post that conversation, Mr.
>        Dunleavy explained to me that *Saul rejected his arguments*."

(*Id.* Stamos Tr. 206:19-207:3 (objection omitted) (emphasis added).)

Another consultant to Sterling Stamos and the Sterling Partners, Tim Dick,[25] also told the Sterling Defendants many years earlier about his concerns that he "couldn't make Bernie's math work—something wasn't right."  In an email to Peter Stamos, Mr. Dick wrote:

> I remember the discussions we had about Bernie in the early days of [Sterling
> Stamos] . . . . Thank goodness you diversified Saul—it is too bad Fred didn't buy
> in to the same degree . . . .  In my introductory discussion with Saul, he brought
> up Bernie and *I told him I couldn't make Bernie's math work—something wasn't
> right* . . . . I don't think Saul was very pleased with the discussion although I tried
> to be objective . . . .

(Ex. 32 (emphasis added).)

Stamos' response to this email confirmed that both Mr. Dick's and Stamos' "instincts and analyses" were right with respect to Madoff:  "Your (our) instincts and analyses were right on

---

[25] Stamos testified that Tim Dick's conversation with Saul Katz occurred in the early stages of Sterling Stamos' development in late 2002 or early 2003.  (Ex. 13, Stamos Tr. 314:1-7.)

both fronts . . . .  I've always been so proud of your judgment and integrity."  (Ex. 32 (emphasis added).)

The Sterling Partners were thus aware that flags of fraud had led to the rejection of Madoff as an investment prospect by their own business partners, by members of Sterling Stamos' board, by Merrill Lynch, and by former consultants.  Yet, the Sterling Partners continued to blindly ignore these warnings.

### G.    The Bayou Ponzi Scheme Was Another Call For Independent Due Diligence On Their BLMIS Investments That The Sterling Partners Willfully Ignored

For years, the Sterling Partners failed to do any reasonable, independent due diligence into their BLMIS investments in the face of their own concerns that Madoff might be engaging in a Ponzi scheme or other fraud, and particularized warnings from their business partners to redeem.  The Sterling Partners received yet another call for diligence in their investments when one of the funds in which they invested through Sterling Stamos, Bayou Superfund LLC ("Bayou"), turned out to be a Ponzi scheme.  Sterling Stamos' routine due diligence process had in fact identified specific "flags" that caused it to redeem its investments in Bayou several months before the Ponzi scheme was revealed.

Sterling Stamos informed the Sterling Partners of the specific "flags" identified by its due diligence process that led it to redeem out of Bayou, [26] which included: (i) lack of transparency

---

[26] Ashok Chachra testified that he told Sterling Partner Saul Katz all of the reasons they redeemed from Bayou:

> I remember having a discussion with him.  You know, I felt awful about the situation, so I felt like it was important that I describe to him exactly why we made our decision.

(Ex. 31, Chachra Tr. 178:11-17; *see also* Ex. 13, Stamos Tr. 188:19-189:5.)  Arthur Friedman stated that the reasons that led to Sterling Stamos' redemption from Bayou were reported to the Sterling Partners at a partners' meeting.  (Ex. 2, Friedman Tr. 577:3-12.)

into the manager's strategy;[27] (ii) an investment manager also serving as a broker-dealer; (iii) the

investment manager's use of a non-traditional audit firm;[28] and (iv) "style drift"—meaning a

change in investment strategy.[29]  (Ex. 31, Chachra Tr. 176:13-178:17; Ex. 13, Stamos Tr.

188:19-189:5; Ex. 2, Friedman Tr. 577:3-12.)[30]

      Many of the Bayou red flags were applicable to BLMIS as well.  Indeed, the Sterling

Partners had already been warned about these identical "flags" concerning Madoff.  For

example, the Sterling Partners were well aware that Madoff's lack of transparency was a flag

that prevented BLMIS from meeting Sterling Stamos' own due diligence requirements.  And the

---

[27] Sterling Partner Fred Wilpon testified that he understood that Sterling Stamos withdrew its investments
from Bayou because of a lack of "transparen[cy]" and a change in investment strategy.  (Ex. 33, Fred
Wilpon Transcript, dated July 20, 2010 ("Wilpon Tr."), 156:13–157:7.)

[28] A Sterling Stamos "Redemption Memorandum" dated March 1, 2005 further identified as another
"flag" Bayou's use of a non-traditional auditor.  (Ex. 34.)

[29] Peter Stamos testified that the "flags" raised with respect to the Bayou investment manager that led
Sterling Stamos to withdraw its investment included growth in assets under management, change in
investment strategy, and broker dealer also serving as investment manager:

    Q.    Why did Sterling Stamos withdraw its funds from Bayou at that time [February
          of 2005]?
    A.    We withdrew capital from… Bayou and submitting a redemption in February of,
          I think it was 2005 for several reasons. . . . [S]o the first issue was AUM [assets
          under management] growth had gone from 200 million to 500 million.  And [he]
          told us of his intention to manage over a billion.  *That was a yellow flag for us*.

          The second issue was that he had been successful in trading short-term equities,
          small cap equities, and informed us that he intended to broaden that strategy to
          include commodities, *and that was also a yellow flag.  A style drift*.

          And then the third were a set of operational issues that our chief financial officer
          raised, and those had to do with issues of back-office administration and the
          strength of the back-office team, and *as well as the fact that he had a broker-
          dealer and was an investment manager himself.  That became one of our issues
          that we raised*.

(Ex. 13, Stamos Tr. 175:17-176:20 (emphasis added); *see also* Ex. 35.)

[30] The Sterling Partners also recorded discussions related to Bayou in their partner meeting minutes.  (Ex.
36 ("SSP – SBK is concerned about the management of the company; Upset about how SSP handled the
Bayou issue."); Ex. 37 ("SSP—Bayou issues continue—we will be involved in lawsuits.").)

Sterling Partners were warned that the investment manager-broker-dealer "flag" also applied to BLMIS, presenting the prospect that Madoff could be front running.  *See* Section E.2 above.

The use of a non-traditional auditor "flag" was another from Bayou that the Sterling Partners knew applied to BLMIS as well.  As early as 1994, the Sterling Partners knew that BLMIS did not have a large or traditional audit firm, because they received financial statements from BLMIS identifying Madoff's auditor as Friehling & Horowitz.  (Ex. 38.)

As for "style drift," in November 2005 just three months after the Bayou Ponzi scheme was revealed, Madoff offered the Sterling Partners the opportunity to invest $22 million in a new "Short-term Special Madoff Investment."  (Ex. 39.)  According to Friedman, who learned about this new investment strategy at a partners' meeting, the new strategy was supposed to increase the Sterling Partners' "normal" returns by fifty percent:

> [Madoff] was offering a special return.  *He felt that there was something*
> *he could do to increase the normal return we were getting by up to, I have*
> *a recollection of something like 50 percent was an estimate.*  There was
> nothing fixed, no guarantee.  And it would be relatively short-term
> investment.

(Ex. 2, Friedman Tr. 434:16:-435:4 (emphasis added).)

All of the Sterling Partners knew that this "Special Madoff Investment Opportunity" was purportedly based upon a new investment strategy. [31]  Yet, the Sterling Partners failed to conduct any reasonable diligence into Madoff's new investment strategy, which is particularly astonishing given the promise to provide them with a *fifty percent* increase in their returns.  The

---

[31] Saul Katz testified that Madoff was "going to try a new strategy that he thinks may be more efficient and make us more money"; Fred Wilpon testified that "Bernie had an idea which would divert from his normal procedure … I have no idea what the strategy was"; and Sterling's Chief Financial Officer Mark Peskin testified that he understood the special investment opportunity to be "a change of formula, a change of thought process …. It was just a different kind of strategy that was being tested."  (Ex. 40, Saul Katz Transcript, dated August 4, 2010 ("S. Katz Tr."), 172:8-15; Ex. 33, Wilpon Tr. 230:11-24; Ex. 9, Peskin Tr. 408:10-12, 408:24-25.)

Sterling Partners' ability to blindly disregard this "style drift" flag of fraud at BLMIS just months after having learned of its significance in the Bayou fraud speaks volumes.

### H.      Despite The Suspicions, The Warnings, And The Bayou Ponzi Lesson, The Sterling Partners Deliberately Continued To Invest With BLMIS

By 2005, the Sterling Partners had been suspicious enough about Madoff's legitimacy that they had shopped for Ponzi scheme insurance; they had been warned that Madoff might be investigated and that their funds at BLMIS could be frozen; and they were warned by their business partners that they should redeem their investments.  And now, the Sterling Partners had received private advice from Sterling Stamos on the due diligence flags that led them to redeem out of Bayou, which later turned out to be a fraud—the mirror image of flags they knew existed with respect to BLMIS.  Any reasonable investor in the Sterling Partners' shoes with more than $400 million invested at BLMIS would have, could have, and should have applied the actual and constructive knowledge they had to the lessons they learned from Bayou and performed basic, independent due diligence.

Instead, the Sterling Partners categorically dismissed any concerns that either Peter Stamos or Kevin Dunleavy raised about Madoff (Ex. 13, Stamos Tr. 161:8-13; 205:25-207:3), and continued to blindly invest with BLMIS in spite of the warnings.  The reason is evident: the Sterling Partners were fixated on continuing to profit from their access to Madoff and his returns that had made them hundreds of millions of dollars.

Fueled by Madoff's returns, the Sterling Partners pushed blindly ahead.  They opened and administered hundreds of separate accounts with Madoff, over 65 of which were held in the names of Sterling-related entities that owned their real estate holdings, their professional baseball franchise, their sports entertainment network and their equity investments.  (Compl. ¶¶ 47, 687; Compl. Exs. A, B, App. II.)  The Sterling Partners used their BLMIS accounts and

Madoff's consistent and steady returns as a source of liquidity for their various businesses, including the New York Mets.  (Defs.' Br. at 51.)  They also used their BLMIS accounts for leverage, borrowing against them in order to obtain additional capital which they then reinvested into their BLMIS accounts in order to double their returns.  (Ex. 9, Peskin Tr. 48:22-49:8, 49:22-50:12; Ex. 2, Friedman Tr. 475:22-478:5.)

Because of the central role that the Sterling Partners' BLMIS accounts and returns played in their various businesses and their private wealth, the Sterling Partners constantly monitored their returns, which Friedman would report on at biweekly partners meetings.  (*See*, *e.g.*, Ex. 33, Wilpon Tr. 61:7-20; Ex. 41; Ex. 42; Ex. 36; Ex. 37.)

When the Sterling Partners formed Sterling Stamos, the hedge fund's express mission was to achieve "Madoff-like returns."  (Ex. 15.)  The Sterling Partners would compare Sterling Stamos' returns to Madoff's returns at the biweekly partners meetings,[32] and when Sterling Stamos was not able to generate returns like Madoff's, the Sterling Partners gave them "crap." (Ex. 29.)  Peter Stamos testified:

> Q.    First, what investors, just to use her colloquialism, gave Sterling Stamos crap about not generating returns like Madoff?
> A.    To be very specific, *the person who gave us the most crap about not generating returns like Madoff was Saul Katz*, to me personally and to Mr. Ashok Chachra.
> Q.    Anyone else?
> A.    I don't recall the specific names of the investors, but I know that other investors who had investments with Madoff often compared us to Mr. Madoff.  And that among those were a number of the Sterling partners. The Sterling Equities partners.  Michael Katz for example.

(Ex. 13, Stamos Tr. 233:18–234:6 (emphasis added).)

---

[32] (Ex. 9, Peskin Tr. 39:23-40:8 (testifying that the comparison between BLMIS and Sterling Stamos returns "was made at all times").)

Indeed, when Sterling Stamos was unable to succeed in generating "Madoff-like returns" in the financial crisis of 2008, Sterling Partner Saul Katz told Peter Stamos he was going to withdraw all or substantially all of his investment from his *own* hedge fund to move them to Madoff.

> Q.    And when Mr. Katz expressed to you that he was going to redeem money from Sterling Stamos and invest it in Madoff, what did you say? At that time.  That specific discussion.
>
> A.    [Peter Stamos:] *I don't recall the specific day it occurred, but I do know it occurred in the week before the fraud was discovered.*  Because it was a painful conversation for me to hear.  I remember him saying something along the lines of, *Peter, I'm very disappointed.  Your fund is down on an unlevered basis 18 percent and Madoff is up 12.  I think I have to redeem <u>all</u> of my capital or a substantial portion of my capital from you and put it with Bernie Madoff.*

(*Id.* Stamos Tr. 200:20-201:18 (emphasis added).)

The Sterling Partners' decision to continue investing with Madoff in spite of all of the warnings and concerns they and others had was a deliberate risk assessment made by the Sterling Partners.  Indeed, by November 2005, after the Bayou fraud had become public, each Sterling Partner was instructed at a biweekly partners meeting that they should all be analyzing their own "Madoff exposure."  (Ex. 42.)[33]

Incredibly, the Sterling Partners were even prepared to discard the very hedge fund that they themselves formed in order attain those Madoff-like returns.  It is clear that the Sterling Partners would do whatever necessary to continue to receive their Madoff returns, no matter what flags of fraud were known to them.

---

[33] According to the minutes of a March 2006 biweekly partners meeting, the Sterling Partners discussed that, "Peter [Stamos] has a concern about [Sterling Equities'] exposure to Madoff."  (Ex. 41.)

I.      **The Sterling Partners Performed No Reasonable, Independent Diligence Regarding Madoff Because They Knew That Violating His Veil Of Confidentiality And Secrecy Would Jeopardize Their Ability To Continue Investing With Him**

To protect their substantial BLMIS investments, the Sterling Partners had looked into fraud insurance, including coverage for a Ponzi scheme.  The Sterling Partners also looked into creating their own hedge fund wherein they sought to try to reduce their exposure to Madoff while at the same time attempting to recreate Madoff-like returns.  The one thing the Sterling Partners did *not* look into was BLMIS itself because, as their actions show, they believed that if they threatened to invade Madoff's veil of confidentiality and secrecy with due diligence questions about his operations, they would be barred from investing in BLMIS.  The Sterling Partners would not accept this risk given their dependence upon their BLMIS accounts and returns for cash flow, liquidity and source of personal wealth.

The Sterling Partners certainly possessed the skills, knowledge, experience and resources necessary to perform due diligence in connection with their investments.  Far from unsophisticated investors who had no idea what due diligence entails, the Sterling Partners formed their own hedge fund, and then marketed their *own* due diligence capabilities in soliciting others to invest in Sterling Stamos:

> Founded over 30 years ago by the Wilpon and Katz families, Sterling Equities has developed deep expertise in hedge funds, private equity, and real estate….*[T]he Wilpon and Katz networks also provide unique proprietary sourcing and due diligence capabilities.*

(Ex. 14 (emphasis added).)

Yet the Sterling Partners failed to conduct any reasonable, independent diligence in connection with their Madoff investments.  Even in their own Motion, the only "diligence" that the Sterling Defendants point to was market price tracking that Arthur Friedman apparently

engaged in during the *1980s*[34] (Defs.' Br. at 34-35), more than a decade before any of their own

suspicions or others warnings about Madoff began to arise.

The Sterling Partners admittedly failed to conduct any due diligence in connection with

Madoff even when they had fiduciary duties to others to do so.  Arthur Friedman testified that

when two of the partners became trustees of the Sterling employee 401(k) plan, which included

an option to invest in Madoff, they did not bother to perform any diligence:

> Q.     Now, you became the Trustee of the 401(k) in 1997.  Did you do any
>        additional diligence on Madoff as a potential investment, in connection
>        with assuming the fiduciary duties of a  trustee to a 401(k) plan?
> A.     No.
> Q.     To your knowledge did Michael Katz do any diligence in connection with
>        his role as trustee and the associated fiduciary duties to the 401(k) plan
>        participants?
> A.     No.  Understand at that time we had been dealing with Madoff for some
>        11 years and a great deal of money invested.  *It would seem a bit strange
>        or unnecessary to do further diligence*…

(Ex. 2, Friedman Tr. 570:5-15 (emphasis added).)

As trustees of the Sterling employees' investments with Madoff, the Sterling Partner-

trustees had a fiduciary duty of the highest order, which could not be satisfied by blind reliance

on the investment manager.  The Sterling Partner-trustees had a duty to actually monitor the

Sterling employees' investments with Madoff, and to conduct ongoing due diligence of Madoff

to protect those investments.  But they failed to fulfill this duty.

Another example of the Sterling Partners' failure to conduct reasonable and prudent due

diligence arose in November 2005, when Madoff offered the Sterling Partners a "Special

Investment Opportunity."  This new "short term" investment strategy discussed above required

the Sterling Partners to accumulate and invest another $22 million with Madoff, and was

---

[34] Sterling Partner Friedman testified that, other than actually tracking market prices "in the very early
stages" of their investments with BLMIS—he wasn't sure whether what he even did was "necessarily due
diligence."  (Ex. 2, Friedman Tr. 124:1-125:1.)

supposedly going to provide them with fifty percent greater rates of return.  Yet Arthur Friedman

confirmed that no due diligence was conducted by the Sterling Partners in connection with this

new strategy.  (Ex. 2, Friedman Tr. 440:18-24.)

It is not difficult to ascertain why the Sterling Partners refrained from conducting

reasonable diligence into BLMIS, even considering the enormous sums of money they had

invested with Madoff.  As discussed above, Madoff ran BLMIS like a private club that was

highly confidential, difficult to get access to, and by invitation only.  (Ex. 13, Stamos Tr. 128:18-

129:1.)  The Sterling Partners' actions show that it was the prospect that Madoff might cut off all

Sterling Partner BLMIS investments if they violated his demands for confidentiality and secrecy

that caused the Sterling Partners to refrain from making due diligence inquiries into BLMIS.

**J.      To Continue Reaping The Benefits Of Their Relationship With Madoff, The
         Sterling Partners Were Willing To Go Beyond Willful Blindness Into
         Executing A Sham Transaction**

To preserve their relationship with Madoff and all of the attendant perks it brought them,

the Sterling Partners were more than willing to turn a blind eye to indicia of fraud.  They were

accommodating to the point of abdicating decision-making authority over their very own hedge

fund in order to appease Madoff's demands for secrecy.  Beyond this, when Madoff was willing

to bestow other benefits upon them, the Sterling Partners were even amenable to entering into a

sham transaction with him.

On or about May 25, 2004, Saul Katz, Fred Wilpon, and Ruth Madoff executed a simple

one page, three paragraph letter agreement with no specified terms that purported to document a

$54 million investment by Ruth Madoff into the Sterling entity that would later become

SportsNet New York ("SNY").  The letter agreement, written on Mets letterhead and addressed

to Ruth Madoff, was apparently drafted in part by Sterling Partner Martin Tepper, and provides:

> This will confirm the conversations with respect to an investment by you [Ruth Madoff] in the Network.  Over the years you have invested with us in, among other things, real estate funds; and we contemplate extending this relationship to the Network …. You are simultaneously wiring to Sterling Equities Associates the sum of $54 million which is expected to be the approximate amount of your proposed investment with the Network.
>
> If at any time you [Ruth Madoff] or the undersigned [Fred Wilpon and Saul Katz] elect to terminate this arrangement in the sole discretion of the terminating party, the terminating party shall give written notice to the other party and in either of such events, the undersigned shall pay to you the sum of $54 million.  In addition, the undersigned shall pay to you a premium to be mutually agreed, having due regard to all the circumstances including, but not limited to, our long and beneficial business and personal relationships.

(Ex. 43.)

However, Ruth Madoff never made any such investment into any Sterling entity, and neither Katz nor Wilpon ever discussed with Ruth Madoff any such investment.  (Ex. 40, S. Katz Tr. 195:19-25, 196:8-197:7; Ex. 33, Wilpon Tr. 219:9-12.)  While $54 million *was* wired from Madoff to the Sterling Partners on or about May 26, 2004, these funds had nothing to do with any transaction involving Ruth Madoff or any investment by Madoff into any Sterling entity.  Instead, in response to an inquiry from the Sterling Partners about making a redemption from their BLMIS accounts, Madoff had responded that such a withdrawal could lower their returns and offered to loan them the $54 million.  Wilpon testified that he was unsure if the funds were a loan or an advance but that no interest was paid (Ex. 33, Wilpon Tr. 224:10-19), and the benefit to Madoff was that the Sterling Partners were "a very good client of his and we were very good friends."  (*Id.* Wilpon Tr. 223:20-24.)  Because the Sterling Defendants received a bank loan for the funds shortly thereafter, they returned the $54 million to Madoff the next day on May 27.

Saul Katz, Fred Wilpon, and Arthur Friedman admitted under oath that the signed letter agreement did not accurately reflect the transaction that it described.  (Ex. 40, S. Katz Tr. 204:21-205:2, 206:2-8; Ex. 33, Wilpon Tr. 220:15-25; Ex. 2, Friedman 231:3-10.)  The letter

36

was false.  None of them provided an explanation for why they created a false record around this transaction, documenting an agreement that, they all concur, never existed.  (Ex. 40, S. Katz Tr. 208:15-18.)  And even today, the Sterling Defendants still offer none; they simply dismiss the transaction as "of no consequence" because the funds were paid back quickly.  (Defs.' Br. at 46.)  But presumably the Sterling Defendants would not have gone to the trouble of drafting and signing a fictitious letter agreement to document a transaction if they knew that they would be in a position to pay back the funds the next day.  And whether the Sterling Partners kept, received, were entitled to, or even wanted the $54 million has no bearing on the relevant issue:  their demonstrated willingness to work with Madoff to knowingly falsify a record of a business transaction.

At best, this episode is an example of the Sterling Defendants' "see no evil" approach to Madoff.  At worst, the Sterling Partners' testimony shows that they participated with Madoff to fraudulently document a transaction.  At the very least, their testimony shows that they acceded to Madoff's false characterization without asking or even knowing why they did so.  This sham transaction requires substantial discovery on a variety of issues, including the financing transactions that were involved and the motivation underlying the need for the sham "investment."

### K.     Debunking The So-Called "False Allegations"

As set forth above, the pre-filing Bankruptcy Rule 2004 investigation establishes that the Sterling Defendants were on inquiry notice of the fraud at BLMIS.  Since 2001, the Sterling Partners were suspicious enough about Madoff's legitimacy that they had shopped for fraud insurance for their BLMIS investments, including coverage for a Ponzi scheme; they had been warned by respected and trusted financial advisors that Madoff might be engaging in criminal front running at BLMIS; they had been warned that Madoff might be investigated and that their

funds at BLMIS could be frozen; and they had been warned for years that they should redeem

their investments out of Madoff.  Notwithstanding all of their own concerns, suspicions and

others' warnings that posed a substantial risk to the $400-500 million they had invested with

Madoff, the Sterling Partners chose to continue investing in BLMIS and to refrain from

conducting any reasonable due diligence into BLMIS' operations because they were fearful that

Madoff would exile them from his "private club" if they violated his demands for confidentiality

and secrecy.

 To distract attention away from the damaging evidence from their own documents and

testimony and that of their business partners at Sterling Stamos, the Sterling Defendants claim

that the Trustee's case is built upon "false allegations."  But these "false allegations" are either

distortions of the Trustee's actual claims, carefully crafted to make it appear that the Sterling

Defendants can defend against them, or mischaracterizations of the evidence.

### 1. Debunking The Notion That Sterling Stamos Gave No Warnings To The Sterling Partners About Madoff

 The Sterling Defendants assert among their so-called "false allegations" that there is no

evidence that Sterling Stamos gave any warnings about Madoff, or that Sterling Stamos ever

questioned Madoff's legitimacy.  (Defs.' Br. at 6, 8.)  In truth, as the Trustee's Rule 2004

investigation revealed, Sterling Stamos warned the Sterling Partners about Madoff's lack of

transparency, about the prospect that Madoff could be illegally front running, about the

possibility that Madoff might be investigated, and about the danger that the Sterling Partners'

funds at BLMIS could be frozen.  Indeed, Sterling Stamos went so far as to tell the Sterling

Defendants that BLMIS would not pass its own due diligence procedures, and that the Sterling

Partners should redeem their investments in BLMIS.

Nor is Peter Stamos' testimony—which the Sterling Defendants selectively cite[35]—to the contrary.  Indeed, the contemporaneous emails of Stamos himself,[36] his brother ("Fortunately my brother Peter called it over 7 years ago"),[37] and several other Sterling Stamos employees ("our CIO always said it was a scam, 'too good to be true'")[38] confirm that Sterling Stamos openly questioned Madoff's legitimacy and had warned the Sterling Partners to redeem their investments in BLMIS for years.

As for the Declaration of Ashok Chachra dated March 20, 2011 ("Chachra Decl.") submitted by the Sterling Defendants, his sworn statement—"[t]o my knowledge no one at

---

[35] The testimony of Peter Stamos that the Sterling Defendants quote both on page 3 and 6 of their brief notably omits the next line of questioning, in which Stamos admits that notwithstanding Madoff's status in the industry, Saul Katz knew that Sterling Stamos' due diligence would have stopped Madoff "at the door":

> Q.    But despite all that, the Madoff fund would not have passed your due diligence tests, right?
> A.    As a fiduciary I couldn't put it in my portfolio for all kinds of reasons by that time.  In early 2002 we could have because at that time we were investing in any closed manager that had a good reputation that we could get into.  But by 2007, 2008 with the new sets of requirements and operational due diligence, risk management and investment due diligence that we would have imposed, *[Madoff] would have been stopped at the door* the moment we found any of these issues.
> Q.    Did you express the fact that Madoff would not have passed your due diligence requirements to Saul Katz?
> A.    I believe that I expressed it and I know for a matter of fact that—I believe that, I believe that Mr. Dunleavy [Merrill Lynch executive] expressed that at the board meeting as well.

(Ex. 13, Stamos Tr. 211:20-212:25 (emphasis added).)

[36] Peter Stamos noted in a December 2008 email that "Fortunately, our firm did not invest with Madoff. That firm and fund wouldn't make it through our risk and ops controls—lack of transparency, no third party administrator, etc.… . . . *Unfortunately, our partners—Saul and Fred—against our recommendations invested as individuals* and through their real estate firm."  (Ex. 19 (emphasis added).)

[37] (Ex. 21 (Basil Stamos December 2008 email: "Madoff Securities was just charged with fraud, perhaps the biggest in Wall Street history.  *Fortunately my brother Peter called it over 7 years ago*.  The man is good at what he does.") (emphasis added); Ex. 22 ("I don't know if you've been following the news on Wall Street, but here's a press release [concerning Sterling Stamos not invested in Madoff Securities] for your interest.  *My brother Peter made this call many years ago."*) (emphasis added).)

[38] (Ex. 29.)

[Sterling Stamos] told any Sterling Partner not to invest with Madoff"—is not credible.

(Chachra Decl. ¶ 7.)  Several emails that Chachra *himself* wrote in December 2008 to other

Sterling Stamos investors directly contradict his current position.  (Ex. 17 ("[Sterling Stamos]

didn't have any exposure [to Madoff.]  It was actually the Wilpon and Katz families' exposure

on a direct basis.  In fact, *we had recommended to them to redeem for years* but they kept their

investment independent of our recommendation.") (emphasis added); *see also* Ex. 18 ("[W]e are

trying to inform all of our investors that our due diligence process rejected Madoff *but,*

*unfortunately, the Katz and Wilpon families maintained their investment independent of our*

*advice.*") (emphasis added).)  Notably, although Chachra avers that he never told anyone that he

"thought there was a lack of trading at Madoff or BLMIS or that it was a Ponzi scheme"

(Chachra Decl. ¶ 4), he does not deny that, as alleged in the Complaint, he "always said

[BLMIS] was a "scam, 'too good to be true[.]'"  (Compl. ¶ 872.)

In any event, Chachra is biased.  He currently works at Allen & Co., which has been a

long-time financial advisor to the New York Mets and is currently assisting the team in its

widely-publicized impending sale.[39]  Chachra is also, according to Saul Katz, the anticipated

"replacement" for Peter Stamos as "advisor" to the Katz and Wilpon families.[40]

### 2. Debunking The Notion That The Sterling Partners Had No Suspicion That Madoff Was Engaged In Fraud, And Were Unsophisticated Dupes Who Could Not Have Detected Madoff Was Engaged In Fraud

The Sterling Defendants also claim that they never suspected Madoff was running a fraud

or a Ponzi scheme (Katz Decl. ¶ 8), and that they could not have detected the fraud because they

"are not sophisticated" stock market experts.  (Defs.' Br. at 11-17.)

---

[39] (Ex. 40, S. Katz Tr. 221:12-14.)

[40] (*Id.* S. Katz Tr. 220:2-13.)

Saul Katz' testimony is not credible.  His statement that the Sterling Partners never suspected Madoff of fraud or a Ponzi scheme is belied by the Sterling Partners' shopping excursion in 2001 for insurance to protect their Madoff investments against "fraud," including coverage for a Ponzi scheme.  (Ex. 1, Ex. 7, Ex. 6.)  Moreover, it is what Saul Katz does *not* say in his declaration that speaks volumes.  In response to more than 90 pages of inquiry notice allegations in the Complaint, Saul Katz submits a declaration containing 20 paragraphs, only four of which even address the issue of inquiry notice.  And of the four relevant paragraphs regarding inquiry notice, in two Katz avers that "I have no recollection."  (Katz Decl. ¶¶ 13-14.)

Equally implausible is the notion advanced by the Sterling Defendants that the Sterling Partners are unsophisticated investors who were duped by a trusted friend.  The Sterling Partners are seasoned investors who formed their own hedge fund, in which they currently remain general partners, and in which they touted their investment expertise.[41]  One of the Sterling Partners, Fred Wilpon, is a former member of the board of directors of Bear Stearns.  The Sterling Partners are also the owners and operators of the New York Mets baseball franchise, a sports entertainment network "SNY", and multiple real estate holdings.  The Sterling Partners opened, monitored and administered hundreds of accounts with Madoff, more than sixty of which provided the liquidity and cash flow for their various businesses.  They were adroit enough to leverage their BLMIS accounts in order to double their Madoff returns, and savvy enough to investigate fraud insurance to protect their Madoff investments.  Two of the Sterling Partners were trustees of their Sterling employees' 401(k) plan, which provided a BLMIS investment

---

[41] Although the Sterling Defendants claim that no Sterling Partner had any material involvement with Sterling Stamos' investment strategies or decisions (Defs.' Br. at 13), the contemporaneous documents of Sterling Stamos and Peter Stamos' testimony discussed above make clear that both Saul and David Katz were actively involved in the investment decisions of Sterling Stamos until the Sterling Partners decided to restructure Sterling Stamos in order to appease Madoff's disclosure-related concerns.

option.  In light of the foregoing, any suggestion that the Sterling Partners are "unsophisticated" is not credible.

Nor were the Sterling Partners unsuspecting "dupes."  They themselves had their own suspicions, and had received multiple warnings about Madoff's legitimacy from a variety of sources, including from their own trusted business partners and other industry professionals. The Sterling Partners made a calculated business decision to assume the risks in order to continue the flow of their BLMIS returns while refraining from doing any due diligence that might jeopardize the continued flow of those returns.

### 3. Debunking The Assertion That The Sterling Partners Did Not Conduct Reasonable Due Diligence Of BLMIS Because They Were Unfamiliar With The Process

The Sterling Defendants suggest that a plausible excuse for their failure to conduct reasonable due diligence into their BLMIS investments in spite of their own suspicions and others' warnings is that they were unfamiliar with the diligence process (Defs.' Br. at 17), even after the Bayou fraud.  (*Id.* at 32.)

The assertion that the Sterling Partners did not understand the diligence process is not credible, given that the Sterling Partners actually marketed their *own* due diligence capabilities to solicit other individuals to invest in their hedge fund.[42]  Peter Stamos confirmed that Saul Katz was familiar with Sterling Stamos' due diligence processes.[43]

---

[42] Sterling Stamos' marketing materials touted the Sterling Partners' due diligence capabilities:

> Founded over 30 years ago by the Wilpon and Katz families, Sterling Equities has developed deep expertise in hedge funds, private equity, and real estate....*[T]he Wilpon and Katz networks also provide unique proprietary sourcing and due diligence capabilities*[.]

(Ex. 14 (emphasis added).)

[43] Peter Stamos testified:

> [A]t some point, as one of the owners of our business, [Saul Katz] became aware of the kinds of issues that [Sterling Stamos] started to monitor and put on our operational due

The Sterling Partners were also well aware of the due diligence process and its *value* in detecting fraud through their personal experiences in Bayou.  As discussed above, Sterling Stamos' due diligence process led its management to redeem its investment from Bayou before the revelation of that fund's fraud, and the Sterling Partners were informed at a partners' meeting of the specific reasons and diligence flags that led to this redemption—many of which they knew were applicable to Madoff.

The limited evidence available to date demonstrates that the Sterling Partners had the skills and wherewithal to conduct due diligence but deliberately chose not to engage in diligence for fear that they would lose access to Madoff's "private" investment club if they violated Madoff's demands for confidentiality and secrecy.

### 4. Debunking The Idea That The Sterling Partners Could Ignore Cumulative Indicia And Warnings Of Fraud

The Sterling Defendants also assert that none of the diligence flags or prospects of fraud at BLMIS that they were repeatedly warned about—Madoff's lack of transparency, concerns that he might be front running, or having custody of securities, and even BLMIS' failure to pass Sterling Stamos' and Merrill Lunch's due diligence processes—are in and of themselves "an indication" of fraud.  (Defs.' Br. at 20, 28, 30).

But this quintessential issue of fact is belied by their own actions and those of their trusted advisors.  If these red flags had not given rise to concerns that Madoff was engaging in a fraud, why would the Sterling Defendants have solicited quotes for Ponzi scheme and insolvency insurance for their Madoff investments?  And if these red flags had not given rise to concerns

---

diligence checklist, and I'm confident that he knew that [a fund manager who was also a broker dealer] was one of the operational due diligence issues that we raised with managers.

(Ex. 13, Stamos Tr. 158:3-14.)

that Madoff was engaging in a fraud, why would their trusted advisors have concluded that they

believed Madoff to be a "scam" and advised them to divest their investments in BLMIS?  (*See*

Ex. 29 (email of Sterling Stamos employee Jia Ou-Yang stating that "a lot of our investors gave

us crap about not generating returns like Madoff's…… and I guess our CIO always said it was a

scam, 'too good to be true'").)

Ultimately what the Sterling Defendants claim is that none of these "flags" were in fact

sufficient *proof* of fraud.  Put another way, the Sterling Defendants believe they are entitled to

keep the money they took from Madoff, whom they suspected and were warned might be

engaging in fraudulent or criminal activity, because they did not actually *know* Madoff was

engaging in a fraud.

But the law does not permit the Sterling Defendants to keep the fruits of fraudulent

transactions simply because they deliberately closed their eyes to the fraud.  And closing their

eyes to the fraud is what they did.  They closed their eyes to Madoff's black box strategy and

self-custodying of securities, even though they knew these were two of the "flags" that led

Sterling Stamos to redeem from Bayou before it was revealed as a fraud.  They closed their eyes

to the possibility that Madoff might be illegally front running,[44] even though they were warned

that Madoff could be investigated and their funds could be frozen.  They closed their eyes to the

fact that BLMIS failed to pass Sterling Stamos' and Merrill Lynch's due diligence standards.

The cumulative effect of all of these diligence flags would have prompted any reasonable

investor in the Sterling Partners' shoes with hundreds of millions of dollars at stake to perform

---

[44] The Sterling Defendants actually argue that it was perfectly acceptable for them to have not inquired
into the prospect that Madoff might be illegally front running because in hindsight, it turned out that that
was not the actual fraud he had committed.  (Defs.' Br. at 28-29.)  The precise type of fraud Madoff
ended up committing is obviously irrelevant to the Sterling Defendants' obligation to conduct a
reasonable investigation in response to the cumulative indicia of fraud.

some reasonable due diligence, but they failed to do so.  Such willful blindness amounts to a lack of good faith as a matter of law.

> **5.      Saul Katz' Testimony About The Restructuring Of Sterling Stamos Is Contradicted By The Testimony Of His Business Partner, Peter Stamos**

Saul Katz' self-serving statement in his declaration that the restructuring of Sterling Stamos was due to concerns of liability and privacy of the Sterling Partners and their families (Katz Decl. ¶ 17-19) is squarely contradicted by the testimony of Peter Stamos.  As discussed above, Peter Stamos testified that the Sterling Partners went to great effort and expense to restructure Sterling Stamos in order to assuage Madoff's disclosure-related concerns.[45] According to Stamos, Saul Katz' only concern at the time was that the Sterling Stamos registration-disclosure issue could lead to Madoff banning the Sterling Partners from investing in BLMIS, which he ran as if it were a private club.  (Ex. 13, Stamos Tr. 128:18-129:1.)

> **6.      Debunking The Notion That The Sterling Partners Performed Reasonable Diligence**

The Sterling Partners claim that they did in fact conduct diligence of BLMIS.  But the only "diligence" that they performed according to their own motion papers was market price tracking that Arthur Friedman apparently engaged in during the 1980s.[46]  (Defs.' Br. at 34-35.) This exercise in the 1980s does not amount to reasonable due diligence in response to concerns and flags about Madoff that are detailed in the Complaint and that began to arise in or around 2001.

---

[45] The excerpt of testimony cited by the Sterling Defendants notably omits several lines of Peter Stamos' testimony regarding the restructuring of Sterling Stamos.  The entirety of this testimony is set forth above.

[46] Sterling Partner Arthur Friedman testified that, other than actually tracking market prices "in the very early stages" of their investments with BLMIS—he wasn't sure whether any other exercises were "necessarily due diligence."  (Ex. 2, Friedman Tr. 124:1-125:1.)

Unable to point to any additional diligence of their own, the Sterling Defendants suggest that further due diligence may have been performed by commercial lenders who reviewed their BLMIS account statements in connection with loans.  (Defs.' Br. at 36-37.)  The Sterling Partners were sophisticated investors and businessmen who also had as their business partners hedge fund professionals at Sterling Stamos, yet remarkably, the only other "diligence" they can point to in connection with their several hundred million dollars investments with Madoff is a review of account statements by a bank on the other side of a loan transaction.  Speculating that a third party may have conducted due diligence does not amount to reasonable due diligence by the Sterling Defendants.

As for the Sterling Partners' claim that they had no diligence obligations[47] (Defs.' Br. at 34), the legal standard is exactly the opposite.  Their failure to conduct a reasonable investigation in response to being aware of mounting indicia of fraud at Madoff amounts to a lack of "good faith" on the part of the Sterling Partners as a matter of law.

### 7.    Debunking The Notion That The Sterling Partners Did Not Substantially Benefit From The Ponzi Scheme

The Sterling Defendants suggest that, because they did not benefit "staggeringly" from the Ponzi scheme as much as some other defendants did, they should be excused from the Trustee's claims.  (Sterling Defs.' Br. at 39).  But they did benefit "staggeringly."  The Sterling Defendants received $300 million in fictitious profits from Madoff's Ponzi scheme.[48]  Well-

---

[47] As noted above, the Sterling Partners who served as trustees of Sterling's employee 401(k) plan, which included a Madoff investment option, did have a fiduciary obligation to conduct diligence on BLMIS.

[48] The Sterling Defendants also complain that the Trustee will not offset the $300 million in fictitious profits with "losses" related to other Sterling Defendants' accounts.  The Trustee is not required to do so under the law because until the Sterling Defendants and their related entities have repaid the fraudulent transfers they received from the estate, including the $300 million in fictitious profits—and, if the Trustee succeeds on his inquiry notice claims against the Sterling Defendants, the additional $700 million in principal—any claim of the Sterling Defendants must be disallowed pursuant to section 502(d) of the Bankruptcy Code.  It is well established that a party will be unable to assert a set-off where the party is

established principles of law require that the Sterling Defendants return this money to the

Trustee for distribution to the net losers of Madoff's scheme.

## II.   THE COURT SHOULD DENY THIS MOTION AND IMMEDIATELY ORDER DISCOVERY TO PROCEED

### A.   The Court May Treat The Sterling Defendants' Motion As Either A Motion To Dismiss Or As One For Summary Judgment

In connection with their motion to dismiss, the Sterling Defendants submitted

declarations and other materials outside the pleadings not properly considered in connection with

such a motion.  *See* Fed. R. Civ. P. 12(b)(6) (applicable to an adversary proceeding under Fed. R.

Bankr. P. 7012).  Under Rule 12(d), when presented with material outside the pleadings, the

court may either set the extraneous material aside and rule on the motion to dismiss, or "convert

the motion to one for summary judgment and give the parties an opportunity to conduct

appropriate discovery and submit the additional supporting material contemplated by Rule 56."

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (citations omitted); *see* Fed.

R. Civ. P. 12(d).

### B.   The Court Should Deny This Motion Or Table It As Premature And Order Discovery To Immediately Proceed

As set forth in Rule 12(d), the Court may elect not to consider any materials outside the

pleadings and treat the Motion as a motion to dismiss.  The Sterling Defendants offer no

colorable basis to justify dismissal of the Complaint, and should the Court elect to consider the

motion as one to dismiss, the Court should deny it for the reasons set forth below.

---

being sued for fraudulent transfers.  This is because where the party seeking to set-off is being sued for fraudulent transfers, there is no mutuality of obligations, which is required under Bankruptcy Code section 553(a).  *In re O.P.M. Leasing Services, Inc.*, 40 B.R. 380, 402 (Bankr.S.D.N.Y. 1984), *aff'd*, 44 B.R. 1023 (S.D.N.Y. 1984) (citations omitted); *Geron v. Schulman (In re Manshul Constr. Copr.)*, No. 97-CV-8851, 2000 WL 1228866, *56-57 (S.D.N.Y. Aug. 30, 2000).

Nevertheless, the Trustee agrees with the Sterling Defendants that the Court is within its prerogative under Rule 12(d) to treat the motion as one for summary judgment, even though it is premature.  As set forth below, based upon the information that the Trustee has been able to obtain through his Rule 2004 pre-filing investigation, there is ample evidence in the record creating genuine issues of material fact that warrant denial of summary judgment.  If the Court chooses to convert the Motion to one for summary judgment, therefore, it should be denied.  But should the Court not be inclined to deny the Motion outright, the Trustee would ask the Court to defer the Motion and order discovery to proceed.  *See* Fed. R. Civ. P. 56(d).[49]

As the Second Circuit set forth in *Chambers*, should the Court convert a motion under Rule 12(d) to one for summary judgment, it must "give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56." 282 F.3d at 154.  While the materials that the Trustee obtained through his Rule 2004 investigation raise genuine issues of material fact, the facts currently in possession of the Trustee are only the tip of the iceberg.

Like any other trustee, the Trustee came to this matter as a stranger to the case.  In addition to reviewing the books and records of BLMIS, the Trustee issued subpoenas to Sterling Equities, Inc. and Sterling American Property, Inc., as well as Sterling Stamos and other third parties.  (Bohorquez Decl. ¶ 3.)  While the Sterling Defendants produced, as they note in their motion, "nearly 700,000" pages of documents, the vast majority of these documents had nothing to do with the critical issues in this case, such as inquiry notice and due diligence.  Instead, those documents included, among other things, approximately 450,000 pages of BLMIS account

---

[49] Should the Court deem it necessary, the Trustee respectfully submits that the Court consider the attached Declaration and exhibits as the functional equivalent of a Rule 56(d) affidavit.  *Reed v. Staniero*, 2007 WL 3430935, *7 (D.N.J. 2007) (suggesting that more relaxed and "less stringent standard" for a 56(d) affidavit applies when discovery is yet to begin).

statements, and approximately 120,000 pages of wire transfers, check requests, IRS filings, and BLMIS portfolio management reports.  (Bohorquez Decl. ¶ 11-14.)

The Complaint covers a three-decade relationship between Madoff and Fred Wilpon, Saul Katz, the rest of the Sterling Partners and the entities they own and operate, including the New York Mets.  Across 1,365 paragraphs, the Complaint sets forth eleven Counts against almost one hundred defendants detailing hundreds of "KW" BLMIS accounts and hundreds of millions of dollars of transfers to the Sterling Defendants over the course of decades that fueled each and every aspect of their business empire.  (*See generally* Compl.)

But the Sterling Defendants' electronic production consisted only of approximately 5,500 emails, and the majority of the electronic documents were from Arthur Friedman's assistant.  (Bohorquez Decl. ¶ 8.)[50]  Fred Wilpon produced seven documents.  (*Id.* ¶ 21.)  The Sterling Defendants also did not collect and produce documents from any non-Sterling partner officer or employee of the New York Mets (*id.* ¶ 9), even though the New York Mets alone had 16 BLMIS accounts and withdrew over $90 million in fictitious profits and another $345 million in principal, and the franchise commonly relied on its BLMIS accounts to finance operating expenses and deferred compensation.  (Ex. 44, Ex. 45, Ex. 46)  Nor did the Sterling Defendants collect and produce documents from key employees in Sterling's Partners Accounting Department, (Bohorquez Decl. ¶ 10), although employees in Partners Accounting were involved in the books and records of all of Sterling's finances, including its BLMIS investments.  (Ex. 9, Peskin Tr. 129:18-130:4, 129:24-25.)

---

[50] Notably, the search terms were agreed to early in the investigation and did not include search terms including key actors such as "Sterling Stamos", "Merrill Lynch" and "Bank of America."  (Bohorquez Decl. ¶ 18.)  Moreover, as the Sterling Defendants refused to provide a data map or inventory of network servers and shared drives, it is unclear whether there exist additional sources of relevant information other than those identified to date. (*Id.* ¶ 15.)

Based on the limited document production and testimonial information from the Sterling Defendants, the Trustee also served Rule 2004 subpoenas on additional non-parties, including Sterling Stamos, Bank of America and Merrill Lynch.  (Bohorquez Decl. ¶ 26.)  The Trustee has reason to believe based on his pre-filing investigation that these non-parties have additional documents that were not provided prior to the filing of the Complaint.  (*Id.* ¶¶ 27-30.)  In fact, Merrill Lynch did not produce any documents in response.  (*Id.* ¶ 29.)  Additionally, the Trustee has identified numerous non-party witnesses with relevant information who were not examined during his Rule 2004 investigation.  (*Id.* ¶ 32.)

Courts are generally reluctant to convert a motion to dismiss to one for summary judgment motion without the opportunity for full discovery.  *See Deluca v. Accessit Group, Inc.*, 695 F. Supp. 2d 54, 61 (S.D.N.Y. 2010) (collecting cases).[51]  The Trustee submits that given the evidence adduced in his Rule 2004 pre-filing discovery, set forth above, he has already discovered a wealth of facts that preclude a grant of summary judgment.  But should the Court be inclined not to deny the motion outright, the Trustee would ask the Court to defer the motion so that the parties may conduct discovery and brief summary judgment on a fully developed record.

### C.    Rule 2004 Is Not A Substitute For Discovery Under The Federal Rules

In the end, whether the Court denies the motion to dismiss, converts the motion to one for summary judgment and denies it, or tables the motion until discovery is completed, the Trustee respectfully submits that the Court should immediately order discovery in this matter.  The Sterling Defendants argue that the Trustee's Rule 2004 investigation obviates the need for

---

[51] Needless to say, were the Court inclined to grant summary judgment, it could not do so without allowing discovery to proceed.  "[O]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery."  *Trammell v. Keane,* 338 F.3d 155, 161 n.2 (2d Cir. 2003).

discovery.  But a Rule 2004 investigation is not a substitute for formal discovery.  *See In re Tenn. Valley Steel Corp.*, 183 B.R. 795, 805 n.16 (Bankr. E.D. Tenn. 1995) ("The opportunity provided to the Committee to participate in the Rule 2004 examinations does not equate to engaging in discovery as provided for in Fed.R.Civ.P. 26 through 37.  The Committee must be allowed, among other things, to depose the individuals identified in the Rule 2004 examinations as allegedly having discoverable information . . . ."); *In re Lang*, 107 B.R. 130, 132 (Bankr. N.D. Ohio 1989) ("[A] Rule 2004 examination is not a substitute for a deposition, and debtor's assertion that plaintiff cannot take a deposition because there has been a Rule 2004 examination of the same debtor is not well-taken.")  *Cf. In re Dana Corp.*, 574 F.3d 129, 149-150 (2d Cir. 2009) (extensive discovery in a related state court proceeding did not preclude further discovery under the Federal Rules).

The fact that the courts have concluded that Rule 2004 is not a substitute for discovery follows from the distinction between the two.  Whereas Rule 2004 is used to determine what claims a Trustee has to satisfy the creditors of the estate, discovery is used to prove those claims. Though "[a]n investigation under Fed. R. Bankr. P. 2004 may seem analogous to the discovery provisions of the Federal Rules of Civil Procedure Federal Rules [sic], [] the provisions are actually quite different. . . . Rule 2004 is substantially a 'pre-litigation device for assessing whether grounds exist to commence an action . . .'"); *In re Handy Andy Home Improvement Centers, Inc.*, 199 B.R. 376, 380 (Bankr. N.D. Ill. 1996) (*quoting In re French*, 145 B.R. 991, 992 (Bankr. D.S.D. 1992)); *see also In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996).  Rule 2004 is the tool to identify and bring the estate's potential claims early on, to "ensure that no viable cause of action is lost."  *In re Mirant Corp.*, 326 B.R. 354, 357 (Bankr. N.D. Tex. 2005).  As a

stranger to the case, Rule 2004 provides the "quick factual fix," *In re Good Hope Refineries, Inc.*, 9 B.R. 421, 423 (Bankr. D. Mass. 1981), necessary to aid the Trustee in bringing all viable claims before the statute of limitations runs.  *See In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 708 (Bankr. S.D.N.Y. 1991) (citation omitted) ("[T]he trustee must learn quickly about the debtor entity . . . that the rights of the creditor may be preserved.")  For that reason, Rule 2004 is intended to be used as a "fishing expedition" to facilitate the identification of causes of action.  *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002).

Rule 2004's limitation to the identification rather than to the prosecution of claims is reflected in the consensus that Rule 2004 is unavailable once the Trustee files a claim against that party.  *See In re Bennett Funding Group, Inc.*, 203 B.R. at 29-30 (citation omitted) ("Thus a trustee, like a creditor, must look to Fed.R.Bankr.P. 7026 *et seq.* after an adversary proceeding is commenced for discovery . . . ."); *In re Enron Corp.*, 281 B.R. at 840 (citations omitted) (noting the "well recognized rule that once an adversary proceeding . . . is commenced, discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004").  Because Rule 2004 becomes unavailable once a claim is filed, and because "Rule 2004 examinations are independent of a complaint or contested matter," *In re Martin*, 403 B.R. 359, 362 (Bankr. D.S.C. 2009), it is implausible to require that this Trustee or any other prove out his case on the basis of Rule 2004 examinations alone.  *See In re North Plaza LLC*, 395 B.R. 113, 122 (S.D. Ca. 2008) ("An examination under Bankruptcy Rule 2004 is nonadversarial in nature and aimed at discovering evidence upon which future causes of action may be based . . .").

### D.   However The Court Decides To Characterize This Motion, Discovery Should Commence Immediately

Whether the Court considers the motion as one for dismissal or for summary judgment, discovery should immediately commence.  This Motion's lack of merit and this case's

procedural posture counsel against any stay of discovery.  Regardless of whether this is

considered as a motion to dismiss or a premature summary judgment motion, the Sterling

Defendants have attached matters outside the pleadings to their submission, and they have

themselves demanded expedited discovery.  The Trustee agrees that discovery should proceed.

## III.   THE STERLING DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OR SUMMARY JUDGMENT AS TO THE TRUSTEE'S CLAIMS FOR FICTITIOUS PROFITS

The Sterling Defendants are not entitled to either dismissal or summary judgment as to

the Trustee's claims.  The Complaint details allegations that amply support each cause of action,

and genuine issues of material fact preclude summary judgment.

The Sterling Defendants attempt to justify dismissal of the Trustee's claims on an

incorrect legal standard.  When the correct legal standard is applied, they have no grounds to

dismiss—indeed, they have no defense whatsoever.  And they base their request for summary

judgment on selective citation to self-serving statements in the record when, in truth, the record

is replete with material evidence supporting the Trustee's claims.

### A.   Applicable Legal Standards

#### 1.   On A Motion To Dismiss, A Court Must Accept The Facts Alleged As True And Weigh All Reasonable Inferences In The Plaintiff's Favor

A court may dismiss a complaint under Fed. R. Civ. P. 12(b)(6), applicable to an

adversary proceeding by Fed. R. Bankr. P. 7012, only if it is beyond doubt that the plaintiff

would not be entitled to any form of relief, even if he proved the factual allegations in his

complaint.  *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 419 n.2 (Bankr. S.D.N.Y. 2005)

(*citing Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  "When considering a motion to dismiss

under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw

all reasonable inferences in the plaintiff's favor."  *Picard v. Merkin* (*In re Bernard L. Madoff*

*Inv. Secs. LLC*), 440 B.R. 243, 253 (Bankr. S.D.N.Y. 2010) (*citing Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

A complaint is generally required only to include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Complaint must state a plausible claim for relief, meaning that it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. In determining plausibility, a "[c]ourt must draw on its judicial experience and common sense to decide whether the factual allegations raise a right to relief above the speculative level." *Merkin*, 440 B.R. at 254 (internal marks and citation omitted).

While allegations of fraud are held to the higher pleading standard of Rule 9(b), requiring that the Complaint "state with particularity the circumstances constituting fraud,"[52] Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009, "[g]reater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases, because . . . it is often the trustee, a third party outsider to the fraudulent transaction, that must plead the fraud on secondhand knowledge for the benefit of the estate and all of its creditors." *Merkin*, 440 B.R. at 254 (*quoting Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (internal marks and citation omitted), *aff'd*, 818 F.2d 240 (2d Cir. 1987)); *Picard v. Chais* (*In re Bernard L. Madoff Investment Securities, LLC*), 445 B.R. 206, 219 (Bankr. S.D.N.Y. Feb. 24, 2011) (internal marks and citation omitted). Rule 9(b) permits "[m]alice, intent, knowledge, and other conditions of a person's mind" to be pled generally. Fed. R. Civ. P. 9(b).

---

[52] Rule 9(b) does not apply to allegations of constructive fraud. *Merkin*, 440 B.R. at 261 (*citing Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs.*), 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005)). As to actual fraud, at least under federal law, the fraudulent intent that must be pled in conformance with Rule 9(b) is that of the transferor—in this case BLMIS. *See* 11 U.S.C. § 548(a)(1)(A) (2010) ("The trustee may avoid any transfer . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the *debtor* . . . made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity . . .".) (emphasis added).

For the same reasons, courts give trustees leeway in pleading on information and belief, "since a bankruptcy trustee rarely has personal knowledge of the events preceding his appointment . . . provided that he pleads specific facts supporting an inference of knowledgeable participation in the alleged fraud." *In re Grumman Olson Indus., Inc.*, 329 B.R. at 429 (internal marks and citation omitted); *Boykin v. KeyCorp.*, 521 F.3d 202, 215 (2d Cir. 2008) (even under Rule 9(b) "allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.") (internal marks and citation omitted).  This Court in both *Merkin* and *Chais* was "mindful of the vastness and complexity of the Trustee's investigation of the Madoff Ponzi scheme, and the disadvantage the Trustee faces in pleading fraud against multiple defendants."  *Merkin*, 440 B.R. at 254; *Chais*, 445 B.R. at 219.

> ### 2.       Summary Judgment Is Unwarranted Because There Are Genuine Issues Of Material Fact In Dispute, Viewing The Evidence In The Light Most Favorable To The Trustee

"Summary judgment is properly granted when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law." *Zalaski v. City of Bridgeport Police Dept.*, 613 F.3d 336, 340 (2d Cir. 2010) (*citing* Fed. R. Civ. P. 56(c), made applicable by Fed. R. Bankr. P. 7056).  As the parties moving for summary judgment, the Sterling Defendants bear the initial burden of producing evidence on each material element of their defense demonstrating that they are entitled to relief.  *Armstrong v. Collins, et al.*, No. 01-Civ-2437, 2010 WL 1141158, at *17 (S.D.N.Y. March 24, 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"In deciding a summary judgment motion, the Court resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *In re Bayou Group, LLC ("Bayou IV")*, 439 B.R. 284, 297 (S.D.N.Y. 2010) (internal marks and citation omitted).  "The court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary

judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility

assessments." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 404 (S.D.N.Y. 2004)

(*citing Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). "The court will not try issues of fact

on a motion for summary judgment, but, rather, will determine 'whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law.'" *Saffire Corp. v. Newkidco*, LLC, 286 F. Supp. 2d 302,

305 (S.D.N.Y. 2003) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

Finally, as discussed above, "Rule 56(b) contemplates that summary judgment will be

granted only 'after adequate time for discovery.'" *Forras v. Andros*, 470 F. Supp. 2d 283, 289

(S.D.N.Y. 2005) (*quoting Celotex*, 477 U.S. at 322). "Only in the rarest of cases may summary

judgment be granted against a plaintiff who has not been afforded the opportunity to conduct

discovery." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303–04 (2d Cir. 2003)

(*quoting Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000)); *see also

Tenn. Valley Steel Corp. v. B.T. Commercial Corp.* (*In re Tenn. Valley Steel Corp.*), 183 B.R.

795, 811 (Bankr. E.D. Tenn. 1995) (*quoting* 10A Charles A. Wright et al., Fed. Prac. & Proc.

§ 2741 (2d ed. 1983 & Supp. 1995)); *In re Dana Corp.*, 574 F.3d at 149 ("[A] party against

which summary judgment is sought must be afforded 'a reasonable opportunity to elicit

information within the control of his adversaries.'"). Therefore, the "burden on the moving party

is greater in cases where discovery is incomplete." *Indergit v. Rite Aid Corp.*, No. 8-Civ-9361,

2010 WL 1327242, at *3 (S.D.N.Y. Mar. 31, 2010) (*quoting Saffire Corp.,* 286 F. Supp. 2d at

306); *Forras*, 470 F. Supp. at 289.

**B.    The Complaint Amply Alleges The Trustee's Entitlement To Approximately $300 Million In Fictitious Profits Received By The Sterling Defendants**

      **1.    A SIPA Trustee Is Empowered To Recover Fraudulent Transfers**

A SIPA liquidation is akin to a bankruptcy proceeding.  *See, e.g.*, *Exch Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453, 457–59 (2d Cir. 1975); *In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 74 (Bankr. S.D.N.Y. 1996) (as corrected July 1, 1996).  Under SIPA, the Trustee has both the general powers of a bankruptcy trustee and additional powers granted by SIPA.  *See* SIPA § 78fff-1(a); Section 78fff(b) (a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of [the Bankruptcy Code]" to the extent that these provisions are consistent with SIPA); 15 U.S.C. § 78fff-2 ("[T]he trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11").

Accordingly, like the trustee in a bankruptcy proceeding, the Trustee is responsible for bringing avoidance actions against those who received fraudulent transfers from BLMIS, as well as other claims, to recover money for distribution to customers and other creditors.  *See Picard v. Fox* (*In re Bernard L. Madoff*), 429 B.R. 423, 435 (Bankr. S.D.N.Y. 2010) (recognizing that the Trustee in this case is endeavoring to collect funds originating with BLMIS for pro rata allocation among Madoff customers).  Under both state and federal law, a trustee may avoid transfers or obligations made or incurred with fraudulent intent.  *See* 11 U.S.C. § 548(a)(1)(A); NYDCL § 276.

2.    **Because BLMIS Was A Ponzi Scheme, The Transfers Of Fictitious Profits To The Sterling Defendants Were Presumptively Fraudulent**

In a Ponzi scheme, the Trustee is entitled to pursue the recovery of all transfers that were made by the debtor to its investors because the entire enterprise was a fraud and there was no value exchanged.  Accordingly, the Trustee is entitled under both the Bankruptcy Code and other applicable law, including the NYDCL, to recover all transfers made by BLMIS to the Sterling Defendants as fraudulent.  *See* 11 U.S.C. § 548(a)(1)(A); 11 U.S.C. § 548(a)(1)(B); NYDCL 276; NYDCL 273-275; CPLR 213(8) & 203(g).

An investor may defend against the avoidance of fraudulent transfers only if it received those transfers for value, for fair consideration, and in good faith.  *See* Section IV.A, *infra*.  In a Ponzi scheme, each and every transfer made to customers is presumed to have been made with fraudulent intent.  "It is now well recognized that the existence of a Ponzi scheme establishes that transfers were made with the intent to hinder, delay and defraud creditors."  *Chais*, 445 B.R. at 220 (*citing Bayou IV*, 439 B.R. at 306 n.19; *Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*) ("*Manhattan Inv. III*"), 397 B.R. 1, 8-14 (S.D.N.Y. 2007)); *Merkin*, 440 B.R. at 255 (*citing Bayou IV*, 439 B.R. at 306 n.19; *Manhattan Inv. III*, 397 B.R. at 8; *Quilling v. Stark*, No. 05-CV-1976 (L), 2006 WL 1683442, *6 (N.D. Tex. June 19, 2006); *see also Perkins v. Parise* (*In re Global Trading Investments LLC*), No. 05-1332, 2006 WL 3040918, *7–8 (Bankr. D.N.J. Oct. 25, 2006) ("under the numerous cases that have discussed Ponzi schemes, all payments to investors were the product of actual fraud . . . .").

It is therefore a virtually universally accepted rule that the debtor's payments to investors that exceed the amount of their investments (such as the approximate $300 million in fictitious profits to the Sterling Defendants here) constitute fraudulent transfers that may be recovered by the Trustee.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.*

*Madoff Inv. Sec. LLC) (Net Equity Decision)*, 424 B.R. 122, 136 n.29 (Bankr. S.D.N.Y. 2010).

*See also In re Bayou Group, LLC ("Bayou I")*, 362 B.R. 624, 636 (Bankr. S.D.N.Y. 2007)

("[V]irtually every court to address the question has held unflinchingly that to the extent that

investors have received payments in excess of the amounts they have invested, those payments

are voidable as fraudulent transfers.") (internal quotation and citations omitted); *Scholes v.*

*Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) (Ponzi-scheme investor "is entitled to his profit only

if the payment of that profit to him, which reduced the net assets of the estate now administered

by the receiver, was offset by an equivalent benefit to the estate.  It was not.") (citation omitted);

*In re Lake States Commodities, Inc.*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) ("Payments in

excess of amounts invested are considered fictitious profits because they do not represent a

return on legitimate investment activity.") (citing cases).  This is because such transfers are

presumed to have been made with fraudulent intent and cannot have been made "for value."  *See*

*Net Equity Decision*, 424 B.R. 136 n.29.

SIPA does not create any exception to this rule for liquidations of SIPC-registered

entities, nor are broker-dealers otherwise exempt from this rule.  *See, e.g.*, SIPA § 78fff-1(a)

(Trustee has general powers of bankruptcy trustee); SIPA § 78fff-2(c)(3) (Trustee's power to

recover transfers); 17 C.F.R. § 300.503(a) ("Nothing in these Series 500 Rules shall be construed

as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities

transaction as fraudulent, preferential, or otherwise voidable under applicable law."); *see also*

*Merkin*, 440 B.R. at 255 (applying Ponzi scheme presumption to BLMIS liquidation under

SIPA); *Chais*, 445 B.R. at 220 (applying Ponzi presumption to BLMIS liquidation under SIPA);

*Focht v. McDermott* (*In re Old Naples Securities, Inc.*), 343 B.R. 310, 319 (Bankr. M.D. Fla.

2006) (for a SIPA trustee's fraudulent conveyance claim following a broker-dealer's Ponzi

scheme, "[p]roof of a Ponzi scheme by itself establishes actual intent to hinder, delay, or defraud

creditors"); *Parise*, 2006 WL 3040918, *7–8 (applying the Ponzi scheme presumption in

evaluating trustee's fraudulent conveyance action following broker-dealer's bankruptcy,

"conclud[ing] that the entire operation of the corporate debtor was a fraudulent enterprise.

Therefore, under the numerous cases that have discussed Ponzi schemes, all payments to

investors were the product of actual fraud . . . ."); *Balaber-Strauss v. Sixty-Five Brokers* (*In re*

*Churchill Mortg. Inv. Corp.*), 256 B.R. 664, 675-76 (Bankr. S.D.N.Y. 2000) (*quoting In re*

*Independent Clearing House*, 77 B.R. 843, 860 (Bankr. D. Utah 1987) ("A Ponzi scheme cannot

work forever . . . a debtor's knowledge that future investors will not be paid is sufficient to

establish his actual intent to defraud them.").

### 3.    The Allegations In The Complaint State A Claim For Recovery Of Fictitious Profits

Because the Complaint alleges and sets forth grounds that the transfers made to the

Sterling Defendants were made in furtherance of a Ponzi scheme, it adequately alleges that they

were made with fraudulent intent.  As set forth in the Complaint, BLMIS was a Ponzi scheme.

(*See* Compl. Sect. IV.)  And, in furtherance of that Ponzi scheme, BLMIS transferred

approximately $1 billion to the Sterling Defendants.  (*See* Compl. Ex. B to App. II (listing

transfers received by each Sterling Defendant).)  Of this amount, approximately $300 million

constituted fictitious profits over and above their investment.[53]  (*See id.*)  To these claims for

---

[53] The approximately $300 million in fictitious profits was calculated by the Trustee based upon the deposits by the Sterling Defendants less any amount they withdrew (the "net investment" or "cash in/cash out" method).  This method does not give credit for falsely reported "profits" by BLMIS to investors, as no investments or profits were ever made in connection with Madoff's Ponzi scheme.  This Court held that it was the "net investment" method, not the "last statement" method, that was consistent with SIPA's definition of "net equity."  *Net Equity Decision*, 424 B.R. at 125.  This ruling was certified for direct appeal to the United States Court of Appeals for the Second Circuit and heard before the Circuit on March 3, 2011.

fictitious profits, the Sterling Defendants have no defense and have identified no shortcoming in the Complaint.  There is no basis for the dismissal of these claims.

### C.  The Undisputed Facts Alleged In The Complaint Entitle The Trustee To The Recovery Of Fictitious Profits

The Sterling Defendants do not dispute any of the facts in the Complaint showing either that (1) BLMIS was engaged in a Ponzi scheme or that (2) approximately $300 million in net winnings were transferred to them in furtherance of that scheme.  Accordingly, to the extent that any party is entitled to summary judgment on these claims, it is the Trustee, not the Sterling Defendants.

### D.  The Fabricated BLMIS Customer Statements Did Not Create An "Antecedent Debt" That Would Bar The Avoidance Of Fraudulent Transfers

#### 1.  The BLMIS Customer Statements Did Not Create "Obligations" Because They Were Fictitious And Reflected "Trades" That Could Never Have Been Achieved In The Marketplace

The Sterling Defendants proffer the legal argument that the last customer statements issued by BLMIS created a "valid debt" to each customer such that no payment consistent with these statements could ever be avoided as a fraudulent transfer.  (Defs.' Br. at 60.)  But this Court has already rejected an equivalent argument.  *See Chais*, 445 B.R. at 228-229 (rejecting contention that the Trustee could recover as fraudulent transfers only payments from BLMIS that "exceeded the phantom account balances provided" in Defendant's account statements).

As this Court has noted, "[i]t would be simply absurd to credit the fraud and legitimize the phantom world created by Madoff" by relying on BLMIS account statements.  *Net Equity Decision*, 424 B.R. at 140.  BLMIS purchased no securities, and all payments to customers consisted either of their own money returned to them or money that had been paid into the scheme by other customers.  The statements issued to customers were fabricated based upon

backdated transactions and, like similar documentation in other Ponzi schemes, had "no relation

to reality." *Net Equity Decision,* 424 B.R. at 139 (internal quotation omitted).  As this Court

observed:

> Although the securities that Madoff allegedly purchased were identifiable in
> name, the securities positions reflected on customer statements were artificially
> constructed.  By backdating trades to produce predetermined, favorable returns,
> Madoff … essentially pulled the fictitious amounts from thin air.  The resulting
> securities positions on customers' November 30th Statements were therefore
> entirely divorced from the uncertainty and risk of actual market trading.

*Id.*  Moreover, the "purchase" of these securities was itself done with fictitious profits; as this

Court pointed out, "the Madoff customers' initial investments were insufficient to acquire their

purported securities positions which were made possible only by virtue of fictitious profits."  *Id.*

at 140.  As a result, not only were the statements fictitious, the positions reflected on those

statements could never have been either purchased or realized.

As discussed above, payments in furtherance of a Ponzi scheme are presumptively

fraudulent, and to the extent such payments are of fictitious profit, they can never be "for value."

The fact that, in this case, the fraudulent transfers were accompanied by fraudulent statements

reflecting fictitious securities transactions does not change that reality.  *See, e.g.*, *Chais*, 445 B.R.

at 229; *Merkin*, 440 B.R. at 262-63; *Armstrong*, 2010 WL 1141158, at *4-9, 61-69 (applying the

Ponzi presumption to actual fraudulent conveyance claims against statement-receiving

customers); *Bayou IV*, 439 B.R. at 307 (noting that Ponzi presumption was applicable, although

bankruptcy court had not applied it, where investors received fictional hedge fund account

statements); *Parise*, 2006 WL 3040918, *8 (applying the Ponzi presumption to claim to avoid

payments from debtor to statement-receiving customers, concluding that "all payments to

investors were the product of actual fraud.").

2.    **Neither The Uniform Commercial Code Nor Rule 10b-5
Creates "Obligations" Within The Context Of A SIPA
Liquidation Proceeding**

The Sterling Defendants contend that customers of a registered broker should be entitled

to keep their fictitious profits because the Uniform Commercial Code ("UCC") "governs the

obligations of a broker to its customer." (Defs.' Br. at 60.) Every fictitious BLMIS customer

statement, they argue, created a "security entitlement" in the customer under the UCC. *Id.* at 60-

62. But the Sterling Defendants themselves acknowledge that the UCC does not "govern[] the

obligations of" BLMIS, because it is insolvent." (*See* Defs.' Br. at 61 n.27 ("The UCC does not

purport to govern distribution on, or priority of, any claim in a SIPA proceeding.").)[54] As the

Official Comment to the UCC explains, SIPA, not the UCC, is controlling in liquidation

proceedings: while "this section describes the property interest of entitlement holders in the

assets held by the intermediary … it does not necessarily determine how property held by a

failed intermediary will be distributed in insolvency proceedings." UCC § 8-503 cmt. 1. "If the

intermediary fails and its affairs are being administered in an insolvency proceeding, *the

applicable insolvency law governs how the various parties having claims against the firm are

treated.*" *Id.* (emphasis added); *see also Amer. Sur. Co. of N.Y. v. Sampsell*, 327 U.S. 269, 272

(1946) ("[F]ederal bankruptcy law, not state law, governs the distribution of a bankrupt's assets

to his creditors."). The Trustee's claims against the Sterling Defendants are a function of the

administration, recovery and distribution of the BLMIS estate: they are brought in furtherance of

his obligation to recover and distribute BLMIS customer property. And as to any claims the

---

[54] Moreover, as the SEC has pointed out, the fraudulent customer statements issued by BLMIS would not
constitute "book entries" creating any securities entitlement under the UCC. *See* SEC Amicus Brief on
Net Equity Appeal, at 11–12, n.5; *see also Net Equity Decision*, 424 B.R. at 135.

Sterling Defendants may have against the BLMIS estate, they too, as the UCC commentary explains, are governed by the "applicable insolvency laws."

The UCC is thus irrelevant. And to the extent that the UCC dictated an outcome inconsistent with SIPA, it would be preempted by SIPA under the Supremacy Clause. *See* U.S. Const., art. VI, cl. 2; *In re Bevill, Bresler & Schulman, Inc.*, 59 B.R. 353, 378 (D.N.J. 1986), *appeal dismissed*, 802 F.2d 445 (3d Cir. 1986) (holding under the Supremacy Clause that state law that is inconsistent with SIPA is preempted).

The Sterling Defendants also invoke Rule 10b-5 contending that under that regulation a client can sue a fraudulent broker-dealer for out-of-pocket damages and, in some limited cases, for "benefit of bargain" claims. But Rule 10b-5 does not apply. As to the Sterling Defendants' claims against BLMIS, these are covered by the Bankruptcy Code, made applicable under SIPA, not by the securities laws governing claims against a solvent broker-dealer. More to the point, Rule 10b-5 is irrelevant to the Trustee's claims against the Sterling Defendants, which are the only claims at issue in this motion. The relevant inquiry is whether (1) BLMIS made transfers to the Sterling Defendants that were actually and/or constructively fraudulent; and, if so whether (2) the Sterling Defendants received those transfers for value, for fair consideration and in good faith.

> ### 3.   Even If The Last Customer Statements Created "Obligations," These Transactions Would Still Be Avoidable

Even if the fictitious customer statements created obligations under the UCC or securities laws, the obligations would still be avoidable.

First, such obligations would be avoidable because they would have been incurred in furtherance of a fraudulent scheme. Under section 548(a)(1)(A) of the Bankruptcy Code, "[t]he trustee may avoid any transfer . . . *or any obligation* . . . incurred by the debtor . . . if the debtor .

. . made such transfer *or incurred such obligation* with actual intent to hinder, delay, or defraud. . . ."  11 U.S.C. § 548(a)(1)(A)) (emphasis added); *see also* NYDCL § 276 ("Every conveyance made *and every obligation incurred* with actual intent . . . to hinder, delay, or defraud either present or future creditors is fraudulent as to both present and future creditors.") (emphasis added); *Manhattan Inv. III*, 397 B.R. at 11 ("In *Sharp*, the transfer at issue was the repayment of a debt that was antecedent to the company's fraud . . . In contrast, in a Ponzi scheme, the transfers sought to be avoided occur as part of the fraud.  They are not made to repay loans or services that preceded the fraud and were unrelated to it.").

Second, any such obligations would be avoidable because BLMIS received less than reasonably equivalent value for them and was insolvent on the date the obligations were incurred.  *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I) ("The trustee may avoid any transfer . . . *or any obligation* . . . incurred by the debtor . . . if the debtor . . . received less than a reasonably equivalent value in exchange for such . . .  obligation; and was insolvent on the date that . . . such obligation was incurred . . . ."); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (Ponzi scheme inherently "insolvent from its inception").

Third, any such obligations would be avoidable because BLMIS received less than reasonably equivalent value for the obligations and "was engaged in business or a transaction . . . for which any property remaining with the debtor was an unreasonably small capital" or "intended to incur, or believed that [BLMIS] would incur, debts beyond [BLMIS'] ability to pay as such debts matured."  *See* 11 U.S.C. § 548(a)(1)(B)(ii)(II, III); *Donell v. Kowell*, 533 F.3d 762, 770-71 (9th Cir. 2008) (Ponzi-scheme operator necessarily "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" and "[i]ntended to incur, or

believed or reasonably should have believed that he or she would incur, debts beyond his or her

ability to pay as they became due"); *see also* NYDCL §§ 273-275, 278 (addressing avoidance of

obligations under New York State law).

Accordingly, the Trustee's avoidance powers do not hinge upon whether or not the last

customer statements create obligations under the UCC or securities law.

### 4.    *Sharp* Did Not Change Fraudulent Transfer Avoidance Law

The Sterling Defendants incorrectly contend that *In re Sharp Int'l Corp.,* 403 F.3d 43 (2d

Cir. 2005) changed the landscape of fraudulent transfer law.  *Sharp* does not stand for the

proposition that a transfer made with fraudulent intent cannot be avoided if it was made "on

account of antecedent debt," as the Sterling Defendants contend.  (Defs.' Br. at 64.)  To the

contrary, *Sharp* reiterates that "[W]here actual intent to defraud creditors is proven, the

conveyance will be set aside *regardless of the adequacy of consideration given*."  *Sharp*, 403

F.3d at 56 (*citing U.S. v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994)) (emphasis added).

In *Sharp*, the debtor was a closely-held distribution business, which began borrowing

from transferee State Street in November 1996.  *Sharp*, 403 F.3d at 47.  Some time before 1997,

Sharp began falsely inflating its revenue, used those inflated figures to fraudulently borrow

funds, and then began looting the company.  *Id*. at 46.  In 1998, State Street began to suspect

fraud and ultimately demanded that Sharp obtain new financing and use those funds to pay off its

loan to State Street.  *Id.* at 47–48.  Sharp complied, and paid $12.25 million to State Street by

fraudulently raising additional funds.  *Id*. at 48.  Sharp subsequently brought an action to recover

the $12.25 million payment alleging, among other things, a claim for actual fraudulent

conveyance under NYDCL § 276.

The Second Circuit affirmed the dismissal of the actual fraudulent conveyance claim

because Sharp had failed to allege that the actual transaction it sought to avoid—the payment to

State Street—was made with the intent to "hinder, delay or defraud either present or future creditors." *Id*. at 56–57.  Instead, the fraud alleged in the complaint "relate[d] to the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of the proceeds to State Street." *Id*. at 56.

Here, as in his avoidance actions against other defendants, the Trustee has pled that each and every transfer made to each and every Sterling Defendant was made to perpetuate BLMIS' Ponzi scheme.  As the district court noted in *Bayou IV*—discussing the other Ponzi scheme in which the Sterling Defendants invested—the circumstances of the claims at issue "could not be more different" than the claims in *Sharp* because they were made "[t]o avoid detection of the fraud, to retain existing investors and to lure new investors," and constituted "an integral and essential element of the alleged fraud, necessary to validate the false financials and to avoid disclosure."  *Bayou IV*, 439 B.R. at 302 (*quoting In re Bayou Group, LLC ("Bayou II")*, 372 B.R. 661, 663 (Bankr. S.D.N.Y. 2007)).

*Sharp*, in contrast, did not involve either a Ponzi scheme or the Ponzi scheme presumption, but a valid transaction predating the fraud.  "[T]he transaction at issue in *Sharp* was different from the typical transaction in a Ponzi scheme.  In *Sharp*, the transfer at issue was the repayment of a debt that was *antecedent to the company's fraud*."  *Manhattan Inv. III*, 397 B.R. at 11 (emphasis added).  "In contrast, in a Ponzi scheme, the transfers sought to be avoided occur as part of the fraud.  They are not made to repay loans or services that preceded the fraud and were unrelated to it.  For this reason, the transfer in *Sharp* is factually distinguishable from the typical transfers in a Ponzi scheme case."  *Id.* at 10-11 ("*Sharp* did not involve a Ponzi scheme and the court did not discuss the Ponzi scheme presumption.  Therefore, there is no reason to ignore the long line of cases that support the presumption's continuing existence.").

Accordingly, the Sterling Defendants' claim that "[t]his case is legally indistinguishable from *Sharp*" is incorrect.  (Defs.' Br. at 67.)  The payments at issue here were not made to repay loans[55] antecedent to BLMIS' fraud but were made during the fraud, for the purpose of perpetuating the fraud.  Nothing in *Sharp* changes the result here.

### 5.   Whether The Sterling Defendants Were "Customers" Under SIPA Is Irrelevant For Avoidance Purposes

The Sterling Defendants contend that the Trustee cannot avoid transfers against "customers" of the BLMIS estate.  But customer status under SIPA establishes an entitlement to priority distribution over general creditors of a broker-dealer estate; it does not preclude avoidance of transfers made with the intent to hinder, delay and defraud creditors.

SIPA defines "customer" as an investor who "has a claim on account of securities received, acquired or held by a debtor in the ordinary course of its business as a broker or dealer from or for the securities account of such person[.]"  SIPA 78lll(2).  "'Customer' status in a SIPA proceeding is a preferred status which gives customers priority in the distribution of certain assets marshaled by the trustee as well as entitlement to advances from the SIPC funds."  *In re A.R. Baron & Co.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998) (internal citations omitted).  Before the enactment of SIPA and its predecessor statute, customers of a bankrupt stockbroker were considered general creditors if they could not reclaim cash or securities that they could trace into the broker's possession.  *Duel v. Hollins,* 241 U.S. 523, 527-29 (1916).  Congress enacted section 60e of the Bankruptcy Act of 1937, which was expanded upon and tailored by

---

[55] Investments in a Ponzi scheme are not loans, despite the Sterling Defendants' efforts to conflate the concepts.  Thus, *In re Carrozzella & Richardson,* 286 B.R. 480, 491 (D. Conn. 2002), and *In re Unified Commercial Capital, Inc.*, 260 B.R. 343 (W.D.N.Y. 2002), are inapposite.  The Sterling Defendants were investors who purportedly received equity in exchange for their investments; they did not loan BLMIS money for a contractually determined time at a contractually determined rate of interest.

Congress with the creation of SIPA in 1970, to address the inequities that could and did result from these requirements.

SIPA established a fund of customer property for distribution in which all "customers" share ratably and to the exclusion of general creditors. *See Net Equity Decision*, 424 B.R. at 133. Each customer is entitled to share in the fund of customer property pro rata to the extent of its "net equity." SIPA 78*lll*(11). To share pro rata in this pool of customer property marshaled by the trustee, and to be eligible for a SIPA advance, the burden is on a claimant to establish that it is a "customer" entitled to SIPA protection. *See, e.g., In re Klein, Maus & Shire, Inc.* 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003).

But whether an investor is a customer under SIPA has no bearing upon whether he received avoidable transfers from the broker-dealer. Nothing in SIPA suggests that in creating a priority distribution for "customers" to the extent of their net equity, SIPA intended to abrogate the Trustee's avoidance powers. To the contrary, SIPA expressly provides that the Trustee has authority under SIPA to avoid transfers of customer property. *See* 15 U.S.C. § 78fff-2 ("[T]he trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11"). The SIPA Rules, which have the force of law, *see In re Adler Coleman Clearing Co.,* 195 B.R. 266, 275 (Bankr. S.D.N.Y. 1996), provide similarly. Rule 503, which governs voidable transactions, states that "Nothing in these Series 500 Rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities transaction as fraudulent, preferential, or otherwise voidable under applicable law." 17 C.F.R. § 300.503(a). The Rules further provide that "Nothing in these Series 500 Rules shall be construed as limiting the right of the Securities Investor Protection Corporation . . . to reject a

claim for cash or a claim for securities if such claim arose out of securities transaction which could have been avoided in a liquidation proceeding under the Act."  17 C.F.R. § 300.503(b).

For all these reasons, the Sterling Defendants' motion to dismiss or for summary judgment should be denied as to the claims for fictitious profits.

## IV.    THE STERLING DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OR SUMMARY JUDGMENT AS TO THE TRUSTEE'S CLAIMS FOR RECOVERY OF PRINCIPAL

The essential theme of the Sterling Defendants' motion is that the Trustee cannot recover transfers from the Sterling Defendants because, they argue, he cannot prove that they actually knew that BLMIS was a Ponzi scheme.  But the Trustee need not plead or prove the Sterling Defendants' actual knowledge for any claim he has asserted.  Instead, as to the Trustee's actual fraud claims, it is the Sterling Defendants who must prove that they received the transfers in good faith.  While the burden of proof is different under the Trustee's constructive fraud claims, the standard is the same.  A lack of "good faith" in this context does not require that the Sterling Defendants knowingly participated in the fraud, had actual guilty knowledge or subjectively believed that BLMIS was a Ponzi scheme.  Rather, the relevant inquiry is whether the Sterling Defendants were aware of facts that would have put a reasonable and similarly situated investor on notice of the fraudulent activity and, if so, whether they conducted a diligent investigation.

The Trustee has no burden to plead any facts relevant to the Sterling Defendants' good faith as to his actual fraud claims.  As to his constructive fraud claims, the Trustee has amply pled this standard, and  has obtained evidence sufficient to, at a minimum, raise questions of fact for trial.

In any event, issues relating to a defendant's good faith are fact intensive issues that are ill suited for summary judgment after full discovery, *see, e.g., Bayou IV*, 439 B.R. at 314-329, much less are they appropriate for a motion to dismiss or a motion for summary judgment before

discovery.  *See Chais*, 445 B.R. at 227 (question of reasonably equivalent value was

"inappropriate for a motion to dismiss" where Trustee had sufficiently alleged that defendants

were not innocent investors and that the transfers consisted, at least in part, of fictitious profits);

*Merkin*, 440 B.R. at 256 ("whether the Moving Defendants accepted in good faith [under section

548(c)] when they allegedly accepted hundreds of millions of dollars in transfers of BLMIS

funds is a disputed issue that this Court can properly determine only upon consideration of all of

the relevant evidence obtained through the discovery process").

### A.   The Trustee Has Pled Claims For Actual Fraud Under The Bankruptcy Code And The NYDCL

#### 1.   The Trustee Has Pled That Defendants Received Actual Fraudulent Transfers Under The Bankruptcy Code

If a transferor makes a transfer with fraudulent intent, that transfer is avoidable as a

fraudulent transfer under Section 548(a)(1)(A) of the Bankruptcy Code; the intent or

understanding of the transferee is not relevant.  11 U.S.C. § 548(a)(1)(A); *see Bayou IV*, 439

B.R. at 304; *Bayou I*, 362 B.R. at 630 (stating that under actual fraud "the entirety of redemption

payments made to investors may be avoided including repayments of principal actually invested

by the defendants.").  As discussed above, the fraudulent intent of the transferor is established as

a matter of law in cases where the debtor operated a Ponzi scheme because transfers made during

the course of the scheme are made for no other purpose other than to hinder, delay or defraud

creditors.  *See Gredd v. Bear, Stearns Secs. Corp.* (*In re Manhattan Inv. Fund, Ltd.*)

("*Manhattan Inv. II*"), 359 B.R. 510, 517-18 (Bankr. S.D.N.Y. 2007) (Lifland, J.), *aff'd in part,

rev'd in part*, 397 B.R. 1, 11-14 (S.D.N.Y. 2007); *Bayou IV*, 439 B.R. at 306, n.19.  As this

Court recently explained in applying the Ponzi presumption to BLMIS-related claims, "[t]he

breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of

the Ponzi scheme presumption to the facts of this case."  *Merkin*, 440 B.R. at 255 (Bankr.

S.D.N.Y. 2010).  As there is no reason to depart here, *see* Compl. at ¶¶ 29-41 (alleging BLMIS'

fraudulent intent), the Sterling Defendants' motion to dismiss the actual fraud claims under the

Bankruptcy Code should be denied.

> **2.      Good Faith Is An Affirmative Defense To Claims Based On**
> **Actual Fraud Under The Bankruptcy Code And Need Not Be**
> **Pled In The Complaint**

Because BLMIS made the transfers to the Sterling Defendants with actual fraudulent

intent, the Trustee will prevail on his Section 548(a)(1)(A) claim unless the Sterling Defendants

can prove that they received the transfers for value and in good faith.  11 U.S.C. § 548(c).  *See*

*Bayou IV*, 439 B.R. at 308 (*citing* 11 U.S.C. § 548(c) (2010)).  "Contrary to the Moving

Defendants' argument, a trustee need not dispute a transferee's good faith defense upon the face

of the Complaint."  *Merkin*, 440 B.R. at 256 (*citing Bayou I,* 362 B.R. at 639 ("[L]ack of good

faith is not an element of a plaintiff's claim under Section 548(a)(1).")).  "Rather, the transferee

bears the burden of establishing its good faith under section 548(c) of the Code as an affirmative

defense that 'may be raised and proved by the transferee at trial.'"  *Merkin*, 440 B.R. at 256

(*citing Gredd v. Bear, Stearns Sec. Corp.* (*In re Manhattan Inv. Fund Ltd.*) ("*Manhattan Inv. I*"),

310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002)).

Because it is not the Trustee's burden to establish the Sterling Defendants' lack of good

faith, the argument that the Trustee has not adequately pled a lack of good faith cannot support a

motion to dismiss these claims.  *See Merkin*, 440 B.R. at 256 (". . . a trustee need not dispute a

transferee's good faith defense upon the face of the Complaint . . . Rather, the transferee bears

the burden of establishing its good faith under section 548(c) of the Code as an *affirmative*

*defense* that 'may be raised and proved by the transferee at trial.'") (*citing Bayou I*, 362 B.R. at

639; *Manhattan Inv. I*, 310 B.R. at 508; *Ortiz v. Guitian Music Bros., Inc.*, No. 07-Civ-3897,

2009 WL 2252107, *2 (S.D.N.Y. 2009)) (emphasis in original); *Merkin*, 440 B.R. at 260 n.20

("As the Trustee has adequately alleged the Moving Defendants' fraudulent intent, [defendants] are not entitled at this time to a defense under section 278(2) of the NYDCL as purchasers providing fair consideration. Rather, the Moving Defendants 'must affirmatively show good faith in order to take advantage of [s]ection 278(2).'") (*quoting Mendelsohn v. Jacobowitz* (*In re Jacobs*), 394 B.R. 646, 659 (Bankr. E.D.N.Y. 2008)).

### 3. The Trustee Has Pled Claims For Actual Fraudulent Transfers Under The NYDCL

The NYDCL provides: "Every conveyance made . . . with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  McKinney's Debtor and Creditor Law § 276.  The Second Circuit has stated that the requisite fraudulent intent under § 276 is that of the transferor.  *See HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995) ("The 'good faith' in § 272 is the good faith of the transferee. . . . By contrast, to prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor."); *Sharp,* 403 F.3d at 43; *see also Geron v. Schulman* (*In re Manshul Constr. Corp.*), No. 99-C2825, 2000 WL 1228866, at *46 (S.D.N.Y. Aug. 30, 2000) ("DCL § 276 requires a showing of a debtor's 'actual intent to hinder, delay, or defraud its creditors.'"); *Le Café Crème, Ltd. v. Le Roux* (*In re Le Café Crème, Ltd.*), 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) ("It is the intent of the transferor and not that of the transferee that is dispositive.") (internal quotation omitted); *U.S. v. Everoff*, 270 Fed. Appx. 75, 77 (2d Cir. 2008) (summary order remanding decision to district court because the lower court had failed to consider the intent requirement in section 276 and limiting remand to the intent of the transferor only).  Thus, for the same reasons the Trustee has pled actual fraud under the Bankruptcy Code, he has pled actual fraud under the NYDCL and the Sterling Defendants' motion to dismiss on these counts should be denied.

Like federal law, New York law provides an affirmative defense to actual fraud claims. Section 278 of the NYDCL permits a creditor to set aside a fraudulent conveyance as against any person except "a purchaser for fair consideration without knowledge of the fraud at the time of the purchase."  *See also Balaber-Strauss v. Sixty-Five Brokers* (*In re Churchill Mortgage Inv. Corp.*), 256 B.R. 664, 676 (Bankr. S.D.N.Y. 2000).  Case law in this Circuit has held that "fair consideration and without knowledge" is an affirmative defense to a claim of actual fraud under § 276 and is therefore the defendant's burden to establish.  *See Mendelsohn v. Jacobowitz* (*In re Jacobs*), 394 B.R. 646, 669 (Bankr. E.D.N.Y. 2008) (on plaintiff's motion for summary judgment, and reading NYDCL in parallel with the Bankruptcy Code, noting that the defendant failed to "provide evidence or authority sufficient to show that a genuine issue of fact exists as to her good faith"); *U.S. v. Orozco-Prada*, 636 F. Supp. 1537, 1541 (S.D.N.Y. 1986) ("Proof of actual fraudulent intent makes a prima facie case [under NYDCL] and shifts to the [transferee] the burden of establishing his good faith in the transfer.").

While a line of lower court cases exists suggesting that a transferee's fraudulent intent must also be shown, *see Merkin*, 440 B.R. at 257 (noting, without deciding, split in authority), these cases are neither consistent with the Second Circuit's precedent nor with the face of the statute, and the leading authority in this line of cases has been corrected.  *See Gentry v. Kovler* (*In re Kovler*), 249 B.R. 238, 246 (Bankr. S.D.N.Y. 2000) (originally stating that "[m]utual fraudulent intention on the part of both parties to the transaction is required…" under Section 276), *modified*, 329 B.R. 17, 17-19 (Bankr. S.D.N.Y. 2005) (correcting the original opinion by among other things, deleting the sentence requiring "mutual intent" under Section 276 and

instead clarifying that "[a]ctual intent to defraud is a prerequisite for an award of attorneys' fees under Section 276-a, and *that* intent must be mutual.") (internal citations omitted).[56]

Even assuming that the Trustee did need to allege and prove fraudulent intent of the transferee under the NYDCL, the Trustee has alleged facts that meet that burden as to the Sterling Defendants.  Fraudulent intent of the transferee may be shown by facts that "either (1) demonstrate that defendants had both the motive and the opportunity to commit fraud; or (2) constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Merkin*, 440 B.R. at 258 (denying motion to dismiss actual fraud claim under NYDCL).  In *Merkin,* this Court found that the Trustee had sufficiently pled the defendant-transferee's fraudulent intent by alleging, among other things, the same or similar factors that are alleged in the Complaint as to the Sterling Defendants, including:

- A longstanding "close business and social relationship" between the defendant and Madoff (*see* Compl. at ¶¶ 732-741);

- The defendants' continuation of business with BLMIS despite having "received warnings of possible fraud from [business partners, advisors] and other Wall Street professionals" (*see* Compl. at ¶¶ 865-948); and

- The failure of these sophisticated defendants to investigate "constant abnormally profitable and consistent returns." *See* Compl. at ¶¶ 1047-1073*)*.

*Merkin*, 440 B.R. at 259.

Like the defendants in *Merkin,* the Sterling Defendants had hundreds of millions of dollars worth of motive to continue investing with BLMIS.  Like the defendants in *Merkin*, their

---

[56] The corrected decision limits the requirement of mutual intent to the collection of attorneys' fees under Section 276-a only, which is consistent with the face of the statute.  Section 276 was intended to, and does, track the actual fraud provision of the Bankruptcy Code.  While Section 276 states merely that a conveyance is fraudulent if it is "*made* with actual intent" to defraud, Section 276-a provides for the unusual remedy of attorneys' fees "where such conveyance is found to have been made by the debtor and received *by the transferee with actual intent* . . . to hinder, delay or defraud …" NYDCL § 276-a (McKinney 2010) (emphasis added).  If the state legislature had intended to require fraudulent intent on the part of the transferee for both sections, the transferee intent language in § 276-a would have been incorporated in § 276 of the DCL.

choice to work around the warnings about BLMIS' lack of verifiable legitimacy instead of conducting even the most cursory investigation constitutes strong circumstantial evidence of conscious misbehavior or recklessness. Accordingly, to the extent the transferee's fraudulent intent is even relevant here, it has been alleged and will be proven by the Trustee, or at the very least there are genuine issues of disputed fact based on the Rule 2004 investigation.

The Trustee can also rely on "badges of fraud" to establish the fraudulent intent of the Sterling Defendants, if necessary. *Pereira v. Grecogas Ltd.* (*In re Saba Enters., Inc.*), 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009) (noting that allegations of circumstantial evidence by the Trustee are sufficient to establish fraudulent intent because the Trustee is pleading from second-hand knowledge); *Merkin*, 440 B.R. at 259, n.18 (noting that "badges of fraud" are designed to establish the fraudulent intent of a transferor but considering them as evidence of transferee intent). Badges of fraud are those circumstances that so often correlate with the existence of fraud that their very presence can be used to allege fraudulent intent. *See id.; Sharp*, 403 F.3d at 56. When many such badges of fraud are present, so too is actual fraud. *In re Saba Enters., Inc.* 421 B.R. at 644 (Bankr. S.D.N.Y. 2009); *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582-83 (2d Cir. 1983). Badges of fraud may include "[i] a close relationship between the parties to the alleged fraudulent transaction; [ii] a questionable transfer not in the usual course of business; [iii] inadequacy of the consideration; . . . and [iv] retention of control of the property by the transferor after the conveyance.") *Sharp*, 403 F.3d at 56 (*quoting Kaiser*, 722 F.2d at 1582–83). Likewise, "[a]ctual fraudulent intent . . . may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction." *HBE Leasing Corp.*, 48 F.3d at 639. As discussed above, many of these

badges of fraud are present against the Sterling Defendants and may be relied upon by the

Trustee, if necessary, to prove transferee intent under the NYDCL's actual fraud provisions.

In short, the Trustee has stated ample facts in the Complaint to state a claim for actual

fraudulent transfer under the NYDCL even to the extent that the Sterling Defendants' fraudulent

intent must be proven.  And as shown below, the Trustee will be able to prove these facts at trial

and, at the very least, the evidence adduced thus far (even before discovery) demonstrates a

triable issue of fact.  *See* Section IV.C, *infra*.

> **B.**     **The Trustee Has Pled Claims For Constructively Fraudulent Transfers Under Federal And State Law**
>
> **1.**     **The Trustee Has Alleged That The Sterling Defendants Did Not Provide Reasonably Equivalent Value Under The Bankruptcy Code**

Under the Bankruptcy Code, a transfer is constructively fraudulent when the debtor

makes a transfer of an interest in property for which the transferee does not provide "reasonably

equivalent value" while the debtor is insolvent, 11 U.S.C. § 548(a)(1)(B), regardless of the good

or bad faith of the transferee.  An investor in a Ponzi scheme does not, strictly speaking, provide

"value" by the mere fact of its investment.  *See Armstrong*, 2010 WL 1141158, at *67 (S.D.N.Y.

Mar. 24, 2010).  "This is because the money invested simply perpetuates the debtor's fraudulent

scheme."  *Id.*  A good faith investor generally would nonetheless be entitled to a claim of

rescission to recover 100% of the amount of his investment due to the fraud perpetrated by the

debtor.  *See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.* (*In re Bayou*

*Group, LLC*) (*"Bayou III"*), 396 B.R. 810, 844 (Bankr. S.D.N.Y. 2008), *rev'd on other grounds*,

439 B.R. 284 (S.D.N.Y. 2010).  Therefore, although the investment itself does not constitute

value, "value" arguably is given in the form of the release of such an investor's rescission claim.

But "only innocent investors who reasonably believed that they were investing in a legitimate

enterprise are entitled to claims for restitution." *Merkin*, 440 B.R. at 262; *Kowell*, 533 F.3d at 772 (finding that "good faith" investors in a Ponzi scheme had a claim for restitution up to the amount of their investment); *cf. Wyle v. C.H. Rider & Family* (*In re United Energy Corp.*)*,* 944 F.2d 589, 596 n.7 (9th Cir. 1991) ("If investments were made with culpable knowledge, all subsequent payments made to such investors within one year of the debtors' bankruptcy would be avoidable under section 548(a)(2), regardless of the amount invested, because the debtors would not have exchanged a reasonably equivalent value for the payments.").

As in the *Merkin* case, and as outlined above, the Trustee here has amply alleged that the Sterling Defendants were not "innocent" investors, but rather knew or should have known of Madoff's fraud. *See Merkin*, 440 B.R. at 263. (*See generally* Compl. at ¶¶ 1-12, 654-1101.)  The Sterling Defendants, therefore, do not have a valid claim for restitution and cannot be found to have given reasonably equivalent value in exchange for their receipt of transfers. *See Merkin*, 440 B.R. at 262-63.  Accordingly, the Bankruptcy Code's constructive fraud provisions provide the Trustee another basis for recovery of transfers of principal to the Sterling Defendants.

### 2. The Trustee Has Alleged That Sterling Defendants Did Not Provide Fair Consideration Under The NYDCL

Similarly, transfers for which BLMIS did not receive "fair consideration" are constructively fraudulent under the NYDCL and may be set aside and avoided. *See* NYDCL § 273-275. "Fair consideration is given for property, or obligation . . . [w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied." *Id.* § 272.  Thus, under New York's constructive fraud statute, a transfer may be deemed legitimate only if a defendant-transferee exchanges fair consideration for such transfer in good faith. *See HBE Leasing Corp.,* 48 F.3d at 638; *In re*

*Jacobs*, 394 B.R. at 669 ("[T]he concept of 'fair consideration' under the DCL contains two

components, the exchange of fair value and good faith—and both are required.").

Virtually all courts treat "fair consideration" as having the same meaning as "reasonably

equivalent value" for purposes of valuing the consideration given.  In addition, NYDCL § 272

defining "fair consideration" also contains an explicit good faith requirement.  *See, e.g.*, *In re*

*Adler Coleman Clearing Corp.*, 247 B.R. 51, 116 (Bankr. S.D.N.Y. 1999).  The good faith

element of this cause of action—as in the affirmative defense of Sections 548(c) of the

Bankruptcy Code and 278 of the NYDCL, discussed below—requires only that an objective

standard is met.  Under NYDCL § 272, "[w]here [] a transferee has given equivalent value in

exchange for the debtor's property, the statutory requirement of 'good faith' is satisfied if the

transferee acted *without either actual or constructive knowledge* of any fraudulent scheme."

*HBE Leasing Corp.*, 48 F.3d at 636 (emphasis added).

In short, the Trustee is entitled to avoid the transfers as constructively, as well as actually,

fraudulent unless they were taken by the Sterling Defendants in good faith.  The facts alleged in

the Trustee's Complaint amply allege that the Sterling Defendants lacked good faith.  (*See*

*generally* Compl. at ¶¶ 1-12, 654-1101.)  And, as even the Rule 2004 evidence before this Court

supports, the Trustee will prove these facts at trial and, at a minimum, the evidence to date

creates an issue of fact sufficient to deny a summary judgment motion.  *See* Section I, *supra*.

### C.     The Trustee Has Alleged And The Evidence Shows That The Sterling Defendants Did Not Receive The Transfers In Good Faith

The Sterling Defendants' Motion is based primarily on their argument that the Trustee

cannot recover any fraudulent transfers unless he can prove that when the Sterling Defendants

gave BLMIS money, they specifically and subjectively knew that they were investing in a Ponzi

scheme.  (Defs.' Br. at 68-70.)  They then detail "evidence" that, they claim, belies any such knowledge.  (*Id*. at 70-80.)

As a threshold matter, as discussed above, the Sterling Defendants' mental state is not relevant to the Trustee's claims for fictitious profit, and the Trustee is not required to establish the Sterling Defendants' state of mind to prevail on his claims for actual fraudulent transfers of principal.  Rather, it is the Sterling Defendants who must prove that they received the transfers in good faith—a standard that has been well developed and explored under the bankruptcy law. And while the terminology and party bearing the burden of proof may vary among the Trustee's claims, to the extent the Sterling Defendants' state of mind is at issue, the analysis is substantially the same.  The transfers are avoidable unless the Sterling Defendants took them in good faith, as well as for value and for fair consideration.  The fact that the Sterling Defendants avoid any reference to the relevant legal standard, but rather go foraging among other legal standards, speaks volumes about the merits of their motion.

1. **The Sterling Defendants Did Not Take The Transfers In Good Faith Under The Bankruptcy Code Because They Were On Inquiry Notice And Did Not Conduct A Diligent Investigation**

The good faith standard is a legal test that requires the fact-finder to answer two questions:  (1) was the defendant on inquiry notice of possible fraud of the debtor; and, if so, (2) was the defendant diligent in its investigation.  *See Manhattan Inv. III*, 397 B.R. at 22–23; *see also Bayou IV*, 439 B.R. at 310 (characterizing first prong of two step standard as "whether the transferee had information that put it on notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose").  To conduct this analysis, the court must determine whether the defendants had information that would have suggested to a reasonably prudent investor that they should have investigated further, and then determine whether the

investigation was reasonable under the circumstances.  *Manhattan Inv. III*, 397 B.R. at 23;

*Bayou IV,* 439 B.R. at 310-13.

### (a) The Sterling Defendants Were On Inquiry Notice Of BLMIS' Fraud

The test for the first prong—whether an investor is on "inquiry notice"—is objective, and

based on what a reasonably prudent investor who had experience, resources and sophistication

similar to the defendant's would do.  *See, e.g., Bayou IV*, 439 B.R. at 313 ("whether a transferee

is on inquiry notice is informed by the standards, norms, practices, sophistication, and

experience generally possessed by participants in the transferee's industry or class"); *Terry v.

June*, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006) ("[T]he transferee must show not that he was

subjectively unaware of the transferor's fraudulent intent, but rather that he did not have

knowledge of facts that should have reasonably put him on notice that the transfer was made in

order to delay, hinder, or defraud creditors of the debtor."); *Manhattan Inv. III*, 397 B.R. at 23

(describing issue presented as whether information "would have caused a reasonable prime

broker in [defendant's] position 'to investigate the matter further.'") (citation omitted); *Jobin*, 84

F.3d at 1338–39 (holding that whether a transferee is on inquiry notice can be informed by the

experience or sophistication of the transferee; inquiry is whether a "reasonably prudent investor

in the [transferee's position] should have known …").

Information available to a transferee that would suggest to a similarly situated investor

that the debtor might be insolvent or engaged in a potential fraud, such that a transfer might be

made for a fraudulent purpose, constitutes inquiry notice, satisfies the first prong of the test set

forth above, and triggers a duty to investigate further.  *Manhattan Inv. III*, 397 B.R. at 22–23

(finding defendant was on inquiry notice when it discovered a "worrisome discrepancy" between

what it knew about fund's performance and the fund's reported profit; this information "put [it]

on alert that there was a potential problem with the Fund"); *Bayou IV*, 439 B.R. at 325 (relevant inquiry was whether fund's actions "would suggest to a reasonably prudent institutional hedge fund investor that Bayou might be insolvent or that a transfer from Bayou might be made with a fraudulent purpose"); *Jobin*, 84 F.3d at 1338-39 ("[A] reasonably prudent investor in [the transferee's] position should have known of [debtor's] fraudulent intent and impending insolvency and that he was therefore not entitled to the good faith defense established by section 548(c).").

Ostrich-like blindness to a fraud likewise constitutes inquiry notice, as a transferee cannot simply choose to "remain willfully ignorant of facts which would alert her to the debtor's fraudulent purpose." *Luzinski v. Gosman (In re Gosman)*, No. 01-30953, 2005 Bankr. LEXIS 3183, at *52 (Bankr. S.D. Fla. Mar. 1, 2005); *see also Armstrong*, 2010 WL 1141158, at *82-83 (rejecting good faith defense because facts indicated that investor "could no longer 'safely turn a blind eye' to the mounting evidence that [debtor] was not engaged in legitimate business") (citations omitted); *Moglia v. Universal Auto., Inc.* (*In re First Nat'l Parts Exch., Inc.*) *("In re First Nat'l")*, No. 98 C5915, 2000 U.S. Dist. LEXIS 10420, at *18–19 (N.D. Ill. July 18, 2000) ("[A] transferee cannot stick its head in the sand, clinging to its subjective belief while purporting to ignore signs of fraud or insolvency on the part of the transferor.").

The Trustee has alleged, and the evidence shows, that the Sterling Defendants were on inquiry notice. The Sterling Defendants were aware of information that caused them to look into obtaining fraud insurance, including whether such insurance would cover "insolvency for whatever reason" or a Ponzi scheme. (*See* Compl. ¶¶ 938-948; Section I.A, *supra*.) They discussed with their advisors rumors that Madoff was illegally front running, and discussed the implications, including their accounts being frozen, if BLMIS were investigated for such a

crime.  (*See* Compl. ¶¶ 881, 886-890, 902; Sections I.E.2, I.F.1, *supra*.)  They created a hedge

fund to diversify away from BLMIS but that could not replicate BLMIS' returns (*see* Compl. ¶¶

702-10, 879-880, 1067-1071; Section I.C, *supra*), and were told by various advisors that they

should redeem from BLMIS because they did not know what BLMIS did, that BLMIS would fail

due diligence protocols, and that as fiduciaries they would not invest any funds into BLMIS.

(*See* Compl. ¶¶ 867-937; Sections I.E, 1.F, *supra*.)  They restructured their own business to

accommodate Madoff's desire for confidentiality (*see* Compl. ¶¶ 949-967; Section I.D, *supra*),

and they even helped him falsely document a $54 million transaction.  (*See* Compl. ¶¶ 990-1006;

Section 1.J, *supra*.)  BLMIS showed all the signs that the Sterling Defendants should have

recognized from Bayou, another Ponzi in which they were invested that collapsed some three

years before BLMIS.  (*See* Compl. ¶¶ 1025-1046; Section 1.G, *supra*.)

> **(b)    Once On Inquiry Notice, The Sterling**
> **Defendants Did Not Conduct Any Investigation,**
> **Much Less A Diligent Investigation, Into BLMIS**

Upon becoming aware of facts that place it on inquiry notice, a transferee must satisfy the

"diligent investigation" requirement to establish its good faith.  This requirement has been

defined variously as requiring a transferee to show that it "was diligent in its investigation" of

the facts, *see, e.g.*, *Manhattan Inv. III*, 397 B.R. at 22–23, or that "diligent inquiry would [not]

have discovered the fraudulent purpose of the transfer."  *Bayou IV*, 439 B.R. at 312 (internal

citation omitted).  The "diligent investigation" prong of the good faith defense "does not lend

itself to the application of rigid or absolute rules,"  *id.* at 317, but rather requires the fact-finder

to consider all relevant circumstances.  At a minimum, however, the requirement is not satisfied

by merely inquiring with the transferor itself.  *Manhattan Inv. II*, 359 B.R. at 526 (diligent

investigation requires "more than simply ask[ing] the wrongdoer if he was doing wrong"), *rev'd*

*on other grounds,* 397 B.R. 1 (S.D.N.Y. 2007).  If the transferee was on inquiry notice and did

not conduct a diligent investigation, the transferee cannot carry its burden of establishing a good faith defense under section 548(c) of the Bankruptcy Code. *See Bayou III,* 396 B.R. at 846, *rev'd on other grounds,* 439 B.R. 284 (S.D.N.Y. 2010).

Of course, if a diligent investigation is conducted that "aggravates, rather than allays, the concerns placing the transferee on inquiry notice, then no 'good faith' defense is supported." *Bayou III*, 396 B.R. at 846, *rev'd on other grounds,* 439 B.R. 284 (S.D.N.Y. 2010); *Jobin*, 84 F.3d at 1335-36 ("The presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment.") (*quoting* 4 Collier on Bankruptcy ¶ 548.07 at 548-73 (15th ed. 1996)) (internal quotations omitted).  Furthermore, support for a finding of inquiry notice can be found in a transferee's own reactions—for example, if the information in fact caused the transferee to take some action. *See Manhattan Inv. III*, 397 B.R. at 23.

The Trustee has alleged, and the evidence shows, that the Sterling Defendants did no diligence whatsoever in response to the information they obtained about BLMIS.  As alleged in the Complaint, not one of the red flags described by the Trustee prompted any inquiry into BLMIS' legitimacy by the Sterling Defendants.  (*See* Compl. ¶¶ 12, 890, 895, 905, 912, 914, 932, 1024, 1045-46, 1057, 1061, 1064, 1074-75.)  To the contrary, they used the diligence teams and other resources available to them to investigate how they could protect themselves without rocking the boat with Madoff.

Nor does any of the evidence submitted by the Sterling Defendants with their motion suggest that they conducted any diligence in response to the warnings at BLMIS.  They assert that they "did a great deal of diligence when their relationship with Madoff was initiated [in

1985]" and "became very comfortable with him and his operation" (Defs.' Br. at 74).  But this is not relevant.  The relevant question is whether, after obtaining information that put them on inquiry notice of the possibility of fraud at BLMIS, they undertook to inquire.  *See* Section IV.C, *supra*.  If such an inquiry would have raised additional questions rather than alleviated their concerns, still further investigation would have been required.  *Bayou III*, 396 B.R. at 846, *rev'd on other grounds,* 439 B.R. 284 (S.D.N.Y. 2010); *Jobin*, 84 F.3d at 1335-36.  Whatever diligence the Sterling Defendants may have conducted in the 1980s could not have alleviated their concerns after becoming aware of the facts detailed in the Complaint, including facts beginning at the latest in the early 2000s.

Similarly, the Sterling Defendants' argument that they could not have undertaken any diligence is an attempt to hide behind the real investors who could not have reasonably discovered BLMIS' fraud.  Whether the Sterling Defendants were on inquiry notice and whether they conducted a diligent investigation must be evaluated from the perspective of a reasonable investor who is similarly situated to the defendants. *See Bayou IV*, 439 B.R. at 313.  The Sterling Defendants claim that they "are not sophisticated market investors" and are just like any other "retail" investor who could not have done any independent diligence on BLMIS.  (Defs.' Br. at 76.)  Not so.  The defendants are investors worth billions of dollars who, as noted in their brief, "operat[ed] businesses with varied and complex ownership structures."  (Defs.' Br. at 89.)  The Sterling Partners own, among other things, a real estate empire and a baseball franchise, and their financial experience includes negotiating financing in the range of hundreds of millions of dollars.

Moreover, they are general partners of a hedge fund that touted their own investment and due diligence expertise.  They had teams of financial advisors on hand whose job included

conducting diligence on their investments and potential investments.  They were being urged on all fronts, including by even one of their own partners, to redeem from BLMIS because it would not pass institutional due diligence protocols, because they did not know what it did, and because they could not make Madoff's math work.  The Sterling Defendants were aware of facts that caused them to consider obtaining insurance to cover a Ponzi scheme or insolvency, but there is no evidence that these facts led them to do any diligence at all into BLMIS.  To the contrary, they undertook to restructure their own hedge fund at great time and expense to accommodate Madoff's desire for secrecy.

Importantly, the quantum of the Sterling Defendants' investigation is not at issue here because, based on the evidence obtained to date, they did none at all.  While the definition of a "diligent investigation" is not subject to bright line rules, it certainly requires more than sticking one's head in the sand and doing nothing.  *In re Gosman*, 2005 Bankr. LEXIS 3183, at *52; *see also  Armstrong*, 2010 WL 1141158, at *82–83 (supra); *In re First Nat'l*, 2000 U.S. Dist. LEXIS 10420, at *18–19 ("[A] transferee cannot stick its head in the sand, clinging to its subjective belief while purporting to ignore signs of fraud or insolvency on the part of the transferor.").  And while the Sterling Defendants are correct that "simply ask[ing] the wrongdoer if he was doing wrong" is insufficient to establish a diligent investigation, *Manhattan Inv. II*, 359 B.R. at 526, it does suggest an obvious answer to the Sterling Defendants' rhetorical question of what they could have done.  At a minimum, a reasonable investor in the Sterling Defendants' position could have begun its investigation by asking "why": why "privacy and confidentiality" was so important to Madoff that disclosing their investment relationship would have risked their then almost 20 year relationship with BLMIS, and so important that it was worth restructuring their own hedge fund to accommodate this need for "privacy"; why their financial advisors' due

diligence would have "stopped [Madoff] at the door" and as a fiduciary, they could not invest in BLMIS; why, instead of either selling stock to raise $54 million or loaning them $54 million against their account to meet their need for $54 million in cash, their need for cash from BLMIS was satisfied with a fictitious agreement that reflected a fictional "investment" by Ruth Madoff into their entities; why they felt the need to investigate Ponzi scheme insurance; and the list goes on.

## 2.       The Analysis Is Equivalent Under The NYDCL

As with Section 548(c) of the Bankruptcy Code, under NYDCL Section 278, "the transferee need not have actual knowledge of the scheme [to] render[] the conveyance fraudulent." *HBE Leasing Corp.*, 48 F.3d at 636.  "Constructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry." *Id.*  Applying section 278, courts have held that "[o]ne who has reasonable grounds for suspecting or inquiring ought to inspect [and] ought to inquire, and the law charges him with the knowledge which the proper inquiry would disclose." *Morse v. Howard Park Corp.*, 272 N.Y.S.2d 16, 23 (N.Y.S.Ct. 1966) (collecting New York authorities on inquiry notice) (citation omitted).  Moreover, as with inquiry notice under the Bankruptcy Code, "the question is whether [the transferee] knew or should have known that [the transferor's] intent in [making the transfer] was to hinder [the transferor's] creditors *in any way*" and thus the transferee need not be on inquiry notice as to the precise nature of the fraud itself.  *Corcoran v. Messer* (*In re Corcoran*), 246 B.R. 152, 161 (E.D.N.Y. 2000).  It is enough that the transferee "ignored warning signs which should have put them on notice that something was awry and that a further inquiry would be prudent." *Orozco-Prada*, 636 F. Supp. at 1544–45; *see also Armstrong*, 2010 WL 1141158, at *60 ("One lacks the good faith that is essential to the UFTA § 8(a) defense to avoidability if

possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction.  Such inquiry notice suffices on the rationale that some facts suggest the presence of others to which a transferee may not safely turn a blind eye.") (internal quotation omitted).

<b>3.    Nothing More Than Inquiry Notice Is Required To Recover<br>Fraudulent Transfers Under Any Theory</b>

Pointing to the Trustee's allegations in the Complaint that the Sterling Defendants were "willfully blind" to and "consciously disregarded" Madoff's fraud, the Sterling Defendants assert that these allegations are insufficient to establish "scienter"—and therefore insufficient to support a fraudulent transfer claim.  (Defs.' Br. at 70-80.)  "Scienter" is defined as "[a] degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission; the fact of an act's having been done knowingly, esp. as a ground for civil damages or criminal punishment."  Black's Law Dictionary (9th ed. 2009).  Various levels of scienter are elements of certain securities law and other claims.  But the Trustee has not brought claims against the Sterling Defendants under the securities laws, and he does not need to allege or prove scienter.  The Sterling Defendants have not cited to a single bankruptcy case (involving SIPA or otherwise) holding that the defendant's scienter is an element of any relevant claim.  Nor can they, because the law is to the contrary.  The relevant standard remains whether the Sterling Defendants can show that they were not on inquiry notice, a standard that has been well developed under the bankruptcy laws.  And as the evidence detailed above demonstrates, one that the Sterling Defendants cannot meet.  Knowing full well that they cannot meet this standard, the Sterling Defendants take the various ways in which their conduct has been described, such as their "willful blindness" and "conscious disregard" of the fraud and try to import standards from other areas of law into the bankruptcy law.  However, these cases, arising under federal statutory

and common law, are inapplicable to the inquiry notice standard as it has developed under the

bankruptcy law.  Thus, the cases from these other areas of law upon which they rely are wholly

inapposite. [57]

One factor in establishing inquiry notice may be to show that the transferee was

"willfully blind" to or "consciously disregarded" a fraud: if it stuck its head in the sand and

refused to acknowledge signs of fraud.  *See* Section IV.C, *supra*.  But there is no requirement

that the transferee's state of mind be the same as a defendant charged with "willful blindness"

under the Lanham Act, RICO, securities fraud claims, or aiding and abetting common law torts.

## V.    THE REMAINDER OF THE STERLING DEFENDANTS' ARGUMENTS RELATING TO THE TRUSTEE'S FRAUDULENT TRANSFER CLAIMS ARE ALSO WITHOUT MERIT

### A.    As This Court Already Has Ruled, Section 546(e) Does Not Insulate The Fraudulent Transfers Received By The Sterling Defendants From Recovery By The Trustee

The Sterling Defendants also attack the Trustee's fraudulent transfer claims under section

546(e) of the Bankruptcy Code.  (Defs.' Br. at 80–84.)  Other defendants in this case already

have argued that the "safe harbor" provision for securities contracts under section 546(e) of the

Bankruptcy Code bars the Trustee's fraudulent transfer claims.  This Court has squarely rejected

---

[57] *See Tiffany* (*NJ*) *Inc. v. eBay, Inc.*, 600 F.3d 93, 110 n.15 (2d Cir. 2010) (considering the knowledge element of contributory liability under the Lanham Act); *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 143 (S.D.N.Y. 2010) (discussing the "motive to commit fraud" element of a RICO conspiracy claim); *Saltz v. First Frontier, LP*, No. 10 Civ. 964, 2010 U.S. Dist. LEXIS 136140, at *15–19, 30 (S.D.N.Y. Dec. 22, 2010) (applying the requirements for bringing a securities fraud claim under Rule 10b-5 to such a claim against a BLMIS feeder fund and other actors); *Kirschner v. Bennett*, No. 07 Civ. 8165, 2010 U.S. Dist. LEXIS 132344, at *79–80 (S.D.N.Y. June 3, 2010) (*citing Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007)) (discussing conscious avoidance in the context of an aiding and abetting claim); *Steed Fin. LDC v. Laser Advisers, Inc.*, 258 F. Supp. 2d 272, 282 (S.D.N.Y. 2003) (dismissing claims for aiding and abetting fraud and aiding and abetting breach of fiduciary duty); *In re Agape Litig.*, 681 F. Supp. 2d 352, 364 (E.D.N.Y. 2010) (discussing the knowledge element of an aiding and abetting claim); *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) (same); *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 256 n.17 (S.D.N.Y. 2008) (same); *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 368 (same); *J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005) (same).

this argument, finding, among other things, that the "application of section 546(e) to the Initial

Transfers must be rejected as contrary to the purpose of the safe harbor provision and

incompatible with SIPA." *Merkin*, 440 B.R. at 267.  Not only is section 546(e) inapplicable to

shield the fraudulent transfers from avoidance, the statute is inapplicable altogether to this case.

*See id.* at 266–67.  (noting, without deciding, that it was "dubious" whether BLMIS was a

"stockbroker" and questionable whether it entered into "securities contracts" for purposes of

546(e)).

Section 546(e) provides that a trustee cannot avoid certain margin or settlement payments

made "in connection with a securities contract."  11 U.S.C. § 546(e).  A "securities contract" is

defined in section 741(7) of the Bankruptcy Code as "a contract for the purchase, sale, or loan of

a security"—in other words, a specific agreement to buy, sell or loan a particular security.

11 U.S.C. § 741(7).  The purpose of section 546(e) is to avoid potential disruptions to the market

caused by undoing settled purchases and sales.  The rationale for section 546(e) is "to minimize

the displacement caused in the commodities and securities markets in the event of a major

bankruptcy affecting those industries."  *Manhattan Inv. I*, 310 B.R. at 513 (*quoting* H.R. Rep.

No. 97-420, at 1 (1982), reprinted in 1982 USCCAN 583, 583).  If security sale and purchase

transactions could be reversed, it would undermine confidence in the system of guarantees and

could lead to the "ripple effect" of bankruptcy filings by other participants in the chain of

guarantees.  *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R 406, 477

(S.D.N.Y. 2001).

Section 546(e) has no application to this case because Madoff never actually traded in

securities for customers, and thus never entered into securities contracts on his investors' behalf.

While BLMIS investors generally gave Madoff the authority to purchase and sell securities and

options on their behalf, no such trades occurred.  Thus, none of the potential disruptions to the

market occasioned by undoing settled purchases and sales discussed above could or would

occur.[58]  Moreover, courts addressing this issue have rejected the application of section 546(e) to

cases "involv[ing] outright illegality or transparent manipulation," such as Ponzi schemes.  *In re*

*Grafton Partners, L.P.*, 321 B.R. 527, 539 (B.A.P. 9th Cir. 2005).[59]

In any event, even if the agreements between BLMIS and its investors were securities

contracts, which these were not, section 546(e) expressly excludes from its reach transactions

that are actually fraudulent.  *See* 11 U.S.C. § 546(e) (excluding intentional fraud avoidance

actions under section 548(a)(1)(A)).  And as set forth above, transfers made in furtherance of

Ponzi schemes are, by definition, made with the intent to defraud.  *See Manhattan Inv. III*, 397

B.R. at 11; *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429–30 (S.D.N.Y. 2006) (*citing* cases).

As this Court has already found, "[s]imply stated, the transfers sought to be avoided emanate

from Madoff's massive Ponzi scheme, and the safe harbor provision 'does not insulate

transactions like these from attack.'"  *Merkin*, 440 B.R. at 267–68 (*quoting Mishkin v.*

*Ensminger* (*In re Adler, Coleman Clearing Corp.*)*,* 247 B.R. 51, 105 (Bankr. S.D.N.Y. 1999)).

---

[58] The Sterling Defendants can find no authority suggesting that section 546(e) of the Bankruptcy Code is applicable here, so they instead cite to cases relating to different statutes, including Section 10(b) of the Securities Exchange Act of 1934 and Rule 10-5, as well as Article 8 of the UCC.  Defs.' Br. at 83–84.

[59] *See also Wider v. Wootton*, 907 F.2d 570, 572–73 (5th Cir. 1990) (declining to apply earlier version of the provision to Ponzi scheme because to protect the transfers at issue "would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims") (internal marks omitted); *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. at 474 (to extend safe harbor protection in the context of a fraudulent securities scheme would be to "undermine rather than promote investor confidence by endorsing a scheme to defraud SIPC"); *Enron Corp. v. JP Morgan Sec., Inc.* (*In re Enron Corp.*), Nos. M-47 (GBD), 01-6034 (AJG), Adv. Nos. 03-92677 (AJG), 03-92682 (AJG), 2008 WL 281972, at *5 (S.D.N.Y. Jan 25, 2008) ("Where transactions are not merely unorthodox, but rather are fundamentally tainted by misconduct or impropriety," safe harbor protection is contrary to the objectives of section 546(e) and would "undermine the spirit of the Bankruptcy Code by allowing a few individuals to reap the preferential benefit of the transfers, thereby diminishing the available assets for equitable distribution.").

**B.    The Avoidance Of Fraudulent Transfers Is Necessary To Effectuate The Goals Of SIPA**

The Sterling Defendants also challenge the Trustee's fraudulent transfer claims by asserting that in recovering customer property, the Trustee has engaged in "broad attacks on customers," and that if SIPA gives the Trustee the right to recover fictitious profits "customers would be far better off had SIPA never been enacted."  Br. at 85–86.

These protests miss the mark.  The purpose of SIPA is to protect customers, which it does by giving customers with valid net equity claims—"net losers" in the parlance of this case—a priority over other creditors.  The Bankruptcy Code works in tandem with SIPA to permit the Trustee to recover fraudulent transfers to supplement the fund of customer property.  It is the first priority of the Trustee to ensure that customers have recovered their net losses.

In arguing that they relied on their BLMIS statements, the Sterling Defendants are doing nothing more than seeking to retain $300 million worth of stolen "profits."  Because this is a Ponzi scheme, these "profits" consist only of other investors' money.  Treating the phony "profits" concocted by Madoff as real would give claimants such as the Sterling Defendants, many who have already received back their principal *and* other people's money, even more of other people's money, at the expense of "net losers" who have not yet recovered their principal.  There is no result less equitable than that.

The initial priority under SIPA is the satisfaction of customer claims, on a *pro rata* basis, to the extent of their net equity.  If the Trustee is able to satisfy all claims of the preferred customer class, this will represent the first time that all BLMIS account holders—whether net winners or net losers—will stand shoulder to shoulder in terms of their principal losses from BLMIS.  If the Trustee recovers additional funds beyond those needed to satisfy customer

claims, net winners and net losers alike—along with other BLMIS customers—could potentially receive a distribution from the general estate.

In a Ponzi scheme, as among equally innocent victims, "equality is equity." *Cunningham v. Brown*, 265 U.S. 1, 13 (1924). It would be the antithesis of equity to twist a statute designed for the protection of all customers to allow a select few—chosen by Madoff himself—to profit from the Ponzi scheme by keeping stolen money, while there remain other customers who have not been made whole. There is no basis in either SIPA or the Bankruptcy Code for this result.

## C.   Basic Principles Of Agency Law And This Court's Recent Decision In *Chais* Support The Trustee's Imputation Claims

The Sterling Defendants argue that the Trustee has failed to state a claim that the Sterling Partners' inquiry notice as to the transfers should be imputed to all the Sterling Defendants. (Defs.' Br. at 87.) Contrary to the Sterling Defendants' position, the Trustee's imputation claims are firmly rooted in elementary agency principles and are consistent with this Court's decision in *Chais*, 445 B.R. at 223–224.

### 1.   The Sterling Partners Were The Agents For All Sterling Defendants With Regard To Their BLMIS Accounts

For almost a quarter century, the Sterling Partners operated, managed and administered the BLMIS investments of all Sterling Defendants as part and parcel of Sterling's overall business. *See* Compl. Sect. VI. All major issues concerning the businesses and investments of the Sterling Partners, Sterling Entity Defendants and Katz/Wilpon Trust Defendants were discussed and decided upon collectively by the Sterling Partners, including, but not limited to, at bi-weekly Sterling Partners meetings. *Id.* ¶ 659.[60] As detailed in the Complaint, given the

---

[60] BLMIS made transfers from approximately 305 BLMIS accounts directly or indirectly to the Sterling Defendants, including the Sterling Partners, their family members (the "Sterling Family Member Defendants"), their trusts (the "Katz/Wilpon Trust Defendants"), and certain Sterling-related entities (the "Sterling Entity Defendants"). (Compl. ¶ 47.)

central role that the Sterling Defendants' BLMIS accounts came to play in their businesses and private wealth, the Sterling Partners' agenda for their bi-weekly partnership meetings always included a separate topic for "Madoff." *Id.* ¶ 759.

The Sterling Partners managed and controlled the BLMIS accounts of all Sterling Defendants, including the Sterling Entity Defendants, Katz/Wilpon Trust Defendants, and Sterling Family Member Defendants. *Id.* ¶ 659; *see generally id.* Sect. XI. The Sterling Partners directed the opening and closing of the Sterling Defendants' BLMIS accounts and otherwise communicated with and provided direction to BLMIS regarding these accounts, while also freely transferring funds between and among the hundreds of BLMIS accounts held by themselves and the other Sterling Defendants, namely their family members and related entities and trusts that they controlled.[61] *Id.* ¶¶ 754–55, 785–86, *see generally id.* Sect. XI.

The Sterling Partners designated one of their partners, Arthur Friedman ("Friedman") to perform the day-to-day monitoring and administration of all the Sterling Defendants' BLMIS accounts—305 in total. *Id.* Sect. VII.D.1. Friedman, as an extension of the Sterling partnership, was responsible for opening and closing all BLMIS accounts, as well as communicating to BLMIS all transaction requests, including deposits, transfers and withdrawals on behalf of all Sterling Defendants. *Id.* ¶¶ 680–81, 755.

---

[61] The intertwined nature of the Sterling Defendants' BLMIS accounts that are the subject of the Complaint is further demonstrated by the approximately 57 of these accounts that were joint tenancies or tenancies-in-common controlled, managed, and administered by the Sterling Partners who—together with many of the Sterling Family Member Defendants and Katz/Wilpon Trust Defendants—held fixed percentage interests. Compl. Sect. VII.D.2, ¶¶ 661, 682, 1087, 1094, 1099–1101.

The Sterling Partners closely monitored the account balances[62] and performance of all of the Sterling Defendants' BLMIS accounts.  *Id.* ¶¶ 758–61.  Specifically, Friedman—using the BLMIS statements for all of the Sterling Defendants' accounts—calculated the average monthly and yearly rates of return, and would then report on Madoff's performance, typically at the bi-weekly Sterling partnership meetings.  *Id.*

The Sterling Partners' management and control over the various Sterling Defendants' BLMIS accounts also extended to making decisions to leverage these accounts to obtain bank loans, the proceeds of which were either invested into BLMIS or used to support Sterling's businesses.  *Id.* Sect. VIII.D.  Over time, more than 28 BLMIS accounts held by the Sterling Partners, family members, trusts and Sterling-related entities were used as collateral for those particular bank loans where the proceeds were used for the specific purpose of investing in BLMIS.  *Id.* ¶ 816.  Under the direction of the Sterling Partners, BLMIS accounts held by several Sterling Family Member Defendants, namely Judith Wilpon and Iris Katz, were the first to leverage their investments with Madoff in order to borrow funds to re-invest in BLMIS.  *Id.* ¶¶ 819–24.  Further, beginning in 2000, the Sterling Partners collectively decided to form limited liability companies, many of which are Sterling Entity Defendants, for the express purpose of investing in "double-up" accounts at BLMIS.[63]  *Id.* ¶¶ 820–27.

---

[62] The Sterling Partners monitored the balances of all the Sterling Defendants' 305 BLMIS accounts through what was often referred to internally as a "Hell Sheet," which was a monthly report prepared by Sterling's accounting department together with Friedman and his assistant.  This report broke down the percentage of the BLMIS account balances held by each Sterling Partner or Family Member Defendant based on his or her interest in a particular account, including those accounts that were joint tenancies or tenancies-in-common between many of the Sterling Defendants, as well as those accounts in the name of the Sterling Entity Defendants and Katz/Wilpon Trust Defendants.  *Id.* ¶ 761.

[63] As explained in the Complaint, the Sterling Partners referred to these BLMIS accounts as "double-ups" because they were used as collateral to receive borrowed funds that were deposited into these accounts doubling the amount invested and, therefore, doubling the returns.  *Id.* ¶ 820.  Some of the "double up" entities named as Sterling Entity Defendants in the Complaint include: Sterling Thirty Venture LLC,

As demonstrated by these facts, all of the Sterling Defendants relinquished their management, control and administration of their BLMIS accounts to the Sterling Partners.  By doing so they authorized the Sterling Partners to act as their agents in connection with their BLMIS investments.  *See Art Finance Partners, LLC v. Christie's Inc.*, 58 A.D.3d 469, 471, 870 N.Y.S.2d 331, 333 (1st Dep't 2009) ("A principal-agent relationship may be established by evidence of the consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act even where the agent is acting as a volunteer.") (internal citation and marks omitted); *Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146, 606 N.Y.S.2d 243, 246 (2d Dep't 1993) ("The agent is a party who acts on behalf of the principal with the latter's express, implied, or apparent authority."); *see also* Restatement (Third) of Agency § 4.01 cmt. d ("Conduct demonstrates consent to becoming subject to the legal consequences of another's act in [] two situations. . . . First, a person may ratify an act by manifesting assent that the act affect the person's legal relations.  Second, the person may ratify the act through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences.").

Accordingly, the Sterling Partners' inquiry notice regarding the BLMIS fraud is imputed to all the Sterling Defendants pursuant to basic principles of  black letter agency law.  *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 899 (1985) ("The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it.") (citing Restatement (Second) of Agency § 272 ("In accordance with and subject to the rules stated in this Topic, the liability of a principal is affected by the knowledge of

---

Sterling 20 LLC, Sterling 10 LLC, Sterling Brunswick Seven LLC, Sterling Twenty Five LLC, and Sterling Tracing LLC. *Id.* ¶¶ 821, 825.

an agent concerning a matter as to which he acts within his power to bind the principal or upon

which it is his duty to give the principal information.")).

The Sterling Partners' inquiry notice is also properly imputed to the Sterling Entity

Defendants and Katz/Wilpon Trust Defendants because, as set forth above, the Sterling Partners

are the controlling decision-makers for *all* of the business affairs of these defendants, which

prior to the Filing Date encompassed their BLMIS investments.[64]  *See Baker v. Latham*

*Sparrowbush Assoc.*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer,

sole shareholder or controlling person of a corporation is imputable to that corporation."); *F.T.C.*

*v. Data Med. Capital, Inc.*, 99-CIV-1266, 2010 WL 1049977, at *20 (C.D.Cal. Jan. 15, 2010)

(imputing to company knowledge of individual who court found to be *de facto* principal of

company, where the individual was managing the company and claiming to be its CEO); *546-*

*552 West 146th Street LLC v. Arfa*, 54 A.D.3d 543, 544, 863 N.Y.S.2d 412, 414 (1st Dep't 2008)

("The alleged malefactors were the only members and managers of the LLCs at the time the

agreements for the payment of the undisclosed commissions were entered into, and, therefore,

their acts and knowledge are imputed to the LLCs."); *see also U.S. v. Josleyn*, 206 F.3d 144, 159

(1st Cir. 2000) (affirming imputation of knowledge by member of company's board of directors

to company where "the facts clearly show that he had authority to act for the company and, in

the instances relevant for these appeals, that he was acting in that capacity with the interests of

the corporation in mind.").

---

[64] While at least one or more of the Sterling Partners is a managing member or officer of each Sterling Entity Defendant, "[c]ontrol persons are not limited to officers and directors of the corporation but, rather, are those persons who exercise *de facto* control of the corporation during the relevant times." *Banco De Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302, 1306 (S.D.N.Y. 1989); *In re Grumman Olson Industries, Inc.*, 329 B.R. 411, 427 (Bankr. S.D.N.Y. 2005).

2.    **The Sterling Partners Are The *De Facto* Owners Of The Sterling Entity Defendants And Katz/Wilpon Trust Defendants, As Well As The BLMIS Accounts In Which The Sterling Family Member Defendants Held Interests**

Far more than mere agents of the Sterling Defendants, the Sterling Partners exercise such domination and control[65] over the Sterling Entity Defendants and Katz/Wilpon Trust Defendants, as well as the BLMIS accounts in which the Sterling Family Member Defendants held interests, that the law recognizes them as the "equitable" owners of these entities, trusts, and accounts.  As the true owner-principals of the Sterling Entity Defendants and Katz/Wilpon Trust Defendants, as well as the assets of the Sterling Family Member Defendants, the inquiry notice of the Sterling Partners is thus possessed by these defendants.

Notably, the Sterling Partners themselves were forced to acknowledge and embrace their *de facto* ownership of the Sterling Entity Defendants', Katz/Wilpon Trust Defendants', and Sterling Family Member Defendants' assets in order to induce their lenders to waive loan defaults and enter into a restructuring package involving the incurrence of over half a billion dollars of collective debt in 2009.[66]  Compl. Sect. VIII.F.  Faced with a liquidity crisis after

---

[65] The Sterling Partners' domination and control is being used here to demonstrate that they so disregarded the separate legal existence of these entities and trusts that, in reality, the Sterling Partners are one and the same as these defendants.  Nevertheless, at a trial on a claim to pierce the veil of the Sterling Entity Defendants and Katz/Wilpon Trust Defendants, the Trustee will be able to demonstrate not only domination and control, but that the Sterling Partners used the Sterling Entity Defendants and Katz/Wilpon Trust Defendants to commit a wrongful act, including attempting to wrongfully shield assets and funds from an anticipated potential adverse judgment obtained by the Trustee.  Compl. ¶¶ 1094–96; *see, e.g.*, *In re Maghazeh*, 310 B.R. 5, 17 (Bankr. E.D.N.Y. 2004) (noting that alter ego theory can be asserted where a defendant fraudulently transfers property to a trust in order to thwart creditors).

[66] The Sterling Partners' ability to pool all of the assets and liabilities of the Sterling Entity Defendants, Katz/Wilpon Trust Defendants, and certain Sterling Family Member Defendants, and reallocate over half a billion dollars of indebtedness among the various Sterling entities, trusts and individual Sterling Defendants is the most obvious indicia of their complete domination and control.  Other classic factors demonstrating domination and control, however, are also present here, including: (i) all business decisions of the Sterling Entity Defendants and Katz/Wilpon Trust Defendants were made by the Sterling Partners; (ii) the Sterling Partners did not deal at arms-lengths with the Sterling Entity Defendants and Katz/Wilpon Trust Defendants; (iii) overlap in ownership, officers, directors, and personnel; and (iv) the sharing of common office space, address and telephone numbers.  Compl. ¶¶ 657–64, 811–14, 825–31,

Madoff's fraud was exposed in December 2008, the Sterling Partners began negotiations with their various lenders to restructure 40 separate loans totaling over a half a billion dollars, which were owed by various Sterling-related entities, including the Sterling Entity Defendants, the Katz/Wilpon Trust Defendants, and several Sterling Family Member Defendants.[67]  *See generally id.*, ¶¶ 1088, 1095.  As part of the restructuring of Sterling's indebtedness, the assets of the Sterling Partners, the Sterling Entity Defendants, the Katz/Wilpon Trust Defendants (except the Mets and SNY) and other Sterling-related entities were pooled and pledged as collateral, and the prior 40 separate loans totaling over half a billion dollars were consolidated into five new credit facilities.  *Id.*

The Sterling Partners' ability to effectuate this  global restructuring of over half a billion dollars involving dozens of entities, trusts and individuals demonstrates their complete domination and control over the Sterling Defendants.  Through the restructuring, the Sterling Partners—and their lenders—treated the Sterling Entity Defendants and Katz/Wilpon Trust Defendants as empty shells through which they could pool and shuffle all of their collective personal and business assets and liabilities in the manner which best suited the Sterling Partners' purposes.

As detailed in the Complaint, under the terms of the restructuring, the Saul Katz Family Trust and the Wilpon Family Trust both incurred new obligations that nearly doubled their previous indebtedness to $100 million, respectively.  *Id.* ¶ 858.  An additional component of the restructuring required many of the Sterling Defendants to become guarantors of the new credit

---

853–60, Sect. XI; *see Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

[67] As detailed in the Complaint, the collapse of Madoff's Ponzi scheme also caused the Sterling Partners, the Sterling Entity Defendants and Katz/Wilpon Trust Defendants and other Sterling-related entities to be in cross-default of a number of loan agreements in which their BLMIS Accounts served as collateral. *Id.* ¶¶ 853–60.

facilities to varying degrees, including all of the Sterling Partners, all of the Katz/Wilpon Trust

Defendants, many of the Sterling Entity Defendants, and several Sterling Family Member

Defendants.  *Id.* ¶ 859.

As illustrated by the post-December 2008 massive, across-the-board restructuring

described above, the Sterling Partners' utter disregard for the corporate form of the Sterling

Entity Defendants and Katz/Wilpon Trust Defendants, as well as their treatment of the assets and

liabilities of these defendants as if they were their very own demonstrate that the Sterling

Partners are the equitable or *de facto* owners of these defendants.  *See Shamis v. Ambassador*

*Factors Corp.*, 34 F. Supp. 2d 879, 900 (S.D.N.Y. 1999) (noting that "a nonshareholder

defendant may be, 'in reality,' the equitable owner of a corporation where the nonshareholder

defendant 'exercise[s] considerable authority over [the corporation] ... to the point of completely

disregarding the corporate form and acting as though [its] assets [are] his alone to manage and

distribute") (quoting *Lally v. Catskill Airways Inc.*, 198 A.D.2d 643, 645, 603 N.Y.S.2d 619, 621

(3d Dep't 1993)); *Guilder v. Corinth Const. Corp.*, 235 A.D.2d 619, 619–620, 651 N.Y.S.2d

706, 707–08 (3d Dep't 1997) ("Even if the [defendants] were not [the corporation's] legal

owners, it is apparent that they dominated and controlled the corporation to such an extent that

they may be considered its equitable owners."); *Freeman v. Complex Computing Co., Inc.*, 119

F.3d 1044, 1051 (2d Cir. 1997) ("New York courts have recognized for veil-piercing purposes

the doctrine of equitable ownership, under which an individual who exercises sufficient control

over the corporation may be deemed an 'equitable owner,' notwithstanding the fact that the

individual is not a shareholder of the corporation.").

Similarly, the Sterling Partners are the *de facto* owner-principals of the BLMIS Accounts

in which the Sterling Family Member Defendants held interests because they exercised dominion

and control over such accounts and treated them as their own.[68]  *See, e.g., In re Davis*, 404 F.2d 312 (2d Cir. 1968) (finding that debtor retained beneficial ownership over house despite transfer to wife and father-in-law, where debtor continued to reside in house and repeatedly represented that he owned the house in applications submitted for personal loans and refinancing).

Accordingly, as the *de facto* owner-principals of the Sterling Entity Defendants and Katz/Wilpon Trust Defendants, as well as the BLMIS accounts in which the Sterling Family Member Defendants held interests, the Sterling Partners' inquiry notice regarding Madoff's fraud is imputed to all of the Sterling Defendants.  *See S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (finding two corporations liable for violations of securities laws, noting that they were "corporate embodiments" of the individual defendant, "and his awareness of the securities laws violations [is] imputed to them"); *S.E.C. v. Ballesteros Franco*, 253 F. Supp. 2d 720, 728 (S.D.N.Y. 2003) (denying trusts' motion to dismiss insider trading claims, holding that insider knowledge of individual who was not trustee may nevertheless be imputed to trust entity which is alleged to be dominated and controlled by that individual, even where the trust was not alleged to have been a sham or the alter ego of the individual); *F.T.C. v. Vocational Guides, Inc.*, No. 3:01-1070, 2009 WL 943486 at *14–15 (M.D. Tenn. Apr. 6, 2009) (imputing knowledge of the *de facto* owner and principal to the company when he "formed the company; managed and monitored its operations, including its sales force; placed its print ads; and controlled its finances"); *F.T.C. v. Data Medical Capital, Inc.*, 99-Civ-1266, 2010 WL 1049977 at *19–20 (C.D. Cal.) (imputing the CEO's knowledge to

---

[68] As detailed in the Complaint, the Sterling Partners had authority and control over the BLMIS accounts in which the Sterling Family Member Defendants held interests.  *Id.* Sect. XI.  Specifically, with respect to the BLMIS accounts in which the Sterling Partners' wives and children held interests, the Sterling Partners counted the purported equity in these accounts toward their own net worth and also used funds withdrawn from these accounts to meet their personal and/or business financial obligations.  *Id.* ¶¶ 660, 684.

the company after finding that the CEO of the company was not only an agent of the company, but was also the *de facto* principal, because he "demonstrated control of [the company] by providing the initial financing of the company, subsequently directing allocation of company funds, exercising hiring and firing authority, dictating company sales strategy, and making other operational decisions…[and] was a signatory on all of [the company's] bank accounts").

### 3.     The Trustee's Allegations Here Are Substantially Similar To Those Already Found Sufficient By This Court In *Chais*

In *Chais*, this Court denied the motions to dismiss of all of the defendant entities that Stanley Chais was alleged to dominate and control, finding that the Trustee had sufficiently alleged an agency relationship between the entity defendants and Chais such that Chais' bad faith could be imputed to those defendants.  *Chais*, 445 B.R. at 223–224.  In reaching this conclusion, the Court pointed to a number of allegations that are nearly identical to allegations set forth in the Complaint against the Sterling Defendants including:

- Stanley Chais, like the Sterling Partners, served as trustee, officer, director, and/or general partner of the Entity Defendants  (*see* Compl. at ¶¶ 59-135);

- Stanley Chais, like the Sterling Partners, personally established the Entity Defendants for his benefit and the benefit of his family members (*see id.* at ¶¶ 654-657);

- Stanley Chais, like the Sterling Partners, functioned as principal and/or directed and controlled the Entity Defendants (*see id.* at ¶¶ 1082-1083);

- Stanley Chais, like the Sterling Partners, had access to and control of the funds in the Entity Defendants' IA Accounts (*see id.* at ¶¶ 677-687, 785-790);

- Stanley Chais, like the Sterling Partners, reviewed and notated customer statements, directed the purchase and sale of securities, transferred funds and directed payments to and among various Entity Defendants, and communicated with, and provided direction to BLMIS (*see id.* at ¶¶ 754-760, 785-790).

*Chais*, 445 B.R. at 224.  The Trustee respectfully submits that, for the same reasons the Court articulated in *Chais,* the Trustee has in this case sufficiently alleged an agency relationship

between the Sterling Partners and the Sterling Defendants, such that the Sterling Partners'

inquiry notice can be imputed to the Entity Defendants.  *Id.* at 223-224.  (citations omitted).

This Court in *Chais* also endorsed the Trustee's domination and control and/or *de facto*

ownership theories of imputation against Chais' entities:

> The Trustee has also adequately pled that the Entity Defendants are plausibly the
> alter egos of Stanley Chais, who "dominated" and used them as a mere instrument
> to facilitate his personal interests and those of his family members. Compl. at ¶
> 92. Accordingly, Stanley Chais and the Entity Defendants may be treated as one
> unit for purposes of determining the sufficiency of the Trustee's allegations.  *S.*
> *New England Tel. Co. v. Global NAPs Inc.,* 624 F.3d 123, 147 (2d Cir. 2010)
> ("[O]nce alter ego status is established, 'the alter egos are treated as one entity'
> for purposes of ... liability.").

*Chais*, 445 B.R. at 224, n.16.

Most notably, the *Chais* decision implicitly endorses the Trustee's imputation of the

Sterling Partners' willful blindness to all of the Sterling Defendants, including the Family

Member Defendants, based upon agency principles.  In denying the family member defendants'

motions to dismiss, this Court in *Chais* found that the Trustee had adequately pled their

fraudulent intent by alleging facts that demonstrated their motive and opportunity to commit

fraud, and/or conscious or reckless misbehavior *through* the actions and knowledge of Stanley

Chais, who controlled their accounts.  *Id.* at *7-8.  Again, the allegations upon which this Court

relied in reaching its conclusions in *Chais* are almost identical to those asserted in the Complaint

against the Sterling Defendants and supported by the limited pre-discovery record thus far,

including:

- With regard to motive to commit fraud:

  ○ The Family Defendants, just as the Sterling Family Member Defendants,
    were receiving implausibly high and consistent rates of return (*see* Compl.
    at ¶¶ 5, 742-746, 815-839, 851, 880, 1047-1073), as well as millions of
    dollars in transfers of fictitious profits by continuing to participate in the
    fraud.  *See id*. at ¶¶ 2-5, 663-664, 682-700, 742-746, 788, 792, 807.

- With regard to opportunity to commit fraud:

  ° The Family Defendants, like the Sterling Defendants, had a unique opportunity to benefit from Madoff's fraud by virtue of their strong familial ties to Stanley Chais, who was closely associated with Madoff (*see id.* at ¶¶ 732-741);

  ° The Family Defendants were members of Stanley Chais' immediate family and innermost circle, just as the Sterling Family Member Defendants are part of the Sterling Partners' immediate families and innermost circles (*see id.* at ¶¶ 476-631);

  ° Stanley Chais completely controlled the Family Defendants' accounts for his personal interests and those of the Family Defendants, just as the Sterling Partners controlled all of the Sterling Defendants' accounts, including those of the Sterling Family Defendants (*see id.* at ¶¶ 678-690, 754-760, 1080-1101);

  ° Stanley Chais was closely associated with Madoff on both a business and social level since at least the 1970s, as were at least two of the Sterling Partners, and thereby enjoyed unusually intimate access to Madoff, allowing Chais an opportunity to gain special access to extensive information about the operations of BLMIS, much like the Sterling Partners (*see id.* at ¶¶ 732-741).

*Id.* at *7. The Court concluded based upon these allegations that:

> In light of the foregoing, it is plausible that the Family Defendants, who were closely related and connected to Stanley Chais and *whose accounts were controlled by him*, likewise had special access to inside information about BLMIS, and thus an exceptional opportunity to participate in, and benefit from, the fraudulent scheme.

*Id.* (emphasis added).  This Court also found that the Trustee's allegations supported a finding of

conscious misbehavior or recklessness by the Chais Family Defendants, by virtue of their

relationship to Stanley Chais and his control over their accounts:

> While motive and opportunity are sufficient to infer fraudulent intent, the allegations in the Complaint additionally support a finding of "conscious misbehavior or recklessness."  The allegations in the [c]omplaint, accepted as true, demonstrate that Stanley Chais, who earned substantial fees in connection with his management of the Family Defendants' accounts, was consciously aware of the fraud. *See* Compl. at ¶ 97. . . . *Through their close familial ties to Stanley Chais, who controlled their accounts, it is plausible that the Family Defendants were similarly aware that BLMIS was predicated on fraud.*

*Id.* at *8 (emphasis added, citation omitted).

Given the nearly identical nature of the allegations pertaining to agency, domination and control that are set forth in the Chais and Sterling complaints, the Sterling Defendants' arguments here are likewise doomed.[69]

### 4. Under Basic Principles Of Agency Law, All Of The Sterling Defendants Are Charged With The Legal Consequences Of Their Agents' Knowledge Of Red Flags Of Fraud And Willful Blindness

The Sterling Defendants assert that the Sterling Partners'[70] "constructive knowledge" that Madoff was operating a Ponzi scheme is not knowledge that can be imputed to the Sterling Defendants because "constructive knowledge cannot be imputed to a principal." Defs.' Br. at 90. This argument is premised upon a complete misapprehension of centuries-old agency principles, pursuant to which a principal is charged with the legal consequences of what his agent knows or should have known, and with his agent's actions and/or omissions. The fact that a "should have known" standard is involved here does not in any way alter the operation of these simple agency principles, and none of the authorities cited by the Sterling Defendants are to the contrary.

---

[69] Contrary to the Sterling Defendants' claim that the Trustee's use of Section 23 of New York Partnership Law exceeds the boundaries of what it has been used for—purportedly for the limited purposes of binding partners with knowledge that prevents the partnership from asserting a claim against another party—this Court in *Chais* endorsed the Trustee's use of the partnership law to impute the knowledge of general partners to the partnership. *See Chais*, 445 B.R. at 223-224.

[70] While the Sterling Defendants argue that the only Sterling Partner who was aware of the existence of red flags of Madoff's fraud was Saul Katz, to the contrary, the Trustee's allegations set forth in ¶¶ 865–1079 of the Complaint assert that in addition to Saul Katz, other Sterling Partners were aware of the indicia of fraud at BLMIS, including Fred Wilpon (Compl. at ¶ 874), the Katz and Wilpon Families (*id.* at ¶ 873), David Katz (*id.* at ¶¶ 878, 915, 919, 1069–70), Michael Katz (*id.* at ¶ 879), Richard Wilpon (*id.* at ¶¶ 922–24) and Arthur Friedman ( *id.* at ¶¶ 915, 919, 947, 1044). Furthermore, as the Trustee alleges, some or all of the indicia of Madoff's fraud were discussed between or among the Sterling Partners, including, but not limited to, at one or more bi-weekly Sterling Partners meetings. *See id.* at ¶¶ 870, 911, 927, 948, 1034-37, 1069–71. More importantly, as demonstrated by the evidence set forth in Section I, *supra*, virtually all the red flags were shared in some fashion with all the Sterling Partners. *See id.*

It is well settled that the imputation of an agent's knowledge to his principal extends not only to facts which the agent knows, but also facts which the agent "should have known."  *See* Restatement (Third) of Agency § 5.03 (2006) "Imputation Of Notice Of Fact To Principal" ("For purposes of determining a principal's legal relations with a third party, *notice of a fact that an agent knows or has reason to know* is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal . . .")[71] (emphasis added); *see also Bennett v. Buchan*, 76 N.Y. 386, 390–91 (1879) ("The general rule is undisputed, that notice to the agent is notice to the principal; and upon general principles of policy *it must be taken for granted that the principal knows whatever the agent knows, and that there is no difference between actual and constructive notice*.") (emphasis added, citations omitted); *Raines v. Moran*, 57 N.Y.S.2d 800, 807 (N.Y. Sup. Ct. Ontario Co. 1945) ("The general rule is fully established, that notice to an agent in the business or employment which he is carrying on for his principal is a constructive notice to the principal himself, so far as the latter's rights and liabilities are involved in or affected by the transaction.  *This rule alike includes and applies to the positive information or knowledge obtained or possessed by the agent in the transaction, and to actual or constructive notice communicated to him therein . . .*".) (emphasis added, citations and marks omitted); *Hilton v. Federated Brokerage Group, Inc.*, 213 N.Y.S.2d 171, 176 (Sup. Ct. N.Y. Co. 1961) ("It is a well-established rule that notice received or knowledge acquired by an agent engaged in his

---

[71] Comment b to Section 5.03 of the Restatement (Third) of Agency (2006) elaborates that:

> Imputation charges a principal with the legal consequences of having notice of a material fact, whether or not such fact would be useful and welcome.  If an agent has actual knowledge of a fact, the principal is charged with the legal consequences of having actual knowledge of the fact.  If the agent has reason to know a fact, the principal is charged with the legal consequences of having reason to know the fact.  A principal may not rebut the imputation of a material fact that an agent knows or has reason to know by establishing that the principal instructed the agent not to communicate such a fact to the principal. Imputation thus reduces the risk that a principal may deploy agents as a shield against the legal consequences of facts the principal would prefer not to know.

principal's business, which should have put him on inquiry, is deemed to be notice or knowledge

of his principal of material facts which the agent would have discovered had he inquired.")

(citations omitted).

Accordingly, a principal is subjected to significant legal consequences arising from the

imputation of knowledge which his agent knew, or should have known, and from the actions

and/or failure to act of his agent, including vicarious liability for his agent's acts of fraud,

negligence, slander, assault, and conversion.[72]  Additional legal consequences to which

principals have been subjected as a result of what their agents "should have known" have

included: property possessed by a principal being subject to an action by another for specific

performance of a prior contract of sale, reformation of a principal's deeds, and loss of a

principal's ability to assert a statute of limitations defense to a claim.[73]

---

[72] *See Lippes v. Atlantic Bank of New York*, 69 A.D.2d 127, 134, 419 N.Y.S.2d 505, 509 (1st Dep't 1979) (affirming jury charge that principal may be liable "for all manner of specified wrongful acts, *including 'tort, negligence and other omissions of duty of its employee agents . . .' "* even though the principal did not authorize or even know of such misconduct, and further charging that agent's knowledge or notice to him, while acting within his authority, is imputed notice or knowledge to his principal) (emphasis added); *Fidelity and Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 140 (2d Cir. 2008) (noting that it is a "well-established principle that an agent's frauds or misrepresentations are imputed to the principal if made within the scope of the agent's authority") (citations omitted); *Murray v. Watervliet City School Dist.,* 130 A.D.2d 830, 831, 515 N.Y.S.2d 150, 151–152 (3d Dep't 1987) (affirming denial of principal-school district's summary judgment motion where agent-teacher's alleged slander could have been within the scope of her employment); *Sims v. Bergamo*, 3 N.Y.2d 531, 535–536, 169 N.Y.S.2d 449, 451–452 (1957) (reinstating judgment for plaintiff against bar and grill where jury found that bartender's assault of customer was within scope of employment); *Hatton v. Quad Realty Corp.,* 100 A.D.2d 609, 610, 473 N.Y.S.2d 827, 829 (2d Dep't 1984) ("As a general rule, a principal is liable for conversion by his agent.") (citations omitted).

[73] *Farr v. Newman*, 18 A.D.2d 54, 58–59, 238 N.Y.S.2d 204, 208–09 (1963), *aff'd,* 14 N.Y.2d 183, 250 N.Y.S.2d 272 (1964) (court holding principal bound by agent-attorney's knowledge of third party's contention that he had right to purchase realty, even though the attorney because of forgetfulness had failed to make proper inquiries based on this knowledge; court noting that "[i]f the agent acquires knowledge of a fact, while engaged in the business of his principal, and fails to institute the proper inquiries, by reason of forgetfulness, it is negligence and the doctrine of constructive notice applies.") (citations omitted); *Polhamus v. Hines*, 218 N.Y.S. 401, 406–07 (Sup. Ct. Onondaga Co. 1926) (charging principals with their attorneys' constructive notice of right-of-way deeds between original owners, noting that it was duty of principals to make or cause to be made an investigation and examination of their title, and a proper search of title could not have been made without the discovery of the right of way deed);

"The risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent," *Andre Romanelli, Inc. v. Citibank, N.A*, 60 A.D.3d 428, 429, 875 N.Y.S.2d 14, 16 (1st Dep't 2009). There are simple policy reasons for charging principals with the legal consequences resulting from their agent's knowledge and actions, after all, the principal is better suited to control the agent's conduct. Moreover, as the Second Circuit has noted, it is appropriate to place legal responsibility upon principals who would otherwise unjustly reap the benefits of their agents' misconduct:

> The business entity [principal] cannot be left free to break the law merely because its owners . . . do not personally participate in the infraction. The treasury of the business may not with impunity obtain the fruits of violations which are committed knowingly by agents of the entity in the scope of their employment. Thus pressure is brought on those who own the entity to see to it that their agents abide by the law.
>
> * * *
>
> Given the purpose of the [tax] Code to penalize the holding or use of nontaxable fuel for taxable purposes, it is entirely appropriate to impose the penalty on the entity that would profit from the forbidden holding or use of the less expensive fuel.

*Apollo Fuel Oil v. United States*, 195 F.3d 74, 77 (2d Cir. 1999) (*quoting United States v. A & P Trucking Co*. 358 U.S. 121, 126, 79 S.Ct. 203, 207 L.Ed.2d 165 (1958)); *see also* Section 5.03 of the Restatement (Third) of Agency (2006), cmt b (explaining that a further rationale for charging principals with the legal consequences of facts which their agents knew or should have known is to prevent principals from using their agents as shields from facts they would "prefer not to know").

Applying these principles here, the Sterling Defendants are charged with the Sterling Partners' knowledge of red flags of fraud and their willful blindness in connection thereto, and

*Diallo v. City of New York*, 224 A.D.2d 339, 339–40, 638 N.Y.S.2d 58, 58–59 (1st Dep't 1996) (reversing trial court's denial of plaintiff's motion to file late notice of claim against city where knowledge of malicious prosecution claim was imputed because a reasonable investigation by the city's agents would have revealed the existence of the claim).

must bear the consequences of their agents' misconduct.  Agency principles operate to ensure

that the Sterling Defendants are not free to reap the benefits of Madoff's fraud in the form of

hundreds of millions in profits and the myriad other ways in which they exploited their BLMIS

investments, all the while that their agents to whom they delegated control of their BLMIS

investments[74] deliberately turned a blind eye to the repeated indicia of fraud.

Indeed, by accepting and retaining the benefits of their fraudulent BLMIS investments

obtained through their agents' willful blindness, the Sterling Defendants are estopped as a matter

of law from denying that their agents' knowledge and actions should be imputed to them.  *See*

*Marine Midland Bank v. John E. Russo Produce Co., Inc*., 50 N.Y.2d 31, 44, 427 N.Y.S.2d 961,

968 (1980) ("A principal that accepts the benefits of its agent's misdeeds is estopped to deny

knowledge of the facts of which the agent was aware.") (*citing Rockey River Dev. Co. v.*

*German-Am. Brewing Co.*, 193 A.D. 197, 201, 184 N.Y.S. 155, 158 (4th Dep't 1920) and

Restatement (Second) of Agency § 282(2) (1958) ("The principal is affected by the knowledge

of an agent who acts adversely to the principal … (c) if, before he has changed his position, the

principal knowingly retains a benefit through the act of the agent which otherwise he would not

have received."))).

Faced with this long-standing rule that an agent's knowledge and actions—whether

intentionally fraudulent, negligent or otherwise—are imputed to its principal, it is not surprising

to find that none of the authorities cited by the Sterling Defendants supports their assertion that

---

[74] The Sterling Defendants make a passing argument that for an agent's knowledge to be imputed, the knowledge must be acquired within the scope of the agency. (Defs.' Br. at 88.)  As set forth in the instant brief, *all* of the Sterling Defendants relinquished their management, control and administration of their BLMIS accounts to the Sterling Partners, and thus authorized the Sterling Partners to act as their agents in connection with their BLMIS investments.  All knowledge acquired and actions taken—and deliberately not taken—by the Sterling Partners in connection with the Sterling Defendants' BLMIS investments by definition fall within the scope of the agency.

constructive knowledge cannot be imputed to anyone else.  *See* Defs.' Br. at 90.[75]  As for the

Restatement provision upon which the Sterling Defendants rely—Section 277 of the Restatement

(Second) of Agency (1958)—that provision was expressly superseded and replaced in 2006 by

Section 5.03 of the Restatement (Third) of Agency cited to above, which expressly provides that

all facts which an agent knows or should have known are imputed to his principal.[76]

Finally, the Sterling Defendants argue that the labyrinth of holding and shell companies

through which they operate all of their businesses should—by nature of its sheer complexity—

provide an impenetrable shield through which the Sterling Partners' knowledge cannot be

"imputed" multiple times.  (*See* Defs.' Br. at 89.)  However, as established by *Chais* and the

authorities it cites, principles of agency law do not blindly adhere to form over substance, but

---

[75] *See Wheatland v. Pryor*, 133 N.Y. 97, 103 (1892) (court refusing to impute knowledge of bank-agent to
plaintiff, where bank-agent "had no relation whatever to the plaintiff, and owed a duty—not to the
plaintiff—but solely to the trust company . . . .[s]o in any view of this case, the knowledge acquired by
the [bank-agent] . . . cannot be imputed to the plaintiff"); *Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d
320, 325–26 (5th Cir.1993) (court refusing to impute knowledge of agent to plaintiff, where there was no
evidence that agent was *plaintiff's* agent, but only that he was the agent of plaintiff's partner in an
unrelated partnership, noting in dicta that if there had been evidence that plaintiff's *partner* had
knowledge of the facts in question, it may have imputed such knowledge to plaintiff as the partner's
principal); *Hare & Chase v. National Surety Co.,* 49 F.2d 447, 458 (S.D.N.Y. 1931) (court refusing to
impute to a defendant knowledge in question finding that, even assuming that the agent was the
defendant's agent, the plaintiff had failed to prove that the agent actually had knowledge of the facts
sought to be imputed to the defendant).

[76] The Reporter's Note b to Section 5.03 of the Restatement (Third) of Agency (2006) reports that Section
277 of the Second Restatement was reformulated in the Third Restatement:

> The discussion of how a principal's legal relations may be affected by an agent's failure
> to know a fact that the agent should know, when the principal as a result breaches a duty
> owed to a third party, differs from the formulation in Restatement Second, Agency § 277.
> . . . Comment b to Restatement Second, Agency § 272 states that "[i]f an agent has
> reason to know or should know a particular fact, the principal is affected as if the
> circumstances were such that the principal would have reason to know or should know
> the fact, subject to the rules stated in Sections 274–282."  The black letter of Restatement
> Second, Agency § 277 states that "[t]he principal is not affected by the knowledge which
> an agent should have acquired in the performance of the agent's duties to the principal or
> to others, except where the principal or master has a duty to others that care shall be
> exercised in obtaining information."  The discussion in this Restatement makes it explicit
> that a principal's liability does not turn on imputing notice to the principal of facts that
> the agent does not know and does not have reason to know."

instead operate to impute the knowledge and actions of the Sterling Partners to the defendant entities and trusts which they dominate, control and own.  *See Chais*, 45 B.R. at 224, n.16; Compl. at ¶¶ 1080-1101.

## VI.   THE STERLING DEFENDANTS' SIPA CLAIMS SHOULD BE TEMPORARILY DISALLOWED UNDER SECTION 502(d).

The Sterling Defendants also seek to dismiss the Trustee's disallowance of their SIPC claims under section 502(d) of the Bankruptcy Code.  (Defs.' Br. at 92.)  However, they received avoidable transfers; as such, the Trustee is empowered by statute to preclude distributions, on otherwise allowable claims, until all avoidable transfers have been returned to the estate.  *See* Compl. at ¶¶ 1393-1397.  Section 502(d) of the Bankruptcy Code states, in relevant part, that "the court shall disallow *any* claim of any entity from which property is recoverable under section . . . 550 . . . or that is a transferee of a transfer avoidable under section . . . 544, . . . 547 [and] 548 of [the Bankruptcy Code]."  11 U.S.C. § 502(d) (2011) (emphasis added).  As explained in detail above, the Sterling Defendants received fraudulent and preferential transfers. Because of this, their customer claims are subject to disallowance under section 502(d) of the Bankruptcy Code until all the avoidable transfers are returned to the estate.

The Sterling Defendants' argument relates not to the validity of the Trustee's section 502(d) claim but rather to the merits of the Trustee's fraudulent transfer claims.  Specifically, the Sterling Defendants argue that "no fraudulent transfer claim lies" because they hold a valid antecedent debt.  (Defs.' Br. at 91–92.)  Moreover, the Sterling Defendants argue that the section 546(e) safe-harbor provision insulates them from liability.  *Id.* at 92.  For the reasons discussed above, the "antecedent debt" and "safe-harbor provision" arguments fail.  Accordingly, the Sterling Defendants' claims should be disallowed until all of the avoidable transfers are returned to the estate.

111

The purpose of section 502(d) is to "'preclude entities that have received voidable transfers from sharing in distribution of assets unless and until the voidable transfer has been returned to the estate.'" *Chais*, 445 B.R. at 239 (*quoting In re Mid Atl. Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986)).  At a minimum, the Sterling Defendants received other peoples' money.  *See* Compl. ¶¶ 42, 632-53, 682-91, 742-46, 1105.  Section 502(d) seeks to remedy this inequality; the provision was "'not [intended] to punish, but to give creditors an option to keep their transfers (and hope for no action by the trustee) or to surrender their transfers and their advantages and share equally with other creditors.'"  *In re Enron Corp.*, 379 B.R. 425, 435 (S.D.N.Y. 2007) (*quoting Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1239 (1st Cir. 1997)).

This Court recently decided the same issue in a different adversary proceeding, and held that where the Trustee has "sufficiently pled his avoidance claims against the . . . [d]efendants" and where the defendants "have not returned to the Trustee the funds purportedly transferred", the Trustee's claim under section 502(d) is adequately pled.  *Chais*, 2010 WL 5841401, at *22. Although the transfers at issue have not been avoided as of this early stage, the Trustee has sufficiently alleged that the Sterling Defendants are "transferee[s] of a transfer avoidable under section ... 544 ... 547, [or] 548" of the Code; therefore, an express ground for disallowance under section 502(d) of the Code exists.  *Merkin*, 440 B.R. at 271.  As there is more than ample evidence at this stage to defeat a summary judgment motion on the Trustee's causes of action for avoidance of the transfers, the Trustee's section 502(d) claim is sufficiently pled and should be sustained.

**VII.   THE TRUSTEE HAS PLED SUFFICIENT FACTS TO MAKE A COLORABLE CLAIM OF EQUITABLE SUBORDINATION AGAINST THE STERLING DEFENDANTS UNDER SECTION 510(c)**

Even if there were a determination that the Sterling Defendants' customer claims should be allowed, the Trustee maintains that these claims should be equitably subordinated under section 510(c) of the Bankruptcy Code.  *See* Compl. ¶¶ 1398–1402.  The Sterling Defendants attempt to dismiss that claim.  (Defs.' Br. at 92–93).  A claim for equitable subordination inherently involves a resolution of fact-specific issues and is, therefore, not susceptible to a motion to dismiss.  Moreover, based upon the allegations of the Trustee, ample grounds exist to support equitable subordination, and the Sterling Defendants' attempt to dismiss the claim should be denied.

Under the doctrine of equitable subordination, "a bankruptcy court may subordinate a particular claim if it finds that the creditor's claim, while not lacking a lawful basis nonetheless results from inequitable behavior on the part of that creditor."  *Kelleran v. Andrijevic*, 825 F.2d 692, 697 (2d Cir. 1987); *see also In re Enron Corp.*, 379 B.R. 425, 432–33 (S.D.N.Y. 2007). Section 510(c) states, in relevant part:

> [A]fter notice and a hearing, the court may ... (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest. . . .

11 U.S.C. § 510(c) (2011).  When section 510(c) was enacted, courts typically employed a three-part test for equitable subordination: (1) the subordinated creditor "must have engaged in some type of inequitable conduct"; (2) "[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant"; and (3) "[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).  Even after the enactment of section

510(c), the majority of courts have continued to use the *Mobile Steel* test, including the Supreme Court.  *See, e.g., United States v. Noland*, 517 U.S. 535, 538–539 (1996); *Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 876 (2d Cir. 1991).  This Court has stated, in more "colloquial" terms, that to properly plead equitable subordination, the Trustee must allege two critical elements: "the defendant must have done something wrong and second, the creditor has to have been harmed by the defendant's conduct." *In re Blockbuster Inc.*, 2011 WL 1042767, at *3 (Bankr. S.D.N.Y. Mar. 17, 2011).  In this case, the Sterling Defendants withdrew an exorbitant amount of funds from BLMIS, even though they were on inquiry notice of fraudulent activity at BLMIS.  Moreover, the Sterling Defendants steered well over a hundred investors to BLMIS, including their own employees through a 401(k) plan of which they were fiduciaries, without sharing their knowledge of indicia of fraud at BLMIS, and invested tens of millions of dollars of borrowed funds into BLMIS, which "doubled" their returns and furthered the fraud to the detriment of the Estate's creditors.

## A.    The Sterling Defendants Engaged In Inequitable Conduct

*Mobile Steel*'s "inequitable conduct" prong "is generally defined as either: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) the claimant's use of the debtor as a mere instrumentality or alter ego." *In re Enron Corp.*, 379 B.R. 425, 433 (S.D.N.Y. 2007).  Against non-insiders or non-fiduciaries, inequitable conduct is satisfied where the defendant has "dominated or controlled the debtor to gain an unfair advantage" or has breached "an existing, legally recognized duty arising under contract, tort or other area of law." *In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994).  "In the absence of a contractual breach, the [trustee] must demonstrate fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity." *Id.*  Inequitable conduct also "encompasses conduct that may be lawful but is nevertheless contrary to equity and good conscience." *In re Verestar, Inc.*,

343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006).  The Trustee's pleading satisfies the above requirements for inequitable conduct or, at a minimum, the evidence against the Sterling Defendants needs further exploration that, despite knowing of the fraud, the Sterling Defendants continued to steer innocent investors to the fraud.

Sufficient questions are raised based upon the allegations in the Complaint justifying the intervention of equity.  The Trustee has alleged and provided evidence from the still developing record that the Sterling Defendants referred hundreds of innocent investors to BLMIS, including those that participated in Sterling's 401(k) plan that was 90% invested with Madoff.  Compl. at ¶¶ 747-753, 914, 974-982.  This flow of new investors provided Madoff with hundreds of millions of dollars in additional capital with which to further the fraud.  Compl. at ¶ 748.  The Sterling Defendants also invested tens of millions of dollars in borrowed funds into BLMIS for the purpose of doubling the amount invested in certain accounts and thereby doubling their returns.  Compl. at ¶¶ 815-839.  This so-called "double-up" strategy not only substantially benefited the Sterling Defendants, but also provided Madoff with even more additional capital with which to further his fraud.  Compl. at ¶¶ 815-839. Equity should not allow the Sterling Defendants to share *pari passu* with other innocent customers when they steered hundreds of innocent investors to BLMIS and enabled Madoff to further his fraud with hundreds of millions in additional capital, all the while they were turning a blind eye to the indicia of fraud before them in order to continue reaping the myriad benefits of their BLMIS investments.  *See generally* Compl. ¶¶ 782–1101; Section I, *supra*.

### B. The Misconduct Resulted In Injury To The Creditors And Conferred An Unfair Advantage On The Sterling Defendants

The issue under *Mobile Steel*'s second prong is whether the alleged inequitable conduct has made it less likely that the general creditors will collect on their debts.  *In re Enron Corp.*,

379 B.R. 425, 433–34 (S.D.N.Y. 2007).  "'If the misconduct results in harm to the entire creditor body, the [trustee] need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner.'"  *In re Enron Corp.*, 379 B.R. 425, 434 (S.D.N.Y. 2007) (*quoting In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994)).

In this case, the Sterling Defendants harmed BLMIS's other customers by withdrawing funds from BLMIS even though they knew or should have known of fraudulent activity at BLMIS.  *See generally* Compl. at ¶¶ 865–1101; Section I, *supra*.  BLMIS's customers were harmed when the Sterling Defendants caused their money to be invested with Madoff, thus further perpetuating Madoff's fraud.  Equity should not allow the Sterling Defendants to retain their customer status where such irreparable injury has been caused to BLMIS' customers and the creditor body as a whole.

### C.  Equitable Subordination Is Not Inconsistent With The Bankruptcy Code

There is nothing in the Bankruptcy Code or in SIPA that would preclude the Court from subordinating the Sterling Defendants' claims.  Moreover, *Mobile Steel*'s third and final prong "carries minimal significance today because the Bankruptcy Code provides explicitly for the remedy of equitable subordination, whereas the former Bankruptcy Act—under which *In re Mobile Steel Co.* was decided—did not."  *In re Hydrogen, L.L.C.*, 431 B.R. 337, 360–61 (Bankr. S.D.N.Y. 2010) (*citing In re Verestar, Inc.*, 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006)).  Therefore, a complaint that satisfies the first two prongs of the *Mobile Steel* test would, arguably, survive a motion to dismiss.  There is nothing in the Bankruptcy Code or SIPA that prevents this Court from equitably subordinating the Sterling Defendants' claims or, at a minimum, that requires dismissal of the Trustee's count for such relief.  In fact, because the theories underlying the Trustee's inquiry notice argument are factually intertwined with the Sterling Defendants'

inequitable conduct, the Court should not dismiss the equitable subordination count at this time.

*See, e.g., Manhattan Inv. I*, 310 B.R. at 513.

## <u>CONCLUSION</u>

For the reasons discussed above, the Trustee respectfully requests that the Sterling

Defendants' motion be denied in its entirety and that discovery be ordered to immediately

proceed.

Date:   May 19, 2011                                          By: */s/ David J. Sheehan*
     New York, New York                              */s/ Fernando A. Bohorquez, Jr.*

Of Counsel:                                                    **BAKER & HOSTETLER LLP**
                                          45 Rockefeller Plaza
**BAKER & HOSTETLER LLP**                        New York, New York 10111
PNC Center, 1900 East 9th Street                   Telephone: (212) 589-4200
Suite 3200                                                    Facsimile: (212) 589-4201
Cleveland, Ohio 44114-3485                          David J. Sheehan
Telephone: (216) 621-0200                            Email:  dsheehan@bakerlaw.com
Facsimile: (216) 696-0740                             Fernando A. Bohorquez, Jr.
Thomas Warren                                            Email:  fbohorquez@bakerlaw.com
Email:  twarren@bakerlaw.com                     Tracy L. Cole
                                          Email:  tcole@bakerlaw.com
                                          Regina L. Griffin
                                          Email:  rgriffin@bakerlaw.com
                                          Keith R. Murphy
                                          Email:  kmurphy@bakerlaw.com
                                          Kathryn M. Zunno
                                          Email:  kzunno@bakerlaw.com
                                          George Klidonas
                                          Email:  gklidonas@bakerlaw.com
                                          Amanda E. Fein
                                          Email:  afein@bakerlaw.com

                                          *Attorneys for Irving H. Picard, Trustee for the*
                                          *Substantively Consolidated SIPA Liquidation*
                                          *of Bernard L. Madoff Investment Securities*
                                          *LLC and Bernard L. Madoff*