BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Oren J. Warshavsky
Anjula Garg
Adam B. Oppenheim
Jennifer M. Walrath
Geoffrey A. North
Keith R. Murphy
Marc S. Skapof

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and Estate of Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) <br><br> **AMENDED COMPLAINT** |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, | Adv. Pro. No. 09-1364 (BRL) |

v.

HSBC BANK PLC; HSBC HOLDINGS PLC;
HSBC SECURITIES SERVICES
(LUXEMBOURG) S.A.; HSBC INSTITUTIONAL
TRUST SERVICES (IRELAND) LIMITED;
HSBC SECURITIES SERVICES (IRELAND)
LIMITED; HSBC INSTITUTIONAL TRUST
SERVICES (BERMUDA) LIMITED; HSBC
BANK USA, N.A.; HSBC SECURITIES
SERVICES (BERMUDA) LIMITED; HSBC
BANK (CAYMAN) LIMITED; HSBC PRIVATE
BANKING HOLDINGS (SUISSE) S.A.; HSBC
PRIVATE BANK (SUISSE) S.A.; HSBC FUND
SERVICES (LUXEMBOURG) S.A.; HSBC
BANK BERMUDA LIMITED; HERALD FUND
SPC; HERALD (LUX) SICAV; PRIMEO FUND;
ALPHA PRIME FUND LIMITED; SENATOR
FUND SPC; HERMES INTERNATIONAL FUND
LIMITED; LAGOON INVESTMENT LIMITED;
THEMA FUND LTD.; THEMA WISE
INVESTMENTS LTD.; THEMA
INTERNATIONAL FUND PLC; GEO
CURRENCIES LTD. S.A.; HERALD ASSET
MANAGEMENT LIMITED; 20:20 MEDICI AG;
UNICREDIT BANK AUSTRIA AG; BA
WORLDWIDE FUND MANAGEMENT
LIMITED; EUROVALEUR, INC.; PIONEER
ALTERNATIVE INVESTMENT
MANAGEMENT LIMITED; ALPHA PRIME
ASSET MANAGEMENT LTD.; REGULUS
ASSET MANAGEMENT LIMITED; CARRUBA
ASSET MANAGEMENT LIMITED;
GENEVALOR, BENBASSAT ET CIE; HERMES
ASSET MANAGEMENT LIMITED; THEMA
ASSET MANAGEMENT (BERMUDA) LTD.;
THEMA ASSET MANAGEMENT LTD.; EQUUS
ASSET MANAGEMENT LTD.; EQUUS ASSET
MANAGEMENT PARTNERS, L.P.; AURELIA
FUND MANAGEMENT LIMITED; URSULA
RADEL-LESZCZYNSKI; SONJA KOHN;
ERWIN KOHN; MARIO BENBASSAT;
ALBERTO BENBASSAT; STEPHANE
BENBASSAT; DAVID T. SMITH; ROBERTO
NESPOLO; LAURENT MATHYSEN-GERST;
OLIVIER ADOR; PASCAL CATTANEO;
VLADIMIR STEPCZYNSKI; JEAN-MARC

WENGER; LAGOON INVESTMENT TRUST;
UNICREDIT S.p.A.; INTER ASSET
MANAGEMENT, INC.; GTM MANAGEMENT
SERVICES CORP. N.V.; T+M TRUSTEESHIP &
MANAGEMENT SERVICES S.A.; AURELIA
ASSET MANAGEMENT PARTNERS; CAPE
INVESTMENT ADVISORS LIMITED; AND
TEREO TRUST COMPANY LIMITED,

Defendants.

## TABLE OF CONTENTS

**Pages**

TABLE OF ABBREVIATIONS .................................................................. 1

NATURE OF THE ACTION .................................................................... 9

JURISDICTION AND VENUE ................................................................ 17

BACKGROUND .................................................................................... 19

THE PONZI SCHEME ........................................................................... 20

THE TRUSTEE'S POWERS AND STANDING ....................................... 23

THE DEFENDANTS .............................................................................. 25

    Sonja Kohn and The Benbassat Family ........................................... 25

    The Funds and Related Investment Vehicles .................................... 27

    The Management Defendants ........................................................... 31

    Management Defendants Primarily Associated With Medici Funds ............................. 31

    Management Defendants Associated with the Benbassat Funds ..................................... 35

    Beneficial Owners ........................................................................... 38

    The HSBC Defendants ..................................................................... 39

    Other Individuals ............................................................................. 44

PERSONAL JURISDICTION ................................................................. 46

    Individual Defendants ...................................................................... 46

    Feeder Fund Defendants ................................................................... 47

    Management Defendants ................................................................... 48

    Beneficial Owners of Management Defendants ................................. 49

    HSBC Defendants ............................................................................ 50

RED FLAGS STRONGLY SUGGESTED THAT BLMIS'S IA BUSINESS WAS A
FRAUD ................................................................................................. 52

    Madoff's Secrecy ............................................................................. 52

    Madoff's Purported Trade Volumes Were Too High to Be Believed ............................. 53

    There Were Not Enough Options to Implement Madoff's Purported Strategy ............... 55

    Many Trades Appeared to Have Been Executed Outside the Daily Price Range .......... 61

    Madoff Insisted on Acting as His Own Custodian .......................... 63

    Negative Cash Balances ................................................................... 64

    Inadequacy of Madoff's Auditors .................................................... 67

    Madoff's Returns Did Not Mirror Market Conditions ..................... 67

## TABLE OF CONTENTS
## (CONTINUED)

**Pages**

Madoff Was Able to Execute Trades at the Perfect Time, Every Time .......................... 68

Madoff Did Not Provide Real-Time Access to IA Business Accounts .......................... 71

Madoff's Account Statements Purported to Transact With Non-Existent Funds ............ 71

Madoff Never Identified His Options Counterparties ..................................................... 72

Madoff's Options Transactions Were Frequently Inconsistent With SSC Strategy ........ 73

BLMIS's Paper Trade Confirmations Were Archaic and Replete with
    Inconsistencies ..................................................................................................... 77

Madoff Walked Away From Hundreds of Millions of Dollars by Employing a
    Bizarre Fee Structure ............................................................................................ 79

Many Financial Professionals Publicly Questioned Madoff's Legitimacy .................... 80

BLMIS Account Statements and Confirmations Often Reflected Settlement
    Anomalies in Options Transactions ...................................................................... 82

Madoff Purported to Execute Trades That Settled on Days When the Market Was
    Closed .................................................................................................................... 84

THE DEFENDANTS' RELATIONSHIP WITH MADOFF .................................................... 84

Kohn and the Benbassats Established a Complex Network Connecting Foreign
    Investors and Madoff ............................................................................................ 84

The Benbassats Solicited Madoff Investors .................................................................... 90

HSBC Helped Funnel Foreign Investors into the Feeder Fund Defendants ................... 93

The Defendants Created Structured Products to Facilitate Additional Investment
    in the IA Business ................................................................................................. 94

The HSBC Swaps .............................................................................................................. 97

The Rye XL Fund Swap .................................................................................................... 97

The Wickford Fund Swap ................................................................................................. 98

The Santa Clara II Fund Options Swap ........................................................................... 98

The BNP Paribas Accreting Strike Call Option Transaction ........................................... 99

The Gaspee Offshore Swap .............................................................................................. 99

The Rye Select Broad Market XL Portfolio Limited Swap ............................................. 99

The Wailea Swap ............................................................................................................ 100

The Leveraged Note Programs ...................................................................................... 101

The STAIRS Note Programs ........................................................................................... 101

The Defendants Enabled Madoff to Act as His Own Custodian .................................. 102

## TABLE OF CONTENTS
## (CONTINUED)

**Pages**

HSBC As Administrator of the Feeder Fund Defendants.............................................. 105

HSBC Marketed Madoff to its Private Banking Clients................................................ 107

HSBC Bank Engaged KPMG to Assess Fraud and Operational Risk at BLMIS
and then Ignores its Findings ................................................................................ 110

KPMG Engaged Again and Uncovers HSBC's Failure to Heed Earlier Warnings ...... 112

THE AFTERMATH: THE DEFENDANTS UNDERSTATED THEIR FAILURE TO
PERFORM DUE DILIGENCE ................................................................................. 113

THE TRANSFERS ........................................................................................................... 114

Initial Transfers from BLMIS to the Feeder Fund Defendants.................................... 114

The Transfers Were Subsequently Transferred to Other Defendants............................ 120

INITIAL TRANSFERS FROM BLMIS TO NON-PARTY FUNDS ....................................... 121

THE NON-PARTY INITIAL TRANSFERS FROM BLMIS WERE SUBSEQUENTLY
TRANSFERRED TO THE HSBC DEFENDANTS ....................................................... 127

CUSTOMER CLAIMS..................................................................................................... 129

COUNT ONE: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREES) 11 U.S.C.
§§ 547(B), 550(A)(1), AND 551 AGAINST ALL FEEDER FUND
DEFENDANTS EXCEPT PRIMEO ........................................................................... 129

COUNT TWO: PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREES) 11
U.S.C. §§ 547(B), 550(A), AND 551 AGAINST THE MANAGEMENT
DEFENDANTS, THE HSBC DEFENDANTS, THE BENEFICIAL OWNERS,
THE INDIVIDUAL DEFENDANTS PRIMEO, AND, IN THE ALTERNATIVE,
HERMES, LAGOON, AND LAGOON TRUST ........................................................... 131

COUNT THREE: FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(A)(1)(A), 550(A),
AND 551 AGAINST THE FEEDER FUND DEFENDANTS .................................... 132

COUNT FOUR: FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(A)(1)(B), 550(A),
AND 551 AGAINST THE FEEDER FUND DEFENDANTS .................................... 133

COUNT FIVE: FRAUDULENT TRANSFER – NEW YORK DEBTOR AND
CREDITOR LAW §§ 276, 276-A, 278 AND/OR 279, AND U.S.C. §§ 544,
550(A)(1), AND 551 AGAINST THE FEEDER FUND DEFENDANTS .................. 134

COUNT SIX: FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND
CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544,
550(A), AND 551 AGAINST THE FEEDER FUND DEFENDANTS....................... 135

COUNT SEVEN: FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND
CREDITOR LAW §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A),
AND 551 AGAINST THE FEEDER FUND DEFENDANTS ..................................... 136

# TABLE OF CONTENTS
## (CONTINUED)

**Pages**

COUNT EIGHT: FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND
CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A),
AND 551 AGAINST THE FEEDER FUND DEFENDANTS ..................................... 137

COUNT NINE: RECOVERY OF ALL FRAUDULENT TRANSFERS NEW YORK
CIVIL PRACTICE LAW AND RULES 203(G) AND 213(8),  AND NEW
YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278  AND/OR 279, 11
U.S.C. §§ 544, 550(A), AND 551 AGAINST THE FEEDER FUND
DEFENDANTS ..................................................................................................... 137

COUNT TEN: RECOVERY OF SUBSEQUENT TRANSFERS NEW YORK DEBTOR
AND CREDITOR LAW §§ 273-279 AND 11 U.S.C. §§ 544, 547, 548, 550(A),
AND 551 AGAINST THE MANAGEMENT DEFENDANTS, THE HSBC
DEFENDANTS,  THE BENEFICIAL OWNERS, THE INDIVIDUAL
DEFENDANTS PRIMEO AND, IN THE ALTERNATIVE, HERMES, THEMA
FUND, AND LAGOON TRUST ................................................................................. 139

COUNT ELEVEN: DISALLOWANCE OF CUSTOMER CLAIMS AGAINST ALPHA
PRIME, GEO CURRENCIES, HERALD, HERALD (LUX),  LAGOON,
SENATOR, THEMA INTERNATIONAL, AND THEMA WISE .............................. 140

COUNT TWELVE: EQUITABLE SUBORDINATION AGAINST ALPHA PRIME,
GEO CURRENCIES, HERALD, HERALD (LUX), LAGOON, SENATOR,
THEMA INTERNATIONAL, AND THEMA WISE ................................................. 141

COUNT THIRTEEN:  PREFERENTIAL TRANSFERS (SUBSEQUENT
TRANSFEREE) 11 U.S.C. §§ 547(B), 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ........................................................................................................ 142

COUNT FOURTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
11 U.S.C. §§ 548(A)(1)(A), 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ........................................................................................................ 144

COUNT FIFTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) 11
U.S.C. §§ 548(A)(1)(B), 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ........................................................................................................ 145

COUNT SIXTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278 AND/OR
279, AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE HSBC
DEFENDANTS ........................................................................................................ 147

COUNT SEVENTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT
TRANSFEREE) NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND
278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE
HSBC DEFENDANTS ............................................................................................. 148

## TABLE OF CONTENTS
### (CONTINUED)

Pages

COUNT EIGHTEEN:  FRAUDULENT TRANSFERS (SUBSEQUENT
      TRANSFEREE) NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278,
      AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE HSBC
      DEFENDANTS ................................................................................................... 150

COUNT NINETEEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE)
      NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279,
      AND 11 U.S.C. §§ 544, 550(A), AND 551 AGAINST THE HSBC
      DEFENDANTS ................................................................................................... 151

COUNT TWENTY: UNJUST ENRICHMENT AGAINST THE MANAGEMENT
      DEFENDANTS, THE HSBC DEFENDANTS, THE BENEFICIAL OWNERS,
      AND THE INDIVIDUAL DEFENDANTS (THE "NON-FUND
      DEFENDANTS") .............................................................................................. 152

COUNT TWENTY-ONE: MONEY HAD AND RECEIVED AGAINST THE NON-
      FUND DEFENDANTS ...................................................................................... 154

COUNT TWENTY-TWO: AIDING AND ABETTING BREACH OF FIDUCIARY
      DUTY AGAINST THE NON-FUND DEFENDANTS ................................................ 155

COUNT TWENTY-THREE: AIDING AND ABETTING FRAUD AGAINST THE
      NON-FUND DEFENDANTS ............................................................................... 157

COUNT TWENTY-FOUR: CONTRIBUTION AGAINST THE NON-FUND
      DEFENDANTS ................................................................................................... 158

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| A. Benbassat | **Alberto Benbassat:** Partner in Genevalor and Equus Partners; Son of M. Benbassat; director and primary manager of feeder funds affiliated with Genevalor, including Hermes, Thema Fund, Thema International, and Geo Currencies, as well as certain of those funds' investment managers and other service providers. |
| Ador | **Olivier Ador:** Partner in Aurelia Partners; managed, administered, and marketed Hermes and Lagoon Trust. |
| Alpha Prime | **Alpha Prime Fund Limited:** (Bermuda) Investment fund created by Bank Austria and Sonja Kohn to facilitate direct investment in BLMIS. |
| Alpha Prime Management | **Alpha Prime Asset Management Ltd.:** (Bermuda) Investment manager to Alpha Prime. |
| Aurelia | **Aurelia Fund Management Limited:** (Bermuda) Part owner of Hermes Management, to which it provided administrative support services. |
| Aurelia Partners | **Aurelia Asset Management Partners:** (Bermuda) The partnership that owned Aurelia, which provided administrative support services to Hermes. |
| BA Worldwide | **BA Worldwide Fund Management Ltd.:** (British Virgin Islands) Offshore subsidiary of Bank Austria that served as investment adviser to Primeo, Alpha Prime, and Thema International before being voluntarily liquidated on or about February 22, 2008. |
| Bank Austria | **UniCredit Bank Austria AG:** (Austria) Financial institution that helped create and control Madoff Feeder Funds Primeo, Alpha Prime, and Senator. |
| Bank Medici | **20:20 Medici AG:** (Austria) Entity owned by Kohn and Bank Austria that acted as investment manager to Herald, Herald (Lux), and Thema International, and which created, controlled, and marketed Madoff Feeder Funds, including Herald, Herald (Lux), and Primeo. |
| Benbassat Funds | **Benbassat Funds:** Madoff Feeder Funds created and/or controlled by the Benbassat Family: Hermes, and its subsidiary, Lagoon, Geo Currencies, Thema Fund, and its subsidiary, Thema Wise, and Thema International. |

| | |
|---|---|
| Beneficial Owners | **Beneficial Owners:**  Includes Bank Austria, UniCredit, Tereo Trust, Eurovaleur, Genevalor, Equus, Equus Partners, Cape Investment, Inter Asset, GTM Management, T+M, Aurelia, Aurelia Partners, Kohn, E. Kohn, M. Benbassat, A. Benbassat, S. Benbassat, Nespolo, D. Smith, Velay, Mathysen-Gerst, Ador, Cattaneo, Stepczynski, and Wenger. |
| Cape Investment | **Cape Investment Advisors Limited:**  (Bermuda) Entity holding an ownership interest in Thema Management Bermuda, investment manager to Thema Fund. |
| Carruba | **Carruba Asset Management Limited:**  (Bermuda) Investment adviser to Senator, a Madoff Feeder Fund. |
| Cattaneo | **Pascal Cattaneo:**  Partner in Aurelia Partners, managed and marketed Hermes and Lagoon, two Madoff Feeder Funds, and was a director and vice-president of Aurelia and general partner of Aurelia Partners. |
| Defender | **Defender Limited:**  (British Virgin Islands) Madoff Feeder Fund. |
| D. Smith | **David T. Smith:**  General partner of Genevalor and Equus Partners; managed, administered, and marketed Madoff Feeder Funds created by the Benbassat family with Genevalor, including Hermes, Thema International, and Thema Fund; director of Thema Fund, Hermes, Lagoon, Lagoon Trust, Thema International, Hermes Management, Thema Management Bermuda; President and a director of Cape Investment; and former employee of HSBC Bank Bermuda. |
| E. Kohn | **Erwin Kohn:**  Owner of Herald Management and husband of Sonja Kohn. |
| Equus | **Equus Asset Management Ltd.:**  (Bermuda) Entity owned substantially by the Benbassat family; provided administrative services to Thema Management Bermuda; part owner of Hermes Management and Thema Management Bermuda. |
| Equus Partners | **Equus Asset Management Partners, L.P.:**  (Bermuda) Entity principally formed by the Benbassat family; provided administrative support services to Hermes Management; holds an ownership interest in Equus. |

| | |
|---|---|
| Eurovaleur | **Eurovaleur, Inc.:**  (USA) Company owned by Sonja Kohn that served as investment sub-adviser to Primeo, and which holds an ownership interest in Thema Management BVI. |
| Feeder Fund Defendants | **Feeder Fund Defendants:**  Primeo, Herald, Herald (Lux), Alpha Prime, Senator, Hermes, Lagoon, Thema Fund, Thema Wise, Thema International, Geo Currencies, and Lagoon Trust. |
| Genevalor | **Genevalor, Benbassat et Cie:**  (Switzerland) Partnership created and controlled by the Benbassat Family and that created and controlled many Madoff Feeder Funds, including Hermes, Thema International, Thema Fund, and Geo Currencies. |
| Geo Currencies | **Geo Currencies Ltd. S.A.:**  (Panama) Madoff Feeder Fund created by the Benbassat Family. |
| GTM Management | **GTM Management Services Corp. N.V.:**  (Curacao) Part owner of Hermes Management, which managed Madoff Feeder Funds. |
| Harley | **Harley International (Cayman) Limited:**  A Madoff Feeder Fund that was the reference fund for the structured products created by the HSBC Defendants. |
| Herald | **Herald Fund SPC:**  (Cayman Islands) Madoff Feeder Fund created by Kohn and Bank Medici. |
| Herald (Lux) | **Herald (Lux) SICAV:**  (Luxembourg) Madoff Feeder Fund created by Kohn and Bank Medici. |
| Herald Management | **Herald Asset Management Limited:**  (Cayman Islands) Investment manager to Herald, a Madoff Feeder Fund owned by Erwin Kohn. |
| Hermes | **Hermes International Fund Limited:**  (British Virgin Islands) Madoff Feeder Fund created by the Benbassat Family. |
| Hermes Management | **Hermes Asset Management Limited:**  (Bermuda) Company co-founded by the Benbassat Family that served as investment manager to Hermes and Lagoon Trust. |
| HITSB | **HSBC Institutional Trust Services (Bermuda) Limited:** Custodian for Madoff Feeder Funds Alpha Prime, Hermes, and Thema Fund. |

| | |
|---|---|
| HITSI | **HSBC Institutional Trust Services (Ireland) Ltd.:** (Ireland) Custodian to Madoff Feeder Funds Defender, Optimal, Landmark and Thema International. |
| HSBC Administrator Defendants | **HSBC Administrator Defendants:** HSSI, HSBC Bank Bermuda, HSBC (Cayman), HSSB, HSSL, and HSBC Fund Services, which served as administrators and sub-administrators. |
| HSBC Bank | **HSBC Bank plc:** (England/Wales) Banking institution that served as payee bank for the Madoff feeder funds named herein. |
| HSBC Bank Bermuda | **HSBC Bank Bermuda Limited:** (Bermuda) Custodian to the Kingate Funds, which facilitated direct investment in BLMIS; former administrator and custodian to Madoff Feeder Funds Alpha Prime, Square One, Hermes, and Thema Fund. |
| HSBC Bank USA | **HSBC Bank USA, N.A.:** (USA) Entity which created derivative investment products based upon returns generated by Madoff Feeder Funds |
| HSBC (Cayman) | **HSBC Bank (Cayman) Limited:** (Cayman Islands) Banking institution that served as administrator of Primeo. |
| HSBC Custodian Defendants | **HSBC Custodian Defendants:** HITSI, HSSL, HITSB, and HSBC Bank Bermuda, which served as custodians and sub-custodians of Madoff Feeder Funds. |
| HSBC Defendants or HSBC | **HSBC Defendants:** HSBC Holdings, HSBC Bank, HSBC Bank USA, HITSB, HITSI, HSBC Private Bank Holdings (Suisse), HSBC Private Bank (Suisse), HSSB, HSSI, HSSL, HSBC (Cayman), HSBC Bank Bermuda, and HSBC Fund Services. |
| HSBC Fund Services | **HSBC Fund Services (Luxembourg) S.A.:** (Luxembourg) Sub-administrator and sub-registrar of Madoff Feeder Fund Hermes. |
| HSBC Holdings | **HSBC Holdings plc:** (England/Wales) Parent company of HSBC Group and all the HSBC entities named herein. |
| HSBC Private Bank (Suisse) | **HSBC Private Bank (Suisse) S.A.:** (Switzerland) Entity which marketed Madoff Feeder Funds to investors. |
| HSBC Private Banking Holdings (Suisse) | **HSBC Private Banking Holdings (Suisse) SA:** (Switzerland) Entity which owned HSBC Private Bank (Suisse) and marketed Madoff Feeder Funds to investors. |

| | |
|---|---|
| HSSB | **HSBC Securities Services (Bermuda) Limited:** (Bermuda) Administrator to Madoff Feeder Funds Alpha Prime, Hermes, and Thema Fund. |
| HSSI | **HSBC Securities Services (Ireland) Limited:** (Ireland) Administrator for Madoff Feeder Funds Defender, Optimal, Landmark, and Thema International. |
| HSSL | **HSBC Securities Services (Luxembourg) S.A.:** (Luxembourg) Administrator to Madoff Feeder Funds Lagoon, Thema Wise, Herald, Herald (Lux), and Senator; sub-administrator to Madoff feeder funds Thema Fund, Alpha Prime, Hermes, and Primeo; custodian to Lagoon, Herald, Herald (Lux), Primeo, and Senator; and sub-custodian to Alpha Prime, Hermes, and Thema Fund. |
| Individual Defendants | **Individual Defendants:** Kohn, E. Kohn, Radel-Leszczynski, M. Benbassat, A. Benbassat, S. Benbassat, Nespolo, D. Smith, Velay, Mathysen-Gerst, Ador, Cattaneo, Stepczynski, and Wenger. |
| Inter Asset | **Inter Asset Management, Inc.:** (British Virgin Islands) Part owner of Hermes Management. |
| Kingate Euro | **Kingate Euro Fund, Ltd.:** (Bermuda) Madoff feeder fund. |
| Kingate Funds | **Kingate Funds:** Kingate Euro and Kingate Global. |
| Kingate Global | **Kingate Global Fund Ltd.:** (Bermuda) Madoff feeder fund. |
| Kohn | **Sonja Kohn:** Marketed Madoff Feeder Funds to new investors; held a majority interest in Bank Medici; director of Alpha Prime. Wife of Erwin Kohn, owner of Herald Management. |
| Lagoon | **Lagoon Investment Limited:** (British Virgin Islands) Nominal holder of accounts at BLMIS's IA Business created by the Benbassat family, which held investments of Hermes and Lagoon Trust. |
| Lagoon Trust | **Lagoon Investment Trust:** (British Virgin Islands) Entity created by Aurelia—associates of the Benbassat family—for purpose of investing in BLMIS through Lagoon. |
| Madoff Feeder Funds | **Madoff Feeder Funds:** Investment funds with the principal or primary purpose of investing funds with BLMIS's IA Business. |

Madoff Structured Products

**Madoff Structured Products:** Derivative investment vehicles which offered investors an opportunity to earn the returns of BLMIS and/or a Madoff feeder fund. HSBC Defendants which swapped an interest in Rye XL, Greenwich, Harley, Thema International, and Senator.

Management Defendants

**Management Defendants:** Bank Medici, Bank Austria, Genevalor, Herald Management, BA Worldwide, Pioneer, Eurovaleur, Alpha Prime Management, Regulus, Carruba, Hermes Management, Thema Management BVI, Thema Management Bermuda, Equus, Equus Partners, and Aurelia.

Mathysen-Gerst

**Laurent Mathysen-Gerst:** General partner in Aurelia Partners; president of Aurelia; founder and director of Hermes and Lagoon; director of Hermes and Lagoon.

M. Benbassat

**Mario Benbassat:** Founding partner of Genevalor who created Madoff feeder funds Hermes, Thema Fund, Thema International, and Geo Currencies.

Medici Funds

**Medici Funds:** Primeo, Alpha Prime, Herald, Herald (Lux), and Senator

Nespolo

**Roberto Nespolo:** General partner of Genevalor and Equus Partners; director of Thema Fund, Thema Management BVI, and Equus; managed Madoff feeder funds Hermes, Thema International, and Thema Fund.

Pioneer

**Pioneer Alternative Investment Management Limited:** (Ireland) Investment adviser to Madoff feeder fund Primeo.

Primeo

**Primeo Fund:** (Cayman Islands) Kohn, Bank Medici, and Bank Austria investment fund that invested directly in BLMIS and indirectly in BLMIS through Herald and Alpha Prime. Currently in liquidation.

Radel-Leszczynski

**Ursula Radel-Leszczynski:** President of BA Worldwide; director of Madoff Feeder Funds Primeo and Alpha Prime; co-founder of Madoff Feeder Funds Alpha Prime and Senator; manager of Madoff Feeder Funds Primeo, Alpha Prime, and Senator.

Regulus

**Regulus Asset Management Limited:** (Bermuda) Investment adviser to Madoff Feeder Fund Senator.

Rye XL

**Rye Select Broad Market XL Fund, L.P.:** Madoff Feeder Fund which served as a reference fund for structured financial products created by the HSBC Defendants.

S. Benbassat

**Stephane Benbassat:** Partner in Genevalor and Equus Partners; son of Mario Benbassat, brother of Alberto Benbassat; managed and directed Madoff Feeder Funds Hermes, Thema Fund, Thema International, and Geo Currencies.

Senator

**Senator Fund SPC:** (Cayman Islands) Madoff Feeder Fund created by Radel-Leszczynski and Bank Austria and/or BA Worldwide.

Sentry

**Greenwich Sentry, L.P.:** One of the largest Madoff Feeder Funds, created and controlled by the Fairfield Greenwich Group.

Square One

**Square One Fund Limited:** (British Virgin Islands) Madoff Feeder Fund that is not named as a party herein.

SSC Strategy

**Split-strike conversion strategy:** The purported investment strategy of BLMIS's IA Business.

Stepczynski

**Vladimir Stepczynski:** General partner in Aurelia Partners and manager of Hermes and Lagoon.

T+M

**T+M Trusteeship & Management Services S.A.:** (Switzerland) Part owner of Thema Management BVI.

Tereo Trust

**Tereo Trust Company Limited:** (Bermuda) Owner of Alpha Prime Management, Regulus, and Carruba.

Thema Fund

**Thema Fund Ltd.:** (British Virgin Islands) Investment fund created by the Benbassat family that invested in the IA Business through its wholly-owned subsidiary, Thema Wise.

Thema International

**Thema International Fund plc:** (Ireland) Madoff Feeder Fund created by the Benbassat family.

Thema Management Bermuda

**Thema Asset Management (Bermuda) Ltd.:** (Bermuda) Investment manager of Madoff Feeder Fund, Thema Fund.

Thema Management BVI

**Thema Asset Management Ltd.:** (British Virgin Islands) Investment manager of Madoff Feeder Fund, Thema International.

| | |
|---|---|
| Thema Wise | **Thema Wise Investments Ltd.:** (British Virgin Islands) Nominal holder of an account of BLMIS's IA Business created by the Benbassat family, which held investments of Thema Fund. |
| UniCredit | **UniCredit S.p.A.:** (Italy) Parent company of Bank Austria and Pioneer. |
| Wenger | **Jean-Marc Wenger:** General partner of Aurelia Partners who managed Madoff Feeder Funds Hermes and Lagoon. |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and substantively consolidated estate of Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] by and through his undersigned counsel, for his Complaint against the above-named defendants (the "Defendants"), states as follows:

## NATURE OF THE ACTION

1.      Madoff did not act alone in perpetrating the largest financial fraud in history.  For more than a decade, HSBC Holdings plc, HSBC Bank plc, and their affiliates (collectively, the "HSBC Defendants" or "HSBC") enabled Madoff's Ponzi scheme by encouraging investment into an international network of feeder funds, including several named as defendants herein (the "Feeder Fund Defendants").  Ultimately, the HSBC Defendants directed over $8.9 billion into BLMIS's fraudulent investment advisory business (the "IA Business").  A September 2008 report commissioned by the HSBC Defendants estimated that at least 33% of all moneys turned over to Madoff were funneled by and through the HSBC Defendants.  The HSBC Defendants aided, enabled, and sustained the massive Ponzi scheme masterminded by Madoff in order to reap an extraordinary financial windfall.  The HSBC Defendants are liable for the damage they caused, in an amount to be proven at trial, which, upon information and belief, will be no less than $6.6 billion.  The Trustee also seeks to recover nearly $2 billion in fraudulent transfers from BLMIS and more than $400 million in fees received by the other Defendants in this action.

2.      For years, Madoff attracted investors through a mix of staggering results and quiet gamesmanship; his legendary secrecy did not decrease his popularity among the investors intoxicated by his unparalleled performance.  Madoff expanded the fortunes of prominent New

---

[1] Subsequent references to SIPA shall omit "15 U.S.C."

Yorkers whose confidence he had gained. His reputation spread to other areas, such as Palm Beach, Florida, and Hollywood, California. But his reputation was, as the world now knows, based on a lie: Madoff was no whiz-kid, he was a criminal using the investments of new customers to satisfy withdrawals by earlier investors. As his pool of investors threatened to run dry, Madoff was on the verge of exhausting the sources from which he had drawn money for his Ponzi scheme. His attention turned to potential investors abroad.

3.     Foreign investors were, in many ways, ideal targets for Madoff. An ocean away, these investors were a vast resource of fuel for the Ponzi scheme. The Defendants named herein came to Madoff's rescue by introducing him to European—and American—investors, many of whom thought they were investing in diverse and thoroughly vetted European funds when, in fact, they were simply depositing their money into the greatest fraud in history.

4.     The Defendants engineered a labyrinth of hedge funds, management companies, and service providers that, to unsuspecting outsiders, seemed to compose a formidable system of checks and balances. Yet the purpose of this complex architecture was just the opposite: it provided different modes for directing money to Madoff while avoiding scrutiny and maximizing fees. At the core of this architecture was a remarkably small group of individuals and the bank on which they all relied to help project an air of credibility and respectability, HSBC.

5.     Beginning in the 1980s, Sonja Kohn ("Kohn") became one of Madoff's top ambassadors, introducing him to a wide array of potential investors. In the early 1990s, Kohn introduced Madoff to the Benbassat Family, commencing in earnest the foreign feeder fund business that ultimately would fuel and sustain Madoff's Ponzi scheme. Beginning in 1992, the Benbassat Family, along with other Defendants, set up a variety of feeder funds, including defendants Hermes International Fund Limited ("Hermes") and its subsidiary, Lagoon

-10-

Investment Limited ("Lagoon"), Lagoon Investment Trust ("Lagoon Trust"), Geo Currencies

Ltd. S.A. ("Geo Currencies"), Thema Fund Ltd. ("Thema Fund") and its subsidiary, Thema Wise

Investments Ltd. ("Thema Wise"), and Thema International Fund plc ("Thema International")

(collectively, the "Benbassat Funds"). The Benbassat Funds funneled more than $1.9 billion into

BLMIS.

      6.     Kohn brokered introductions between Madoff and Carlo Grosso and Federico

Ceretti, who created the Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund,

Ltd. ("Kingate Euro") (collectively, the "Kingate Funds," both of which are defendants in

another action brought by the Trustee). The Kingate Funds funneled more than $1.7 billion into

BLMIS.

      7.     In the early 1990s, Kohn moved back to Austria and, along with defendant

UniCredit Bank Austria AG ("Bank Austria"), set up a series of funds, associated with defendant

20:20 Medici AG ("Bank Medici"). These included Primeo Fund ("Primeo"), Alpha Prime Fund

Limited ("Alpha Prime"), Herald Fund SPC ("Herald"), Herald (Lux) SICAV ("Herald (Lux)"),

and Senator Fund SPC ("Senator") (collectively, the "Medici Funds"). The Medici Funds

directed more than $2.8 billion to BLMIS.

      8.     The Feeder Fund Defendants and their managers were able to rely primarily on

one financial institution—HSBC—to act as their marketer, custodian, and administrator. All of

these funds bore HSBC's imprimatur, as did other feeder funds not named herein, including

Defender Limited (which deposited over $530 million with BLMIS), and funds associated with

Optimal Multiadvisors Ltd. (which deposited more than $1.7 billion with BLMIS). The HSBC

imprimatur was the perfect endorsement to convince foreign (and, ultimately, other American)

investors to pour money into BLMIS. To unknowing investors, the Feeder Fund Defendants

appeared to be sound, legitimate investment vehicles because the documents describing those investments were emblazoned with HSBC's brand.

9.      The HSBC brand was backed not by reasonable due diligence, but by the explanation—to which several Feeder Fund Defendants subscribed—that BLMIS's performance in the market was the result of "magic." One Feeder Fund Defendant official explained that the feeder fund with which he was associated had "confirmed" that BLMIS's returns were, in fact, the product of a "magic formula" because others in the industry had tried to replicate Madoff's returns, but were unable to do so.

10.     The Feeder Fund Defendants believed that Madoff had graced them with the opportunity to invest in BLMIS and to receive returns generated by the magic formula. Even when the HSBC Defendants were granted permission to perform due diligence on BLMIS, certain Feeder Fund Defendants feared that an intrusive due diligence process by HSBC would jeopardize the Feeder Fund Defendants' relationships with Madoff. The Feeder Fund Defendants warned HSBC that it had to exhibit appropriate reverence toward Madoff and BLMIS staff during the due diligence process. Probing the magic formula too deeply might evoke Madoff's wrath and spell the end of the Feeder Fund Defendants' access to BLMIS. HSBC acquiesced.

11.     The Defendants were well aware of the indicia of fraud surrounding BLMIS. In yearly due diligence reports, certain of the HSBC Defendants identified numerous badges of fraud, including: Madoff's secrecy, his insistency on retaining custody of all its assets under management, his seemingly supernatural trading performance, BLMIS's untraditional fee structure, and the lack of a qualified auditor.

12.    Despite being armed with knowledge of the serious risks of fraud that Madoff posed, the HSBC Defendants delegated many of their most critical roles and responsibilities to BLMIS.  For example, certain HSBC Defendants purported to serve as custodian of the assets of the Medici Funds, the Benbassat Funds, and the Kingate Funds, as well as others, but without any public disclosure to investors, they surrendered all custodial duties to BLMIS.  By doing so, the HSBC Defendants helped Madoff create a system devoid of checks and balances—a system ripe for fraud.  Remarkably, when conducting due diligence on other Madoff Feeder Funds, HSBC explicitly noted that BLMIS's role as custodian of assets created a serious risk of theft.

13.    Madoff's scheme could not have been accomplished or perpetuated unless the HSBC Defendants agreed to look the other way and to pretend that they were ensuring the existence of assets and trades when, in fact, they did no such thing.  Instead, the HSBC Defendants merely delegated their responsibilities to BLMIS.  The fees they received for their various roles were nothing more than kickbacks paid for looking the other way while legitimizing BLMIS through their name and brand, making it attractive to investors.

14.    The HSBC Defendants twice retained KPMG to perform due diligence on BLMIS; KPMG twice reported serious fraud risks and deficiencies, many already known to the HSBC Defendants.  Knowing that BLMIS was likely a fraud, the HSBC Defendants nevertheless continued to enable Madoff's fraud for their own gain.  No longer satisfied with being a mere marketing tool, the HSBC Defendants developed derivative structured financial products that poured even more money into BLMIS's IA Business, providing Madoff with the substantial assistance he needed to keep the Ponzi scheme going.

15.    The remaining defendants named herein are the management companies and service providers of the Medici Funds and the Benbassat Funds, as well as their directors.  Given

that Madoff did all of the "managing," these other defendants truly provided no services at all. Their overlapping ownership, and their receipt of fees for doing nothing, demonstrate that they were merely profit vehicles for Kohn, the Benbassats, and their associates.

16.     These Defendants are financial institutions, hedge funds, investment advisers, managers, and/or promoters whose financial sophistication gave them unparalleled insight into Madoff's fraud long before his confession and arrest in December 2008.  Each possessed a strong financial incentive to participate in, perpetuate, and stay silent about Madoff's fraudulent scheme.  The Defendants received management, administrative, performance, advisory, distribution, custodial, and/or other fees for driving new investors into BLMIS's IA Business. Every cent of the fees they collected is either stolen Customer Property,[2] as defined by statute, which must be returned to the Trustee for distribution, or represents the unjust enrichment of the Defendants, and must also be returned to the Trustee for the benefit of the victims of Madoff's fraud.

17.     These Defendants recklessly disregarded the numerous indicia of fraud that surrounded BLMIS.  Because of their institutional avarice, what was already a terrible crime was transformed into one of the largest thefts in history.

18.     The Defendants' financial incentives led them to turn a blind eye to numerous indicia of illegitimate trading activity and fraud, including:

(a)     Madoff refused to meet with HSBC despite the billions of dollars HSBC helped funnel into BLMIS's IA Business;

---

[2] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

-14-

(b)      BLMIS purported to trade equities and options in volumes so implausibly high that they often exceeded the *entire daily reported volume* of such options and equities traded on the world's exchanges;

(c)      BLMIS account statements sometimes showed securities trades executed outside of the daily price range;

(d)      BLMIS served as custodian of its customers' funds, *i.e.*, there was no independent third-party that could verify either that BLMIS's assets existed or that customer funds were maintained in segregated accounts;

(e)      BLMIS was too good of a deal; Madoff walked away from hundreds of millions of dollars by not charging industry standard management and performance fees. BLMIS also purported to execute trades in a manner that would have required the IA Business to front at least hundreds of millions of dollars to its customers, yet Madoff never charged the Defendants for this remarkable accommodation;

(f)      BLMIS, which had domestic and international operations with tens of billions of dollars under management, was audited by an unknown and unsophisticated auditor;

(g)      BLMIS was insulated from performance volatility even in the most volatile markets. Madoff seemed to possess a near-perfect ability to time purchases and sales of stocks and options, so that BLMIS always managed to enter and exit the markets at the precise right time on the precise right day to maximize returns and avoid losses;

(h)      BLMIS refused to allow its customers real-time access to their accounts, instead transmitting paper trade confirmations days after trades were purportedly made—a significant departure from industry practice, and an inexplicable practice at a firm that publicly proclaimed its early adoption of cutting-edge technologies;

-15-

(i)    BLMIS's billions of dollars in purported trades never caused observable price displacement or liquidity disruptions in the market;

(j)    Madoff refused to identify any of BLMIS's options trading counterparties to any of the Defendants and their customers who, collectively, risked billions of dollars in exposure to such counterparties;

(k)    BLMIS's reported trading activity frequently deviated from the purported investment strategy of the IA Business;

(l)    From the end of 2005 until Madoff's arrest, BLMIS's account statements showed transactions with the "Fidelity Spartan U.S. Treasury Money Market Fund" even though that fund had changed its name in August 2005; and

(m)    BLMIS's trade confirmations did not comport with industry standards and often used improper or incorrect terminology to describe trades.

19.    The Defendants observed all these red flags of fraud and others, but ignored them. In a 2001 due diligence report, HSBC noted that the investment community was "baffled" by Madoff and doubted that the split-strike conversion strategy (the "SSC Strategy") that he purported to employ could generate the returns he claimed. Upon information and belief, the Defendants suspected that Madoff might be illegally front-running the market using information he gleaned from his market-making operations or the "potentially greater risk" that Madoff was not, in fact, implementing the SSC Strategy. However, driven by the steady returns BLMIS purported to produce, and the profits it generated, the HSBC Defendants looked the other way.

20.    Instead of reacting to these red flags with any modicum of suspicion, skepticism, or candor, the Defendants reacted with sarcasm. In February 2006, two ███████ officials, ███
███████████████████, wrote:



"It's the magic of Madoff."

21.    Ultimately, as custodians and administrators, the HSBC Defendants oversaw the

infusion of no less than $8.9 billion into BLMIS's IA Business through a network of feeder

funds.  The HSBC Defendants funneled even more money into BLMIS in connection with

derivative structured financial products that they issued and sold to their customers.

22.    For their efforts, the Defendants received billions of dollars to which they are not

entitled.  Many of these Defendants received tens, if not hundreds, of millions of dollars by

selling, marketing, lending to, and investing in financial instruments designed to substantially

assist Madoff by pumping money into BLMIS and prolonging the Ponzi scheme.

23.    Through this Complaint, the Trustee seeks the return of Customer Property

belonging to the BLMIS estate, including redemptions, fees, compensation, and assets, as well as

compensatory and punitive damages caused by the Defendants' misconduct, and the

disgorgement of all amounts by which the Defendants were unjustly enriched at the expense of

BLMIS's customers.

## JURISDICTION AND VENUE

24.    The Trustee brings this adversary proceeding pursuant to his statutory authority

under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 510(c), 544, 547, 548, 550,

and 551 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), the New York Fraudulent

Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.*) ("DCL"), New York Civil Practice Law

and Rules ("N.Y. C.P.L.R."), and other applicable law, for the avoidance and recovery of

preferences and fraudulent conveyances, unjust enrichment, money had and received,

contribution, aiding and abedding breaches of fiduciary duty, aiding and abetting fraud,

disallowance and/or equitable subordination of customer claims, and damages in connection with

property BLMIS transferred, directly or indirectly, to or for the benefit of the Defendants, or

other activities of the Defendants in connection with BLMIS investment.  Among other things,

the Trustee seeks to set aside and recover all avoidable transfers, collect damages caused by the

Defendants, preserve the Customer Property for the benefit of BLMIS's defrauded customers,

and recover from the Defendants all Customer Property, in whatever form it may exist now or in

the future.

25.     This is an adversary proceeding brought in this Court, where the main underlying

SIPA case, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending.  The SIPA case originally

was brought in the United States District Court for the Southern District of New York as

*Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08

CV 10791 (the "District Court Proceeding"), on December 11, 2008 (the "Filing Date"), and

thereafter was removed to this Court.  This Court has jurisdiction over this adversary proceeding

under 28 U.S.C. § 1334(b) and SIPA §§ 78eee(b)(2)(A) and (b)(4).

26.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and

(O).

27.     Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND

28.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment

adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange

Commission ("SEC") filed a complaint in the District Court commencing the District Court

Proceeding against Madoff and BLMIS.  The District Court Proceeding remains pending.  The

SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment

advisory activities of BLMIS.

29.     On December 12, 2008, the Honorable Louis L. Stanton of the District Court

entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the

"Receiver").

30.     On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an

application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protections afforded by SIPA.  On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC

consented to a combination of its own action with SIPC's application.

31.     Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS

pursuant to SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to

SIPA § 78eee(b)(3);

(c)     removed the case to this Bankruptcy Court pursuant to SIPA §

78eee(b)(4); and

-19-

(d)      removed the Receiver for BLMIS.

32.      By orders dated December 23, 2008, and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of

BLMIS.

33.      At a Plea Hearing (the "Plea Hearing") on March 12, 2009, in the case captioned

*United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an eleven-count

criminal information filed against him by the United States Attorney's Office for the Southern

District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme

through the investment advisory side of [BLMIS]."  Additionally, Madoff asserted "[a]s I

engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."

34.      Another former BLMIS employee, Frank DiPascali, also subsequently pleaded

guilty to participating and conspiring to perpetuate the Ponzi scheme at a Plea Hearing on

August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS).

Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS at least

as early as the 1980s.  *See* Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*,

No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

## THE PONZI SCHEME

35.      BLMIS was founded in 1959 by Madoff and, for most of its existence, operated

from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as

founder, chairman, chief executive officer, and sole owner, operated BLMIS together with

several of his friends and family members.  BLMIS was registered with the SEC as a securities

broker-dealer under Section 15(b) of the Securities Exchange Act of 1934 (the "1934 Act"),

15 U.S.C. § 78*o*(b).  By virtue of that registration, BLMIS is a member of SIPC.  BLMIS had

three business units:  the IA Business, market-making, and proprietary trading.

36.    Outwardly, Madoff ascribed the consistent success of the IA Business to the SSC

Strategy.  Pursuant to that strategy, Madoff purported to invest BLMIS customers' funds in a

basket of common stocks within the S&P 100 Index—a collection of the 100 largest publicly

traded companies.  Madoff claimed that this basket of stocks would mimic the movement of the

S&P 100 Index.  He also asserted that he would carefully time purchases and sales to maximize

value and, correspondingly, BLMIS customers' funds would, intermittently, be out of the

market.  While out of the market, those funds were purportedly invested in United States

Treasury bills or in funds holding Treasury bills.  The second part of the SSC Strategy was the

hedge of Madoff's stock purchases with S&P 100 Index option contracts.  Those option contracts

functioned as a "collar" limiting both the potential gains and the potential losses on the baskets

of stocks.  Madoff purported to use proceeds from the sale of S&P 100 Index call options to

finance the cost of purchasing S&P 100 Index put options.  Madoff also told IA Business

customers, including the Defendants named herein, that he would enter and exit the market

between eight and twelve times each year.

37.    BLMIS's IA Business customers received fabricated monthly or quarterly

statements showing that securities were held in, or had been traded through, their accounts.

However, the securities purchases and sales shown in those account statements never occurred,

and the reported profits were entirely fictitious.  At the Plea Hearing, Madoff admitted that he

never purchased any of the securities he claimed to have purchased for the IA Business's

customer accounts.  In fact, there is no record of BLMIS having cleared a *single* purchase or sale

of securities in connection with the SSC Strategy on any trading platform on which BLMIS

reasonably could have traded securities.  Madoff's SSC Strategy was entirely fictitious.

38.    At times prior to his arrest, Madoff told customers and regulators that he

purchased and sold the put and call options over-the-counter rather than through an exchange.

Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever

purchased or sold *any* of the options described in customer statements.  Additionally, the Options

Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100

companies, has no record of the IA Business having bought or sold *any* exchange-listed options

on behalf of any IA Business customers.

39.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme.

The money received from investors was not invested in stocks and options.  Rather BLMIS used

its IA Business customers' deposits to pay other customers' redemptions and to make other

transfers, which are, of course, avoidable by the Trustee.

40.    The falsified monthly account statements reported that the accounts of IA

Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme,

BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS

was able to survive for as long as it did only because it used the stolen principal invested by

some customers to pay other customers.  Indeed, entities like the Feeder Fund Defendants and

the HSBC Defendants, by introducing billions in capital, assisted Madoff and BLMIS in

extending the life of the Ponzi scheme.

41.    At all times relevant hereto, the liabilities of BLMIS were greater than its assets.

BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it

could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

42.     Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

43.     This and similar complaints are being brought to recapture moneys paid to, or for the benefit of, BLMIS's customers, including moneys that were subsequently transferred by BLMIS's investors to other entities, so that these recovered funds can be placed in the Customer Property fund and be distributed *pro rata* in accordance with SIPA § 78fff-2(c)(1).

## THE TRUSTEE'S POWERS AND STANDING

44.     As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers and others who received avoidable transfers to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

45.     To this end, the Trustee is bringing this action against the Defendants to recover no less than $2.3 billion in avoidable transfers received from BLMIS by the Defendants and/or persons or entities on their behalf, for the six year period ending on the filing date.

46.    The Trustee is also seeking to recover subsequent transfers and other moneys received by the Defendants in their roles as investment managers, investment advisers, administrators, custodians, and providers of back-office support to the funds, and further subsequent transfers of other moneys received by the beneficial owners of these entities, all of whom facilitated the growth of the Ponzi scheme.  These subsequent transfers and moneys arose, *inter alia*, from: withdrawals; management, performance advisory, and administrative fees; fees from the marketing and sale of structured products; and other distributions.  The Trustee is seeking from Defendants an amount to be proven at trial, which, upon information and belief, will be no less than $400 million.

47.    The Trustee brings this action against the Defendants to, among other things, recover all Customer Property received, directly or indirectly, from BLMIS.

48.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff-1(b).  Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case.

49.    In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

50.    The Trustee has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

(a)    Defendants received Customer Property;

(b)    BLMIS incurred losses as a result of the claims set forth herein;

(c)    BLMIS's customers were injured as a result of the conduct detailed herein;

-24-

(d)     SIPC cannot, by statute, advance funds to the Trustee to fully reimburse all customers for all of their losses;

(e)     the Trustee will not be able to satisfy fully all claims;

(f)     the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

(g)     as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted.  As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

(h)     SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

(i)     the Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

## THE DEFENDANTS

### *Sonja Kohn and The Benbassat Family*

51.     <u>Sonja Kohn</u> ("Kohn") is responsible for facilitating all of the Feeder Fund Defendants' investments with BLMIS, and was instrumental in marketing those funds to investors across Europe and around the world.  She also served various functions with respect to a number of the Medici Funds, including managing their relationships with BLMIS, and regularly traveled to New York City to meet with Madoff.  Upon information and belief, not only

-25-

did Kohn introduce all of the Feeder Fund Defendants to Madoff, she also ushered other funds, such as Harley International (Cayman) Ltd. ("Harley") and the Kingate Funds to Madoff.

52.      Kohn and/or members of her family are majority shareholders of defendant Bank Medici, which provided "services" to a number of the Feeder Fund Defendants, and the direct or beneficial "owners" of a variety of companies that generated fees from Madoff Feeder Funds.  In these roles, upon information and belief, Kohn received fees and/or distributions to which she is not entitled and/or which are composed, in part, of Customer Property.  In addition, upon information and belief, Kohn also received and benefited from payments directly from BLMIS and its sister company in London, Madoff Securities International Ltd.  Upon information and belief, Kohn received fees and/or distributions to which she was not entitled and/or which are composed, in part, of Customer Property.

53.      <u>Mario Benbassat</u> ("M. Benbassat"), a friend of Kohn, helped create the Benbassat Funds and directed those funds' investments into the IA Business.  Upon information and belief, M. Benbassat was a director of a number of, and controlled, the Benbassat Funds, and regularly traveled to New York City to meet with Madoff.  Also upon information and belief, M. Benbassat received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

54.      <u>Alberto Benbassat</u> ("A. Benbassat"), M. Benbassat's son, helped manage and served as a director of the Benbassat Funds.  He also managed the Benbassat Funds' relationship with Madoff and regularly traveled to New York City to meet with Madoff.  Upon information and belief, A. Benbassat received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

55.    Stephane Benbassat ("S. Benbassat"), M. Benbassat's son and A. Benbassat's brother, also helped manage and served as a director of a number of the Benbassat Funds.  He also managed the Benbassat Funds' relationship with Madoff, and regularly traveled to New York City to meet with Madoff.  Upon information and belief, S. Benbassat received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

56.    As detailed further herein, A. Benbassat, M. Benbassat, and S. Benbassat (collectively, the "Benbassat Family") created a variety of entities that purported to provide services to the Benbassat Funds.  Likewise, Kohn and defendant UniCredit Bank Austria AG set up a variety of entities that claim to have provided services to the Medici Funds.  Upon information and belief, as further detailed herein, all of these entities were established principally for the purpose of investing in BLMIS and further extracting fees from investors placed in the Feeder Fund Defendants.

**_The Funds and Related Investment Vehicles_**

57.    Primeo Fund ("Primeo") is an investment fund organized under the laws of the Cayman Islands with a registered address at the offices of Zolfo Cooper (Cayman) Ltd., P.O. Box 1102, Cayman Financial Center, Bermuda House, Cayman Islands.  Primeo invested, directly and indirectly, with BLMIS.  Upon information and belief, defendants Kohn, Bank Medici, and UniCredit Bank Austria AG created and controlled Primeo.  Primeo is currently in liquidation in the Cayman Islands.  Primeo received approximately $145 million in avoidable direct and/or indirect transfers from BLMIS.

58.    Herald Fund SPC ("Herald") is an investment fund organized under the laws of the Cayman Islands.  Its registered agent is M&C Corporate Services Limited, P.O. Box 309 GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.  Herald

invested directly with BLMIS.  Upon information and belief, defendants Bank Medici and Kohn

created and controlled Herald for the purpose of investing assets with BLMIS.  Herald received

approximately $578 million in avoidable direct and/or indirect transfers from BLMIS.

59.    Herald (Lux) SICAV ("Herald (Lux)") is an investment fund organized under the

laws of the Grand Duchy of Luxembourg, with a registered office at 6, place de Nancy, L-2212

Luxembourg.  Upon information and belief, since its inception, Herald (Lux) was qualified as an

Undertaking for Collective Investment in Transferable Securities ("UCITS") fund within the

meaning of the UCITS regulations in Luxembourg.  Herald (Lux) invested directly with BLMIS.

Upon information and belief, defendants Kohn and Bank Medici created and controlled Herald

(Lux) for the purpose of investing assets with BLMIS.  Herald (Lux) is currently in liquidation in

Luxembourg.  Herald (Lux) received the benefit of approximately $134,000 in direct and/or

indirect avoidable transfers from BLMIS.

60.    Alpha Prime Fund Limited ("Alpha Prime") is an investment fund organized

under the laws of Bermuda, with a registered address at Bank of Bermuda Building, 6 Front

Street, Hamilton HM 11, Bermuda.  Alpha Prime invested directly with BLMIS.  Upon

information and belief, defendant UniCredit Bank Austria AG, and Ursula Radel-Leszczynski,

with the help of Kohn, created and controlled Alpha Prime for the purpose of investing assets

with BLMIS.  Alpha Prime received approximately $86 million in avoidable direct and/or

indirect transfers from BLMIS.

61.    Senator Fund SPC ("Senator") is an investment fund organized under the laws of

the Cayman Islands.  Its registered agent is DMS Corporate Services Ltd., P.O. Box 1344, DMS

House, 20 Genesis Close, Grand Cayman KY1-1108, Cayman Islands.  Senator invested directly

with BLMIS.  Upon information and belief, defendant UniCredit Bank Austria AG and its

-28-

subsidiary, BA Worldwide Fund Management Limited, as well as Ursula Radel-Leszczynski—whom Kohn introduced to Madoff—created and controlled Senator for the purpose of investing assets with BLMIS. Senator received approximately $95 million in avoidable direct and/or indirect transfers from BLMIS.

62.    Hermes International Fund Limited ("Hermes") is an investment fund organized under the laws of Bermuda and later redomiciled under the laws of the British Virgin Islands. Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands. Hermes was invested with BLMIS through its wholly-owned subsidiary, Lagoon Investment Limited, in whose name accounts were held at BLMIS. Upon information and belief, Hermes was created and run by the Benbassat Family and related individuals and entities, identified below. Hermes received approximately $250 million in avoidable direct and/or indirect transfers from BLMIS.

63.    Lagoon Investment Limited ("Lagoon") is a company organized under the laws of the British Virgin Islands on or about January 7, 1992. Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands. Lagoon is a wholly-owned subsidiary of Hermes that, upon information and belief, was created by the Benbassat Family and related entities and individuals, identified below, for the purpose of investing assets with BLMIS. Lagoon was the nominal holder of five BLMIS accounts (account numbers 1FN021, 1FN066, 1FN096, 1FR015, and 1FR016) and received approximately $250 million in direct and/or indirect avoidable transfers from BLMIS.

64.    Thema Fund Ltd. ("Thema Fund") is an investment fund organized under the laws of the British Virgin Islands. Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

Thema Fund invested with BLMIS through its wholly-owned subsidiary, Thema Wise

Investments Ltd., in whose name an account was held at BLMIS. Upon information and belief,

Thema Fund was created and controlled by the Benbassat Family and their related entities for the

purpose of investing a substantial portion of its assets with BLMIS. Thema Fund received

approximately $132 million in direct and/or indirect avoidable transfers from BLMIS.

65.    Thema Wise Investments Ltd. ("Thema Wise") is a company organized under the

laws of the British Virgin Islands. Its registered agent is Codan Trust Company (B.V.I.) Ltd.,

Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

Thema Wise is a wholly-owned subsidiary of Thema Fund that, upon information and belief, was

created and controlled by the Benbassat Family and their related entities for the purpose of

investing assets of Thema Fund with BLMIS. Thema Wise was the holder of BLMIS account

number 1FR093, and received approximately $132 million in direct and/or indirect avoidable

transfers from BLMIS.

66.    Thema International Fund plc ("Thema International") is an investment fund

organized under the laws of Ireland. Its registered agent is William Fry, Solicitors, Fitzwilton

House, Wilton Place, Dublin 2, Ireland. Upon information and belief, since at least December

31, 2006, Thema International has been authorized to operate as a UCITS fund within the

meaning of the UCITS regulations in Ireland. Upon information and belief, the Benbassat

Family and their related entities created and controlled Thema International for the purpose of

investing assets with BLMIS. Thema International received approximately $692 million in

direct and/or indirect avoidable transfers from BLMIS.

67.    Geo Currencies Ltd. S.A. ("Geo Currencies") is an investment fund organized

under the laws of Panama. Its registered agent is B. Arias & Asociados, Banco General Tower,

15th Floor, Aquilino de la Guardia Street, Marbella, Panamá 5, Republic of Panama.  Geo

Currencies received the benefit of approximately $416,000 in avoidable direct and/or indirect

transfers from BLMIS.

68.     Lagoon Investment Trust ("Lagoon Trust") was created pursuant to a trust deed

between defendants Lagoon and Hermes Asset Management Limited, and is a professional fund

recognized in the British Virgin Islands.  Its registered agent is Codan Trust Company (B.V.I.)

Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin

Islands.  Upon information and belief, defendant Aurelia Fund Management Limited, along with

the Benbassat Family and their related entities, created and controlled Lagoon Trust for the

purpose of investing with BLMIS.  Upon information and belief, Lagoon Trust received

approximately $250 million in direct and/or indirect avoidable transfers from BLMIS.

69.     Collectively, Primeo, Herald, Herald (Lux), Alpha Prime, Senator, Hermes,

Lagoon, Thema Fund, Thema Wise, Thema International, Geo Currencies, and Lagoon Trust are

referred to herein as the "Feeder Fund Defendants."

### *The Management Defendants*

### *Management Defendants Primarily Associated With Medici Funds*

70.     20:20 Medici AG ("Bank Medici") is a company organized under the laws of

Austria, with a registered address at Hegelgasse 17/17, 1010 Vienna, Austria.  Defendant

UniCredit Bank Austria AG founded Bank Medici in 1994.  Later that year, Kohn purchased a

majority interest in Bank Medici.  In 2003, Bank Medici was granted a banking license and was

renamed Bank Medici AG.  Upon information and belief, Bank Medici's banking license was

revoked on or about May 28, 2009.  On or about June 19, 2009, it changed its name to 20:20

Medici AG and, upon information and belief, continues to operate without a banking license.

Also upon information and belief, Bank Medici helped create and control two of the Feeder Fund

Defendants, Herald and Herald (Lux), and helped create and market Primeo. In addition, at various times, Bank Medici acted as the investment manager to Herald, Thema International, and Herald (Lux), and marketed Herald and Herald (Lux) to investors across the globe. Upon information and belief, Bank Medici received at least $15 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

71.    UniCredit Bank Austria AG ("Bank Austria") is a company organized under the laws of Austria, with a registered address at Schottengasse 6-8, 1010 Vienna, Austria. Upon information and belief, during a portion of the relevant period, Bank Austria maintained a branch office at 150 E. 42nd Street, New York, New York. Bank Austria is a subsidiary of defendant UniCredit S.p.A. Upon information and belief, Bank Austria helped create, control, and/or market Primeo, Alpha Prime, and Senator. Upon information and belief, Bank Austria received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

72.    BA Worldwide Fund Management Ltd. ("BA Worldwide") was a company organized under the laws of the British Virgin Islands with a registered address at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. BA Worldwide was a subsidiary of defendant Bank Austria and was voluntarily liquidated on or about February 22, 2008. At various times, BA Worldwide served as the investment adviser to Primeo, Alpha Prime, and Thema International. Upon information and belief, BA Worldwide received at least $68 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

73.    UniCredit S.p.A. ("UniCredit") is a company organized under the laws of Italy, with a registered address at Via Alessandro Specchi, 16, 00186, Rome, Italy, and a general

management headquarter office at Piazza Cordusio, 20123, Milan, Italy.  Upon information and

belief, UniCredit has a branch office at 150 E. 42nd Street, New York, New York.  UniCredit is

the parent company of defendants Bank Austria and Pioneer and, at various times, upon

information and belief, helped control the activities of Primeo.  Upon information and belief,

UniCredit received fees and/or distributions to which it is not entitled and/or which are

composed, in part, of Customer Property.

74.    Herald Asset Management Limited ("Herald Management") is a company

organized under the laws of the Cayman Islands with a last known registered address at

Whitehall House, 238 North Church Street, P.O. Box 31362, Seven Mile Beach, George Town,

Grand Cayman, Cayman Islands.  Upon information and belief, Herald Management is wholly-

owned by Kohn's husband, defendant Erwin Kohn, via a trust.  Herald Management served as

investment manager to Herald.  Upon information and belief, Herald Management received at

least $99 million in fees and/or distributions to which it is not entitled and/or which are

composed, in part, of Customer Property.

75.    Eurovaleur, Inc. ("Eurovaleur") is a company organized under the laws of the

State of New York with multiple last known addresses at 230 Park Avenue, Room 539, New

York, New York 10169, and 767 5th Avenue, 5th Floor, Room 507, New York, New York 10022.

Eurovaleur is wholly-owned by Kohn and members of her family.  Upon information and belief,

Eurovaleur served as the investment sub-adviser to Primeo and received 20% of the fees that BA

Worldwide received in connection with Primeo.  Upon information and belief, Eurovaleur holds

an ownership interest in defendant Thema Asset Management Limited.  Upon information and

belief, Eurovaleur received fees and/or distributions to which it is not entitled and/or which are

composed, in part, of Customer Property.

-33-

76.   <u>Pioneer Alternative Investment Management Limited</u> ("Pioneer") is a company organized under the laws of Ireland with a registered address at 1, George's Quay Plaza, George's Quay, Dublin 2, Ireland.  Pioneer is a wholly-owned subsidiary of Pioneer Global Asset Management S.p.A., a subsidiary of UniCredit.  Pioneer served as an investment adviser to Primeo.  Upon information and belief, Pioneer received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

77.   <u>Alpha Prime Asset Management Ltd.</u> ("Alpha Prime Management") is a company organized under the laws of Bermuda with a registered address at 83 Front Street, Hamilton HM 12, Bermuda.  Alpha Prime Management served as the investment manager to Alpha Prime. Upon information and belief, Alpha Prime Management received fees and/or distributions of at least $16 million to which it is not entitled and/or which are composed, in part, of Customer Property.

78.   <u>Regulus Asset Management Limited</u> ("Regulus") is a company organized under the laws of Bermuda with a registered address at 83 Front Street, Hamilton HM 12, Bermuda. Regulus served as an investment manager to Senator.  Upon information and belief, Regulus received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

79.   <u>Carruba Asset Management Limited</u> ("Carruba") is a company organized under the laws of Bermuda with a registered address at 83 Front Street, Hamilton HM 12, Bermuda. Carruba served as investment adviser to Senator.  Upon information and belief, in connection with that role, Carruba received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

80.    <u>Tereo Trust Company Limited</u> ("Tereo Trust") is a company organized under the laws of Bermuda with a principal place of business at Swiss Fund Services, 83 Front Street, Hamilton HM 12, Bermuda.  Tereo Trust wholly owns Alpha Prime Management, Regulus, and Carruba.  Upon information and belief, Tereo Trust received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

### *<u>Management Defendants Associated with the Benbassat Funds</u>*

81.    <u>Genevalor, Benbassat et Cie</u> ("Genevalor") is a partnership formed under the laws of Switzerland with a registered address at rue 6 Place Camoletti, CH 1207, Geneva, Switzerland.  Upon information and belief, defendant M. Benbassat co-founded Genevalor.  The following are partners in Genevalor:  A. Benbassat, S. Benbassat, Nespolo, D. Smith, M. Benbassat, and Union Bancaire Privée.  Upon information and belief, Genevalor helped control and create Hermes, Lagoon, Thema International, Thema Fund, Thema Wise, and Geo Currencies.  Genevalor, at various times, served as the distributor and sub-distributor of Thema International.  Upon information and belief, Genevalor received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

82.    <u>Hermes Asset Management Limited</u> ("Hermes Management") is a company organized under the laws of Bermuda with a registered address at Ecosse Ltd., Bermudiana Arcade, 3rd Floor, 27 Queen Street, Hamilton HM 11, Bermuda.  Upon information and belief, Hermes Management is owned and controlled, in part, by the Benbassat Family and/or Genevalor.  Hermes Management served as the investment manager of Hermes and Lagoon Trust.  Upon information and belief, in connection with those roles, Hermes Management received at least $79 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

83.    <u>Thema Asset Management (Bermuda) Ltd.</u> ("Thema Management Bermuda") is a company organized under the laws of Bermuda with a registered address at Ecosse Ltd., Bermudiana Arcade, 3rd Floor, 27 Queen Street, Hamilton HM 11, Bermuda.  Upon information and belief, members of the Benbassat Family are co-owners and directors of Thema Management Bermuda.  Thema Management Bermuda served as the investment manager of Thema Fund.  Upon information and belief, Thema Management Bermuda received approximately $10 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

84.    <u>Thema Asset Management Limited</u> ("Thema Management BVI") is a company organized under the laws of the British Virgin Islands with best known registered addresses at Codan Trust Company (B.V.I) Ltd., Romasco Place, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, and at Harneys Corporate Services, Ltd., Craigmuir Chambers, P.O. Box 71, Road Town, Tortola VG1110, British Virgin Islands.  Upon information and belief, members of the Benbassat Family formed and are the directors of Thema Management BVI and, along with Kohn's company, Eurovaleur, are owners of the company.  Thema Management BVI served as the investment manager and global distributor for Thema International.  Upon information and belief, Thema Management BVI received at least $105 million in fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

85.    <u>Equus Asset Management Limited</u> ("Equus") is a company organized under the laws of Bermuda with a registered address at Warner Building, 85 Reid Street, Hamilton HM 12, Bermuda.  Equus is owned, in substantial part, by entities owned by members of the Benbassat Family and other partners in Genevalor.  Upon information and belief, principals of Equus co-founded and were active in controlling Hermes, Thema Fund, Thema International, and Geo

-36-

Currencies. Equus provided administrative support to Thema Management Bermuda in its

capacity as investment manager of Thema Fund. In addition, Equus holds ownership interests in

Hermes Management and Thema Management Bermuda. Upon information and belief, Equus

received fees and/or distributions to which it is not entitled and/or which are composed, in part,

of Customer Property.

86.    Equus Asset Management Partners, L.P. ("Equus Partners") is a partnership

formed under the laws of Bermuda with a registered office at Warner Building, 85 Reid Street,

Hamilton HM 12, Bermuda. Defendants A. Benbassat, S. Benbassat, M. Benbassat, Nespolo,

and D. Smith hold, or have held, partnership interests in Equus Partners. Equus Partners is an

owner of defendant Equus and, ultimately, holds interests in Hermes Management and Thema

Management Bermuda by virtue of its ownership interest in Equus. Equus Partners also

provided administrative support to Hermes Management, in its capacity as investment manager

of Hermes and Lagoon Trust. Upon information and belief, Equus Partners received fees and/or

other distributions to which it is not entitled and/or which are composed, in part, of Customer

Property.

87.    Aurelia Fund Management Limited ("Aurelia") is a company organized under the

laws of Bermuda with a registered address at Conyers, Dill & Pearman, Clarendon House, 2

Church Street, Hamilton HM 11, Bermuda. Upon information and belief, Aurelia has wound up,

or is in the process of winding up, its operations in Bermuda and no longer is a going concern.

Upon information and belief, Aurelia holds an ownership interest in Hermes Management, and

principals of Aurelia co-founded and were active in controlling Hermes and Lagoon Trust.

Aurelia provided administrative support to Hermes Management, the investment manager of

Hermes and Lagoon Trust. Aurelia was also the investment adviser of Lagoon Trust. Upon

information and belief, Aurelia received fees and/or other distributions to which it is not entitled

and/or which are composed, in part, of Customer Property.

88.    Bank Medici, Bank Austria, Genevalor, Herald Management, BA Worldwide,

Pioneer, Eurovaleur, Alpha Prime Management, Regulus, Carruba, Hermes Management, Thema

Management BVI, Thema Management Bermuda, Equus, Equus Partners, and Aurelia are

referred to collectively herein as the "Management Defendants."

### *Beneficial Owners*

89.    <u>Inter Asset Management Inc.</u> ("Inter Asset") is a company organized under the

laws of the British Virgin Islands.  Its registered agent is Citco B.V.I. Limited, Citco Building,

P.O. Box 662, Wickhams Cay, Road Town, Tortola, British Virgin Islands.  Upon information

and belief, Inter Asset has an ownership interest in Hermes Management, and received fees

and/or distributions to which it is not entitled and/or which are composed, in part, of Customer

Property.

90.    <u>T+M Trusteeship & Management Services S.A.</u> ("T+M") is a company organized

under the laws of Switzerland with a registered address at rue de Prince 9-11, 1204 Geneva,

Switzerland.  Upon information and belief, T+M has an ownership interest in Thema

Management BVI, and received fees and/or distributions to which it is not entitled and/or which

are composed, in part, of Customer Property.

91.    <u>GTM Management Services Corp. N.V.</u> ("GTM Management") is a company

organized under the laws of Curaçao with a registered address at c/o Holland Intertrust (Antilles)

N.V., De Ruyterkade 58A, Curaçao, Netherlands Antilles.  Upon information and belief, GTM

Management has an ownership interest in Hermes Management, and received fees and/or

distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

-38-

92.     <u>Aurelia Asset Management Partners</u> ("Aurelia Partners") was a partnership organized under the laws of Bermuda with a registered address at Chevron International Limited, Chevron House, 11 Church Street, Hamilton HM 11, Bermuda. The partnership was dissolved on October 12, 2009. Upon information and belief, partnership interests in Aurelia Partners were held by defendants Laurent Mathysen-Gerst, Olivier Ador, Pascal Cattaneo, Vladimir Stepczynski, and Jean-Marc Wenger. Aurelia Partners was the owner of Aurelia. Upon information and belief, Aurelia Partners received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

93.     <u>Cape Investment Advisors Limited</u> ("Cape Investment") is a company organized under the laws of Bermuda with a registered address at Warner Building, 85 Reid Street, Hamilton, HM 12, Bermuda. Cape Investment holds an ownership interest in Thema Management Bermuda. Upon information and belief, Cape Investment received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

94.     Bank Austria, UniCredit, Tereo Trust, Eurovaleur, Genevalor, Equus, Equus Partners, Cape Investment, Inter Asset, GTM Management, T+M, Aurelia, and Aurelia Partners, as well as the Individual Defendants named herein, are referred to collectively herein as the "Beneficial Owners."

### *The HSBC Defendants*

95.     <u>HSBC Holdings plc</u> ("HSBC Holdings") is a public limited corporation, incorporated under the laws of England and Wales, with a principal place of business at 8 Canada Square, London E14 5HQ, United Kingdom. HSBC Holdings is the parent company of what is known as the HSBC Group, including all of the HSBC entities named as Defendants herein. Upon information and belief, HSBC Holdings received fees and/or distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

-39-

96.     <u>HSBC Bank plc</u> ("HSBC Bank") is a banking institution incorporated under the

laws of England and Wales with a principal place of business at 8 Canada Square, London E14

5HQ, United Kingdom.  HSBC Bank was the payee bank for all of the Feeder Fund Defendants.

Upon information and belief, all moneys that were deposited with BLMIS by the Feeder Fund

Defendants went through HSBC Bank.  Upon information and belief, all moneys which were

withdrawn from BLMIS by the Madoff Feeder Fund Defendants went through HSBC Bank.

Upon information and belief, HSBC Bank received fees and/or distributions to which it is not

entitled and/or which are composed, in part, of Customer Property.

97.     <u>HSBC Bank USA, N.A.</u> ("HSBC Bank USA") is a national bank chartered by the

Office of the Comptroller of the Currency with a principal executive office at 452 Fifth Avenue,

New York, New York 10018 and also with a corporate headquarters at 1800 Tysons Boulevard,

Suite 50, McLean, VA.  HSBC Bank USA operates over 50 branches in Manhattan alone.

HSBC Bank USA created structured financial products and entered into transactions involving

those structured products, which ultimately served to increase the amount of money invested

with BLMIS's IA Business.  Upon information and belief, HSBC Bank USA received fees

and/or distributions to which it is not entitled and/or which are composed, in part, of Customer

Property.

98.     <u>HSBC Securities Services (Bermuda) Limited</u> ("HSSB"), is incorporated under

the laws of Bermuda with a principal place of business at 6 Front Street, Hamilton HM 11,

Bermuda.  Upon information and belief, HSSB served as administrator to Thema Fund, Hermes,

and Alpha Prime, and directed and facilitated the transfer of millions of dollars into and out of

BLMIS's IA Business.  Upon information and belief, HSSB received fees and/or distributions to

which it is not entitled and/or which are composed, in part, of Customer Property.

99.    <u>HSBC Institutional Trust Services (Bermuda) Limited</u> ("HITSB") is a corporation

organized and existing under the laws of Bermuda with a principal place of business at 6 Front

Street, Hamilton HM 11, Bermuda.  HITSB served as the custodian for Alpha Prime, Hermes,

and Thema Fund.  Upon information and belief, HITSB received fees and/or distributions to

which it is not entitled and/or which are composed, in part, of Customer Property.

100.    <u>HSBC Bank Bermuda Limited</u> ("HSBC Bank Bermuda"), formerly known as The

Bank of Bermuda Limited, is a banking institution with a principal place of business at 6 Front

Street, Hamilton HM 11, Bermuda.  HSBC Bank Bermuda formerly served as the administrator

and custodian of Alpha Prime, Thema Fund, Hermes, and Square One Fund Limited ("Square

One"), which is a defendant in a separate action being brought by the Trustee.  HSBC Bank

Bermuda also served as custodian for the Kingate Funds, both of which are defendants in a

separate action being brought by the Trustee.  Upon information and belief, HSBC Bank

Bermuda entered into at least one sub-custodian agreement with BLMIS.  Upon information and

belief, HSBC Bank Bermuda received fees and/or distributions to which it is not entitled and/or

which are composed, in part, of Customer Property.

101.    <u>HSBC Securities Services (Luxembourg) S.A.</u> ("HSSL"), formerly known as

Bank of Bermuda (Luxembourg) S.A., is a limited liability company incorporated as a société

anonyme under the laws of the Grand Duchy of Luxembourg, and maintains its principal place of

business at 16, boulevard d'Avranches, L-1160 Luxembourg.  HSSL served as administrator to

Lagoon, Herald, Herald (Lux), and Senator, and, upon information and belief, served as the sub-

administrator to Thema Fund, Alpha Prime, Hermes, and Primeo.  HSSL also served as

custodian to Lagoon, Herald, Herald (Lux), Primeo, and Senator, and served as sub-custodian to

Alpha Prime, Hermes, and Thema Fund.  Also, upon information and belief, HSSL engaged

BLMIS to act as its sub-custodian to those Madoff Feeder Funds for which the bank served as

custodian or sub-custodian. Upon information and belief, HSSL received fees and/or

distributions to which it is not entitled and/or which are composed, in part, of Customer Property.

102.    HSBC Bank (Cayman) Limited ("HSBC (Cayman)"), which merged into Bank of

Bermuda (Cayman) Limited, is a banking institution incorporated and existing under the laws of

the Cayman Islands with a principal place of business at HSBC House, 68 West Bay Road,

Grand Cayman, KY1-1102, Cayman Islands. HSBC (Cayman) served as the administrator of

Primeo. Upon information and belief, HSBC (Cayman) received fees and/or distributions to

which it is not entitled and/or which are composed, in part, of Customer Property.

103.    HSBC Private Banking Holdings (Suisse) S.A. ("HSBC Private Banking

Holdings (Suisse)") is a majority-owned subsidiary of HSBC Bank existing under the laws of

Switzerland, with a principal place of business at Quai du Général Guisan, 2, P.O. Box 3580,

CH-1211, Geneva 3, Switzerland. Upon information and belief, HSBC Private Banking

Holdings (Suisse)—and/or entities under its control—marketed and directed investor moneys to

the Madoff Feeder Funds, including the Feeder Fund Defendants. Upon information and belief,

HSBC Private Banking Holdings (Suisse) received fees and/or distributions to which it is not

entitled and/or which are composed, in part, of Customer Property.

104.    HSBC Private Bank (Suisse) S.A. ("HSBC Private Bank (Suisse)") is a public

company incorporated and existing under the laws of Switzerland, with a principal place of

business at Quai du Général Guisan, 2, P.O. Box 3580, CH-1211 Geneva 3, Switzerland. It is a

subsidiary of HSBC Private Banking Holdings (Suisse). Upon information and belief, HSBC

Private Banking Holdings (Suisse)—and/or entities under its control—marketed Madoff Feeder

Funds, including the Feeder Fund Defendants to investors. Upon information and belief, HSBC

Private Bank (Suisse) received fees and/or distributions to which it was not entitled and/or which are composed, in part, of Customer Property.

105.    <u>HSBC Institutional Trust Services (Ireland) Ltd.</u> ("HITSI") is a limited liability company incorporated under the laws of Ireland with a principal place of business at One Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland. HITSI served as custodian to Thema International, and other Madoff Feeder Funds, including Defender, Landmark, and Optimal. Upon information and belief, HITSI appointed BLMIS to act as its sub-custodian for those Madoff Feeder Funds for which it served as custodian. Upon information and belief, HITSI received fees and/or distributions to which it was not entitled and/or which are composed, in part, of Customer Property.

106.    <u>HSBC Securities Services (Ireland) Ltd.</u> ("HSSI") is a limited liability company incorporated under the laws of Ireland with a registered office at One Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland. HSSI served as administrator to Thema International, Defender, Landmark, and Optimal. Upon information and belief, HSSI received fees and/or distributions to which it was not entitled and/or which are composed, in part, of Customer Property.

107.    <u>HSBC Fund Services (Luxembourg) S.A.</u> ("HSBC Fund Services"), formerly known as Management International (Luxembourg) S.A., is a wholly-owned subsidiary of HSBC Holdings incorporated under the laws of the Grand Duchy of Luxembourg, and has a registered address at 16, boulevard d'Avranches, L-1160 Luxembourg. HSBC Fund Services acted as sub-administrator and sub-registrar for Hermes. Upon information and belief, HSBC Fund Services received fees and/or distributions to which it was not entitled and/or which are composed, in part, of Customer Property.

-43-

108.    HSBC Holdings, HSBC Bank, HSBC Bank USA, HITSB, HITSI, HSBC Private

Banking Holdings (Suisse), HSBC Private Bank (Suisse), HSSB, HSSI, HSSL, HSBC

(Cayman), HSBC Fund Services, and HSBC Bank Bermuda are referred to collectively herein as

the "HSBC Defendants."

109.    In addition to the fees and/or distributions described above, the HSBC Defendants

are liable to the Trustee for damages caused by actions that enabled, prolonged, and worsened

the Ponzi scheme, in amounts to be determined at trial but, in any event, no less than the

subscriptions which the HSBC Defendants facilitated into BLMIS and/or the Feeder Fund

Defendants.

### *Other Individuals*

110.    <u>Erwin Kohn</u> ("E. Kohn") is the husband of Kohn, and owns Herald Management

through a trust vehicle.

111.    <u>Ursula Radel-Leszczynski</u> ("Radel-Leszczynski") served as a director of Primeo

and Alpha Prime.  Radel-Leszczynski also was the President of BA Worldwide from 2000 until

at least 2007 and, upon information and belief, was subsequently employed by Pioneer or one of

its affiliates.  Also upon information and belief, Radel-Leszczynski co-founded Alpha Prime and

Senator; was actively involved in the management of Primeo, Alpha Prime, and Senator; and

managed Madoff's relationship with Primeo, Alpha Prime, and Senator.  Upon information and

belief, Radel-Leszczynski received fees and/or distributions to which she was not entitled and/or

which are composed, in part, of Customer Property.

112.    <u>Roberto Nespolo</u> ("Nespolo") is a general partner of Genevalor and, upon

information and belief, managed, administered, and marketed Hermes, Thema International, and

Thema Fund for many years.  Nespolo also served as a director of Thema Fund, Thema

Management Bermuda, and Equus, and is a general partner of Equus Partners.  Upon information

and belief, Nespolo received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

113.    David T. Smith ("D. Smith") is a general partner of Genevalor and, upon information and belief, managed, administered, and marketed Hermes, Thema International, and Thema Fund for many years.  D. Smith served as a director of Thema Fund, Hermes (and its subsidiary, Lagoon), Thema International, Hermes Management, and Thema Management Bermuda; was the President and a director of Equus; was the President and a Director of Cape Investment; and was a general partner of Equus Partners.  Upon information and belief, D. Smith received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

114.    Laurent Mathysen-Gerst ("Mathysen-Gerst"), upon information and belief, co-founded and managed, administered, and marketed Hermes and Lagoon Trust.  Mathysen-Gerst also served as a director of Hermes (and its subsidiary, Lagoon); was an authorized signatory for Hermes; served on Hermes's investment committee (which decided with which managers the fund invested); was a director and the President of Aurelia; and was a general partner of Aurelia Partners.  Upon information and belief, Mathysen-Gerst received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

115.    Olivier Ador ("Ador"), upon information and belief, co-founded, managed, administered, and marketed Hermes and Lagoon Trust.  Ador also was a general partner of Aurelia Partners.  Upon information and belief, in connection with those roles, Ador received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

116.   <u>Pascal Cattaneo</u> ("Cattaneo"), upon information and belief, co-founded and managed, administered, and marketed Hermes and Lagoon Trust. Cattaneo served as a director and Vice-President of Aurelia, and was a general partner of Aurelia Partners. Upon information and belief, Cattaneo received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

117.   <u>Vladimir Stepczynski</u> ("Stepczynski"), upon information and belief, co-founded, managed, administered, and marketed Hermes and Lagoon Trust. Stepczynski served as a director of Aurelia; was an authorized signatory for Hermes; served on Hermes's investment committee (which decided with which managers the fund invested); and was a general partner of Aurelia Partners. Upon information and belief, Stepczynski received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

118.   <u>Jean-Marc Wenger</u> ("Wenger"), upon information and belief, co-founded, managed, administered, and marketed Hermes and Lagoon Trust. Wenger served as a director of Aurelia, and was a general partner of Aurelia Partners. Upon information and belief, Wenger received fees and/or distributions to which he was not entitled and/or which are composed, in part, of Customer Property.

119.   Kohn, E. Kohn, Radel-Leszczynski, M. Benbassat, A. Benbassat, S. Benbassat, Nespolo, D. Smith, Mathysen-Gerst, Ador, Cattaneo, Stepczynski, and Wenger are referred to collectively herein as the "Individual Defendants."

## **PERSONAL JURISDICTION**

### ***Individual Defendants***

120.   This Court has personal jurisdiction over all of the Individual Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004. All of the Individual Defendants have maintained minimum contacts with New York in connection with the claims

alleged herein. All of the Individual Defendants provided substantial assistance to Madoff in perpetrating a massive fraud and, thereby, committed tortious acts, both within and outside of New York, causing injury within New York. In addition, all of the Individual Defendants and/or their agents have traveled to New York to meet with Madoff, undertaken significant commercial activities in New York, and derived significant revenue from New York.

121. Kohn, Radel-Leszczynski, M. Benbassat, A. Benbassat, S. Benbassat, and Mathysen-Gerst regularly communicated with persons in New York regarding BLMIS.

122. A. Benbassat, D. Smith, and Radel-Leszczynski entered into agreements with BLMIS on behalf of Thema Wise, Thema International, Lagoon, and/or Alpha Prime, and delivered the agreements, or caused the agreements to be delivered, to BLMIS's headquarters in New York.

123. Upon information and belief, all of the Individual Defendants routinely assisted in transferring investor funds to BLMIS for the express purpose of investing with BLMIS.

124. Upon information and belief, Radel-Leszczynski and Ador have filed customer claims in this action seeking to recover assets allegedly lost through BLMIS, and thus have submitted to this Court's jurisdiction.

### *Feeder Fund Defendants*

125. This Court has personal jurisdiction over the Feeder Fund Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004. All of the Feeder Fund Defendants have maintained minimum contacts with New York in connection with the claims alleged herein. The Feeder Fund Defendants all invested, directly or indirectly, with BLMIS, which operated its principal place of business in New York, New York. Additionally, BLMIS maintained accounts for the benefit of the Feeder Fund Defendants in New York, New York. The Feeder Fund Defendants and/or their agents sent, and/or directed others to send, funds to BLMIS, and

received funds from BLMIS.  The Feeder Fund Defendants used New York banks when

redeeming funds distributed to them by BLMIS and when investing additional funds with

BLMIS.  All of the Feeder Fund Defendants and/or their agents routinely directed the transfer of

their investors' funds to, and received moneys and receipts from, BLMIS's account at JPMorgan

Chase, Account #xxxxxxxxxxxx'703 (the "703 Account"), in New York, New York to conduct

trading activities.

126.    Alpha Prime, Herald, Herald (Lux), Geo Currencies, Hermes, Lagoon, Primeo,

Senator, Thema Fund, Thema Wise, and Thema International, and/or their agents, executed

and/or caused to be executed a variety of agreements relating to BLMIS accounts they

maintained and/or that were maintained on their behalf.  Specifically, the Feeder Fund

Defendants executed, or caused to be executed, Customer Agreements, Option Agreements, and

Trading Authorizations Limited to Purchases and Sales of Securities and Options, and delivered

those agreements to BLMIS at BLMIS's headquarters in New York, New York.  By their terms,

those agreements were to be performed by BLMIS in New York through activities that were to

take place in New York.

127.    Further, certain Feeder Fund Defendants—specifically, Alpha Prime, Geo

Currencies, Herald, Herald (Lux), Lagoon, Senator, Thema International, and Thema Wise—

filed SIPA claims seeking to recover funds that they allegedly lost on their investments in

BLMIS, and thus have submitted to this Court's jurisdiction.

### *Management Defendants*

128.    This Court has personal jurisdiction over all of the Management Defendants

pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004.  All of the Management

Defendants maintained minimum contacts with New York in connection with the claims alleged

herein.  In addition, all of the Management Defendants routinely directed the transfer of investor

funds to, and the receipt of investor funds from, BLMIS in New York; derived significant
revenue from the purported sales and purchases of securities in New York; and committed
tortious acts, both within and outside of New York, causing injury within New York. The
Management Defendants reasonably should have expected those acts to have consequences in
New York, and derived substantial revenue from interstate or international commerce.

129.    Upon information and belief, the Management Defendants and/or their agents
communicated regularly with persons in New York regarding BLMIS, and their agents
communicated with BLMIS on multiple occasions in connection with the allegations herein.

130.    Upon information and belief, certain Management Defendants delivered to
BLMIS's headquarters in New York account opening documents, including agreements, relating
to BLMIS accounts maintained for the Feeder Fund Defendants.

131.    Upon information and belief, the Management Defendants all received BLMIS
account statements and trade confirmations, and derived substantial revenue based on the
purported trading activities of BLMIS.

### *Beneficial Owners of Management Defendants*

132.    This Court has personal jurisdiction over all of the Beneficial Owners pursuant to
N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004. All the Beneficial Owners have
maintained minimum contacts with New York in connection with the claims alleged herein. At
all relevant times, all of the Beneficial Owners have derived significant revenue from New York
and committed tortious acts, both within and outside of New York, causing injury within New
York.

133.    Upon information and belief, during at least a portion of the relevant period, Bank
Austria, Eurovaleur, and UniCredit maintained offices in New York, New York, and regularly
transacted business in New York.

134.    Upon information and belief, all of the Beneficial Owners have assisted in directing the transfer of funds into, and the receipt of funds from, the 703 Account for the explicit purpose of investing with BLMIS, and they and/or their agents regularly transacted business in New York.

135.    Upon information and belief, all of the Individual Defendants who are Beneficial Owners, and/or their agents, traveled to New York, New York to meet with Madoff in the offices of BLMIS, and transacted business in New York.  These Defendants have purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York and by receiving Customer Property to their benefit.

### HSBC Defendants

136.    This Court has personal jurisdiction over all of the HSBC Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004.  All of the HSBC Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.

137.    Acting in their capacity as fund administrators and sub-administrators, HSSI, HSBC Bank Bermuda, HSBC (Cayman), HSSB, HSSL, and HSBC Fund Services (collectively, the "HSBC Administrator Defendants") transmitted instructions to BLMIS, and received from BLMIS trade confirmations, account statements, and other information.  The HSBC Administrator Defendants communicated with BLMIS in connection with their "duties" as fund administrators and were compensated for such communications.  The HSBC Administrator Defendants transmitted the false information provided by BLMIS to customers located around the world, including within the United States.  The HSBC Administrator Defendants have availed themselves of the laws of the State of New York by undertaking substantial commercial activities in New York and by receiving Customer Property to their benefit.

138.    Acting in their capacity as fund custodians and sub-custodians, HITSI, HSSL,

HITSB, and HSBC Bank Bermuda (collectively, the "HSBC Custodian Defendants") directed

and facilitated the transfer of hundreds of millions of dollars to and from BLMIS in New York

for the purported purchase and sale of securities in New York.  Through these activities, the

HSBC Custodian Defendants purposely availed themselves of the laws of the State of New York

by undertaking substantial commercial activities in New York and by receiving Customer

Property to their benefit.  The HSBC Custodian Defendants committed tortious acts both within

and outside of New York, causing injury in New York, and reasonably should have expected

those acts to have consequences in New York and elsewhere in the United States.

139.    Each HSBC Custodian Defendant that entered into a sub-custodian agreement

with BLMIS engaged BLMIS as its agent to act as the sub-custodian of fund assets.  BLMIS,

acting as an agent on behalf of the HSBC Custodian Defendants, committed multiple torts in the

State of New York causing substantial injury to persons in the State of New York and elsewhere

in the United States.

140.    Acting in their capacity as payee banks, certain HSBC Defendants, including

HSBC Bank, received and facilitated the transfer of stolen Customer Property out of BLMIS in

New York or for the benefit of the Feeder Fund Defendants, and facilitated the transfer of funds

from certain Feeder Fund Defendants to BLMIS in New York.

141.    Further, certain of the HSBC Defendants, including HSBC Bank and HSBC Bank

USA, increased the flow of funds into Madoff's Ponzi scheme by creating and marketing

structured financial products.  Those products facilitated the investment of hundreds of millions

of dollars into the Madoff Feeder Funds.  The inflow of funds from those structured products

helped to perpetuate Madoff's Ponzi scheme, thus deepening the insolvency of BLMIS and perpetuating Madoff's fraud.

142.    HSBC Bank USA is domiciled in the United States, and maintains offices and regularly transacts business in the State of New York.

143.    The HSBC Defendants have purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York, and by receiving Customer Property to their benefit. The HSBC Defendants derived significant revenue from New York. The HSBC Defendants have committed tortious acts both within and outside of New York, causing injury in New York, and the HSBC Defendants expected or should have reasonably expected those acts to have consequences in New York.

## RED FLAGS STRONGLY SUGGESTED
## THAT BLMIS'S IA BUSINESS WAS A FRAUD

144.    For years, the Defendants invested—and encouraged others to invest—through BLMIS's IA Business notwithstanding explicit awareness of myriad red flags indicating that Madoff was engaged in a massive fraud. Despite observing and even internally reporting many signs that, at the very least, Madoff was not investing the way he purported to, the Defendants abandoned all candor and skepticism in order to profit from the supernaturally consistent returns of BLMIS's IA Business. The red flags were shocking not only for what they demonstrated about Madoff's investment strategy, but also for what they demonstrated about the depth of the Defendants' awareness of the fraud.

### *Madoff's Secrecy*

145.    Although Madoff touted the simplicity of his investment strategy, he refused to provide even the most basic details about how he implemented that strategy. Madoff's secrecy was a red flag. As HSBC noted in a 2001 report regarding Greenwich Sentry, L.P. ("Sentry"):

"transparency issues prevent us from conducting a proper due diligence." Yet HSBC had no

problem encouraging its customers to invest in a wide array of identical Madoff funds and

products. This concern repeatedly was identified by the Defendants, who ultimately ignored

Madoff's inexplicable secrecy and the implication that there was something to hide.

146.    The HSBC Defendants, Management Defendants, and Feeder Fund Defendants

all acquiesced to Madoff's demands and kept Madoff's name out of offering documents relating

to the Feeder Fund Defendants. In addition, to assist in maintaining Madoff's secrecy, the

Feeder Fund Defendants were established in domiciles that permitted them to omit mention of

both Madoff and BLMIS in offering materials.

147.    The Defendants acknowledged that they were concealing Madoff's identity and

role in managing the Madoff Feeder Funds. In August 2005, ████████ of ████ told ███

████ of ██████, ████████████████████████████████████████████████

████████████████████████████████████████████

148.    Similarly, Bank Medici employees were instructed never to mention Madoff

when discussing the funds with unsophisticated investors.

### Madoff's Purported Trade Volumes Were Too High to Be Believed

149.    Although for many years Madoff was not willing to disclose BLMIS's assets

under management, the Defendants knew that the IA Business was too big to plausibly execute

the SSC Strategy: with *at least* billions under management, there were not enough shares of

stock to enable Madoff's supposedly seamless entry into and exit out of the market. Madoff

purported to purchase baskets of stocks and options which were then allocated to each customer

account. When BLMIS registered as an investment adviser in August 2006, it disclosed

(inaccurately) that it had $11.7 billion in assets under management at the end of July 2006.

Despite the inaccuracy of this disclosure, the Defendants should have recognized that a fund of

that size would entail trading immense percentages of some of the most highly-traded stocks in

the world.  At times, BLMIS's purported trades in stocks on behalf of its IA customers

approached or exceeded the entire volume of trades in those stocks on the composite tape, which

includes all listed and unlisted market volumes.

150.    For example, on November 26, 2007, BLMIS purportedly traded 8,608 shares of

Abbott Laboratories (ABT) in Senator's account, an amount which, when extrapolated to the

entire IA Business, would have exceeded the daily volume of that stock traded on the composite

index by 407%.

151.    In fact, across all of the accounts of the funds for which the HSBC Administrator

Defendants served as administrator, there were 484 purported trades in stocks which, when

extrapolated across the entire IA Business, would have exceeded the entire volume of trades in

those stocks on the composite tape, and an additional 445 which, if similarly extrapolated, would

have represented more than 50% of the volume traded in those stocks on the composite tape.

Across all of the accounts of the funds for which HSBC served as custodian there were 454

purported transactions where BLMIS's trades represented more than 50% of the purportedly

traded stock's volume on the composite tape and an additional 484 where BLMIS's trades

exceeded the entire volume of the purportedly traded stock on the composite tape.

152.    Aside from the implausibility of effecting trades comprising more than half of the

daily trading volume in a particular stock, the Defendants should have—at the very least—been

concerned with the fact that these massive trades never caused *any market displacement*

*whatsoever*.

153.    Despite the large volumes that Madoff purported to trade, BLMIS's IA Business

never caused the slightest ripple in the market.  Madoff purported to fully exit and re-enter the

-54-

market eight to twelve times every year, each time in just a few days, trading billions of dollars worth of stocks without causing any price displacement or other market effect. As the world now knows, this displacement was never observed because the trading did not occur. Based on the lack of observable market reaction, the Defendants knew or should have known that Madoff's trades were not happening as he claimed.

154.    At the very least, these observations should have caused the Defendants to inquire further about Madoff's purported trading activity. Despite these signs that BLMIS was not trading in the manner represented to its customers, the Defendants buried their heads in the sand, and the Management Defendants and HSBC Defendants continued to receive fees for their "efforts."

### *There Were Not Enough Options to Implement Madoff's Purported Strategy*

155.    The Defendants were on notice of the impossibility of executing the number of options contracts required by the SSC Strategy. It should have been obvious that there was insufficient open interest in the listed options contracts required to hedge the billions of dollars under management at BLMIS's IA Business. Additionally, it would be, practically speaking, impossible to find OTC counterparties to supply the required option liquidity.

156.    While, at times, Madoff claimed to purchase options over-the-counter, at other times he claimed to purchase the option contracts on the Chicago Board Options Exchange ("CBOE"). Either method was, on its face, impossible on numerous occasions, the option volume reported to BLMIS's customers exceeded the total volume of comparable options contracts traded on the CBOE by many hundreds and even thousands of times. The volume of the purported options trading in the Feeder Fund Defendants' accounts alone warranted further investigation by sophisticated financial entities such as the Defendants. However, the Defendants ignored this red flag and continued to market the funds.

157.    In addition, there were days on which Madoff purportedly executed options

trades, but publicly available records show no options that had the same purchase date, strike

price, and expiration date as those Madoff purportedly traded on the CBOE on those days.  The

Defendants also ignored this red flag.

158.    The purported options trading in each of the Funds' accounts was far beyond

worldwide reported volume.  As set forth in the following table, the volume of options contracts

which BLMIS reported to the Defendants and the Madoff Feeder Funds exceeded the total

volume of contracts for options with the same purchase date, strike price, and expiration date

traded on the CBOE:

| | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|
| Alpha Prime/Alpha Prime Management | 153 | 440 | 34.77% |
| Aurelia/Equus Partners | 381 | 844 | 45.14% |
| BA Worldwide | 561 | 837 | 67.03% |
| Bank Medici | 236 | 399 | 59.15% |
| Defender | 72 | 102 | 70.59% |
| Eurovaleur | 272 | 714 | 38.10% |
| Genevalor | 613 | 860 | 71.28% |
| Geo Currencies | 55 | 631 | 8.72% |
| Herald/Herald Management | 223 | 399 | 55.89% |
| Herald (Lux) | 31 | 57 | 54.39% |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 381 | 844 | 45.14% |
| HITSB | 141 | 161 | 87.58% |
| HSBC Administrator | 780 | 871 | 89.55% |
| HSBC Bank Bermuda | 784 | 861 | 91.06% |
| HSBC (Cayman) | 275 | 724 | 37.98% |
| HSBC Custodian | 813 | 875 | 92.91% |
| HSSB | 392 | 844 | 46.45% |
| HSSI/HITSI | 727 | 839 | 86.65% |
| HSSL | 562 | 859 | 65.42% |
| Kingate Euro | 422 | 843 | 50.06% |
| Kingate Global | 740 | 838 | 88.31% |
| Landmark | 43 | 80 | 53.75% |

| | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|
| Optimal | 654 | 837 | 78.14% |
| Pioneer | 3 | 10 | 30.00% |
| Primeo Fund | 275 | 724 | 37.98% |
| Senator/Regulus/Carruba | 52 | 138 | 37.68% |
| Square One | 64 | 822 | 7.79% |
| Thema International | 502 | 825 | 60.85% |
| Thema Management BVI | 366 | 674 | 54.30% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 126 | 553 | 22.78% |

159.    Similarly, as described in the following graphs, from 2001 to 2008, BLMIS purported to trade—on behalf of accounts serviced by the HSBC Administrator Defendants—volumes that regularly were many hundreds of times greater than the total number of put and call options for options executed on the CBOE with the same purchase date, strike price, and expiration date:





160.    Similarly, as set forth in the following graphs, from 2001 to 2008, BLMIS purported to trade—on behalf of accounts serviced by the HSBC Custodian Defendants—volumes that regularly were many thousands of times greater than the total number of put and call options executed on the CBOE with the same purchase date, strike price, and expiration date options:





### *Many Trades Appeared to Have Been Executed Outside the Daily Price Range*

161.    Many of the trades described in the Defendants' account statements appeared to have been executed outside the daily price range.  The Management Defendants and HSBC Defendants, as administrators, sub-administrators, custodians, and/or sub-custodians of the Feeder Fund Defendants, should have reviewed trade confirmations on a regular basis in connection with these duties.  Yet these Defendants simply ignored that these trade confirmations often reflected average trade values that were outside the daily price range for such securities.

162.    For example, Lagoon's account statement for January 2001 reported the purchase of 33,120 shares of Pfizer Inc. (PFE) with a settlement date of January 8, 2001.  BLMIS's records indicate that these shares were purchased on January 3, 2001 at a price of $40.56.  However, the price range for Pfizer Inc. stock on January 3, 2001 ranged only between $46.44 and $42.50.  Upon information and belief, the Defendants reviewed these trade confirmations and took no action in response to this anomaly.  There are a total of 142 unique instances where Lagoon's account bought or sold securities outside of the daily price range.

163.    As set forth in the following table, BLMIS regularly purported to execute equities transactions on behalf of the Feeder Fund Defendants' and Madoff Feeder Funds' accounts that were outside the transacted security's daily price range:

|  | Equities Total Trades Out of Range |
|---|---|
| Alpha Prime/Alpha Prime Management | 26 |
| Aurelia/Equus Partners | 277 |
| BA Worldwide | 304 |
| Bank Medici | 22 |
| Defender | 0 |
| Eurovaleur | 141 |
| Genevalor | 568 |

|  | Equities Total Trades Out of Range |
|---|---|
| Geo Currencies | 52 |
| Herald/Herald Management | 22 |
| Herald (Lux) | 0 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 277 |
| HITSB | 3 |
| HSBC Administrator | 1,116 |
| HSBC Bank Bermuda | 815 |
| HSBC (Cayman) | 141 |
| HSBC Custodian | 1,396 |
| HSSB | 278 |
| HSSI/HITSI | 417 |
| HSSL | 566 |
| Kingate Euro | 140 |
| Kingate Global | 140 |
| Landmark | 0 |
| Optimal | 278 |
| Pioneer | 0 |
| Primeo Fund | 141 |
| Senator/Regulus/Carruba | 0 |
| Square One | 134 |
| Thema International | 139 |
| Thema Management BVI | 139 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 100 |

164.    Any one of these facially impossible trades should have, at the very least, put these Defendants on notice that Madoff was not doing what he purported to do.  In fact, across all of the HSBC Administrator Defendants' accounts, there were 1,116 equity transactions executed at a price above the daily high or below the daily low for the purportedly traded security.

165.    Across all of the accounts for which the HSBC Defendants served as custodian, there were 1,396 equity transactions executed at a price above the daily high or below the daily low for the purportedly traded security.

### *Madoff Insisted on Acting as His Own Custodian*

166.    The HSBC Custodian Defendants were responsible for insuring that Madoff had the customer funds he purported to have.  Their independence was critical to the integrity and trustworthiness of the customer statements.  Of course, had there been a reliable custodian, it would have been obvious that Madoff did not have the assets he purported to have.  Therefore, Madoff insisted that he act as his own custodian.  Always willing to play the lapdog, HSBC delegated to BLMIS the safekeeping of the assets of a number of Madoff Feeder Funds, including, but not limited to, Thema International, Thema Fund and its subsidiary, Thema Wise, Primeo, Hermes and its subsidiary, Lagoon, Alpha Prime, Herald, Herald (Lux), Kingate Euro, Kingate Global, Square One, Senator, Defender, and Landmark.

167.    HSBC's delegation of its custodial duties violated industry practices requiring that assets be held by an independent custodian.  Without an independent custodian, there could be no independent verification of assets.  Madoff was able to conceal his trading—or the lack thereof—because BLMIS acted as prime broker, custodian, and portfolio manager.  The Defendants should have recognized Madoff's insistence on keeping custody of the assets he managed for what it was—a hallmark of fraud.

168.    This was pointed out in stark terms by KPMG, the company that HSBC Defendants retained to review fraud risks at Madoff.  KPMG wrote that allowing BLMIS to act as custodian for its own funds created the potential that the trades were "a sham in order to divert client cash."

169.    HSBC itself recognized this as a serious problem.  In its own due diligence reviews, HSBC repeatedly pointed to BLMIS's role as a sub-custodian as a fraud risk.  For example, HSBC identified as a risk the lack of "independent custody and verification of trading

activity away from the investment manager (unlike a standard hedge fund that has a prime

broker)." HSBC identified this risk every year from at least 2003 through 2008, yet did nothing.

170.    Further, upon information and belief, the Defendants never publicly disclosed that

BLMIS acted as sub-custodian of investor assets. Instead, the HSBC Custodian Defendants

allowed their names to be used by the Feeder Fund Defendants to indicate—inaccurately—that

HSBC exercised control over and care of investor assets. Despite having no control over the

assets and providing no supervision over BLMIS, the HSBC Custodian Defendants collected

fees for these "services."

171.    Armed with knowledge of this red flag and its implications, the Defendants

nonetheless handed unsupervised responsibility over the safekeeping of the assets to BLMIS and

Madoff. By giving BLMIS unchecked control over all of the assets, the HSBC Custodian

Defendants played an indespensible role in allowing Madoff's scheme to grow and function for

as long as it did.

### *Negative Cash Balances*

172.    At times, Madoff appeared to execute the SSC Strategy in a manner which, had it

been true, would have left his accountholders with a negative cash balance. This could occur for

one of three principal reasons: (i) Madoff did not liquidate a sufficient number of Treasury bills

to generate enough cash to purchase a basket of equities; (ii) the account satisfied a redemption

request while in the market (BLMIS typically did not purport to sell anything to provide a

withdrawal, but simply withdrew money, creating a negative cash event); or (iii) the purported

purchase of put options occurred *before* the sale of corresponding call options, the sale of which

was supposed to finance those put options according to the SSC Strategy.

173.    In fact, on 832 separate occasions, the Feeder Fund Defendants' BLMIS accounts

went into a negative cash position. This was clear based upon a cursory review of the relevant

customer statements.  For example, on January 11, 2006, Madoff purported to purchase a basket of equities on behalf of Primeo's BLMIS account but had not liquidated a sufficient number of Treasuries to finance the purchase, resulting in a negative cash balance in Primeo's account in the amount of $78,289,845.  Essentially, that meant that Madoff provided Primeo with a $78 million interest-free loan.  Similarly, over a fourteen-day period in November 2005, Primeo had an average negative balance of $39,786,011.  On 129 separate occasions, for a total of 573 days, Primeo's cash balances with Madoff had a negative value, yet Primeo was charged no interest, nor did Primeo have a margin agreement with BLMIS.  No legitimate institution could advance this amount of money without a margin account, for Primeo's benefit, and none would have failed to charge interest during these periods.  Madoff did not do so.  Madoff's failure to require a margin account and/or charge interst was an alarming red flag.  Primeo never questioned it.

174.    Madoff never charged the Feeder Fund Defendants any interest for what appeared to be the extension of huge lines of credit to finance the SSC Strategy for their benefit.  That the Defendants failed to inquire into or acknowledge this unorthodox practice speaks volumes of their disregard for principles of independent, meaningful, and reasonable due diligence.  The Defendants should have been suspicious of Madoff's willingness to advance them hundreds of millions of dollars in interest-free loans.

175.    As set forth in the following table, the Defendants' BLMIS accounts had negative cash balances for thousands of days, yet BLMIS never charged them interest for these extensions of credit:

|  | Number of Days with Negative Cash Balances | Number of Instances of Negative Balances |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 112 | 34 |
| Aurelia/Equus Partners | 1,085 | 327 |

| | Number of Days with Negative Cash Balances | Number of Instances of Negative Balances |
|---|---|---|
| BA Worldwide | 1,045 | 264 |
| Bank Medici | 93 | 34 |
| Defender | 3 | 3 |
| Eurovaleur | 661 | 150 |
| Genevalor | 1,978 | 617 |
| Geo Currencies | 289 | 108 |
| Herald/Herald Management | 64 | 24 |
| Herald (Lux) | 2 | 2 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 1,085 | 327 |
| HITSB | 57 | 15 |
| HSBC Administrator | 3,508 | 1,053 |
| HSBC Bank Bermuda | 2,349 | 740 |
| HSBC (Cayman) | 662 | 151 |
| HSBC Custodian | 4,232 | 1,308 |
| HSSB | 1,104 | 333 |
| HSSI/HITSI | 1,106 | 373 |
| HSSL | 2,101 | 591 |
| Kingate Euro | 375 | 128 |
| Kingate Global | 349 | 127 |
| Landmark | 10 | 4 |
| Optimal | 651 | 233 |
| Pioneer | 1 | 1 |
| Primeo Fund | 662 | 151 |
| Senator/Regulus/Carruba | 14 | 4 |
| Square One | 312 | 93 |
| Thema International | 442 | 133 |
| Thema Management BVI | 415 | 125 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 162 | 49 |

176.   Upon information and belief, the Defendants did not ever question where Madoff obtained the money he loaned to them.  As one of the world's largest lenders, the HSBC Defendants had to recognize the absurdity that Madoff was—literally—lending HSBC's clients hundreds of millions of dollars for no charge whatsoever.  But for the numerous incentives to

look the other way, the Defendants would have known that Madoff was not executing the trades described on customer statements.

### *Inadequacy of Madoff's Auditors*

177.    The Defendants knew that BLMIS relied on Friehling & Horowitz—an unknown, three-person accounting firm based in a strip mall in Rockland County, New York—to audit a multi-billion dollar investment fund.  The Defendants were on notice that BLMIS's auditors did not have the competence, resources, technological capabilities, or expertise to perform the domestic and international auditing functions associated with BLMIS and its billions under management.  That BLMIS, with billions of dollars under management, relied on an auditor like Friehling & Horowitz should have raised a warning sign with the Defendants.  The Defendants, instead, acted as if nothing were out of the ordinary and continued to expand their relationships with BLMIS.

178.    The absurdity of this situation was not lost on the Defendants; HSBC Private Bank identified as a concern "Madoff's lack of [a] realistically independent auditor—Friehling & Horowitz is a very small firm with Madoff as its only major client."  Despite being explicitly aware of this red flag, the Defendants did nothing.

### *Madoff's Returns Did Not Mirror Market Conditions*

179.    BLMIS's IA Business appeared to be immune from any market instability, enjoying consistent rates of return at all times.  For example, through the burst of the dotcom bubble in 2000, September 11th, and the market downturn in 2008, the SSC Strategy produced consistent and positive returns.  Even during the last 14 months of BLMIS's existence, the IA Business generated positive returns while the S&P 100 fell nearly 40%.  Overall, from January 2000 through November 2008, the Madoff Feeder Funds experienced no more than five months

of negative returns, while the S&P 100 experienced 53 months of negative returns over the same period.

180.    Despite these logic-defying returns, the Defendants failed to conduct even a cursory review of how Madoff's SSC Strategy could achieve these results, and ignored clear evidence that Madoff could not possibly be generating the purported returns using the SSC Strategy. Genevalor employees tried to replicate Madoff's performance by using monthly account statements from BLMIS to reconstruct the SSC Strategy and BLMIS's returns, but were unable to do so. Yet Genevalor did not take any steps to inquire further, or to have any of its funds—Hermes, Thema Fund, or Thema International—cease investing in, or withdraw its investments from, BLMIS. The Defendants turned a blind eye to the fact that a strategy purportedly tied to the S&P 100 produced results that bore virtually no correlation to that index.

### *Madoff Was Able to Execute Trades at the Perfect Time, Every Time*

181.    Madoff appeared to have a near-perfect ability to buy low and sell high not only from day to day, but *within* each trading day. The Defendants were on notice that this was, practically speaking, impossible. Pricing reflected on trade confirmations and account statements demonstrated the implausibility of Madoff's trades, which almost always occurred at precisely the right time of the day. With remarkable consistency, when Madoff was purchasing shares, the reported average purchase price was in the lower half of the daily range, and when selling shares, the sale price was in the upper half of the daily range.

182.    Madoff's routine ability to get the best price was, itself, a red flag. But Madoff further represented to investors that he was time-slicing (that is, entering the market at specific intervals over the course of a trading day). This meant that the reported trade prices were an *average*, and therefore should have gravitated toward the daily midpoint. Instead, they gravitated toward Madoff's optimal (and fictional) price point—a statistical impossibility that

should have spurred the Defendants to undertake the independent, reasonable, and meaningful due diligence they eschewed.

183.    In fact, each of the Feeder Funds consistently received trade confirmations which showed purported executions of favorable price points within the day. This was impossible given Madoff's purported time slicing execution process, which should have led to execution at or near the midpoint of the daily trading range. A summary of these staggering results across all the Feeder Fund Defendants is set forth in the following table:

| | Total Below Midpoint | Total Buys | Percentage Below Midpoint | Total Above Midpoint | Total Sells | Percentage Above Midpoint |
|---|---|---|---|---|---|---|
| Alpha Prime/Alpha Prime Management | 2,709 | 3,269 | 82.87% | 2,127 | 2,851 | 74.61% |
| Aurelia/Equus Partners | 10,832 | 14,171 | 76.44% | 8,852 | 12,673 | 69.85% |
| BA Worldwide | 10,911 | 13,858 | 78.73% | 9,029 | 12,431 | 72.63% |
| Bank Medici | 3,755 | 4,650 | 80.75% | 2,754 | 3,837 | 71.77% |
| Defender | 654 | 845 | 77.40% | 454 | 661 | 68.68% |
| Eurovaleur | 4,360 | 5,645 | 77.24% | 3,628 | 5,124 | 70.80% |
| Genevalor | 22,734 | 29,391 | 77.35% | 18,493 | 26,194 | 70.60% |
| Geo Currencies | 3,462 | 4,454 | 77.73% | 2,699 | 3,858 | 69.96% |
| Herald/Herald Management | 2,526 | 3,060 | 82.55% | 1,992 | 2,671 | 74.58% |
| Herald (Lux) | 267 | 395 | 67.59% | 133 | 210 | 63.33% |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 10,832 | 14,171 | 76.44% | 8,852 | 12,673 | 69.85% |
| HITSB | 3,848 | 4,780 | 80.50% | 2,884 | 4,277 | 67.43 |
| HSBC Administrator | 44,967 | 57,806 | 77.79% | 36,351 | 51,071 | 71.18% |
| HSBC Bank Bermuda | 27,006 | 34,928 | 77.32% | 22,764 | 31,819 | 71.54% |
| HSBC (Cayman) | 4,490 | 5,795 | 77.48% | 3,628 | 5,124 | 70.80% |
| HSBC Custodian | 55,105 | 70,921 | 77.70% | 44,740 | 63,004 | 71.01% |
| HSSB | 12,756 | 16,561 | 77.02% | 10,231 | 14,735 | 69.43% |
| HSSI/HITSI | 16,212 | 21,011 | 77.16% | 13,069 | 18,493 | 70.67% |
| HSSL | 25,040 | 31,967 | 78.33% | 20,135 | 28,188 | 71.43% |
| Kingate Euro | 5,049 | 6,534 | 77.27% | 4,165 | 5,962 | 69.86% |
| Kingate Global | 5,089 | 6,581 | 77.33% | 4,129 | 5,833 | 70.79% |
| Landmark | 429 | 595 | 72.10% | 304 | 458 | 66.38% |
| Optimal | 10,149 | 13,130 | 77.30% | 8,252 | 11,654 | 70.81% |
| Pioneer | 130 | 150 | 86.67% | | | |
| Primeo Fund | 4,490 | 5,795 | 77.48% | 3,628 | 5,124 | 70.80% |
| Senator/Regulus/Carruba | 756 | 952 | 79.41% | 520 | 716 | 72.63% |
| Square One | 4,885 | 6,317 | 77.33% | 4,069 | 5,730 | 71.01% |
| Thema International | 4,980 | 6,441 | 77.32% | 4,059 | 5,720 | 70.96% |

| | Total Below Midpoint | Total Buys | Percentage Below Midpoint | Total Above Midpoint | Total Sells | Percentage Above Midpoint |
|---|---|---|---|---|---|---|
| Thema Management BVI | 4,018 | 5,246 | 76.59% | 3,430 | 4,764 | 72.00% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 3,460 | 4,325 | 80.00% | 2,883 | 3,943 | 73.12% |

184.    Across all of the accounts for which the HSBC Defendants served as administrator, BLMIS purported to purchase equities on 57,806 occasions; 44,967 of these were in the lower half of the daily price range. On behalf of these accounts BLMIS purported to sell equities on 51,071 occasions; 36,351 of these occurred in the upper half of the daily price range. In other words, Madoff was buying low 77.79% of the time and selling high 71.18% of the time.

185.    Across all of the accounts for which the HSBC Defendants served as custodian, BLMIS purported to purchase equities on 70,921 occasions; 55,105 of these were in the lower half of the daily price range. On behalf of these accounts BLMIS purported to sell equities on 63,004 occasions; 44,740 of these occurred in the upper half of the daily price range. In other words, Madoff was buying low 77.70% of the time and selling high 71.01% of the time. Common sense dictates that such a success rate is impossible, especially since Madoff represented that he was time slicing. Yet, the HSBC Defendants did nothing.

186.    Instead, HSBC routinely identified—and then ignored—red flags concerning Madoff's supernatural trading ability. As early as 2001, HSBC recognized the improbability of Madoff being able to generate such consistent, positive returns with such a simplistic strategy:

> Bernie Madoff's 12 year track record trading a split strike conversion strategy on the S&P 100, is quite simply astounding. His annualized return of 15%, (net of a 20% performance fee), at a risk of 3%, yields a sharpe ratio of 3.3. Over this period the fund has endured only 4 down months, (the maximum of which was down 0.5%), and has now gone almost 6 years without a drawdown.

> With this track record, seemingly derived from such a <u>simple</u>
> <u>investment strategy</u>, certain members of the investment community
> are <u>baffled</u>, as to how such a return stream has been earned.

(emphasis in original).

187.    In January 2003, HSBC again admitted that "[i]t is unclear how [Madoff's]

strategy has generated a track record with almost no down months." Upon information and

belief, HSBC did nothing to inquire further, and did not cease investing in BLMIS or advising its

clients to invest with the Feeder Fund Defendants.

### *Madoff Did Not Provide Real-Time Access to IA Business Accounts*

188.    Despite Madoff's reputation as an early adopter of advanced trading technology,

BLMIS did not provide real-time access to IA Business accounts and sent only paper trade

confirmations to its customers. By the mid-2000s, electronic access and immediate investment

performance information were industry standard, and routinely required by funds of funds which

engaged in real-time hedging. BLMIS, however, transmitted paper copies of trade confirmations

to the Defendants and/or their affiliates or representatives three to four days *after* trades

purportedly occurred. Upon information and belief, the HSBC Defendants sought to receive

trade confirmations electronically, yet, Madoff refused to do so. His nonsensical explanation

was a fear that these service providers would steal his "strategy." Like the other red flags, this

was ignored by the Defendants.

### *Madoff's Account Statements Purported to Transact With Non-Existent Funds*

189.    The SSC Strategy purported to invest IA Business customers' funds in U.S.

Treasury bills or mutual funds holding Treasury bills. One such fund was, until 2005, called the

"Spartan U.S. Treasury Money Market Fund." However, on August 15, 2005, that fund changed

its name to Fidelity U.S. Treasury Money Market Fund. Despite that, Madoff's account

statements continued to indicate that customers' funds had been invested in Fidelity Spartan U.S.

Treasury Money Market Fund, which no longer existed at the time. The Defendants' failure to investigate this error speaks to the short shrift they gave their responsibilites as administrators, custodians, managers, and advisers.

### *Madoff Never Identified His Options Counterparties*

190.    Madoff never identified the parties on the other side of the thousands of hedging options transactions he purported to effect each month. This should have been an intolerable practice to the Defendants, who bore the risk if those counterparties defaulted on the options agreement.

191.    The SSC Strategy purportedly involved the purchase of a basket of between 35 and 50 S&P 100 equities together with a collar of S&P 100 Index put and call options on those stocks to limit the up-side potential and down-side risks. BLMIS purportedly executed agreements with third parties on behalf of account holders pursuant to the "Master Agreement for OTC Options."

192.    At times, Madoff claimed simply to execute over-the-counter options trades with a network of unidentified counterparties, claiming that their identities were proprietary. At other times, he claimed simply that the counterparties were large, European financial institutions. And at still other times, Medici employees were told that Madoff's counterparties were American pension funds. The Defendants had excellent reasons to care about the identity of Madoff's purported counterparties as, in those options contracts, they understood that it was the Feeder Fund Defendants—not BLMIS—that bore the risk. Thus, the Defendants could be regularly exposed to hundreds of millions of dollars in potential risk. Had the purported counterparties been unable to meet their obligations, not only would there have been no collar, but the account would have been left exposed to the market without the protections that were so central to the SSC Strategy and they would not have been able to collect on the value of the options contracts.

-72-

193.     Despite this potential exposure, the Feeder Fund Defendants, the Management Defendants, and the HSBC Defendants, acting as the Funds' administrator and/or custodian, all failed to perform any reasonable, meaningful, or independent inquiry into the counterparties' ability to perform under the contracts.  Given the hundreds of millions of dollars at risk had those purported option counterparties been unable to deliver cash as required by the puts and calls, the Defendants' lack of inquiry or skepticism evinces a disregard for the reasonable, meaningful, and independent due diligence demanded.  Upon information and belief, the Defendants did not review, comment on, modify, negotiate, or reject any form of draft or final counterparty agreement or OTC transaction confirmation.  Despite bearing the risk of the counterparties' failure to perform, the Defendants had no knowledge of the counterparties' identities.  The Defendants chose to blindly accept Madoff's nonsensical explanations in order to continue to collect their fees.  Additionally, these Defendants should have recognized that under the 1934 Act, Rule 10b-10, states that upon written request, the identity of the counterparty must be disclosed; BLMIS's refusal to provide this information was, in fact, unlawful.

### *Madoff's Options Transactions Were Frequently Inconsistent With SSC Strategy*

194.     The Defendants' account statements frequently showed short-term, one-sided, speculative options trades that did not hedge any existing equity investment.  These trades were inconsistent with the SSC Strategy and should have sounded alarms because they created precisely the market exposure that the SSC Strategy purported to avoid and were inconsistent with the offering memoranda, prospectuses, and marketing materials of the Feeder Fund Defendants which promised strict compliance with the SSC Strategy and no speculations in options.  This was a glaring red flag to sophisticated financial entities such as the Defendants. The Defendants' customer accounts revealed regular deviations from the much vaunted SSC Strategy, yet the Defendants raised no objections.

-73-

195.    For example, on August 14, 2002, on behalf of Thema International, BLMIS purported to purchase 13,938 S&P 100 call option contracts with a strike price of 450 at $5.30 per option contract, which was the exact opposite of how the typical SSC Strategy opened. These options did not correspond to the purchase or sale of any equities in Thema International's BLMIS equities trading account, and was therefore a high-risk, stand alone position, far exceeding the implied risk of the SSC Strategy. This position was closed on August 19, 2002 with the purported sale of these options at $18.44 per option, resulting in a gain of $18,305,532. Obviously, Madoff deviated from the SSC Strategy to smooth out his returns—he deviated when he needed to meet his goal and other trading activity failed to do so. There were a total of 44 such speculative option transactions on Thema International's BLMIS account, creating a total net gain of $51,569,327.75.

196.    As set forth in the following table, BLMIS purported to engage in hundreds of these speculative options transactions, virtually all of which were profitable, generating purported gains of hundreds of millions of dollars:

|  | Total Speculative Option Trades | Net Gain or Loss |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 12 | $4,191,723 |
| Aurelia/Equus Partners | 120 | $27,083,399 |
| BA Worldwide | 94 | $60,966,609 |
| Bank Medici | 16 | $38,411,760 |
| Defender | 4 | $4,659,731 |
| Eurovaleur | 58 | $20,009,432 |
| Genevalor | 220 | $83,376,629 |
| Geo Currencies | 42 | $1,395,283 |
| Herald/Herald Management | 8 | $23,000,802 |
| Herald (Lux) | 4 | $1,419,670 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 120 | $27,083,399 |
| HITSB | 22 | $15,301,450 |
| HSBC Administrator | 387 | $231,240,773 |
| HSBC Bank Bermuda | 275 | $191,256,924 |
| HSBC (Cayman) | 58 | $20,009,432 |

| | Total Speculative Option Trades | Net Gain or Loss |
|---|---|---|
| HSBC Custodian | 513 | $400,554,344 |
| HSSB | 130 | $33,410,936 |
| HSSI/HITSI | 148 | $148,987,012 |
| HSSL | 220 | $81,188,258 |
| Kingate Euro | 50 | $32,920,758 |
| Kingate Global | 76 | $136,392,813 |
| Landmark | 4 | $1,195,313 |
| Optimal | 96 | $91,562,641 |
| Pioneer | 0 | – |
| Primeo Fund | 58 | $20,009,432 |
| Senator/Regulus/Carruba | 4 | $2,154,612 |
| Square One | 21 | $1,212,781 |
| Thema International | 44 | $51,569,328 |
| Thema Management BVI | 40 | $37,578,040 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 14 | $3,328,620 |

197.    Across all of the accounts for which the HSBC Defendants served as administrator, there were 387 such speculative options transactions, creating a total net gain of $231,240,773.  In reviewing the account statements of the funds for which they served as administrator, the HSBC Administrator Defendants should have raised questions about these speculative option transactions as they left the funds dangerously exposed to downside risk and were inconsistent with the SSC Strategy.  But, because these speculative events almost always created gains, smoothed out the returns, and ultimately generated fees, the HSBC Administrator Defendants chose to ignore these readily apparent red flags.

198.    Across all of the accounts for which the HSBC Defendants served as custodian, there was a total of 513 speculative options transactions, creating a total net gain of $400,554,344.  In reviewing the account statements of the funds for which they served as custodian, the HSBC Custodian Defendants should have raised questions about these speculative option transactions as they left the funds dangerously exposed to downside risk and were inconsistent with the SSC Strategy.

-75-

199.    Additionally, Madoff engaged in options transactions that were often unbalanced in that changes to Madoff's basket of equities did not result in corresponding changes to the hedging options. Such "unbalanced hedges" were also inconsistent with the SSC Strategy and should have caused Defendants to inquire about deviations from that strategy.

200.    One such unbalanced hedge is evident on the January and February 2004 BLMIS account statements of Kingate Global, Kingate Euro, Primeo, Thema International, Lagoon, Thema Wise, Square One, and Optimal. On January 8, 2004, Madoff purported to purchase two baskets of S&P 100 stocks, each of which included shares of Texas Instruments Inc. (TXN). However, according to the account statements, the shares of Texas Instruments were not sold between February 20 and 25, 2004, as were the other equities contained in the baskets, but rather on January 22, 2004. Despite this early sale of the Texas Instruments shares, the corresponding option hedges did not change. Madoff's failure to rebalance the hedge on these baskets was a deviation from the SSC Strategy that should have put Defendants on inquiry notice as to the purpose of the inconsistency.

201.    As set forth in the following table, the Defendants and Madoff Feeder Funds' BLMIS account statements indicate that Madoff regularly did not make changes to the corresponding hedges when he purportedly sold one equity before the rest of the basket:

|  | Sells Without Hedge Adjustment |
|---|---|
| Alpha Prime/Alpha Prime Management | 22 |
| Aurelia/Equus Partners | 34 |
| BA Worldwide | 73 |
| Bank Medici | 9 |
| Defender | 0 |
| Eurovaleur | 22 |
| Genevalor | 116 |
| Geo Currencies | 38 |
| Herald/Herald Management | 6 |

|  | Sells Without Hedge Adjustment |
| --- | --- |
| Herald (Lux) | 0 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 34 |
| HITSB | 8 |
| HSBC Administrator | 202 |
| HSBC Bank Bermuda | 151 |
| HSBC (Cayman) | 22 |
| HSBC Custodian | 266 |
| HSSB | 39 |
| HSSI/HITSI | 80 |
| HSSL | 99 |
| Kingate Euro | 31 |
| Kingate Global | 33 |
| Landmark | 0 |
| Optimal | 48 |
| Pioneer | 0 |
| Primeo Fund | 22 |
| Senator/Regulus/Carruba | 3 |
| Square One | 24 |
| Thema International | 32 |
| Thema Management BVI | 29 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 12 |

202.    Across all of the accounts for which HSBC was administrator, Madoff did not rebalance the hedge on 202 occasions.  By leaving the hedge unbalanced, Madoff deviated from his stated SSC Strategy, but HSBC did not question Madoff about these inconsistencies.

203.    Across all of the accounts for which HSBC was custodian, Madoff did not rebalance the hedge on 266 occasions.  By leaving the hedge unbalanced, Madoff deviated from his stated SSC Strategy, but HSBC did not question Madoff about these inconsistencies.

### *BLMIS's Paper Trade Confirmations Were Archaic and Replete with Inconsistencies*

204.    The Defendants and/or their affiliates and representatives received trade confirmations from BLMIS containing numerous inconsistencies that should have raised a red flag that Madoff was not implementing the SSC Strategy as he purported to do.  However, the

Defendants ignored these troubling trade confirmations and instead continued to market the Feeder Fund Defendants to their customers.

205.    For example, the trade confirmations did not reflect either the reporting or payment of the "Section 31" fees required by NASD and FINRA rules. This should have raised a red flag with the HSBC Defendants.

206.    BLMIS's trade confirmations erroneously characterized options as "trade origins," rather than transactions, on checklists that appeared on the trade confirmations. The trade confirmations did not indicate the origin of those options trades. BLMIS's trade confirmations accurately characterized other transactions, such as purchases of stocks, as "transactions" and accurately indicated the origins of those other transactions. The inaccurate reporting of options transactions on BLMIS's trade confirmations should have raised a red flag with the Defendants that there were irregularities with BLMIS's options trading; however, the Defendants failed to make any inquiries into this anomaly.

207.    The trade confirmations also frequently indicated that BLMIS had effected the same trades as both principal and agent. Upon information and belief, the Defendants saw, but did not question, this paradox. At times, the front of the BLMIS trade confirmations coded purported trades as "principal transactions" while the backs of the trade confirmations stated, "[w]e have acted in the capacity of Agent for your transaction." Upon information and belief, the Feeder Fund Defendants and HSBC Defendants were aware of this conflicting language, yet failed to made any inquiries to resolve these inconsistencies.

208.    Finally, BLMIS's option trade confirmations often contradicted Madoff's claim that, from time to time, he purchased options in the over-the-counter market. All of the options trade confirmations contained Committee on Uniform Security Identification Procedures